## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INGENIO, FILIALE DE LOTO-
QUEBEC, INC.,

           Plaintiff,

      v.

GAMELOGIC, INC. and
SCIENTIFIC GAMES CORPORATION,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 04-1532 (KAJ)

**JURY TRIAL DEMANDED**

**PUBLIC VERSION**

---

**DEFENDANT GAMELOGIC, INC.'S OPENING BRIEF IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899-0951
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

Gary M. Hnath
Susan Baker Manning
Star-shemah Bobatoon
BINGHAM MCCUTCHEN LLP
1120 20th Street, NW
Suite 800
Washington, D.C. 20036
(202) 778-6150
(202) 778-6155 (facsimile)

*Attorneys for Defendant
GameLogic, Inc.*

Dated:  March 8, 2005
Public Version Filed:  March 15, 2005

TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................ 1

II.   NATURE AND STAGE OF THE PROCEEDING.................................. 2

III.  SUMMARY OF ARGUMENT ................................................................. 2

IV.   STATEMENT OF FACTS ......................................................................... 3

      A.   The Patents-in-Suit............................................................................. 3

           1.    The '082 patent ......................................................................... 3

           2.    The '603 patent ......................................................................... 6

           3.    The prosecution histories of the patents-in-suit.................... 8

      B.   The HomePlay Lottery game suite ............................................... 11

           1.    HomePlay Lottery Access Codes.......................................... 12

           2.    The HomePlay Lottery Website............................................ 13

           3.    The HomePlay Lottery Interactive Games ......................... 14

V.    THE APPLICABLE LAW JUSTIFIES SUMMARY JUDGMENT OF
      NON-INFRINGEMENT............................................................................ 16

      A.   The Summary Judgment Standard. ................................................ 16

      B.   The Non-Infringement Analysis. ................................................... 17

           1.    Claim Construction Standards. .............................................. 17

           2.    Comparison of the Properly Construed Claims to the
                 Accused Products.................................................................... 18

VI.   GAMELOGIC'S PRODUCTS DO NOT INFRINGE ANY CLAIM OF
      THE '082 OR '603 PATENTS ................................................................. 20

      A.   Construction of Relevant Terms. ................................................... 20

           1.    "gaming piece including a code which includes data
                 indicating whether the player wins or loses" ...................... 20

           2.    "programmable memory" ....................................................... 22

           3.    "reading the code"................................................................... 23

           4.    "event external to operation of the lottery type game"...... 24

      B.   GameLogic's Products Do Not Infringe the Patents-in-Suit .................... 26

           1.    GameLogic does not infringe any claim of the patents-in-
                 suit because neither the access code nor the serial number
                 includes win/loss information ................................................ 26

i

TABLE OF CONTENTS

Page

2.    The HomePlay Lottery product does not include the
additional limitations of dependent claims 2, 3, 5, 7, 9, 11,
12, 14 or 17 of the '082 patent......................................................... 27

3.    GameLogic does not infringe claims the '603 patent
because there is no processor or date reader that "reads" the
code............................................................................................... 28

4.    GameLogic does not infringe claims 2 or 6-13 of the '603
patent because its products do not include a gaming piece
with a "programmable memory." .................................................. 29

5.    GameLogic does not infringe claims 14-17 of the '603
patent because whether a player wins or loses does not
depend on the occurrence of an "event external to operation
of the lottery type game."........................................................... 30

VII.    CONCLUSION.................................................................................... 30

DCDOCS/620622.4

## TABLE OF AUTHORITIES

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)........................................................................................ 16

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)........................................................................................ 16

*Digital Biometrics, Inc. v. Identix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998)....................................................................... 18

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*
    535 U.S. 722 (2002)............................................................................ 19, 20, 30

*Gart v. Logitech, Inc.,*
    254 F.3d 1334, 1339 (Fed. Cir. 2001).............................................................. 17

*General Mills, Inc. v. Hunt-Wesson, Inc.,*
    103 F.3d 978 (Fed. Cir. 1997).......................................................................... 16

*Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.,*
    285 F.3d 1046, 1054 (Fed. Cir. 2002).............................................................. 19

*Johnson Worldwide Associates, Inc. v. Zebco Corp.,*
    175 F.3d 985 (Fed. Cir. 1999)............................................................. 18, 21, 23

*Kent v. Pittsburgh Press Co.,*
    349 F. Supp. 622, 625 (W.D. Pa. 1972 ........................................................... 17

*Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.*
    873 F.2d 1422 (Fed. Cir. 1989)....................................................................... 19

*Linear Tech. Corp. v. Impala Linear Corp.,*
    379 F.3d 1311, (Fed. Cir. 2004)....................................................................... 20

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967, 976 (Fed. Cir. 1995)......................................................... 17, 18, 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574, 586 (1986)................................................................................ 16

*Maxwell v. J. Baker, Inc.,*
    86 F.3d 1098, 39 USPQ2d 1001 (Fed.Cir.1996) ............................................. 19

*Mitnik v. Cannon,*
    789 F. Supp. 175, 176 (E.D. Pa. 1992) ........................................................... 17

*Nike, Inc. v. Wolverine World Wide, Inc.,*
    43 F.3d 644, 646 (Fed. Cir. 1994).................................................................... 16

*Pennwalt v. Durland-Wayland, Inc.,*
    833 F.2d 931, 934 (Fed. Cir. 1987).................................................................. 19

*Ratner v. Young,*
    465 F. Supp. 386, 393 (D.V.I. 1979) ............................................................... 17

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001)........................................................................ 17

*Sage Prods., Inc. v. Devon Indus., Inc.,*
    126 F.3d 1420, 1424-25 (Fed.Cir.1997) .......................................................... 19

*Samson v. Harvey's Lake Borough,*
    881 F. Supp. 138, 145 (M.D. Pa. 1995)........................................................... 17

iv

## TABLE OF AUTHORITIES

Page

*Southwall Technologies, Inc. v. Cardinal IG Co.,*
54 F.3d 1570, 1575 (Fed. Cir. 1995)............................................................... 18, 25

*Unidynamics Corp. v. Automatic Products, Int'l, Ltd.,*
157 F.3d 1311, 1322 (Fed. Cir. 1998)................................................................. 19

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,*
520 U.S. 17 (1997)............................................................................. 18, 19, 26

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.,*
904 F.2d 677, 685- 86 (Fed.Cir.1990) ............................................................... 27

**Other Authorities**
Manual of Patent Examining Procedure § 2111.03 ................................................ 21

**Rules**
Fed. R. Civ. P. 56(c) ...................................................................................... 16

°

## I.    INTRODUCTION

Plaintiff accuses GameLogic, Inc. and Scientific Games Corporation of infringing two patents that simply do not apply to GameLogic's products. This case is not a close call. It can and should be resolved promptly by summary judgment without further consumption of this Court's time or the parties' resources. GameLogic is aware of this Court's typical practice to consider summary judgment motions later in the life of a case. Nevertheless, because of the particular facts here, as discussed below, early consideration of the motion will serve judicial economy and save considerable resources for the parties.

U.S. Patent No. 5,569,082 ("the '082 patent") and U.S. Patent No. 5,709,603 ("the '603 patent") cover lottery gaming products that allow a player to obtain a gaming piece such as a ticket or token that is encoded with information about whether the player wins or loses two related games. The lottery game (sometimes referred to as "the actual game" in the patent specifications) reveals the results of a lottery in which the player does or does not win a prize. To make that lottery more interesting for the player, it is preceded by another game, the "amusement game," that the player plays for entertainment prior to learning the results of the lottery game. The outcome of both games is predetermined and encoded on the gaming piece.

GameLogic's products do not include any code with the predetermined results of either a lottery game or an amusement game—and there is no plausible argument that they do. For that reason alone, GameLogic does not infringe any claim of the asserted patents, and Ingenio's suit must fail. Even if that were not enough—and it is—GameLogic would still be entitled to summary judgment at this time. Its products clearly do not include other required elements of at least eight '082 patent claims, and of all the '603 patent claims.

Given the plain language of the patents-in-suit and the undisputable evidence of the design and operation of GameLogic's products, there can be no genuine dispute that GameLogic does not infringe the patents-in-suit. In light of the clear evidence, this case can and should be resolved sooner rather than later. GameLogic therefore respectfully requests

1

summary judgment of non-infringement in its favor.

## II.    NATURE AND STAGE OF THE PROCEEDING

Plaintiff Ingenio, Filiale de Loto-Quebec, Inc. filed suit on December 20, 2004, accusing defendants GameLogic, Inc. and Scientific Games Corporation of willfully infringing the '082 and '603 patents. Ingenio specifically accuses defendants'[1] HomePlay Lottery™ game of infringing the patents-in-suit. GameLogic and Scientific Games both timely answered, denying any infringement and further asserting the defenses of invalidity, unenforceability and estoppel. Answer of Defendant GameLogic, Inc. at ¶¶ 34-41; Answer of Defendant Scientific Games Corp. at ¶¶ 32-39. Although formal discovery has yet to begin, GameLogic has already produced over 1900 pages of documents. Those documents include, among other things, all of the intrinsic evidence upon which claim construction is based, detailed information describing the design and operation of the HomePlay Lottery game system, and voluminous prior art of which GameLogic is already aware. *See* Exhibit S. The Court has set an initial scheduling conference for March 10, 2005.

## III.    SUMMARY OF ARGUMENT

GameLogic does not directly infringe, contributorily infringe or induce the infringement of any claim of the '082 or '603 patents. The accused HomePlay Lottery product does not include at least the following required steps or elements:



[1]

DCDOCS/620622.4



Because GameLogic's products do not include every limitation of any claim, GameLogic does not infringe the patents-in-suit as a matter of law, and summary judgment is appropriate.

## IV.    STATEMENT OF FACTS

### A.    The Patents-in-Suit

The two asserted patents are closely related. The '603 patent is a continuation-in-part of the '082 patent, and both are entitled "Personal Computer Lottery Game." *See* Exs. A & B. The inventor filed the application that later issued as the '082 patent in April 1995. At the time, personal computers were, of course, slower and typically had much smaller memory and storage capacities than are commonly available today. As is well-known, the internet was then in its infancy.

#### 1.    The '082 patent

The '082 patent describes a method and system for playing both a lottery game and a separate amusement game. In prior art games, the player "purchase[s] a chance to win and then at some point a single and usually quick action displays the outcome of the game." Ex. A at Col. 1, lines 21-24. The playing of a scratch off lottery, for example, consists largely of the act of scratching off the coating on the ticket to reveal whether the ticket is a winner or not. *Id.* at Col. 1, lines 25-34. As noted by the patentee, "[t]his activity provides the player with just a brief few moments of excitement." *Id.* at Col. 1, lines 32-34. The claimed invention of the '082 patent is intended to overcome the problems of this prior art

3

by providing for play of an amusement game, as well as the primary lottery game. *Id.* at Col. 1, lines 62-66 ("[A]ny improved design of such a game should incorporate the principle of allowing a player to acquire at least one chance to win, in a game of chance, and then provide an exciting and interesting display for the outcome of that chance.").

The purpose of the amusement game is to entertain. Ex. A at Col. 3, lines 25-27 (the amusement game "is purely for player enjoyment, and is used to give the feel of a completely random game of chance"). "The purpose of the actual game is to display, in a pleasing fashion, the actual prize that is stored in the Destiny Code and to display the game results as though there is a completely random element." *Id.* at Col. 3, lines 34-37.

In the claimed invention of the '082 patent, the player acquires a gaming piece that includes a code indicating whether the player wins or loses both the lottery game and the amusement game, but the player does not know the outcome prior to play of the games. Ex. A at Abstract (the player acquires "a gaming piece which includes a predetermined code having data indicating whether the player wins or loses the game, the data being unrecognizable to the player, such that the player does not know the outcome of the game prior to the play of the game"); Summary of Invention (same); and Col. 10, line 66 – Col. 12, line 37 (all claims refer to both a lottery game and an amusement game). The outcome of the lottery game is predetermined by data included in the gaming piece. In the specification of the '082 patent, this code is called a "Destiny Code" "because [its] primary function is to *store* the outcome of the game of chance." *Id.* at Col. 2, lines 59-60 (emphasis added). It determines the outcome of the lottery and amusement games, as well as specifying what, if anything, the player wins. *Id.* at Col. 2, line 67 – Col. 3, line 3 ("The total and actual result of the game is encoded in the Destiny Code. By decoding the Destiny Code one reveals whether or not a game was a winner or loser, and if it was a winner, the prize won."). The codes can, in addition, store other data that assists in the playing of the game, the tracking of the game, the security of the game, or any other data that may enhance the game or its operation. *Id.* at Col. 2, lines 61-64.

4

The player enters the code into a processor that allows the amusement game to be played on a terminal. *Id.* at Abstract & Summary of Invention. "One example of the game is a horse race in which the player is given a predetermined number of dollars to bet. At some point, either at the discretion of the player or the necessity of the game (all races have been run or the player has run out of money), the amusement game comes to an end." *Id.* at Col. 3, lines 27-32. The outcome of the amusement game, like the lottery game, is controlled by the processor, and is based on the code entered by the player. *Id.* at Col. 3, lines 22-23. Although the actual play of the game is interactive, the outcome is predetermined and based on the code entered by the player. *Id.* at Summary of Invention ("[T]he player controls game play by inputting game parameters to the processor. The processor controls the outcome of the game of chance played by the player based upon the code entered by the player.")

Once the amusement game ends, the system allows play of the actual game, that is, the lottery game.[2] *Id.* at Col. 3, lines 33-45; Fig. 1, block 15. The purpose of the lottery game—which the patent describes as "the actual game" to distinguish it from the amusement game—"is to display, in a pleasing fashion, the actual prize that is stored in the Destiny Code and to display the game results as though there is a completely random element." *Id.* at Col. 3, lines 34-37. For example, the player could use winnings from the horserace amusement game to purchase fictitious lottery tickets. *Id.* at Col. 3, lines 33-45. If the Destiny Code indicates that the player is to win $25, then the system selects and displays numbers that match the player's fictitious lottery ticket(s) in a combination that wins the player $25. *Id.* at Col. 3, lines 46-54. If the Destiny Code indicates that the player is to lose, then the system selects and displays numbers that do not match the player's fictitious lottery tickets, and the player views a losing game. *Id.*

---

[2]     In the specification, the patentee referred to the lottery game of the claims as the "actualization game." *See, e.g.,* Ex. A at Col. 3, line 46 – Col. 4, line 9 & Col. 6, lines 7-19.

The '082 includes two independent claims, and fifteen claims depending from them.

Claim 1 is a method claim:

> 1. A method for playing a player lottery game comprising the step of: acquiring by a player a game piece, the gaming piece including a code which includes data indicating whether the player wins or loses the lottery game and an amusement game, the data being unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game;
>
> entering the code by the player into a processor prior to amusement game play;
>
> the processor generating the amusement game on a display for play by the player, the player controlling game play by inputting game parameters to the processor;
>
> the processor controlling whether the player will win or lose the amusement game based upon the code entered by the player; and
>
> providing on a display an indication to the player of the amusement game win or loss based upon the code.

Ex. A at Col. 10, line 66 – Col. 11, line 16. Independent claim 10 covers the corresponding product. *Id.* at Col. 12, lines 4-20.

### 2.    The '603 patent

As noted above, the '603 patent is a continuation-in-part of the '082 patent. It includes 17 claims, of which six (claims 1, 5, 7, 9, 11 and 14) are independent. Ex. B. The applicant added new Figures 14-19, as well as an additional written description starting at Column 11, line 13, to the disclosure of the earlier '082 patent. *Id.* This additional information relates to gaming pieces that contain Destiny Codes stored in, for example, the memory of a casino chip or token. *See, e.g.,* Ex. B at Col. 11, lines 13-16 and 57-64. As described in the patent specification, a player obtains the casino chip or token and inserts it into a gaming machine, in much the same way coins are inserted into conventional slot machines. *Id.* at Col. 12, lines 1-3. The gaming machine, which the patentee refers to as "the amusment+actualization game system," then reads the Destiny Code contained on the chip or token. *Id.* at Col. 12, lines 3-4 and Col. 13, lines 26-33. As in the '082 patent, the

code is unrecognizable to the player, and the player does not know the outcome of the game

prior to play. *Id.* at Abstract. Also consistent with the '082 patent, the code controls the

outcome of both the lottery game and the amusement game. *Id.* at Summary of Invention.

The '603 patent has two independent method claims:

> 1. A method for playing a lottery type game comprising the
> steps of:
>
> acquiring by a player a gaming piece, the gaming piece
> including a code which includes data indicating whether the
> player wins or loses the lottery type game and an amusement
> game, the data being unrecognizable to the player, such that
> the player does not know whether the player will win or lose
> the games prior to play of the amusement game;
>
> reading the code by a processor;
>
> the processor generating the amusement game on a display for
> play by the player;
>
> the processor controlling whether the player will win or lose
> the amusement game based upon the code; and
>
> providing on the display an indication to the player of the
> amusement game win or game loss based upon the code.

Ex. B at Col. 15, line 64 – Col. 16, line 14. In claim 5, the step "reading the code by a

processor" is replaced by the steps "inserting the gaming piece into a data reader for reading

the code" and "inputting the code into a processor." *Id.* at Col. 16, lines 24-46. The third

limitation of claim 1 becomes "the processor generating a plurality of amusement games on

a display for play by the player, the player selecting at least one of the plurality of

amusement games for play by the player" in the fourth limitation of claim 5. *Id.* (additional

claim 5 language emphasized).

In addition, the '603 patent has four independent product claims. Claim 7 is

representative:

> 7. A lottery type game comprising:
>
> a gaming piece, said gaming piece including a programmable
> memory for storing a code which includes data indicating
> whether a player wins or loses the lottery type game and an
> amusement game, said data being unrecognizable to the

7

> player, such that the player does not know whether the player
> will win or lose the games prior to play of the amusement
> game;
>
> a processor for reading said code from said memory prior to
> amusement game play;
>
> said processor generating the amusement game on a display
> for play by the player;
>
> said processor determining whether the player will win or lose
> the amusement game based upon said code; and
>
> said display providing an indication to the player of the
> amusement game win or loss based upon said code.

*Id.* at Col. 16, lines 49-65. *See also id.* at Col. 17, lines 1-18 (claim 9) & Col. 17, line 24 –

Col. 18, line 9 (claim 11). Claim 14 differs from the other independent product claims by,

among other things, being limited to a lottery type game whose outcome depends on events

external to the lottery game itself.

> 14. A lottery type game comprising:
>
> a gaming piece, said gaming piece including a predetermined
> code which includes data indicating whether a player wins or
> loses; and
>
> a processor for reading said code, the player winning or losing
> the lottery type game based upon said code and occurrence of
> an event external to operation of the lottery type game, such
> that the player does not know whether the player will win or
> lose the lottery type game until after the occurrence of the
> event.

*Id.* at Col. 18, lines 15-25.

### 3. The prosecution histories of the patents-in-suit

### a. The prosecution of the '082 patent

The patentee filed the application that led to the '082 patent on April 6, 1995. Ex. C

at GL00066-110. On January 31, 1996, the Patent and Trademark Office rejected all claims

as "replete with indefiniteness." *Id.* at GL00117. The PTO also rejected several claims

(which were later cancelled) as anticipated by U.S. Patent No. 5,348,299 ("Clapper"). *Id.* at

GL00117-118. *See also* Ex. G. In addition, the PTO rejected the rest of the claims,

including both independent claims of the issued '082 patent, as obvious in light of Clapper

DCDOCS/620622.4

in view of four different references. *Id.* at GL00118-123 (citing the Bergeron, Heidel, Koza, and Wilson references).

In response, the applicant's attorney conducted a telephone interview with the Examiner, and submitted an amendment dated March 25, 1996. *Id.* at GL00136 (summary of February 28, 1996 telephone interview) & GL00128-135 (amendment).[3] The Applicant amended several claims, including independent claims 1 and 10, and specifically stated that those amendments were to make the claims patentable. *Id.* at GL00135. In the amendment, the patentee distinguished independent claims 1 and 10 over the prior art by characterizing the invention (without reference to any particular claim) as follows:

> The present invention relates to a game and method in which a player acquires a gaming piece, such as for example, a ticket. *The ticket includes encoded data or a code*, unrecognizable to the player. *The code determines whether the player will win or lose the game.* The data is input by the player into a game processor which in turn generates an interactive game for play by the player. *The actual play of the game by the player does not control whether the player will win or lose the game, since the outcome of the game is predetermined by the code on the gaming ticket* . . . the code encoded on the ticket is required to be input into the gaming processor by the game player prior to game play. *The processor does not independently or randomly determine the outcome of the game, as the outcome is determined by the code input by the game player.*

*Id.* at GL00133 (emphasis added).

In late May and early June 1996, the Examiner conducted three additional telephone interviews with the inventor and/or his attorney. *Id.* at GL00137. The Examiner further amended the claims, adding the words "amusement" and "lottery" (or "lottery type") in front of "game" to all but 3 claims in order to distinguish between the primary game and the amusement game. *Id. See also* Ex. E (showing all amendments to the '603 patent). The PTO issued a Notice of Allowability of claims 1-17 on June 11, 1996. *Id.* at GL00138-142.

---

[3]    For the Court's convenience, a document showing all amendments to the '082 patent is attached as Ex. E.

In the Notice of Allowability, the Examiner gave specific "reasons for allowance":

> [T]he combination of acquiring a gaming piece that includes a "code which includes data indicating whether the player wins or loses the lottery game and an amusement game, the data being unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game" [claim 1, element a], the player playing the amusement game with a processor "controlling whether the player will win or lose the amusement game based upon the code entered by the player" [claim 1, element d] and "providing on a display an indication to the player of the amusement game win or loss based upon the code" [claim 1, element e] appears novel and non-obvious over the prior art."

*Id.* at GL00141. The '082 patent issued on October 29, 1996.

### b.    The prosecution of the '603 patent

On October 25, 1996, four days before the issuance of the '082 patent, the inventor filed the continuation-in-part application that later issued as the '603 patent. Ex. D at GL00195-234. In a first office action dated March 5, 1997, the Examiner allowed claims 1-4 and 7-13, but rejected all other pending claims. *Id.* at GL00262-66. Specifically, the Examiner rejected claims 5, 6, & 14-17 as indefinite. *Id.* The Examiner also rejected claims 14-17 as anticipated. *Id.* (citing the Bergeron, Rusnak and Sludikoff references). *See also* Ex. H ("Sludikoff").

The applicant responded by amending claims 5, 14 and 17. Ex. D at GL00268-71. The amendments of claim 14 were significant. Specifically, the applicant limited claim 14 to "a processor for reading said code, the player winning or losing the lottery type game based upon said code and occurrence of an event <u>external to operation of the lottery type game, such that the player does not know whether the player will win or lose the lottery type game until after the occurrence of the event.</u>" *Id.* (amendment emphasized). The applicant also amended claim 14 to recite a "<u>predetermined</u> code which includes data indicating whether a player wins or loses." *Id.* at GL00269 (amendment emphasized).[4] The

---

[4]    For the Court's convenience, a document showing all amendments to the '603 patent is attached as Ex. F.

applicant specifically argued that the amendment made claim 14 patentable over the references cited by the Examiner. *Id.* at GL00270-71. The PTO issued a Notice of Allowability on August 15, 1997, and the '603 patent issued on January 20, 1998.

### B.    The HomePlay Lottery game suite

GameLogic has developed HomePlay Lottery™, a suite of lottery-related interactive games. Hardy Decl. ¶ 5. HomePlay Lottery is a fixed-odds game of chance, much like a traditional state-sponsored lottery. *Id.* The primary difference between HomePlay Lottery and a more traditional lottery is that HomePlay Lottery allows, but does not require, lottery ticket purchasers to play one or more interactive games via the internet prior to learning whether the ticket is a winner or not. *Id.*



There are four basic steps to HomePlay Lottery:

- the player buys a paper ticket from a lottery vendor (such as a convenience store or other location where lottery products are sold) or from an on-line lottery terminal;

- the player logs onto the HomePlay Lottery website by entering the access code printed on the paper ticket;

- the player selects and plays one or more interactive games in order to reveal whether or not the lottery ticket is a winner; and

- if the lottery ticket is a winner, the player presents the winning paper ticket to a lottery vendor in order to redeem the prize.

Hardy Decl. ¶ 6; Ex. J at 1-2; and Ex. K at 1.



**[Confidential Figure Redacted]**

Fig. 1—HomePlay Lottery Standard Suite ticket



### 1.    HomePlay Lottery Access Codes



12



2.     The HomePlay Lottery Website.



DCDOCS/620622.4

**[Confidential Figure Redacted]**

Fig. 2—HomePlay Lottery login screen



### 3.     The HomePlay Lottery Interactive Games

**[Confidential Figure Redacted]**

Fig. 3 – HomePlay Lottery Games Menu



---

5



**[Confidential Figure Redacted]**



Fig 4—Prize Reel Blackjack



15

## V.     THE APPLICABLE LAW JUSTIFIES SUMMARY
##        JUDGMENT OF NON-INFRINGEMENT.

### A.     The Summary Judgment Standard.

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike, Inc. v. Wolverine World Wide, Inc.,* 43 F.3d 644, 646 (Fed. Cir. 1994). *See also* Fed. R. Civ. P. 56(c). The issue of infringement is especially susceptible to summary judgment when facts pertaining to the operation of the accused device are undisputed because then infringement is purely a question of law. *General Mills, Inc. v. Hunt-Wesson, Inc.,* 103 F.3d 978 (Fed. Cir. 1997).

Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Thus, a court may grant summary judgment when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Once the moving party meets its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 256. The factual dispute claimed by the non-moving party must be "material" and the dispute over it "genuine." *Anderson,* 447 U.S. at 248. A "material" issue is one that affects the outcome of the suit; a dispute is "genuine" only if it could reasonably be resolved in favor of either party. *Id.* at 255. Unsupported allegations or conjecture are insufficient to raise a genuine issue of material fact. *Id.* at 248. Therefore, to defeat this summary judgment motion, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Courts can, and regularly do, grant prompt summary judgment where the facts are

16

clear. Summary judgment serves the important function of avoiding long and expensive

litigation "productive of nothing." *Ratner v. Young*, 465 F. Supp. 386, 393 (D.V.I. 1979);

*Kent v. Pittsburgh Press Co.*, 349 F. Supp. 622, 625 (W.D. Pa. 1972. Summary judgment

also curbs the danger that the threat of expensive litigation will be used to harass or coerce a

settlement. *Id.* Early motions for summary judgment further advance that function, and are

both contemplated by Rule 56, *Mitnik v. Cannon*, 789 F. Supp. 175, 176 (E.D. Pa. 1992),

and permitted by the courts. *Samson v. Harvey's Lake Borough*, 881 F. Supp. 138, 145

(M.D. Pa. 1995) (summary judgment granted during early stages of litigation and before

substantial discovery was completed). *See also Banks v. Mannoia*, 890 F. Supp. 95

(N.D.N.Y. 1995) (summary judgment can and often should be granted without discovery);

*Walker v. U.S. Environmental Protection Agency*, 802 F. Supp. 1568 (S.D. Tex. 1992) (Rule

56 does not require that discovery take place before a motion for summary judgment may

be considered).

### B.    The Non-Infringement Analysis.

Infringement "is properly decided upon summary judgment when no reasonable jury

could find that every limitation recited in the properly construed claim either is or is not

found in the accused device either literally or under the doctrine of equivalents." *Gart v.

Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001). Determination of patent infringement

entails a two-step analysis: (1) the asserted claims of the patent must be properly construed

to determine their meaning and scope, and (2) the claims as properly construed must be

compared to the allegedly infringing device. *Markman v. Westview Instruments, Inc.*, 52

F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

### 1.    Claim Construction Standards.

Claim construction is an issue of law for this Court to decide. *Markman*, 52 F.3d at

970-971. Claim interpretation is a three-step process. *See Rexnord Corp. v. Laitram Corp.*,

274 F.3d 1336, 1342 (Fed. Cir. 2001). First, the court identifies the ordinary meaning of a

claim term as understood by a person of ordinary skill in the relevant art. *Id.* Second, the

court "examine[s] the written description and the drawings to confirm that the patentee's use of the disputed terms is consistent with the meaning given to it by the court." *Id.* Third, "the same confirmatory measure must be taken with the prosecution history." *Id.* at 1343. "[A] court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (citing cases).

The presumption of ordinary meaning is overcome, however, where the prosecution history or specification show that the applicant redefined or limited a claim term. An applicant can affect the scope of his or her claims through statements made during prosecution that "redefine[] the term" or by "characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). *See also Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998) ("global comments [in the prosecution history] made to distinguish the applicants' 'claimed invention' from the prior art" limit all claims of patent).

### 2. Comparison of the Properly Construed Claims to the Accused Products.

#### a. Direct infringement.

Once a claim is properly construed, it must be compared to the accused device. *Markman*, 52 F.3d at 976. An accused device can only be found to infringe a claim directly if the device embodies each and every limitation of that claim, either literally or by a substantial equivalent. *Warner-Jenkinson*, 520 U.S. at 29; *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002). Literal infringement occurs when every element of a patent claim is met "exactly" in the accused device or process. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995).

18

### b.    The doctrine of equivalents.

When the accused product does not literally include every element of a claim, but the elements of the product differ only insubstantially from those claimed, the claim may be infringed under the doctrine of equivalents. The doctrine of equivalents is applied on an element-by-element basis, not to the invention as a whole. *Warner-Jenkinson Co.*, 520 U.S. at 29; *Unidynamics Corp. v. Automatic Products, Int'l, Ltd.*, 157 F.3d 1311, 1322 (Fed. Cir. 1998). An element is present under the doctrine of equivalents if it performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed element. *Pennwalt Corp. v. Durland-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987). *See also, e.g., Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424-25 (Fed. Cir.1997) (a claim element is equivalently present in an accused device if only "insubstantial differences distinguish the missing claim element from the corresponding aspects of the accused device.").

A patentee may not recapture disclosed but unclaimed subject matter through the doctrine of equivalents. *Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 39 USPQ2d 1001 (Fed. Cir.1996). Even when a claim is entitled to some range of equivalents, a court may not use the doctrine of equivalents to erase structural and functional limitations of the claims on which the public is entitled to rely in avoiding infringement. *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989).

Courts presume that the doctrine of equivalents does not apply where, as here, the patentee made a limiting amendment during the prosecution of the patent. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002) ("Estoppel arises when an amendment is made to secure allowance of the patent and the amendment narrows the patent's scope."); *Warner-Jenkinson*, 520 U.S. at 33 (prosecution history estoppel bars the application of the doctrine of equivalents to a claim element that was added by amendment for reasons related to patentability). It is the patentee's burden to show otherwise. *Festo*

19

*Corp.*, 535 U.S. at 740 ("The patentee, as the author of the claim language, may be expected to draft claims encompassing readily known equivalents. A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim.").

<b>c.    Indirect infringement.</b>

In addition to direct infringement, the Patent Act contemplates two types of indirect infringement: contributory infringement and inducing the infringement by another. Contributory infringement liability arises when one sells a component of a patented machine, or an apparatus for practicing a patented process, knowing that it is made or especially adapted for infringing use, and that it has no substantial non-infringing use. 35 U.S.C. § 271(c). Inducement arises when a party actively encourages another to infringe. 35 U.S.C. § 271(b). A fundamental prerequisite to any claim of inducing or contributory infringement is direct infringement. *See, e.g., Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) ("There can be no inducement of infringement or contributory infringement without an underlying act of direct infringement.").

**VI.    GAMELOGIC'S PRODUCTS DO NOT INFRINGE ANY CLAIM OF THE '082 OR '603 PATENTS**

    **A.    Construction of Relevant Terms.**

        **1.    "gaming piece including a code which includes data indicating whether the player wins or loses"**

Every claim of the patents-in-suit requires a gaming piece that includes win/loss information. This limitation is clearly stated in the claims themselves, and confirmed by both the specification and the prosecution history of the patents-in-suit.

Independent claim 1 of the '082 patent is limited to a lottery game in which the player acquires a "gaming piece including a code which includes data indicating whether the player wins or loses the lottery game and an amusement game." Claim 10 of the '082 patent, and independent claims 1 and 5 of the '603 patent, include the same limitation, albeit

DCDOCS/620622 4

with slight differences in phraseology.[6]  Independent claims 7, 9 and 11 of the '603 patent

specify that a "programmable memory" stores "a code which includes data indicating

whether a player wins or loses the lottery type game and an amusement game." Ex. B at

Col. 16, lines 50-53 (claim 7: "said gaming piece including a programmable memory for

storing a code which includes data indicating whether a player wins or loses the lottery type

game and an amusement game"); Col. 17, lines 2-5 (claim 9: same); and Col. 17, lines 24-

27 (claim 11: same).  Claim 14 of the '603 patent does not refer to the lottery game and

separate amusement game, instead simply requiring a "gaming piece including a

predetermined code which includes data indicating whether a player wins or loses." Ex. B

at Col. 18, lines 17-19.

The plain language of every claim requires a gaming piece "including" the code that

indicates whether the player wins or loses.  In this context, the ordinary meaning of

"including" indicates that the code is a part of the gaming piece, and is stored in or on the

gaming piece.  *See, e.g.,* Ex. I (The American Heritage College Dictionary) at 687

("include 1. To take in as a part, an element, or a member.  2. To contain as a secondary or

subordinate element.).  *See also* Manual of Patent Examining Procedure § 2111.03

("including," "comprising," and "containing" are synonymous).  *See also Johnson

Worldwide*, 175 F.3d at 989 (claims terms are presumed to have their ordinary meaning).

The specification and the prosecution history both confirm this ordinary meaning of

"includes."  The specification of both patents describes storing the Destiny Code in or on

the gaming piece:

> The system for generating the Destiny Codes stores the codes
> on a secure medium called the Game Medium. . . .  The
> process of storing the Destiny Codes on the Game Medium
> depends on the type of Game Medium used.  If, for example,

---

[6]      Claim 10 of the '082 patent changes the reference from "the player" to "a player." *See* Ex.
A at Col. 12, lines 5-7.  Claims 1 and 5 of the '603 patent refer to the "lottery game" as a "lottery
type game," but the limitation is otherwise identical to that recited by Claim 1 of the '082 patent.
*See* Ex. B at Col. 15, line 66 – Col. 16, line 2 (claim 1) & Col 16, lines 26-29 (claim 5).

> the Game Medium is paper, then the storing of the Destiny
> Codes is through printing. If the Game Medium is a
> computer, then the storage of the Destiny Codes includes
> magnetic or laser techniques.

Ex. A at Col. 3, lines 4-13; Ex. B at Col. 3, lines 19-28. The specification of the '603 patent

is equally clear when it defines both "gaming piece" and how the code is "included" on it:

> As used herein, the terms "Game Medium", "game media"
> and "gaming piece" include, but are not limited to, a paper
> ticket, or a token or a casino chip simulating a coin.
> Characteristic of all gaming pieces utilized with the present
> invention are that the piece includes the Destiny Codes stored
> thereon, either by printing, magnetics, or an integrated circuit
> memory device.

Ex. B at Col. 3, lines 32-38. Moreover, both patents describe a "Self-Contained

Amusement/Actualization embodiment" that absolutely requires the game piece to include

win/loss information. *See* Ex. A at Col. 4, line 29 – Col. 5, line 58 & Figs. 2 – 5; Ex. B at

Col. 4, line 53 – Col. 6, line 13 & Figs. 2 – 5. Such a self-contained device simply would

not be able to show a player his or her winnings if the win/loss information were not

included in or on the game piece itself. The patentee clearly describes the "included" code

as being stored in or on the gaming piece. Therefore, in the '082 patent, and in claims 1, 5

and 14 of the '603 patent, the requirement that the "gaming piece" "include[]" the "code

which includes data indicating whether the player wins or loses" means the code must be

stored in or on the "gaming piece." As to claims 7, 9 and 11 of the '603 patent, the

"programmable memory" must be a part of—that is, stored in or on—the "gaming piece,"

and the code is in turn stored in the "programmable memory." In all claims, the "data

indicating whether the player wins or loses" is "include[ed]" in the code itself. The data is

therefore resident on the game piece itself.

### 2. "programmable memory"

Independent claims 7, 9 and 11 of the '603 patent, as well as dependent claims 2 and

6, each recite a "gaming piece [that] includes a programmable memory for storing the code"

or some close variation of that language. *See* Ex. B at Col. 16, lines 15-16 (Claim 2: "The

method of claim 1 wherein the gaming piece includes a programmable memory for storing

22

the code."); Col. 16, lines 47-48 (Claim 6: "The method of claim 5 wherein the gaming piece includes a programmable memory for storing the code."); Col. 16, lines 50-51 (claim 7), Col. 17, lines 2-3 (claim 9: "said gaming pieces including a programmable memory for storing a code"), and Col. 17, lines 24-25 (claim 11: "said gaming pieces including a programmable memory for storing a code"). "Programmable memory" is a common, well-understood term. A "programmable memory" is an electronic storage device such as an integrated circuit that holds data in machine readable format. Declaration of Dow K. Hardy in Support of GameLogic's Motion for Summary Judgment of Non-Infringement ("Hardy Decl.") ¶35.

The '603 patent specification is consistent with this plain meaning, and describes a gaming piece including an integrated circuit. Ex. B, Col. 13, lines 21-26 ("Included on gaming piece 340 is an integrated circuit memory device 342 which stores Destiny Codes. Integrated circuit memory device 342 is selectively programmable to store multiple Destiny Codes, and is electronically erasable to store new Destiny Codes and may include, for example, a random access memory device."). *See also* Ex. B, Col. 3, lines 35-38 (describing "storing Destiny Codes [] utilizing an integrated circuit memory")); Col. 11, line 62 – Col. 13, line 13 ("a processor [] reads the Destiny Code stored in the memory device contained on the gaming piece"); and Fig. 15.

The claim term "programmable memory" should therefore be given its ordinary meaning: an electronic storage device such as an integrated circuit that holds data in machine readable format. *Johnson Worldwide*, 175 F.3d at 989.

### 3.     "reading the code"

The '603 patent teaches "gaming pieces in the form of casino chips or tokens containing Destiny Codes to allow a player to simulate wagering games with cash." Ex. B at Col. 11, lines 13-16. The patent goes on to describe how a gaming piece such as a token can be inserted "into a receptacle, such as present in a conventional slot machine." *Id.* at Col. 12, lines 2-3. "[T]he amusement+actualization game system reads the Destiny Code

contained on the gaming piece. The reading operation takes place by a processor which reads the Destiny Code stored in the memory device contained on the gaming piece." Ex. B at Col. 12, lines 3-7. *See also id.* at Col. 13, lines 26-33.

All of the '603 patent claims require the reading of the code from the game piece as described in the specification. Five of the six independent '603 patent claims require a processor "for reading" the code. Ex. B at Col. 16, line 6 (claim 1); Col. 16, line 57 (claim 7); Col. 17, line 11 (claim 9); Col. 17, lines 35-37 (claim 11); Col. 18, line 20 (claim 14). Claim 5 of the '603 patent recites the step of "inserting the gaming piece into a data reader for reading the code." Ex. B, Col. 16, lines 33-34. Claim 5 requires the player to "insert[] the gaming piece into a data reader for reading the code." *Id.* at Col. 16, lines 33-34. In all six independent claims, the processor or data reader must "read" the code, and in claims 7, 9 and 11 it must be "read" from the programmable memory of the a gaming piece.

"Read" is, of course, not a term of art. The dictionary defines it as "to examine and grasp the meaning of (written or printed characters, words, or sentences)." Ex. I (American Heritage Dictionary) at 1136. To read is to take the active step of acquiring written information. The claimed processor or data reader that "read[s]" the code must take that active step. In other words, the processor or data reader of the claims is not a passive recipient of the code. That understanding is the only one consistent with the ordinary meaning of "reading" and the '603 patent specification.

### 4.    "event external to operation of the lottery type game"

Independent claim 14 of the '603 patent discloses "a processor for reading said code, the player winning or losing the lottery type game based upon said code and occurrence of an *event external to operation of the lottery type game*, such that the player does not know whether the player will win or lose the lottery type game until after the occurrence of the event." Ex. B, Col. 18, lines 20-25 (emphasis added).

As discussed above, when originally filed, claim 14 disclosed a lottery game whose

outcome depended on "said code" and the occurrence of a generic "event." Ex. D at

GL00268 (showing original language of claim as well as later amendment). *See also* Ex. F.

The Examiner rejected claim 14 as anticipated by several references, including the

Sludikoff patent. *Id.* at GL00263-265 (describing Sludikoff as "including a code which

includes data indicating whether a player wins or loses"). *See also* Ex. H. The patentee

amended claim 14, and limited it to cover only the situation where winning or losing the

lottery game depends on both the code and on the occurrence of a specific type of event: an

"event external to operation of the lottery type game." *Id.* at GL00269. As the applicant

told the PTO in his Remarks accompanying the amendment:

> The present lottery type game as claimed in Claim 14 includes
> a gaming piece with a predetermined code that includes data
> indicating whether a player wins or loses the lottery type
> game. Additionally, in order to win the lottery type game, the
> occurrence of an external event must occur. ***Therefore, the
> combination of the win code as well as the occurrence of the
> event, external to the lottery type game, must both be present
> for the player to win.*** The event external to the lottery type
> game may include, for example, the identification of a winner
> of a sporting event.

Ex. D at GL00270 (emphasis added).

As argued by the patentee, then, Claim 14 distinguishes between an event that is

inherent to and part of the play of the lottery game itself, and one that is external to the

lottery game. *See Southwall Techs.,* 54 F.3d at 1576 ("The prosecution history limits the

interpretation of claim terms so as to exclude any interpretation that was disclaimed during

prosecution. . . . Claims may not be construed one way in order to obtain their allowance

and in a different way against accused infringers.") (citations omitted).

This is consistent with the specification of the '603 patent, where the patentee stated:

> [T]o further enhance the interest of the present lottery type
> and raffle type games, the gaming piece may be linked to an
> external event. Not only must a player have a winning gaming
> piece, the player must also select the winner of an external
> event, such as, for example, the winner of a football game."

Ex. B, Col. 15, lines 18-23. *See also id.* at Fig. 19; Ex. I (American Heritage College

Dictionary) at 484 ("External . . . 4. Acting or coming from the outside.").

The limitation "event external to operation of the lottery type game" should therefore be defined as an "external event separate from and external to the operation of the lottery game, including the determination of a win/loss status inherent within the lottery game."

**B.    GameLogic's Products Do Not Infringe the Patents-in-Suit**

The second step of the infringement analysis is to compare the properly construed claims to the accused device. *Markman*, 52 F.3d at 976. An accused device infringes a claim only if it embodies each and every limitation of that claim, either literally or by a substantial equivalent. *Warner-Jenkinson*, 520 U.S. at 29; *Teleflex*, 299 F.3d at 1323. GameLogic's products do not include every limitation of any claim. GameLogic does not, therefore, infringe the '082 and '603 patents as a matter of law.

**1.    GameLogic does not infringe any claim of the patents-in-suit because neither the access code nor the serial number includes win/loss information**

As discussed above, all of the '082 and '603 patent claims require a code stored in or on a gaming piece that includes win/loss data. *See above* at § V(D)(1). The HomePlay Lottery "gaming piece" is the paper ticket purchased by the player from a lottery vendor.



█████████████████████████████████████████████

This is a fundamental difference between HomePlay Lottery and every claim of the patents-in-suit. Because HomePlay Lottery does not include this required element, it does not infringe. *Warner-Jenkinson*, 520 U.S. at 29 (a claim cannot be infringed unless every element is present in the accused device or process).

Furthermore, ████████████████████████████ is a substantial difference from storing it in or on the gaming piece itself, as in the claimed invention. The doctrine of equivalents does not apply. *Pennwalt*, 833 F.2d at 934 (an element is present under the doctrine of equivalents only if it performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed element).

### 2. The HomePlay Lottery product does not include the additional limitations of dependent claims 2, 3, 5, 9, 11, 12, 14 or 17 of the '082 patent.

GameLogic does not infringe any claim of the '082 patent because, as shown above, it does not infringe either of the independent claims. *See, e.g., Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 685-86 (Fed. Cir. 1990) (if an independent claim is not infringed, none of the claims depending from it can be infringed as a matter of law). In addition, GameLogic does not infringe several of the dependent '082 patent claims because the HomePlay Lottery product does not include the additional recited steps or elements.

██████████████████████████████████████████████

Exhibit A at Col. 11, lines 18-19 (claim 2: "The method of claim 1 wherein the gaming piece includes magnetic media for storing the code."); Col. 11, lines 20-21 (claim 3: "The method of claim 1 wherein the gaming piece includes laser optical media for storing the code."); Col. 12, lines 21-22 (claim 11: "The lottery type game of claim 10 wherein said gaming piece includes magnetic media for storing said code."); and Col. 12, lines 23-25 (claim 12: "The lottery type game of claim 10 wherein said gaming piece includes laser

27

optical media for storing said code.").

[REDACTED] Exhibit A at Col. 11, lines 24-25 (claim 5: "The method of claim 1 wherein the amusement game includes a horse race."); and Col. 12, lines 28-29 (claim 14: "The lottery type game of claim 10 wherein said amusement game includes a horse race.").

[REDACTED] Exhibit A at Col. 12, lines 1-3 (claim 9: "The method of claim 1 wherein the step of entering the code into a processor includes a processor within an on-line subscription service."); and Col. 12, lines 34-36 (claim 17: equivalent product claim).

### 3. GameLogic does not infringe claims the '603 patent because there is no processor or data reader that "reads" the code.

All of the claims of the '603 patent require a processor or data reader that "reads" the code. Claim 1, for example, is a method claim. One of the steps of the disclosed method is "reading the code by a processor." Ex. B at Col. 16, line 6. Similarly, claims 7 and 9 include "a processor for reading said code from said memory" *Id.* at Col. 16, line 57 (claim 7) and Col. 17, line 11 (claim 9 refers to "codes" rather than a singular "code"). Claim 11 includes yet another version of the same limitation: "a processor at each of said terminals for reading said code from said memory of gaming pieces played at said terminals." *Id.* at Col. 17, lines 35-37. In claim 14, the phraseology is "a processor for reading said code." *Id.* at Col. 18, line 20. Claim 5 of the '603 patent recites the step of "inserting the gaming piece into a data reader for reading the code." Ex. B, Col. 16, lines 33-34. In all six independent claims the processor or data reader must "read" the code, and in claims 7, 9 and 11 it must be "read" from the memory of the gaming piece.

None of these straightforward limitations are found in the accused HomePlay

28

Lottery games. 

[7] Therefore, none of the claims of the '603 patent are infringed.

### 4. GameLogic does not infringe claims 2 or 6-13 of the '603 patent because its products do not include a gaming piece with a "programmable memory."

Independent claims 7, 9 and 11 of the '603 patent, as well as dependent claims 2 and 6, each require a "gaming piece" that includes a "programmable memory for storing a code." *See* Ex. B at Col. 15, lines 15-16 (claim 2); Col. 15, lines 47-48 (Claim 6); Col. 16, lines 50-51 (claim 7); Col. 17, lines 2-3 (claim 9); and Col. 17, lines 24-25 (claim 11). As discussed above, the ordinary meaning of "programmable memory" is "an electronic storage device such as an integrated circuit." *See above* at § V(D)(2).



GameLogic does not therefore infringe claims 2 or 6-13 of the '603 patent.

---

[7]

DCDOCS/620622.4

### 5. GameLogic does not infringe claims 14-17 of the '603 patent because whether a player wins or loses does not depend on the occurrence of an "event external to operation of the lottery type game."

Independent claim 14 of the '603 patent discloses "a processor for reading said code, the player winning or losing the lottery type game based upon said code and occurrence of *an event external to operation of the lottery type game,* such that the player does not know whether the player will win or lose the lottery type game until after the occurrence of the event." Ex. B, Col. 18, lines 20-25 (emphasis added). "[A]n event external to operation of the lottery type game" is necessarily an "external event separate from and external to the operation of the lottery game, including the determination of a win/loss status inherent within the lottery game." *See above* at § V(D)(4).



GameLogic does not, therefore, literally infringe claim 14 of the '603 patent, or claims 15-17 which depend from it. Because the applicant amended claim 14 to obtain issuance of the patent, the applicant surrendered all equivalents. *Festo,* 535 U.S. at 736.

## VII. CONCLUSION

The accused GameLogic products do not include each and every limitation of any claim of the '082 or '603 patents. There are no genuinely disputed material facts; the products work the way they work, and they do not work in the way covered by the patents-in-suit. GameLogic does not infringe the '082 and '603 patents as a matter of law, and summary judgment is appropriate. GameLogic therefore respectfully requests an Order granting Summary Judgment of Non-Infringement of the '082 and '603 patents.

DCDOCS/620622.4

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Gary M. Hnath
Susan Baker Manning
Star-shemah Bobatoon
BINGHAM MCCUTCHEN LLP
1120 20th Street, NW
Suite 800
Washington, D.C. 20036
(202) 778-6150
(202) 778-6155 (facsimile)

Dated: March 8, 2005
Public Version Filed: March 15, 2005

673092
673995

By:   /s/ David E. Moore
       Richard L. Horwitz (#2246)
       David E. Moore (#3983)
       Hercules Plaza 6th Floor
       1313 N. Market Street
       P.O. Box 951
       Wilmington, DE  19899-0951
       Tel:  (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore!@potteranderson.com

*Attorneys for Defendant*
*GameLogic, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 15, 2005, the attached document

was electronically filed with the Clerk of the Court using CM/ECF which will send

notification of such filing(s) to the following and the document is available for viewing

and downloading from CM/ECF:

Edmond D. Johnson
Thomas H. Kovach
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Jack B. Blumenfeld
Roger D. Smith
Morris Nichols Arsht & Tunnell
Chase Manhattan Centre, 18th Floor
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

I hereby certify that on March 15, 2005, I have Federal Expressed the documents

to the following non-registered participants:

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
Hunton & Williams LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006

By: _____
Richard L. Horwitz
David E. Moore
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

672965