# EXHIBIT

# G



US005348299A

## United States Patent [19]

### Clapper, Jr.

[11] **Patent Number:** 5,348,299

[45] **Date of Patent:** Sep. 20, 1994

[54] **ELECTRONIC GAMING APPARATUS**

[75] Inventor: Ronald C. Clapper, Jr., Chatsworth, Calif.

[73] Assignee: LTB Game Enterprises, Chatsworth, Calif.

[21] Appl. No.: 879,747

[22] Filed: May 6, 1992

[51] Int. Cl.⁵ ............................................. A63F 9/24
[52] U.S. Cl. ............................... 273/138 A; 273/138 R
[58] Field of Search ................. 273/138 A, 139, 143 R

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,689,742 | 8/1987 | Troy et al. | 273/138 A |
| 4,725,079 | 2/1988 | Koza et al. | 273/139 |
| 4,842,278 | 6/1989 | Markowicz | 273/138 A |

#### FOREIGN PATENT DOCUMENTS

888155  12/1981  U.S.S.R. .................... 273/138 A

### OTHER PUBLICATIONS

Virginia Lottery—Instant Ticket Vending Machine Brochure.

*Primary Examiner*—Benjamin H. Layno
*Attorney, Agent, or Firm*—Robert J. Schaap

[57] **ABSTRACT**

An electronic gaming apparatus which preferably corresponds to and effectively electronically automates the game of chance known as "Pull-Tab." A primary strip of indicia in the form of a roll is provided in the apparatus and upon actuation of the apparatus, a segment of the strip is severed to provide a strip segment or ticket and is dispensed. If the indicia on the severed segment corresponds to a winning indicia, then the player would win the game. A duplicate copy of each severed segment of the primary strip is maintained on a duplicate strip and stored for purposes of later auditing. In addition, an electronic display is provided on the apparatus. The primary or duplicate strip of indicia contains a code corresponding to the indicia printed on each dispensed segment. This code is read as a segment of the strip is dispensed and simultaneously displayed on the screen.

**11 Claims, 4 Drawing Sheets**



GL00326

**U.S. Patent**        Sep. 20, 1994        Sheet 1 of 4        **5,348,299**



FIG. 1

GL00327



**FIG. 2**

GL00328



FIG. 3



FIG.4                    FIG. 5

GL00329

**U.S. Patent**          Sep. 20, 1994          Sheet 4 of 4          **5,348,299**



FIG. 6

GL00330

5,348,299

1

## ELECTRONIC GAMING APPARATUS

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates in general to certain new and useful improvements in electronic gaming apparatus, and more particularly, to a gaming apparatus which is capable of dispensing selected segments of a strip containing indicia and maintaining a duplicate copy thereof, as well as displaying the indicia on the strip segment which is dispensed.

2. Brief Description of the Prior Art

In the conventional game of Pull-Tab, frequently played in gaming establishments, a large number of cards, or similar substrates, are located in a box or other open container. Each of the cards are printed with some type of indicia which may be a number, a symbol or the like and only a limited number of the cards in this box or other container have a winning indicia. Each of the indicia are covered by a removable cover sheet having a tab thereon.

A dealer, upon appropriate payment by a player, will remove one of the cards from the container and provide the same to a player. Since the indicia are covered by the removable cover sheet, and since the cards with winning indicia are randomly located within the container, neither the dealer nor the player know if the player is receiving a card with a winning indicia until such time as the tab is engaged and the cover sheet is removed.

The present invention relies on an innovation which electronically enhances this game and other similar games which utilize selection of randomly arranged substrates having indicia thereon.

### OBJECTS OF THE INVENTION

It is, therefore, one of the primary objects of the present invention to provide a gaming apparatus which automates a game of gambling previously played with a plurality of playing tickets in a container and adapted for dispensing from the container.

It is another object of the present invention to provide an electronic gaming apparatus of the type stated which is capable of dispensing a strip segment containing selected indicia thereon and which also maintains a duplicate copy of all strip segments which have been dispensed.

It is a further object of a further invention to provide a gaming apparatus of the type stated which is designed to provide a display of the indicia on the strip segments which may be dispensed from the apparatus upon playing thereof.

It is an additional object of the present invention to provide a method of automating a game previously played with playing pieces or substrates dispensed from an open container.

With the above and other objects in view, my invention resides in the novel features of form, construction, arrangement and combination of parts presently described and pointed out in the claims.

### BRIEF SUMMARY OF THE INVENTION

The present invention relates to an electronic gaming apparatus, which in a broad aspect, is capable of dispensing a segment of a strip containing indicia thereon upon actuation of the apparatus. In a more preferred aspect, this apparatus maintains a duplicate record of

2

the dispensed segment and particularly the indicia on that dispensed segment.

The electronic gaming apparatus contains a primary strip which can be subdivided into individual segments and which contain the indicia thereon. This strip may be in the form of a roll containing the segments and where each segment contains the indicia thereon. The apparatus also comprises a duplicate or secondary strip containing indicia thereon in substantially the same location as on the primary strip. The apparatus further comprises means for severing a segment of the primary strip and dispensing the same upon actuation of the apparatus. This apparatus will store a corresponding portion of the duplicate strip as, for example, on a take-up roll thereof.

In a more preferred embodiment, there is provided a separating means which separates the primary strip from the duplicate strip after actuation of the apparatus. In addition, a separate means for dispensing is provided which dispenses the substrate segment after cutting from the primary strip. The cutting means may be in the form of an anvil and cutting blade.

In a further embodiment of the invention, the electronic gaming apparatus is also capable of dispensing a segment of a strip containing indicia thereon and which simultaneously displays the indicia of the dispensed segment. This embodiment of the apparatus further includes a means for severing a segment of a primary strip and dispensing the same upon actuation of this apparatus. Further, the apparatus includes means for simultaneously displaying the indicia on the dispensed segment.

In the latter embodiment of the apparatus, there is provided a display screen on the apparatus for displaying the indicia. A code corresponding to the indicia is imprinted on the opposite side of the segment which contains the indicia and the apparatus includes a scanning means for scanning the code and for conversion and display of the indicia.

Preferably, the rear surface of the primary strip will contain the indicia, that is, the side of the strip in facewise contact with the secondary strip. The rear surface of the duplicate or secondary strip will contain the code which is readable by a scanner. Thus, and in this respect, the duplicate strip will serve as a type of tab and moreover, a tab which is stored. The apparatus of the invention will remove the tab, that is the duplicate strip, from the primary strip, for the user. By virtue of the fact that the indicia on the primary strip are in facewise contact with the duplicate strip, the indicia will always be in unknown to anyone who is playing the apparatus or even monitoring the play of the apparatus until the duplicate strip is separated from the primary strip. The bar code is not readable by the user or observer of the apparatus since the code is only machine readable.

The present invention thereby provides a unique and novel electronic gaming apparatus which satisfies and fulfills all of the above-identified objects and other objects which will become more fully apparent from a consideration of the forms in which the gaming device may be embodied. One of these forms is more fully illustrated in the accompanying drawings and described in the following detailed description of the invention. However, it should be understood that the accompanying drawings and the detailed description are set forth only for purposes of illustrating the general principles of the invention and are not to be taken in a limiting sense.

GL00331

3

## BRIEF DESCRIPTION OF THE DRAWINGS

Having thus described the invention, reference will now be made to the accompanying drawings in which:

FIG. 1 is a perspective view of an apparatus constructed in accordance with and embodying the present invention;

FIG. 2 is a fragmentary perspective view showing one side of the apparatus and particularly those components necessary for feeding, scanning, severing and dispensing a strip segment along with a take-up mechanism;

FIG. 3 is a sectional view showing a portion of the scanning mechanism forming part of the apparatus of the invention;

FIG. 4 is a fragmentary view showing a rear face of a portion of a primary strip used in the apparatus;

FIG. 5 is a fragmentary view showing a rear face of a portion of a duplicate strip used in the apparatus; and

FIG. 6 is a perspective view of the primary and juxtaposed duplicate strips.

## DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

Referring now in more detail and by reference characters to the drawings which illustrate a practical embodiment of the present invention, A designates a gaming apparatus comprised of an upstanding housing 10 having a front face 12 with a display screen 14 capable of generating a display of indicia such as numbers or symbols, on Pull-Tab tickets, as hereinafter described.

The housing 10 is also provided with a plurality of manually actuable keys 16 which are provided for a user to actuate the apparatus as hereinafter described. The keys represent various functions which the user may select and operate the keys according to the desired function.

The gaming apparatus housing 10 is also provided with a money or currency receiver 18 which may be in the form of a coin exchanger for operating the apparatus with coins or in the form of a bill or paper currency reader. When the proper amount of money is introduced into the money receiver 18 the apparatus will be actuated in a manner to be hereinafter described in accordance with the push button switches 16.

Finally, the housing 10 is also provided with a discharge chute 20 for dispensing of Pull-Tab tickets or other type of gaming substrate segments and which are dispensed in accordance with the play of the gaming apparatus.

Referring to FIG. 2, the apparatus comprises an operating mechanism 24 comprised of a supply spool 26 suitably mounted on a supply spool spindle 28. The supply spool 26 is provided with a primary strip 30 of substrate, in the form of a roll, and which may be dispensed form the supply spool. The substrate material is usually a paper or thin paper-board material, but may effectively adopt any type of rollable or bendable material such as a thin plastic strip or the like.

The rear face of the primary strip is disposed facewise engagement with a marginally registered duplicate strip 32 and the latter of which is trained about a take-up spool 34. The take-up spool 34 is mounted on a drive spindle 36 which is driven by a motor 38 through a drive belt 40. In this case, the motor would be actuated under the control of the microprocessor (not shown) upon proper insertion of the selected amount of money

4

and actuation of any one of the manually actuable switches 16.

In accordance with the arrangement as illustrated in FIG. 2, it can be observed that the take-up spool 34 is the primary driving member since it is, in effect, driven by the motor 38. It should be understood that other means for driving the supply spool 36 may also be employed and synchronized to the motor 38, if desired.

The primary strip 30 is imprinted on its rear face with a plurality of indicia, such as indicia 42 which may be in the form of numbers, letters, graphic symbols, or the like. The indicia are located in separate indicia locations which are often severed into selectable segments or so-called "tickets." Each strip segment or ticket is equivalent to a pull-tab in the game of Pull-Tab. In the embodiment as illustrated, each strip segment or ticket is shown as being separated from the next adjacent strip segment on the strip by means of score lines 44. In actuality, these score lines do not exist as true perforations and moreover, are not even required since the strip itself will be cut in a manner to be hereinafter described.

The primary strip 30 and the juxtaposed duplicate strip 32 are fed from the supply spool 26 through a pair of pinch sprockets 46 and then introduced into a scanner housing 48. The scanner housing 48 is provided with an opening 50 on its undersurface and located immediately beneath the opening 50 is a conventional scanner 52 and a light source 54. The scanner may adopt the form of a charge coupled diode or similar scanning mechanism.

As the primary and juxtaposed duplicate sheets 30 and 32 pass through the scanner housing 48, the scanner 52 will read a bar code 56 on the rear surface of the duplicate sheet. This bar code 56 corresponds to the indicia 42 on the primary strip. Thus, each strip segment or ticket will have its own individual bar code corresponding to the indicia imprinted on the front surface thereof. The relationship between the indicia and the bar code is recorded in a storage mechanism and the microprocessor will access that storage mechanism in order to determine the proper indicia for display. Thereafter, the indicia is displayed on the monitor 14. In this way, the user of the apparatus will receive a ticket as hereinafter described and will also be able to observe the indicia on that ticket on the display screen 14.

The primary strip and the duplicate strip are separated by a separating mechanism, which in this case, may be a conventional wire 60 trained transversely across the path of the two strips in the manner as illustrated, in FIG. 3. In this way, the primary strip can be separated from the secondary and the latter allowed to re-wind on the take-up spool 34.

The primary strip is introduced into a cutting mechanism 64 having a cutting blade 66 cooperating with an anvil 68. The primary strip is located between the cutter 66 and the anvil 68 when a solenoid is actuated. Upon receipt of a proper signal initiated through the microprocessor, the cutting mechanism 66 will be operated by the solenoid and sever the primary strip 30 into the individual strip segments or tickets. The tickets are thereupon allowed to deposit in the discharge chute 20 where they may be picked up by the player of the apparatus. The tickets can then be taken to a cashier or like individual for purposes of collecting the money if any of the tickets carries a winning indicia thereon.

The rear face of the primary strip 30 which contains the indicia will actually be disposed in intimate facewise

GL00332

5,348,299

5                                                                6

contact with the forward face of the duplicate strip 32. Thus, the indicia on the primary strip will not be initially observable until the apparatus separates the duplicate strip from the primary strip and dispenses the strip segment. The rear face of the duplicate strip will contain the bar code 56, as aforesaid, and this bar code is only machine readable, that is, it cannot be intelligibly read by a user or observer of the apparatus. The indicia, therefore, will not be intelligible to the player or observer until the apparatus dispenses the ticket or displays the symbols corresponding to the bar code, or both.

Thus, there has been illustrated and described a unique and novel electronic gaming apparatus and a method of use therefor which fulfills all of the objects and advantages which have been sought. It should be understood that many changes, modifications, variations and other uses and applications will become apparent to those skilled in the art after considering this specification and the accompanying drawings. Therefore, any and all such changes, modifications, variations and other uses and applications which do not depart from the spirit and scope of the invention are deemed to be covered by the invention.

Having thus described the invention, what I desire to claim and secure by letters patent is:

1. An electronic gaming apparatus capable of dispensing a segment of a strip containing indicia thereon upon actuating the apparatus and which maintains a duplicate record copy, said apparatus comprising:

  a) a primary strip containing indicia thereon;

  b) a duplicate strip containing indicia thereon and in essentially the same locations as on said primary strip and wherein the primary and duplicate strips are in juxtaposed relationship to one another;

  c) means for severing a segment of the primary strip and dispensing same upon actuation of the apparatus and storing a corresponding portion of the duplicate strip.

2. The electronic gaming apparatus of claim 1 further characterized in that separating means separates the primary strip from the duplicate strip after actuation of the apparatus.

3. The electronic gaming apparatus of claim 2 further characterized in that cutting means severs a segment of the strip and enables dispensing of the same.

4. An electronic gaming apparatus capable of dispensing a segment of a strip having a rear face and a front face containing indicia thereon upon actuating the apparatus and simultaneously reading and displaying the indicia in the dispensed segment, said apparatus comprising;

  a) a primary strip containing indicia on the front face thereof and a code representing the indicia on the rear face thereof and which code is unintelligible to an individual and only machine readable;

  b) a removable cover strip disposed over and concealing the indicia on the front face thereof;

  c) means for scanning the code on the rear face and connecting the code to the equivalent indicia for purposes of display;

  d) means for severing a segment of the primary strip and dispensing same upon actuation of the apparatus; and

  e) means for simultaneously displaying the code which is read and converted into indicia corresponding to the indicia on the dispensed segment, without removing the cover strip from the indicia on the strip.

5. The electronic gaming apparatus of claim 4 further characterized in that separating means separates the primary strip from a duplicate strip after actuation of the apparatus.

6. The electronic gaming apparatus of claim 5 further characterized in that cutting means severs a segment of the primary strip and enables dispensing of same.

7. The electronic gaming apparatus of claim 4 further characterized in that a display screen is on said apparatus for displaying the indicia.

8. The electronic gaming apparatus of claim 7 further characterized in that the code corresponding to the indicia which is imprinted on the front face of the segment is a bar code.

9. An electronic gaming apparatus capable of dispensing a segment of a strip containing indicia thereon upon actuating the apparatus and simultaneously displaying the indicia in the dispensed segment, said apparatus comprising;

  a) a primary strip containing indicia thereon and being in juxtaposed relationship to a duplicate strip;

  b) means for separating the primary strip from the duplicate strip upon actuation of the apparatus;

  c) means for severing a segment of the primary strip and dispensing same upon actuation of the apparatus; and

  d) means for simultaneously displaying the indicia on the dispensed segment.

10. The electronic gaming apparatus of claim 9 further characterized in that the means for severing is a cutting means which severs a segment of the primary strip and enables dispensing of same.

11. The electronic gaming apparatus of claim 9 further characterized in that a display screen is on said apparatus for displaying the indicia.

     * * * * *

# EXHIBIT

# H



US005116049A

# United States Patent [19]

## Sludikoff et al.

[11] Patent Number: 5,116,049

[45] Date of Patent: May 26, 1992

[54] **LOTTERY GAME SYSTEM AND METHOD OF PLAYING**

[76] Inventors: Stanley R. Sludikoff, 17437 Tarzana St., Encino, Calif. 91316; Carl Alexoff, 539 Tarrington Ct., Cherry Hill, N.J. 08034

[21] Appl. No.: 766,075

[22] Filed: Sep. 27, 1991

[51] Int. Cl.⁵ .................................... A63F 3/06
[52] U.S. Cl. ............................ 273/139; 283/903
[58] Field of Search ........... 273/138 R, 139, 148 R; 283/901, 903

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

4,688,797  8/1987  Sebestyen ............. 273/148 R
4,871,172  10/1989  Hwang ................ 273/138 R

**FOREIGN PATENT DOCUMENTS**

494948  4/1977  Australia ............. 283/903

**OTHER PUBLICATIONS**

Virginia Lottery Pick 3 Play Slip and Rules

Primary Examiner—Benjamin Layno
Attorney, Agent, or Firm—Shlesinger Arkwright & Garvey

[57] **ABSTRACT**

The lottery game is played by selecting a plurality of multiple digit rows of numbers each row is offset from the preceding row. The game is played by matching according to a lottery sponsored drawing sets of the selected numbers. A winning ticket is obtained when the drawn numbers are matched to those on the ticket in a consecutive manner either across or down matching all of the numbers across produces a jackpot winner. Matching some of the numbers either across or down also produces a prize winning ticket.

**8 Claims, 2 Drawing Sheets**



**U.S. Patent**          May 26, 1992          Sheet 1 of 2          5,116,049





*FIG. 4*

*FIG. 5*

5,116,049

1

# LOTTERY GAME SYSTEM AND METHOD OF PLAYING

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by any one of the patent disclosure, as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all copyright rights whatsoever.

## FIELD OF THE INVENTION

This invention is directed to a lottery game in which numbers are selected and recorded and then matched against a number set produced after the initial selection and recordation.

## BACKGROUND OF THE INVENTION

The evolution of lottery games has evolved from the original passive draw-type lottery to instant winning games and then on to pick three and pick four games and then to lotto jackpot type games. The passive draw-type game included a purchase of a prenumbered ticket. These tickets were generally sold in ascending numerical order and after a certain period of time a winning number of one of the tickets sold was selected and the prize was awarded to the holder of the ticket bearing the winning number.

Instant winning games were introduced in 1974 which generally included some kind of scratch-off game where a number or a certain number of items were matched according to a predetermined winning scheme.

Next, the pick your own number games were introduced which included the pick three game, the pick four game and the lotto jackpot game. In the pick three and pick four games, three or four numbers, respectively are chosen and must be matched in consecutive order with the winning number produced by the lottery operator.

The jackpot lotto game is played by picking generally six numbers of a selected set such as from 1 to 50. The six numbers may be selected by a computer or may be selected by the player and generally with the long odds of winning on the game, no particular order of numbers is required. The winning numbers are generally selected from a box containing ping pong balls numbered from 1 to 50, for example.

The players of these lottery games prefer the better odds of winning available from the pick three and pick four games, but on the other hand, the large jackpots are only available in the lotto games which have extremely long odds. The factors of the foregoing games have lead to a general decline in their popularity.

In view of the foregoing it can be seen that there is a need for a new lotto game which incorporates the "believe I can win feeling" of small odds games, added to the lottomania excitement of large jackpots.

## OBJECTS AND SUMMARY OF THE INVENTION

It is an object of the invention to provide a game design which includes a multiplicity of games with different odds and prize structures.

It is also an object of the invention to integrate all pick your own number type games into a single game.

2

Still another object of the invention is to provide a new lottery game which will operate on existing on-line equipment.

Yet another object of the invention is to provide a game which combines the frequency of daily prize awards with the excitement of daily drawings plus the potential of future winnings.

In summary, therefore, this invention is directed to a game having a ticket with a plurality of rows and columns of numbers whereby winning is accomplished by matching numbers in consecutive order with a number drawn by the lottery sponsor. A winning ticket is obtained when the drawn numbers are matched to those on the ticket in a consecutive manner either across or down. The requirement for consecutive matching reduces the amount of numbers required for a selection.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a sample ticket for a one game drawing;

FIG. 2 is a sample ticket for a five consecutive game drawing;

FIG. 3 is a sample ticket of a seven consecutive game drawing;

FIG. 4 is an illustration of a sample playslip; and,

FIG. 5 is an enlarged fragmentary view of the playslip of FIG. 4.

## DETAILED DESCRIPTION OF THE INVENTION

The invention is directed to a lottery game in which the players' wagers are placed in a common pool and divided among them and the lottery sponsor in accordance with their own selections and the rules of the game.

Preferably, the game is played over seven consecutive days, with one number set being drawn each day. In addition, a new game is begun each day, which is linked to as many as six previous and/or subsequent games. Preferably, each set includes seven numbers. A given number will occur only once in each set. To win the top prize, one must match the seven numbers drawn in exact order.

The invention will be further described with reference to the drawing figures. FIG. 1 shows a sample ticket 2 having a number selection 4 beginning on a designated day 6 (Monday in this instance). Codes 8 prevent counterfeiting of the ticket 2.

Prizes can be won by matching the seven digits in exact order. Matching three or four or five or six of the numbers in consecutive order will also produce a prize winning ticket. The game begun with this ticket can be played for seven days by matching in consecutive order the first number of each drawing for seven consecutive days beginning on Monday. Again, matching three or four or five or six of the numbers will also produce a prize. This way the player's interest is kept for seven days.

FIG. 2 shows a sample five-game ticket 10 for use in a game started on five consecutive days, Friday-Tuesday. Seven numbers for each game are chosen and printed on the ticket face 12. The ticket face 12 indicates the dates of the drawings extend from November into December by designation Nov/Dec 14, and a date line 16, top and bottom, and the sale date 18. Matching the seven numbers 20 on the Friday row 22 drawn by the lottery sponsor will provide a winning ticket. The numbers must be matched in the exact order, i.e. 9347860. Matching three or four or five or six of the numbers will

GL00828

5,116,049

3

also produce a prize. Due to possible matching of vertical numbers, the ticket provides additional chances to win on the third through ninth days. Due to the staggered start the ticket is in play for eleven days.

A separate drawing of seven numbers will be commenced each following day, Saturday, Sunday, Monday and Tuesday.

After the third day's drawings, the player can begin to match numbers vertically. On Sunday in ticket 10, the player can match three numbers in the vertical column 26: 443. The player could also match 934 across by taking the first number of each day's drawing. After Monday's drawing, multiple ways to win become more evident. The player can match 752 or 525 in a vertical direction, or 347 on the top line or 145 on the second line. In addition to the pick three numbers previously described, the opportunity to win on a pick four game also arises with the choices being 7525 in the vertical direction, and 9347 in the horizontal row. On Tuesday additional pick three horizontal choices of 478, 458 and 324 on the top, second and third rows, and additional vertical choices of 884, 846 and 463 become available. In addition pick four choices of 3478 and 1458 become available on the top and second rows, while vertical pick four choices of 8846 and 8463 become available. Additional pick five choices of 93478 horizontally and 88463 vertically become available. On Wednesday the following additional choices become available: pick three horizontally—786, 582, 247, 563; pick four horizontally 4786, 4582 and 3247; pick five horizontally—34786 and 14582; and pick six horizontally 934786. Vertically, additional pick three choices are 627, 273 and 736; pick four choices are 6273 and 2736, and a vertical pick five of 62736.

On Thursday the following additional choices become available: pick three horizontally—860, 826, 475, 637 and 367; pick four horizontally—7860, 5826, 2475 and 5637; pick six horizontally—47860, 45826 and 32475; pick six horizontally—347860 and 145826; and pick seven horizontally—9347860. Vertically, additional pick three choices are—065, 657 and 577; pick four choices are 0657 and 6577; and pick five of 06577.

On Friday the following additional choices become available: pick three horizontally—269, 759, 378 and 674; pick four horizontally—8629, 4759, 6378 and 3674; pick five horizontally—58269, 24759 and 56378; pick six horizontally—458269 and 324759; and pick seven horizontally—1458269. Vertically, additional pick three choices are—998 and 984; and pick four choice of 9984.

On Saturday the following additional choices become available: pick three horizontally—590, 781 and 745; pick four horizontally —7590, 3781 and 6745; pick five horizontally—47590, 63781 and 36745; pick six horizontally—247590 and 563781; and pick seven horizontally—3247590. Vertically, an additional pick three of 015 is the last available choice.

On Sunday the following additional choices become available: pick three horizontally—812 and 459; pick four horizontal—7812 and 7459; pick five horizontal 37812 and 67459; pick six horizontal—637812 and 367459; and pick seven horizontal—5637812.

4

On Monday the following additional choices become available: pick three horizontal—592; pick four horizontal—4592; pick five horizontal—74592; pick six horizontal 674592; and pick seven horizontal 3674592. The charge 28 for the ticket is preferably coincident with or a multiple of the number of days played.

Preferably, the payoff would be in accordance with the largest winning prize in a line, however, multiple prizes may be available from one ticket wherein prizes may be won on consecutive days by matching either horizontally or vertically.

As shown in FIG. 3, the ticket 30 has a front face 32 indicating the month and year 34, a date line 36 and the date of purchase 38. The game can and preferably is played with a seven day card wherein the rows 40 of seven horizontal beginning with a Friday row 42 and ending with a Thursday row 44. The lines of numbers are staggered so that along with the seven horizontal jackpot chances, there will also be one vertical jackpot chance 46. The charge 48 for the ticket is also preferably shown on the front face. A bar code and other numbers 50 provide additional security to prevent counterfeiting.

On a seven day ticket 30, counting all of the possible pick three, pick four, pick five, pick six and seven number matches, there exists a total of fifteen ways to win on each horizontal line for a total of one hundred and five ways to win in the across direction. Adding to that amount, the possible winners in the vertical direction of fifty five ways to win going down, there are a total of one hundred and sixty ways to win on one seven day card.

The three tickets 2, 10 and 30 indicate the purchase date of Friday, November 23. It is not necessary to start playing the game on the day the ticket is purchased. The player can defer the beginning of the game up to a week from the purchase date.

As previously stated, prizes are awarded for consecutively matching in the horizontal direction seven across, six across, five across, four across and three across. At the option of the lottery sponsor, prizes may also be offered for matching two across. Prizes are also awarded for matching seven down vertically, six down, five down, four down and three down. At the option of the lottery sponsor, prizes may be offered for matching two down. Winners of the largest prizes for consecutive vertical matches are determined each day, while winners of the largest number of consecutive matches across can only be determined after seven days of drawings. One seven across winner will be determined every day. With winners being determined only by a minimum of three across or down, a seven day ticket 30 as shown in FIG. 3 can win as many as sixteen prizes with as many as one hundred and sixty possible ways to win. By allowing matches of two across and down, one seven day ticket can win as many as eighteen prizes with as many as two hundred and thirty eight possible ways to win. The following Table I illustrates the number of prizes as well as the total ways to win in a seven game ticket.

TABLE I

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | * | * | * | * | * | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | * | * | * | * | * | SAT | -- { [1]-15 WAYS TO WIN ON THIS LINE |
| * | 1 | 2 | 3 | 4 | 5 | 6 | 7 | * | * | * | * | SUN | -- { [2]-15 WAYS TO WIN ON THIS LINE |
| * | * | 1 | 2 | 3 | 4 | 5 | 6 | 7 | * | * | * | MON | -- { [3]-15 WAYS TO WIN ON THIS LINE |
| * | * | * | 1 | 2 | 3 | 4 | 5 | 6 | 7 | * | * | TUE | -- { [4]-15 WAYS TO WIN ON THIS LINE |
| * | * | * | * | 1 | 2 | 3 | 4 | 5 | 6 | 7 | * | WED | -- { [5]-15 WAYS TO WIN ON THIS LINE |
| * | * | * | * | * | 1 | 2 | 3 | 4 | 5 | 6 | 7 | THU | -- { [6]-15 WAYS TO WIN ON THIS LINE |

5,116,049

| 5 | 6 |
| --- | --- |

TABLE I-continued



```
* * * * * * 1 2 3 4 5 6 7 FRI  - - {  [7]-15 WAYS TO WIN ON THIS LINE
       | | | | | | |             105 TOTAL WAYS TO WIN ACROSS

       | | | | | | + - - - - - - - - - -   { [8]- 1 WAY TO WIN ON THIS LINE
       | | | | | + - - - - - - - - - - - -  { [9]- 3 WAYS TO WIN ON THIS LINE
       | | | | + - - - - - - - - - - - - -   { [10]- 6 WAYS TO WIN ON THIS LINE
       | | | + - - - - - - - - - - - - - -    { [11]-10 WAYS TO WIN ON THIS LINE
       | | + - - - - - - - - - - - - - -     { [12]-15 WAYS TO WIN ON THIS LINE

       | | + - - - - - - - - - - - - - - - -  { [13]-10 WAYS TO WIN ON THIS LINE
       | + - - - - - - - - - - - - - - - - -   { [14]- 6 WAYS TO WIN ON THIS LINE
       + - - - - - - - - - - - - - - - - - -    { [15]- 3 WAYS TO WIN ON THIS LINE
       + - - - - - - - - - - - - - - - - - -    { [16]- 1 WAY TO WIN ON THIS LINE
                                          55 TOTAL WAYS TO WIN-DOWN
          THERE ARE - - - 160 TOTAL WAYS TO WIN
```

The playslip 52 for selecting the numbers and tickets as shown in FIGS. 4 and 5 is designed to work with existing terminals used in playing lotto. The playslip 52 may be made for variations to be played with eight or up to fifteen balls in the random number generator. Each playslip 52 preferably includes a series of seven boxes 56, 58, 60, 62, 64, 66 and 68 having seven vertical columns of the total number of balls used in the game. The seven vertical columns represent the order in which numbers will be drawn. The player should select one number out of each column, with no two numbers being the same to obtain the first horizontal row of numbers The numbers are selected by blackening the appropriate boxes as shown in FIG. 5. The player can elect a quick pick 70 which is a machine drawn number, and if the player makes an error in the selection process a void 72 is selected. The playslip includes a bar initializing codes 74 along one edge which initializes the playslip reader (not shown) to automatically read the playslip after numbers have been selected. One end of the playslip includes boxes which indicate the start day 76 and the number of plays selected 78 for the game on the same day. Blackening of these boxes indicates these selections to the computer which then prints out the ticket such as shown in FIGS. 1, 2 or 3 which is retained for playing the game.

Preferably, no more than two games may start on the same day in each ticket. Therefore, if box 80 is selected in line 78, then the player will receive one ticket having two games and another ticket with one game thereon, all starting on the same day. This prevents the possibility of someone having a seven by seven block of numbers and having a jackpot chance every day and a possibility of eight jackpots on the last day.

The precise manner in which the prize pool is allocated can be tailored to meet the objectives of the lottery sponsor. This allocation is related to the odds in the game and would vary in accordance with the prize category selected and the number of balls in the game.

Rollover jackpots add interest, excitement and participation to any lottery game. With the present invention there are eight possible jackpots on a seven day ticket that could roll over. Each day's game played over a seven day period could end in a roll over. The seven down game, played on the seventh day of the seven day ticket is very likely to roll over, due to the long odds for a winner. It is possible that the down jackpot could be rolled over to the immediate next game while the across jackpot could be rolled over to the game starting the next day. Thus the Monday game jackpot will be rolled to the next Monday. The larger down jackpot may take

several days to be hit and could even roll over for a week or more, this will encourage considerable activity due to the large amount which could be won.

While this invention has been described as having a preferred design, it is understood that it is capable of further modifications, and uses and/or adaptations of the invention and following in general the principle of the invention and including such departures from the present disclosure as come within the known or customary practice in the art to which the invention pertains, and as may be applied to the central features hereinbefore set forth, and fall within the scope of the invention or limits of the claims appended hereto.

We claim:

1. A method of playing a lottery game, said method comprising the steps of:

    a) selecting numbers for a series of rows to create a plurality of rows and at least one column of numbers;

    b) printing a ticket having said series of rows of numbers including at least a first row and a succeeding row wherein the succeeding row is located below said first row and offset at least one number, said series of rows forming at least one column of numbers where said rows overlap; and,

    c) matching at least some of said numbers from either a row or a column with a second drawn set of numbers.

2. The method as set forth in claim 1, wherein;

    a) the step of matching at least some of said numbers includes matching said numbers in consecutive order.

3. The method as set forth in claim 1, wherein:

    a) selecting numbers for each of said rows includes selecting a plurality of numbers, each being different from the other and said numbers being selected from a defined group.

4. The method as set forth in claim 1, wherein:

    a) matching at least some of said numbers includes matching seven numbers from either a row or a column will win a prize.

5. The method as set forth in claim 1, wherein:

    a) matching at least three of said numbers in either a row or a column produces a winning ticket.

6. The method as set forth in claim 1, further comprising:

    a) awarding of prizes based upon the amount of consecutive numbers matched between the ticket numbers and said second drawn set of numbers.

GL00830

5,116,049

7

7. A ticket for playing a lottery game in which a winning set of numbers is randomly selected after a ticket purchasing period has expired, said ticket comprising:

a) a substrate having a front and a back;

b) said front having indicia thereon in the form of a first row of evenly spaced apart numbers followed by succeeding rows of numbers located beneath said first row said succeeding rows of numbers each also having evenly spaced apart numbers, each said succeeding row of numbers being later-

8

ally offset rom each proceeding row of numbers by at least one number;

c) columns of numbers are formed vertically by overlapping numbers between said first row and said succeeding rows; and,

d) whereby the game is played by consecutively matching at least one of said rows and columns to at least a portion of said winning set.

8. The ticket as set forth in claim 7, wherein:

a) said indicia includes seven rows of seven numbers;

b) each of said succeeding rows is offset from the preceding row by one number so that one column of seven numbers is formed.

*  *  *  *  *

GL00831

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO. : 5,116,049                                    Page 1 of 2

DATED       : May 26, 1992

INVENTOR(S) : Stanley R. Sludikoff & Carl Alexoff

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

    In cols. 3, 4, 5 and 6, Table I should be deleted and substitute
    therefore the attached sheet consisting of Table I.

GL00832

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

**PATENT NO.** : 5,116,049                                   Page 2 of 2

**DATED** : May 26, 1992

**INVENTOR(S)** : Stanley R. Sludikoff & Carl Alexoff

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

```
                              TABLE I


1 2 3 4 5 6 7 * * * * * SAT --(  [1]-15 WAYS TO WIN ON THIS LINE
* 1 2 3 4 5 6 7 * * * * SUN --(  [2]-15 WAYS TO WIN ON THIS LINE
* * 1 2 3 4 5 6 7 * * * MON --(  [3]-15 WAYS TO WIN ON THIS LINE
* * * 1 2 3 4 5 6 7 * * TUE --(  [4]-15 WAYS TO WIN ON THIS LINE
* * * * 1 2 3 4 5 6 7 * WED --(  [5]-15 WAYS TO WIN ON THIS LINE
* * * * * 1 2 3 4 5 6 7 THU --(  [6]-15 WAYS TO WIN ON THIS LINE
* * * * * * 1 2 3 4 5 6 7 FRI --(  [7]-15 WAYS TO WIN ON THIS LINE

                       105 TOTAL WAYS TO WIN-ACROSS

            +-----------(  [8]- 1 WAY TO WIN ON THIS LINE
          +-------------(  [9]- 3 WAYS TO WIN ON THIS LINE
        +---------------( [10]- 6 WAYS TO WIN ON THIS LINE
      +-----------------( [11]-10 WAYS TO WIN ON THIS LINE
    +-------------------( [12]-15 WAYS TO WIN ON THIS LINE
      +-----------------( [13]-10 WAYS TO WIN ON THIS LINE
        +---------------( [14]- 6 WAYS TO WIN ON THIS LINE
      +-------------------( [15]- 3 WAYS TO WIN ON THIS LINE
   +--------------------------( [16]- 1 WAY TO WIN ON THIS LINE

                        55 TOTAL WAYS TO WIN-DOWN

         THERE ARE --- 160 TOTAL WAYS TO WIN
```

Signed and Sealed this

Twentieth Day of July, 1993

*Attest:*

*Michael K. Kirk*

**MICHAEL K. KIRK**

*Attesting Officer*            *Acting Commissioner of Patents and Trademarks*

GL00833

# EXHIBIT

# I

# THE
# AMERICAN
# HERITAGE®
# COLLEGE
# DICTIONARY

## THIRD EDITION



HOUGHTON MIFFLIN COMPANY

*Boston • New York*

*in·ci·dens, incident-,* pr.part. of *incidere.* to happen : *in·*
*on;* see IN-² + *cadere,* to fall; see KAD-*.]

**in·ci·den·tal** (ĭn′sĭ-dĕn′tl) *adj.* 1. Occurring or likely to oc-
cur as an unpredictable or minor accompaniment. 2. Of a
minor, casual, or subordinate nature: *incidental expenses*
— *n.* A minor accompanying item or expense.

**in·ci·den·tal·ly** (ĭn′sĭ-dĕn′tl-ē) *adv* 1. As a minor or subor-
dinate matter: *a lawyer and incidentally a musician.* 2. (*also*
ĭn·dĕn′tlē) Apart from the main subject; parenthetically.
**incidental music** *n Mus.* Music accompanying the action or
dialogue of a drama or filling intervals between scenes or acts

**in·cin·er·ate** (ĭn-sĭn′ə-rāt′) *v.* -at·ed. -at·ing. -ates. — *tr.*
To cause to burn to ashes   — *intr.* To burn completely. [Lat.
*incinerāre, incinerāt-* : Lat. *in-,* causative pref.; see IN-²
+ Lat. *cinis, ciner-,* ashes.] — **in·cin′er·a′tion** *n*

**in·cin·er·a·tor** (ĭn-sĭn′ə-rā′tər) *n.* One that incinerates, esp.
an apparatus, such as a furnace, for burning waste.

**in·cip·i·ent** (ĭn-sĭp′ē-ənt) *adj.* Beginning to exist or appear:
*detecting incipient tumors.* [Lat. *incipiēns, incipient-,* pr.part.
of *incipere,* to begin. See INCEPTION.] — **in·cip′i·en·cy. in·**
**cip′i·ence** *n* — **in·cip′i·ent·ly** *adv.*

**in·cip·it** (ĭn′sĭ-pĭt′, -ĭng′kĭ-) *n.* The beginning or opening
words of the text of a medieval manuscript or early printed
book. [Lat., third pers. sing. pr.t. of *incipere,* to begin. See
INCEPTION.]

**in·cise** (ĭn-sīz′) *tr.v.* -cised. -cis·ing. -cis·es. 1. To cut into, as
with a sharp instrument: *incised the tablet with chisels.*
2.a. To engrave (designs, for example) into a surface; carve.
b. To engrave designs, writing, or other marks into. [Fr. *in-*
*ciser < OFr. enciser < VLat. *incīsāre, freq. of Lat. incīdere,*
*incīs-: in-;* see IN-² + *caedere,* to cut; see kaə-Id-*.]

**in·cised** (ĭn-sīzd′) *adj.* 1. Cut into a surface; engraved.
2. Made with or as if with a sharp instrument. 3. Deeply and
sharply cut: *the incised margin of a leaf.*

**in·ci·sion** (ĭn-sĭzh′ən) *n.* 1. The act of incising. 2. *Medic.* a. A
cut into a body tissue or organ, esp. during surgery. b. The
scar resulting from such a cut. 3. A notch, as in the edge of
a leaf. 4. The condition or quality of being incisive.

**in·ci·sive** (ĭn-sī′sĭv) *adj.* Penetrating, clear, and sharp, as in
expression: — **in·ci′sive·ly** *adv* — **in·ci′sive·ness** *n.*

**in·ci·sor** (ĭn-sī′zər) *n.* A tooth for cutting or gnawing, located
at the front of the mouth along the apex of the dental arch.

**in·ci·ta·tion** (ĭn′sī-tā′shən, ĭn-sī-) *n.* 1. The act of inciting.
2. Incitement. 3. An incentive.

**in·cite** (ĭn-sīt′) *tr.v.* -cit·ed. -cit·ing. -cites. To provoke and
urge on: *inciting workers to strike.* [ME *enciten < OFr. en-*
*citer < Lat. incitāre,* to urge forward : *in-,* intensive pref.; see
IN-² + *citāre,* to stimulate, freq. of *ciēre,* to put in motion; see
KEI-¹.] — **in·cite′ment** *n.* — **in·cit′er** *n.* — **in·ci·ta′tion** *n.*

**in·ci·vil·i·ty** (ĭn′sĭ-vĭl′ĭ-tē) *n., pl.* -ties. 1. The quality or con-
dition of being uncivil. 2. An uncivil or discourteous act.
*incl. abbr.* 1. Including. 2. Inclusive.

**in·clasp** (ĭn-klăsp′) *v.* Var. of enclasp.

**in·clem·ent** (ĭn-klĕm′ənt) *adj* 1. Stormy; inclement weather.
2. Showing no clemency; unmerciful. — **in·clem′en·cy** *n.*

**in·clin·a·ble** (ĭn-klī′nə-bəl) *adj.* 1. Having a specified tenden-
cy or disposition; inclined. 2. Favorably disposed; amenable.

**in·cli·na·tion** (ĭn′klə-nā′shən) *n.* 1. The act of inclining or
the state of being inclined; a bend or tilt. 2.a. A deviation or
the degree of deviation from the horizontal or vertical; a slant.
b. An inclined surface; a slope. 3. A tendency toward a cer-
tain condition. 4. A characteristic disposition to do, prefer, or
favor something rather than another; a propensity.

**in·cline** (ĭn-klīn′) *v.* -clined. -clin·ing. -clines. — *intr.* 1. To
deviate from the horizontal or vertical; slant. 2. To be dis-
posed to a certain preference, opinion, or course of action.
3. To lower or bend the head or body, as in a nod or bow.
— *tr.* 4. To cause to lean, slant, or slope. 5. To influence to
have a certain tendency; dispose. 6. To bend or lower in a nod
or bow. — *n.* (ĭn′klīn′). An inclined surface; a slope or gra-
dient: [ME *enclinen < OFr. encliner < Lat. inclīnāre : in-,*
into, toward; see IN-² + *-clīnāre,* to lean; see klei-*.] — **in·**
**clin′er** *n.*

**Syns: incline, bias, dispose, predispose.** The central
meaning shared by these verbs is "to influence or be influ-
enced toward a particular attitude or course of action": *in-*
*clined to believe him; is biased in her favor; were disposed to*
*admire him; predisposed to studying.* See also Syns at slant.

**in·clined** (ĭn-klīnd′) *adj* 1. Sloping, slanting, or leaning.
2. Having a preference, disposition, or tendency.
**inclined plane** *n.* A plane set at an angle to the horizontal, esp.
to raise or lower a load by rolling or sliding.

**in·cli·nom·e·ter** (ĭn′klə-nŏm′ĭ-tər) *n.* 1. An instrument used
to determine the angle of the earth's magnetic field in respect
to the horizontal plane. 2. An instrument for showing the
inclination of an aircraft or a ship relative to the horizontal.
3. See clinometer.

**in·close** (ĭn-klōz′) *v.* Var. of enclose.

**in·clude** (ĭn-klōōd′) *tr.v.* -clud·ed. -clud·ing. -cludes. 1. To
take in as a part, an element, or a member. 2. To contain as
a secondary or subordinate element. 3. To consider with or
place into a group, class, or total. [ME *includen < Lat. in-*
*clūdere,* to enclose : *in-,* in; see IN-² + *claudere,* to close.]
— **in·clud′a·ble, in·clud′i·ble** *adj.*

**Usage Note:** Some writers have insisted that *include* be
used only when it is followed by a partial list of the contents
of the referent of the subject. One may write *New England*
*includes Connecticut and Rhode Island.* but one must use
*comprise* or *consist of* when a full enumeration is provided:
*New England comprises Connecticut, Rhode Island. Massa-*
*chusetts. Vermont. New Hampshire. and Maine. Include,*
however, does not rule out the possibility of a complete list-
ing. Thus the sentence *The bibliography should include all the*
*journal articles you have used* does not entail that the bibli-
ography must contain something other than journal articles.
though it does leave that possibility open. When one wants to
make clear that the listing is exhaustive, however, the use of
*comprise* or *consist of* will avoid ambiguity. See Usage Note
at comprise.

**in·clud·ed** (ĭn-klōō′dĭd) *adj.* 1. *Bot.* Not protruding beyond a
surrounding part, as stamens that do not project from a co-
rolla. 2. *Math* Formed by and between two intersecting
straight lines: *an included angle.*

**in·clu·sion** (ĭn-klōō′zhən) *n.* 1. The act of including or the
state of being included. 2. Something included. 3. *Geol.* A
solid, liquid, or gaseous foreign body enclosed in a mineral or
rock. 4. *Biol.* A nonliving mass, such as fat, in the cytoplasm
of a cell. 5. *Comp Sci.* A logical operation that assumes the
second statement of a pair is true if the first one is true. [Lat.
*inclūsiō, inclūsiōn- < inclūsus, p.part. of inclūdere,* to enclose.
See INCLUDE.] — **in·clu′sion·ar′y** (-zhə-nĕr′ē) *adj.*
**inclusion body** *n.* An abnormal structure in a cell nucleus or
cytoplasm having characteristic staining properties and asso-
ciated esp. with certain viral infections, such as rabies.

**in·clu·sive** (ĭn-klōō′sĭv) *adj* 1. Taking a great deal or every-
thing within its scope; comprehensive. 2. Including the spec-
ified extremes or limits and the areas between them. — **in·**
**clu′sive·ly** *adv.* — **in·clu′sive·ness** *n.*
**inclusive of** *prep.* Taking into consideration; including.

**in·co·er·ci·ble** (ĭn′kō-ûr′sə-bəl) *adj.* Difficult or impossible
to coerce or control forcibly: *incoercible rebel leaders*
*incog. abbr.* Incognita; incognito.

**in·cog·i·tant** (ĭn-kŏj′ĭ-tənt) *adj.* Thoughtless; inconsiderate.
[Lat. *incōgitāns, incōgitant- : in-,* not; see IN-¹ + *cōgitāns,*
pr.part. of *cōgitāre,* to think; see COGITATE.]

**in·cog·ni·ta** (ĭn′kŏg-nē′tə, ĭn-kŏg′nĭ-tə) *adv. & adj.* With
one's identity disguised or concealed. Used of a woman. [Ital.,
fem. of *incognito* < Lat. *incognitus.*] — **in·cog′ni·ta** *n.*

**in·cog·ni·to** (ĭn′kŏg-nē′tō, ĭn-kŏg′nĭ-tō) *adv. & adj.* With
one's identity disguised or concealed. — *n., pl.* -tos. 1. One
whose identity is disguised or concealed. 2. The condition of
having a disguised or concealed identity [Ital. < Lat. *incog-*
*nitus,* unknown : *in-,* not; see IN-¹ + *cognitus, p.part. of*
*cognōscere,* to learn, recognize; see COGNITION.]

**in·cog·ni·zant** (ĭn-kŏg′nĭ-zənt) *adj.* Lacking knowledge or
awareness; unaware.

**in·co·her·ence** (ĭn′kō-hîr′əns) *n.* 1. The condition or quality
of being incoherent. 2. Something incoherent. — **in′co·her′**
**en·cy** *n.*

**in·co·her·ent** (ĭn′kō-hîr′ənt) *adj.* 1. Lacking cohesion, con-
nection, or harmony; not coherent. 2. Unable to think or
express one's thoughts in a clear or orderly manner. — **in′**
**co·her′ent·ly** *adv.* — **in′co·her′ent·ness** *n.*

**in·com·bus·ti·ble** (ĭn′kəm-bǔs′tə-bəl) *adj.* Incapable of
burning. — *n.* An incombustible object or material. — **in′**
**com·bus′ti·bil′i·ty** *n.* — **in′com·bus′ti·bly** *adv.*

**in·come** (ĭn′kǔm′) *n.* 1. The amount of money or its equiv-
alent received during a period of time for labor or services,
from the sale of goods or property, or as profit from financial
investments. 2. The act of coming in; entrance. [ME, arrival,
entrance < *incomen,* to come in < OE *incuman : in-,* in; see
IN-¹ + *cuman,* to come; see COME.]
**income tax** *n.* A tax levied on personal or business income.

**in·com·ing** (ĭn′kǔm′ĭng) *adj.* 1. Coming in or about to come
in; entering: *incoming trains.* 2. About to assume an office or
a position: *the incoming governor.* — *n.* 1. The act of coming
in; arrival. 2. Income; revenue. Often used in the plural.

**in·com·men·su·ra·ble** (ĭn′kə-mĕn′sər-ə-bəl, -shər-) *adj.*
1.a. Impossible to measure or compare. b. Lacking a common
quality on which to make a comparison. 2. *Math* Having no
common measure or multiple of which all the given lengths or
measures are integral multiples. — *n.* One that is incommen-
surable. — **in′com·men′su·ra·bil′i·ty** *n* — **in′com·**
**men′su·ra·bly** *adv.*

**in·com·men·su·rate** (ĭn′kə-mĕn′sər-ĭt, -shər-) *adj.* 1.a. Not
commensurate; disproportionate: *a reward incommensurate*
*with their efforts.* b. Inadequate. 2. Incommensurable. — **in′·**
**com·men′su·rate·ly** *adv.* — **in′com·men′su·rate·ness** *n.*

**in·com·mode** (ĭn′kə-mōd′) *tr.v.* -mod·ed. -mod·ing.
-modes. To cause to be inconvenienced; disturb. [Fr. *incom-*
*moder < OFr. < Lat. incommodāre < incommodus, incon-*
*venient : in-,* not; see IN-¹ + *commodus,* convenient; see COM-
MODIOUS.]

**in·com·mo·di·ous** (ĭn′kə-mō′dē-əs) *adj.* Inconvenient or
uncomfortable, as by not affording sufficient space. — **in′·**
**com·mo′di·ous·ly** *adv.* — **in′com·mo′di·ous·ness** *n*

| | |
|---|---|
| ă pat | oi boy |
| ā pay | ou out |
| âr care | ŏŏ took |
| ä father | ōō boot |
| ĕ pet | ŭ cut |
| ē be | ûr urge |
| ĭ pit | th thin |
| ī pie | th this |
| îr pier | hw which |
| ŏ pot | zh vision |
| ō toe | ə about |
| ô paw | item |

Stress marks:
´ (primary);
′ (secondary), as in
dictionary (dĭk′shə-nĕr′ē)

**1136**

razor clam

read

edged piece of steel that can be fitted into a razor.

**razor clam** *n.* Any of various clams of the family Solenidae, characteristically having long narrow shells.

**razor wire** *n.* A sharp-edged wire used for fences and barriers.

**razz** (răz) *Slang.* — *n.* A raspberry sound; a Bronx cheer. — *tr.v.* **razzed, razz·ing, razz·es.** To deride, heckle, or tease. [Shortening and alteration of RASPBERRY.]

**razz·le-daz·zle** (răz′əl-dăz′əl) *n. Informal.* Dazzling excitement. [Redup. of DAZZLE.]

**razz·ma·tazz** (răz′mə-tăz′) *n Slang.* **1.** A flashy action or display intended to bewilder, confuse, or deceive. **2.** Ambiguous or evasive language; double talk. **3.** Ebullient energy; vim. [Perh. alteration of RAZZLE-DAZZLE.]

**Rb** The symbol for the element rubidium.

**RBC** or **rbc** *abbr.* **1.** Red blood cell. **2.** Red blood cell count.

**RBI** also **rbi** *abbr. Baseball.* Run batted in; runs batted in.

**RC** *abbr.* **1.** Red Cross. **2.** Roman Catholic.

**RCAF** also **R.C.A.F.** *abbr.* Royal Canadian Air Force.

**R.C.Ch.** *abbr.* Roman Catholic Church.

**RCMP** also **R.C.M.P.** *abbr.* Royal Canadian Mounted Police

**R.C.P.** *abbr.* Royal College of Physicians

**rcpt.** *abbr.* Receipt

**R.C.S.** *abbr.* Royal College of Surgeons.

**rct.** *abbr.* Recruit.

**rd** *abbr.* **1.** Rod (unit of measure). **2.** Rutherford.

**RD** *abbr.* Rural delivery.

**rd.** *abbr.* **1.** Or Rd. Road. **2.** Round.

**RDA** *abbr.* Recommended daily allowance.

**RDF** *abbr.* Radio direction finder.

**re¹** (rā) *n. Mus.* The second tone of the diatonic scale in solfeggio. [ME < Med.Lat. See GAMUT.]

**re²** (rē) *prep.* In reference to; in the case of; concerning. [Lat. rē, ablative of rēs, thing. See rē-*.]

**Re¹** (rā) *n. Myth.* Var. of Ra¹.

**Re²** The symbol for the element rhenium.

**Re.** *abbr.* Rupee.

**re–** *pref.* **1.** Again; anew: *rebuild.* **2.** Backward; back: *react.* **3.** Used as an intensive: *refine.* [ME < OFr. < Lat. See re-*.]

**re. Are:** *They're not at home.*

**re·ab·sorb** (rē′əb-sôrb′, -zôrb′) *v.* **-sorbed, -sorb·ing, -sorbs.** — *tr.* **1.** To absorb again; resorb. **2.** To accommodate or accept again, as into a group or category. — *intr.* To undergo reabsorption; resorb. —**re′ab·sorp′tion** (-sôrp′shən, -zôrp′-) *n.*

**re·ac·cred·i·ta·tion** (rē′ə-krĕd′ĭ-tā′shən) *n.* **1.** The process of reviewing the accreditation of an institution. **2.** Renewal of accreditation status.

**reach** (rēch) *v.* **reached, reach·ing, reach·es.** — *tr.* **1.** To stretch out or put forth (a body part); extend. **2.** To touch or grasp by stretching out or extending. **3.** To arrive at; attain. **4a.** To succeed in getting in contact with or communicating with. **b.** To succeed in having an effect on. **5a.** To extend as far as. **b.** To project as far as: *A cry reached our ears.* **c.** To travel as far as. **6.** To aggregate or amount to; **7.** *Informal.* To grasp and hand over to another. — *intr.* **1.** To thrust out or extend something. **2.** To try to grasp or touch something. **3a.** To have extension in space or time. **b.** To be extensive in influence or effect. **4.** To make an excessive effort, as in drawing a conclusion or making a joke; overreach. **5.** *Naut.* To sail a course between close-hauled and dead downward. — *n.* **1.** The act or an instance of stretching or thrusting out. **2.** The extent or distance something can reach. **3a.** Range of understanding; comprehension. **b.** Range or scope of influence or effect. **4.** An expanse; a reach of prairie. **5.** A pole connecting the rear axle of a vehicle with the front. **6.** *Naut.* Any course of a sailing vessel between close-hauled and dead downwind. **7.** The stretch of water visible between bends in a river or channel. [ME *rechen* < OE *rǣcan.* See reig⁴-*.] —**reach′a·ble** *adj.* —**reach′er** *n.*

**Syns:** *reach, achieve, attain, gain, compass:* All of these verbs mean to succeed in arriving at a goal or objective. *Reach* is the least specific: *reach an understanding; Achieve* suggests the application of skill or initiative: *achieved recognition. Attain* often implies the impelling force of ambition, principle, or ideals: *trying to attain self-confidence. Gain* connotes considerable effort in surmounting obstacles: *gained their cooperation. Compass* implies succeeding by circumventing impediments: *will compass the task.*

**re·act** (rē-ăkt′) *intr.v.* **-act·ed, -act·ing, -acts. 1.** To act in



Nancy Reagan
Photographed by
Lord Snowdon
(Antony Armstrong-Jones)



Ronald Reagan
Photographed in 1976

response to or under the influence of a stimulus or prompting: *reacted strongly to my sarcasm.* **2.** To act in opposition to a former condition or act: *reacted against romanticism.* **3.** To act reciprocally or in return. **4.** *Chem.* To undergo a reaction.

**re·ac·tance** (rē-ăk′təns) *n. Symbol X.Elect* Opposition to the flow of alternating current caused by the inductance and capacitance in a circuit rather than by resistance.

**re·ac·tant** (rē-ăk′tənt) *n.* A substance participating in a chemical reaction, esp. a directly reacting substance present at the initiation of the reaction.

**re·ac·tion** (rē-ăk′shən) *n.* **1a.** A response to a stimulus. **b.** The state resulting from such a response. **2.** A reverse or opposing action. **3a.** A tendency to revert to a former state. **b.** Opposition to progress or liberalism; extreme conservatism. **4.** *Chem.* A change or transformation in which a substance decomposes, combines with other substances, or interchanges constituents with other substances. **5.** *Phys.* A nuclear reaction. **6.** *Phys.* An equal and opposite force exerted by a body against a force acting upon it. **7.** The response of cells or tissues to an antigen. **8.** *Psychol.* A pattern of behavior constituting a mental disorder or personality type.

**re·ac·tion·ar·y** (rē-ăk′shə-nĕr′ē) *adj.* Characterized by political reaction, esp. opposition to progress or liberalism; extremely conservative. — **re·ac′tion·ar′y** *n.*

**reaction engine** *n.* An engine that develops thrust by the focused expulsion of matter, esp. against fuel gases.

**reaction formation** *n. Psychol.* A defense mechanism in which the opposite of an objectionable impulse is expressed.

**reaction time** *n.* The interval of time between application of a stimulus and detection of a response.

**re·ac·ti·vate** (rē-ăk′tə-vāt′) *tr.v.* **-vat·ed, -vat·ing, -vates. 1.** To make active again. **2.** To restore the ability to function or the effectiveness of. —**re·ac′ti·va′tion** *n.*

**re·ac·tive** (rē-ăk′tĭv) *adj.* **1.** Tending to be responsive or to react to a stimulus. **2.** Characterized by reaction. **3.** *Chem. & Phys.* Tending to participate readily in reactions. —**re·ac′tive·ly** *adv.* —**re·ac′tive·ness, re′ac·tiv′i·ty** *n.*

**re·ac·tor** (rē-ăk′tər) *n.* **1.** One that reacts to a stimulus. **2.** *Electron.* A circuit element, such as a coil, used to introduce reactance. **3.** *Phys.* A nuclear reactor.

**read** (rēd) *v.* **read** (rĕd), **read·ing, reads.** — *tr.* **1.** To examine and grasp the meaning of (written or printed characters, words, or sentences). **2.** To utter or render aloud (written or printed material). **3.** To have the ability to examine and grasp the meaning of (written or printed material in a given language or notation): *reads Chinese.* **4a.** To examine and grasp the meaning of (language not in writing): *reading sign language.* **b.** To examine and grasp the meaning of (a graphic representation): *reading a map.* **5a.** To discern and interpret the nature or significance of through close examination or sensitive observation: *read the trail for signs of deer.* **b.** To discern or anticipate through examination or observation; descry. **6.** To determine the intent or mood of: *I can read your mind.* **7a.** To attribute a certain interpretation or meaning to: *read my words differently.* **b.** To consider (something written or printed) as having a particular meaning or significance. **8.** To foretell or predict (the future). **9.** To receive or comprehend (a radio message, for example). **10.** To study or make a study of. **11.** To learn or get knowledge of from something written or printed. **12.** To indicate, register, or show: *The dial reads 32.* **13.** To have or use the preferred reading in a particular passage: For change read charge. **14.** To indicate, register, or show: *The dial reads 32.* **15.** *Comp. Sci.* To obtain (information) from a storage medium, such as a magnetic disk — *intr.* **1.** To examine and grasp the meaning of printed or written characters, words or music. **2.** To speak aloud the words that one is reading. **3.** To learn by reading. **4.** To study. **5.** To have a particular wording: *Recite the poem exactly as it reads.* **6.** To contain a specific meaning. **7.** To indicate, register, or show a measurement or figure. **8.** To have a specified character or quality for the reader. — *n. Informal.* Something that is read: *a good read.* — *adj.* (rĕd). Informed by reading; learned. — *phrasal verbs.* **read out.** To read aloud. **read up.** To study or learn by reading. — *idioms.* **read a lecture** (or **lesson**). To issue a reprimand. **read between the lines.** To perceive or detect an obscure or unexpressed meaning. **read out of.** To expel by proclamation from a social, political, or other group. [ME *reden* < OE *rǣdan,* to advise. See ar-*.]

**re·cal′cu·late′** *tr.v.*
**re′cal·cu·la′tion** *n.*
**re′com·pose′** *tr.v.*
**re′com·po·si′tion** *n.*
**re′con·firm′** *tr.v.*
**re′con·fir·ma′tion** *n.*
**re′con·sid′er·a′tion** *n.*
**re·con·sid′er·a′tion** *n. & intr.v.*
**re′dis·trib′ute** *tr.v.*
**re·dis′trict** *tr.v.*
**re·for′est** *tr.v.*

**re′for·es·ta′tion** *n.*
**re·house′** *tr.v.*
**re′in·te′grate′** *tr.v.*
**re′in·te·gra′tion** *n.*
**re′in·te·gra′tive** *adj.*
**re′in·ter′pret** *tr.v.*
**re′in·ter′pre·ta′tion** *n.*
**re′in·vest′** *tr.v.*
**re′in·vest′ment** *n.*
**re′in·vig′o·rate′** *tr.v.*
**re′in·vig′o·ra′tion** *n.*

**re′in·vig′o·ra′tor** *n.*
**re·num′ber** *tr.v.*
**re·pack′age** *tr.v.*
**re·pack′ag·er** *n.*
**re·stock′** *tr.v.*
**re·sup·ply′** *tr.v.*

**re·test′** *tr.v. & n.*
**re·trace′** *tr.v.*
**re·trace′a·ble** *adj.*
**re·trace′ment** *n.*

**re·trac′er** *n.*
**re·train′** *tr. & intr.v.*
**re·train′a·ble** *adj.*
**re·train·ee′** *n.*
**re·us′a·bil′i·ty** *n.*
**re·us′a·ble** *adj. & n.*
**re·use′** *tr.v. & n.*
**re·val′i·date′** *tr.v.*
**re·val′i·da′tion** *n.*
**re·wak′en** *tr. & intr.v.*

delivery or transport — *n.* **1.a.** A rapid, efficient system for the delivery of goods and mail. **b.** Goods and mail conveyed by such a system. **2.** A means of transport, such as a train, that travels rapidly and makes few or no stops before its destination. **3.** *Chiefly British* A special messenger. **b.** A message delivered by special courier. [ME *expressen* < OFr. *expresser* < Med.Lat. *expressāre*, freq. of Lat. *exprimere* : *ex-*, *ex-* + *premere*, to press; see per-⁴*.] — ex·press′er *n.* — ex·press′i·ble *adj.*

ex·pres·sion (ĭk-sprĕsh′ən) *n.* **1.** The act of expressing, conveying, or representing in words, art, music, or movement; a manifestation. **2.** Something that expresses or communicates **3.** *Math* An operation or a quantity stated in symbolic form, such as √*x*, *y*², or *x* + *y*. **4.** The manner in which one expresses oneself, esp. in speaking, depicting, or performing. **5.** A particular word or phrase. **6.** The outward manifestation of a mood or a disposition. **7.** A facial aspect or a look that conveys a special feeling. **8.** The act of pressing or squeezing out. **9.** *Genet.* The act or process of expressing a gene.

ex·pres·sion·ism (ĭk-sprĕsh′ə-nĭz′əm) *n.* A movement in the arts during the early part of the 20th century that emphasized subjective expression of the artist's inner experiences. — ex·pres′sion·ist *n.* — ex·pres′sion·is′tic *adj.* — ex·pres′sion·is′ti·cal·ly *adv.*

ex·pres·sion·less (ĭk-sprĕsh′ən-lĭs) *adj.* Lacking expression.

ex·pres·sive (ĭk-sprĕs′ĭv) *adj.* **1.** Of, relating to, or characterized by expression. **2.** Serving to express or indicate. **3.** Full of expression; significant: *an expressive glance.* — ex·pres′sive·ly *adv.* — ex·pres′sive·ness *n.*

**Syns:** *expressive, eloquent, meaningful, significant.* The central meaning shared by these adjectives is "effectively conveying a feeling, an idea, or a mood": *an expressive gesture; an eloquent speech; a meaningful look; a significant smile.*

ex·pres·siv·i·ty (ĕk′sprĕ-sĭv′ĭ-tē) *n., pl.* -ties. **1.** The quality of being expressive. **2.** *Genet.* The degree to which an expressed gene produces its effects in an organism.

ex·press·ly (ĭk-sprĕs′lē) *adv.* **1.** In an express or a definite manner; explicitly. **2.** Especially; particularly.

ex·pres·so (ĕk-sprĕs′ō, ĕk-) *n.* Var. of espresso.

ex·press·way (ĭk-sprĕs′wā′) *n.* A major divided highway designed for high-speed travel.

ex·pro·pri·ate (ĕk-sprō′prē-āt′) *tr.v.* -at·ed, -at·ing, -ates. **1.** To deprive of possession. **2.** To transfer (another's property) to oneself. [Med.Lat. *expropriāre, expropriāt-* : Lat. *ex-, ex-* + Lat. *propriāre,* to appropriate (< *proprius,* one's own; see morə₂).] — ex·pro′pri·a′tion *n.* — ex·pro′pri·a′tor *n.* — ex·pro′pri·a·to′ry (-ə-tôr′ē, -tōr′ē) *adj.*

expt. *abbr.* Experiment.

exptl. *abbr.* Experimental.

ex·pul·sion (ĭk-spŭl′shən) *n.* The act of expelling or the state of being expelled. [ME *expulsioun* < OFr. *expulsion* < Lat. *expulsiō, expulsiōn-* < *expulsus,* p.part. of *expellere,* to expel. See EXPEL.]

ex·punc·tion (ĭk-spŭngk′shən, -spŭng′-) *n.* The act of expunging or the condition of being expunged. [Lat. *expunctiō, expunctiōn-,* execution < Lat. *expunctus,* p.part. of *expungere,* to strike out. See EXPUNGE.]

ex·punge (ĭk-spŭnj′) *tr.v.* -punged, -pung·ing, -pung·es. **1.** To erase or strike out. **2.** To eliminate completely; annihilate. See Syns at erase. [Lat. *expungere* : *ex-,* ex- + *pungere,* to prick; see peuk-*.] — ex·pung′er *n.*

ex·pur·gate (ĕk′spər-gāt′) *tr.v.* -gat·ed, -gat·ing, -gates. To remove erroneous, vulgar, obscene, or otherwise objectionable material from (a book, for example) before publication. [Lat. *expūrgāre, expūrgāt-,* to purify : *ex-,* intensive pref.; see ex- + *pūrgāre,* to cleanse; see peuə-*.] — ex′pur·ga′tion *n.* — ex′pur·ga′tor *n.*

ex·pur·ga·to·ry (ĕk-spûr′gə-tôr′ē, -tōr′ē) also ex·pur·ga·to·ri·al (-tôr′ē-əl, -tōr′-) *adj.* Of or relating to expurgation or an expurgator.

expy *abbr.* Expressway

ex·qui·site (ĕk′skwĭ-zĭt, ĭk-skwĭz′ĭt) *adj.* **1.** Marked by intricate and beautiful design or execution. **2.** Of such beauty or delicacy as to arouse delight. See Syns at delicate. **3.** Excellent; flawless. **4.** Acutely perceptive or discriminating. **5.** Intense; keen. **6.** *Obsolete* Ingeniously devised or thought out — *n.* One excessively fastidious in dress, manners, or taste. [ME *exquisit,* carefully chosen < Lat. *exquīsītus,* p.part. of *exquīrere,* to search out : *ex-,* ex- + *quaerere,* to seek.] — ex′qui·site·ly *adv.* — ex′qui·site·ness *n.*

exr. *abbr.* Executor.

exrx. *abbr.* Executrix.

ex·san·gui·nate (ĕks-săng′gwə-nāt′) *tr.v.* -nat·ed, -nat·ing, -nates. To drain of blood. [< Lat. *exsanguinātus,* drained of blood : *ex-, ex-* + *sanguis, sanguin-,* blood.] — ex·san′gui·na′tion *n.*

ex·san·guine (ĕks-săng′gwĭn) *adj.* Lacking blood; anemic. [Lat. *exsanguis, exsanguin-* : *ex-, ex-* + *sanguis,* blood.]

ex·scind (ĭk-sĭnd′) *tr.v.* -scind·ed, -scind·ing, -scinds. To cut out; excise. [Lat. *exscindere* : *ex-, ex-*+ *scindere,* to cut; see skei-*.]

ex·sert (ĭk-sûrt′) *tr.v.* -sert·ed, -sert·ing, -serts. To thrust



expressionism
*No More War!*
by Käthe Kollwitz

(something) out or forth; cause to protrude. — *adj.* Also ex·sert′ed (-sûr′tĭd) Thrust outward or protruding [Lat. *exsertus*, p.part. of *exserere,* to stretch out : *ex-, ex-* + *serere,* to join; see ser-² *.] — ex·ser′tion *n.*

ex·sic·cate (ĕk′sĭ-kāt′) *intr. & tr.v.* -cat·ed, -cat·ing, -cates. To dry up or cause to dry up. [Ult. < Lat. *exsiccāre, exsiccāt-* : *ex-, ex-* + *siccāre,* to dry [< *siccus,* dry].] — ex′sic·ca′tive *adj.* — ex′sic·ca′tor *n.*

ex·stip·u·late (ĕks-stĭp′yə-lĭt) *adj.* *Bot.* Lacking stipules.

ext *abbr.* **1.** Extension. **2.a.** External. **b.** Externally. **3.** Extinct. **4.** Extra. **5.** Extract

ex·tant (ĕk′stənt, ĕk-stănt′) *adj.* **1.** Still in existence; not destroyed, lost, or extinct. **2.** *Archaic* Standing out; projecting. [Lat. *exstāns, exstant-,* pr.part. of *exstāre,* to stand out : *ex-, ex-* + *stāre,* to stand; see stā-* .]

ex·tem·po·ral (ĕk-stĕm′pər-əl) *adj.* *Archaic* Extemporaneous. [Lat. *extemporālis* < *ex tempore.* See EXTEMPORE.]

ex·tem·po·ra·ne·ous (ĭk-stĕm′pə-rā′nē-əs) *adj.* **1.** Carried out or performed with little or no preparation; impromptu. **2.** Prepared in advance but delivered without notes or text. **3.** Skilled at or given to unrehearsed speech or performance. **4.** Provided, made, or adapted as an expedient; makeshift [< LLat. *extemporāneus* < Lat. *ex tempore.* See EXTEMPORE.] — ex·tem′po·ra·ne′i·ty (-pə-rə-nē′ĭ-tē), ex·tem′po·ra′ne·ous·ness *n.* — ex·tem′po·ra′ne·ous·ly *adv.*

ex·tem·po·rar·y (ĭk-stĕm′pə-rĕr′ē) *adj.* Spoken, done, or composed with little or no preparation or forethought. [< EXTEMPORE.] — ex·tem′po·rar′i·ly (-rĕr′ə-lē) *adv.*

ex·tem·po·re (ĭk-stĕm′pə-rē) *adj.* Extemporary — *adv.* In an extemporaneous manner. [Lat. *ex tempore* : *ex,* of; see ex- + *tempore,* ablative of *tempus,* time.]

ex·tem·po·rize (ĭk-stĕm′pə-rīz′) *v.* -rized, -riz·ing, -riz·es. — *tr.* To do or perform (something) without prior preparation or practice. — *intr.* To perform an act or utter something in an impromptu manner; improvise. — ex·tem′po·ri·za′tion (-pər-ĭ-zā′shən) *n.* — ex·tem′po·riz′er *n.*

ex·tend (ĭk-stĕnd′) *v.* -tend·ed, -tend·ing, -tends. — *tr.* **1.** To open or straighten (something) out; unbend. **2.** To stretch or spread (something) out to greater or fullest length. **3.a.** To exert (oneself) vigorously or to full capacity. **b.** To cause to move at full gallop. Used of a horse. **4** a. To increase in quantity or bulk by adding a cheaper substance. **b.** To adulterate. **5.a.** To enlarge the area, scope, or range of. **b.** To expand the influence of. **c.** To make more comprehensive or inclusive. See Syns at increase. **6.a.** To offer. **b.** To make available; provide. **7.a.** To cause (something) to be or last longer. **b.** To prolong the time allowed for payment of. **8.** *Chiefly British.* **a.** To appraise or assess; value. **b.** To seize or make a levy on for the purpose of settling a debt. — *intr.* To be or become long, large, or comprehensive. [ME *extenden* < OFr. *extendre* < Lat. *extendere* : *ex-,* ex- + *tendere,* to stretch; see ten-* .] — ex·tend′i·bil′i·ty *n.* — ex·tend′a·ble, ex·tend′i·ble *adj.*

ex·tend·ed (ĭk-stĕn′dĭd) *adj.* **1.** Stretched or pulled out: *an extended telescope.* **2.** Continued for a long period of time; protracted. **3.** Enlarged or broad in meaning, scope, or influence. — ex·tend′ed·ly *adv.*

extended family *n.* A family group that consists of parents, children, and other close relatives, often in close proximity.

ex·tend·er (ĭk-stĕn′dər) *n.* A substance added to another substance to modify, dilute, or adulterate it.

ex·ten·si·ble (ĭk-stĕn′sə-bəl) *adj.* **1.** Capable of being extended or protruded. **2.** *Comp Sci* Of or relating to a programming language or a system that can be modified by changing or adding features. — ex·ten′si·bil′i·ty *n*

ex·ten·sile (ĭk-stĕn′sĭl) *adj.* Extensible.

ex·ten·sion (ĭk-stĕn′shən) *n.* **1.** The act of extending or the condition of being extended. **2.** The amount, degree, or range to which something extends or can extend **3.a.** The act of straightening or extending a limb. **b.** The position assumed by an extended limb. **4.** *Medic.* The application of traction to a fractured or dislocated limb to restore the normal position. **5.a.** An addition that increases the area, influence, operation, or contents of something. **b.** An additional telephone connected to a main line. **6.a.** An allowance of extra time, esp. for the repayment of a debt. **b.** The period of this extra time. **7.** The property of an object by which it occupies space. **8.** A program in a university, college, or school for students unable to attend at the usual time or in the usual place. **9.** *Logic.* The class of objects designated by a specific term or concept; denotation. **10.** *Math.* A set that includes a given and similar set as a subset. [ME *extensioun* < OFr. *extension* < Lat. *extēnsiō, extēnsiōn-* < *extēnsus,* p.part. of *extendere,* to extend. See EXTEND.] — ex·ten′sion·al *adj.*

ex·ten·si·ty (ĭk-stĕn′sĭ-tē) *n., pl.* -ties. **1.a.** The quality of having extension or being extensive. **b.** A specific degree or range of extension. **2.** The attribute of sensation that enables one to perceive space or size.

ex·ten·sive (ĭk-stĕn′sĭv) *adj.* **1.** Large in extent, range, or amount. **2.** Of or relating to the cultivation of vast areas of land with a minimum of labor or expense. — ex·ten′sive·ly *adv.* — ex·ten′sive·ness *n.*

ex·ten·som·e·ter (ĕk′stĕn-sŏm′ĭ-tər) *n* An instrument used

# EXHIBIT

# J

# REDACTED

# EXHIBIT

# K

# REDACTED

# EXHIBIT

# L

# REDACTED

# EXHIBIT

# M

# REDACTED

# EXHIBIT

# N

# REDACTED

# EXHIBIT

# O

# REDACTED

# EXHIBIT

# P

# REDACTED

# EXHIBIT

# Q

# REDACTED

# EXHIBIT

# R

# REDACTED

# EXHIBIT

# S

**BINGHAM McCUTCHEN**

Gary M. Hnath
Direct Phone: (202) 778-3166
Direct Fax:     (202) 778-6155
gary.hnath@bingham.com

March 7, 2005

**VIA OVERNIGHT MAIL**

Bingham McCutchen LLP
Suite 800
1120 20th Street, NW
Washington, DC
20036-3406

202.778.6150

202.778.6155 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

Edmond D. Johnson, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Re:  **Ingenio, Filiale De Loto-Quebec, Inc. v. GameLogic, Inc.
      and Scientific Games Corporation, Civil Action No. 04-1532-KAJ**

Dear Mr. Johnson:

Enclosed are Document Nos. GL00001 - GL01943 which are being produced on behalf
of our client, GameLogic, Inc., in the above-referenced matter. Please note that
Document Nos. GL 01691 - GL 01943 have been marked as "CONFIDENTIAL" and,
pursuant to Local Rule 26.2, the disclosure of these documents should be limited to
members and employees of the firm of trial counsel and other counsel who have been
admitted pro hac vice, until such time as a Protective Order is in place (we forwarded to
you a Joint Stipulated Protective Order last week). Pursuant to Local Rule 26.2, those
documents should be maintained as confidential and should be used only for purposes of
litigating this case.

Please do not hesitate to contact us should you have any questions.

Very truly yours,

Gary M. Hnath

cc:    Rodger L. Tate, Esq. (w/o encl.)
       Jack B. Blumenfeld, Esq. (w/encl.)
       Richard L. Horwitz, Esq. (w/o encl.)

DCDOCS/620669.1

# EXHIBIT

# T

# REDACTED

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 15, 2005, the attached document

was electronically filed with the Clerk of the Court using CM/ECF which will send

notification of such filing(s) to the following and the document is available for viewing

and downloading from CM/ECF:

Edmond D. Johnson
Thomas H. Kovach
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Jack B. Blumenfeld
Roger D. Smith
Morris Nichols Arsht & Tunnell
Chase Manhattan Centre, 18th Floor
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

I hereby certify that on March 15, 2005, I have Federal Expressed the documents

to the following non-registered participants:

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
Hunton & Williams LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006

By: _____
        Richard L. Horwitz
        David E. Moore
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, Delaware 19899-0951
        (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

672965