**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INGENIO, FILIALE DE LOTO-QUEBEC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1532 (KAJ) |
| | ) | |
| GAMELOGIC, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT GAMELOGIC, INC.'S
<u>OPENING BRIEF ON CLAIM CONSTRUCTION</u>**

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

Gary M. Hnath
Susan Baker Manning
Goutam Patnaik
Timothy A Molino
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
(202) 373-6000

*Attorneys for Defendant
GameLogic, Inc.*

Dated: May 1, 2006

# TABLE OF CONTENTS

Page

I.     THE PATENTS-IN-SUIT ...................................................................................1

II.    THE LAW RELATING TO CLAIM CONSTRUCTION .......................................5

III.   ORDINARY SKILL IN THE ART ......................................................................7

IV.    GAMELOGIC'S PROPOSED CLAIM CONSTRUCTIONS ...............................7

      A.     THE QUALITIES OF THE CLAIMED "CODE" .....................................8

          1.     The Win/Loss Outcome is Stored In the Code Itself ......................9

          2.     The Encoded Data Is Unrecognizable to the Player .....................15

      B.     "LOTTERY GAME AND AN AMUSEMENT GAME" ........................17

      C.     THE "PROCESSOR" ...........................................................................23

      D.     "PROCESSOR WITHIN A COMPUTING DEVICE" ...........................26

      E.     "PROCESSOR WITHIN AN ON-LINE SUBSCRIPTION
            SERVICE" ...........................................................................................26

      F.     "PROCESSOR INCLUDES A COMPUTING DEVICE" .......................28

      G.     "READING" .........................................................................................28

V.     CONCLUSION ................................................................................................30

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001) ................................................................10

*Digital Biometrics, Inc. v. Identix, Inc.*,
149 F.3d 1335 (Fed. Cir. 1998) ..................................................................6

*Ekchian v. Home Depot, Inc.*,
104 F.3d 1299 (Fed. Cir. 1997) ................................................................14

*Helifix, Ltd. v. Blok-Lok, Ltd.*,
208 F.3d 1339 (Fed. Cir. 2000) ..................................................................7

*Honeywell International v. International Trade Commission*,
341 F.3d 1332 (Fed. Cir. 2003) ..................................................................5

*In rem Klein*,
1930 C.D. 2, 393 O.G. 519 (Comm'r Pat. 1930) ........................................1

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995),
*aff'd*, 116 S. Ct. 1384 (1996)......................................................................5

*On Demand Machine Corp. v. Ingram Industrial, Inc.*,
2006 U.S. App. LEXIS 7889 (Fed. Cir. March 31, 2006) ...........................6

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .........................................................*passim*

*Scimed Life System, Inc. v. Advanced Cardiovascular System, Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ................................................................10

*Southwall Techs., Investment v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995) ....................................................................6

*Teleflex, Inc. v. Ficosa North America Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ..................................................................6

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ................................................................7, 9

# TABLE OF AUTHORITIES

Page

## FEDERAL STATUTES

35 U.S.C. § 102...................................................................................................21

35 U.S.C. § 103...................................................................................................21

35 U.S.C. § 112 ...........................................................................................13, 21

37 C.F.R. § 1.53(b) ...............................................................................................1

Pursuant to the Court's Scheduling Order, dated March 28, 2005, and as amended on April 17, 2006, Defendant GameLogic, Inc. ("GameLogic") submits the following Brief concerning claim construction of the patents-in-suit in this litigation. The Court has presently scheduled the claim construction hearing on disputed terms for June 9, 2006.

## I.    THE PATENTS-IN-SUIT

Plaintiff Ingenio, Filiale de Loto-Quebec, Inc. ("Plaintiff" or "Ingenio") alleges that GameLogic's HomePlay Lottery[TM] product infringes U.S. Patent No. 5,569,082 ("the '082 patent") and U.S. Patent No. 5,709,603 ("the '603 patent").

Perry Kaye is the named inventor of the patents-in-suit, and both are entitled "Personal Computer Lottery Game." The application for the '082 patent was filed on April 6, 1995, and the patent issued on October 26, 1996. The application for the '603 patent was filed on October 25, 1996, and that patent issued on January 20, 1998. The '603 patent is a

continuation-in-part[1] of the '082 patent. As such, there is language in common in the written description portions of the two asserted patents.[2]

The '082 patent abstract substantially describes the claimed invention of independent method claim 1 and independent apparatus claim 10:

---

[1] A continuation-in-part (CIP) is an application filed during the lifetime of an earlier nonprovisional application filed by the same applicant, repeating some substantial portion or all of the earlier nonprovisional application and adding matter not disclosed in the earlier nonprovisional application. *In rem Klein*, 1930 C.D. 2, 393 O.G. 519 (Comm'r Pat. 1930); *see* 37 CFR § 1.53(b) and MPEP § 201.08.

[2] Throughout this Brief, as the specifications of the asserted patents substantially overlap, citations will be made to the '082 patent specification only to avoid unnecessary duplication, unless otherwise specifically noted.

A method and system for playing a player interactive lottery type game includes a gaming piece which includes a predetermined code having data indicating whether the player wins or loses the game, the data being unrecognizable to the player, such that the player does not know the outcome of the game prior to play of the game. The code is entered by the player into a processor. The processor presents a game of chance to the player on a display for interactive play by the player, and the player controls game play by inputting game parameters to the processor. The processor controls the outcome of the game of chance played by the player based upon the code entered by the player. A display provides an indication to the player of a game win or a game loss based upon the code.

Joint Appendix ("JA") Exhibit A, '082 Patent at Abstract; *see also id.* at col. 10, line 66 – col. 11, line 17 (claim 1), and col. 12, lines 4-20 (claim 10).[3]

The '603 patent abstract is nearly identical to the '082 patent abstract. In the '082 patent, the second sentence of the abstract reads: "The code is entered by the player into a processor." '082 Patent at Abstract. In the '603 patent abstract, that sentence is replaced by: "The code is stored on the gaming piece in a memory device. The gaming piece is reusable with different codes. The code is read by a processor." JA Ex. B, '603 Patent at Abstract. This difference is also reflected in claim 1, the only asserted '603 patent claim. *Id.* at col. 16, line 6. Thus, where the '082 patent requires that a player enter a code into a computer in order to play a game, the '603 patent requires that the processor read a code from a gaming piece in order for the player to play a game.

Ingenio specifically accuses GameLogic of infringing claims 1, 4, 6, 8-10, 13, 15 and 16 of the '082 patent, and claim 1 of the '603 patent (collectively, "the asserted claims").

---

[3] The parties have attached to their Joint Claim Construction Chart a Joint Appendix which includes copies of the patents-in-suit as well as their file histories, which shall be cited throughout this Brief with the prefix, "JA."

The asserted claims of the '082 patent recite:

> 1. A method for playing a player lottery game comprising the step [sic] of:
>
> acquiring by a player a game piece, the gaming piece including a code which includes data indicating whether the player wins or loses the lottery game and an amusement game, the data being unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game;
>
> entering the code by the player into a processor prior to amusement game play;
>
> the processor generating the amusement game on a display for play by the player, the player controlling game play by inputting game parameters to the processor;
>
> the processor controlling whether the player will win or lose the amusement game based upon the code entered by the player; and
>
> providing on a display an indication to the player of the amusement game win or loss based upon the code.
>
> * * *
>
> 4. The method of claim 1 wherein the gaming piece includes paper media for storing the code.
>
> * * *
>
> 6. The method of claim 1 wherein the amusement game includes a card game.
>
> * * *
>
> 8. The method of claim 1 wherein the step of entering the code into a processor includes a processor within a computing device.
>
> 9. The method of claim 1 wherein the step of entering the code into a processor includes a processor within an on-line subscription service.
>
> 10. A lottery type game comprising:
> a gaming piece, said gaming piece including a code which includes data indicating whether a player wins or loses the lottery game and an amusement game, said data being

3

unrecognizable to the player, such that the player does not know whether the player will win or lose the games prior to play of the amusement game;

a processor for receiving said code input by the player prior to amusement game play;

said processor generating the amusement game on a display for play by the player,

said processor determining whether the player will win or lose the amusement game based upon said code; and

a display for providing an indication to the player of the amusement game win or loss based upon said code.

* * *

13. The lottery type game of claim 10 wherein said gaming piece includes a paper media for storing said code.

* * *

15. The lottery type game of claim 10 wherein said amusement game includes a card game.

16. The lottery type game of claim 10 wherein said processor includes a computing device.

JA Ex. A, '082 Patent, col. 10, ln. 66 – col. 12, ln. 33.  The asserted claim of the '603

patent recites:

1.  A method for playing a lottery type game comprising the steps of:

acquiring by a player a gaming piece, the gaming piece including a code which includes data indicating whether the player wins or loses the lottery type game and an amusement game, the data being unrecognizable to the player, such that the player does not know whether the player will win or lose the games prior to play of the amusement game;

reading the code by a processor;

the processor generating the amusement game on a display for play by the player;

>   the processor controlling whether the player will win or lose
>   the amusement game based upon the code; and
>
>   providing on the display an indication to the player of the
>   amusement game win or game loss based upon the code.

JA Ex. B, '603 Patent, col. 15, ln. 64 – col. 16, ln. 14.

The problems intended to be overcome by the inventions claimed in the asserted patents include such things as a low level of excitement that is generated from the display of the games' outcomes, tracking and control of the game card, fraud caused by game card theft or tampering, and allowing for system wide and regional control and monitoring. *See* JA Ex. A, '082 patent, col. 1, lns. 35-55.

## II.    THE LAW RELATING TO CLAIM CONSTRUCTION

Determining the scope of a patent's claims involves examining the claim language and interpreting the meaning of that language. The language of the claims is interpreted (by a judge rather than a jury) as it would be by a person of "ordinary skill in the art" relating to the invention. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995), *aff'd,* 116 S. Ct. 1384 (1996).

The analytical focus of claim construction begins with and remains on the language of the claims themselves. *Honeywell Int'l v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). The "proper judicial construction of a claim and its terms is from the viewpoint of a person of ordinary skill in the field of this invention; the court must determine how such a person would understand the claim in the context of the particular technology and the description in the specification, with due deference to the prosecution history." *On Demand Machine Corp. v. Ingram Indus., Inc.*, 2006 U.S. App. LEXIS 7889, *11 (Fed. Cir. March 31, 2006) (attached at Exhibit 1). The Federal Circuit

Court of Appeals has "stressed the dominance of the specification in understanding the scope and defining the limits of the terms used in the claim." *Id.* (citing *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005)).

An applicant can affect the scope of his or her claims through statements made during prosecution that "redefine[s] the term" or by "characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002); *see also Southwall Techs., Inv. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution . . . . Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers" (citations omitted)); *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1347 (Fed. Cir. 1998) ("global comments [in the prosecution history] made to distinguish the applicants' 'claimed invention' from the prior art" limit all claims of the patent).

In sum, to determine a claim's meaning, a court looks to the claim language, the specification ("the single best guide"), and the prosecution history. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1314-17 (Fed. Cir. 2005). A court may also consider extrinsic evidence -- such as dictionaries and expert testimony -- although such evidence is generally "less significant" and "less reliable" than the intrinsic record. *See Id.* at 1317-18.

In particular, *Phillips* explicitly warned against reliance on extrinsic evidence that is "conclusory or unsupported," "clearly at odds with the claim construction mandated by

the claims themselves," or "entirely divorced from the context of the written description." *Id.* at 1318, 1321.  Furthermore, if a claim term can be construed based on the intrinsic evidence, then extrinsic evidence may not be relied upon to establish a different construction.  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term."); *Helifix, Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).

## III.   ORDINARY SKILL IN THE ART

The claims are to be construed from the perspective of a hypothetical person of ordinary skill in the art at the time a patent application is filed.  At the time the application for the '082 patent was filed, April 6, 1995, one of ordinary skill in the art would have a bachelors of science degree in computer engineering or a minimum of five years of industry experience in computer programming or software development, with a general knowledge of a encryption.  *See* attached Exhibit 2, Grimes Depo. Tr. 40-43.[4]

## IV.   GAMELOGIC'S PROPOSED CLAIM CONSTRUCTIONS

Many of the claim terms which are currently in dispute are found in the first element of each of the asserted independent claims, namely claims 1 and 10 of the '082 patent and claim 1 of the '603 patent.  For example, most of the disputed claim terms are indicated in the first element of claim 1 of the '082 patent, as underlined:

> acquiring by a player a game piece, the gaming piece
> including <u>a code which includes data indicating whether the
> player wins or loses the lottery game and an amusement</u>

---

[4]   Relevant excerpts of deposition testimony taken in this case and cited herein are provided at attached Exhibits 2 - 4.

game, the <u>data being unrecognizable to the player</u>, such that the player does not know whether the player will win or lose the game prior to play of the <u>amusement game</u>

JA Ex. A, '082 patent, col. 10, ln. 67 - col. 11, ln. 6.

## A. THE QUALITIES OF THE CLAIMED "CODE"

Fundamental to the asserted claims of the patents-in-suit is the use of a code which has data in it stating whether the player wins or loses the lottery game and an amusement game. The claims themselves, as well as the specification and the prosecution history, outline and specify the characteristics and qualities of the "code" claimed in the '082 and '603 patents.

The term "code" should be construed as a system of symbols used to represent assigned and often secret meanings. The "code" stores within it encoded data independent of the gaming machine stating whether the player wins or loses both the lottery game and a distinct amusement game. The win/loss data is encoded and encrypted in order to preclude the player from being able to know the outcome of the games prior to play of the amusement game. Thus, the data stating the outcome of the lottery game and an amusement game is put into a code that must be decrypted and decoded.

To begin the process of claim construction, "the context in which a term is used in the asserted claim can be highly instructive." *Phillips,* 415 F.3d at 1314 (noting that the claim term "steel baffles" strongly implies that the term "baffles" are objects not made of steel). This is especially true in terms of the "code" claimed in the asserted patents. The first element in each of the asserted independent claims provides important attributes and the scope of the claimed "code" and thus, the first element should be examined in its entirety to fully construe the claimed characteristics of the "code." Nonetheless, certain

8

attributes of the "code" set forth in the first elements shall now be examined in turn to facilitate its construction.

### 1.    The Win/Loss Outcome is Stored In the Code Itself

In each of the asserted independent claims, the "code includes data indicating whether the player wins or loses the lottery game and an amusement game."  As an initial matter, the code stores data.  As such, the code is encoded with certain information. Specifically, that data states whether the player wins or loses both the lottery game and an amusement game.

The ordinary meaning of "includes" as used in the independent claims means to contain within or store.  Similarly, "indicating" connotes that the data itself states the win/loss outcome.  Indeed, the specification and the prosecution history fully support this construction of the code storing within it and stating the win/loss outcome information.

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips*, 415 F.3d at 1313.  The language in the specification is usually "dispositive; it is the single best guide to the meaning of a disputed term."  *Id*. at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The specifications in the asserted patents support the encoded nature of the code, as well as outlining other features of the code, as found in the examples of how the claimed code is used in practice.

As noted in *Phillips*:

> One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive. The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent.

*Phillips*, 415 F.3d at 1323 (citations omitted). It is clear from the specifications in the '082 and '603 patents that the patentee intended for the claims and the embodiments to be coextensive as they relate to the "code." Further, it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1317; *see also Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268-69, 1271 (Fed. Cir. 2001) ("The written description can provide guidance as to the meaning of claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format").

The '082 and '603 patent specifications describe in considerable detail and consistently what a "Destiny Code" is, including its characteristics. Moreover, each disclosed embodiment uses the "Destiny Code" synonymously with the claimed "code." Thus, using the embodiments in the specification to construe the claimed characteristics of the "code" is not improperly reading a limitation from the written description into the claims, but rather, relying on the written description for guidance as to the meaning and scope of the claims. *See Phillips*, 415 F.3d at 1317; s*ee also Scimed Life Sys., Inc. v.*

*Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340-41 (Fed. Cir. 2001).  The

following descriptions of "Destiny Code" are from the '082 patent:

> FIG. 1 is a block diagram of the basic components of the
> present system.  Block 10 shows that the start of the system
> requires a secure system for generating and controlling and
> tracking <u>encrypted symbolic codes that signify the outcome</u>
> <u>of the particular game of chance to be played by the player.</u>
> <u>These codes are called "Destiny Codes" because their</u>
> <u>primary function is to store the outcome of the game of</u>
> <u>chance</u>.  The codes can, in addition, store other data that
> assists in the playing of the game, the tracking of the game,
> the security of the game, or any other data that may enhance
> the game or its operation.  <u>If the player knew the procedure to</u>
> <u>decode the Destiny Code, the player would be able to</u>
> <u>determine if the Destiny Code contained a winning chance or</u>
> <u>a losing chance.  The total and actual result of the game is</u>
> <u>encoded in the Destiny Code.  By decoding the Destiny Code</u>
> <u>one reveals whether or not a game was a winner or a loser,</u>
> <u>and if it was a winner, the prize won.</u>

JA Ex. A, '082 patent, col. 2, ln. 54 – col. 3, ln. 3 (emphasis added).  Similarly:

> The Destiny Code includes encoded control information for
> security purposes, such as, for example manufacturers code,
> lot number, game type, version number of the game and other
> information.  <u>Program information includes whether the</u>
> <u>Destiny Code is a winner or a loser</u>; the amount of money
> that the Destiny Code wins; the minimum prize for this
> game; the maximum prize for this game; and related game
> details.  <u>This Destiny Code will be the actual number that can</u>
> <u>be entered at a redemption site to indicate whether or not the</u>
> <u>Game Medium contains a winning game, independent of</u>
> <u>whether or not the game is played.</u>

*Id.*, col. 6, lns. 55-65 (emphasis added).

The win/loss outcome contained in the Destiny Code is predetermined at the time

the Destiny Code is created.  *See* JA Ex. A, '082 patent, col. 10, lns. 12-14 ("This will

give the appearance of randomness even though the outcome was predetermined at the

time the Destiny Code was created").  Furthermore, once "a Destiny Code is generated

11

and stored, a player can acquire the Destiny Code and use the code in the play of a game. Because the Destiny Code stores the actual outcome of the game, the code must be processed to discover how the game should play.  Block 13 indicates the step of decrypting and decoding of a Destiny Code."  JA Ex. B, '603 patent, col. 3, lns. 39-44. Likewise, the Destiny Code is decrypted and decoded at block 25 of the Figures, which "makes the Destiny Code readable."  JA Ex. A, '082 patent, col. 5, lns. 40-42.

The "Destiny Codes" of the patents-in-suit are clearly defined as a code containing the win or loss outcome.  For instance, the specifications state that "the outcome of the game is stored <u>in</u> the Destiny Code . . . ."  *See, e.g.,* JA Ex. A, '082 patent, col. 6, lns. 29-30 (emphasis added).  Further, phrases such as "*their primary function is to store the outcome*" ('082 patent, col. 2, lns. 59-60); and  "*[t]he total and actual result of the game is encoded in the Destiny Code*" ('082 patent, col. 2, ln. 67- col. 3, ln. 1, and "*[b]y decoding the Destiny Code one reveals whether or not a game was a winner or a loser*" ('082 patent, col. 3, lns. 1-3) describe in unambiguous terms that Destiny Codes contain all the data necessary to determine win or loss based on "decoding" that data as opposed to looking up additional data.  Furthermore, the patent specification specifies that the data is encoded in such a way that if the player knew the procedure to decode the Destiny Code, he would know whether he will win or lose. '082 patent, col. 2, lns. 64-67. These defined characteristics of the code clearly show that the win/loss data is contained in the code itself, without reference to information or data contained elsewhere.

The patentee confirmed these characteristics of the claimed "code" during the prosecution of the '082 patent.  The prosecution history is a proper source to aid in interpreting the claims as it "can often inform the meaning of the claim language by

demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips,* 415 F.3d at 1317 (citations omitted).

In response to examiner rejections of all the original claims sought in the application for the '082 patent, including for among other reasons, that the "code" was indefinite under 35 U.S.C. §112 (*see* JA Ex. C, at IN001409), the patentee amended many of the original claims, including independent claims 1 and 10 of the '082 patent. In doing so, the patentee remarked:

> The present invention relates to a game method in which a player acquires a gaming piece, such as for example, a ticket. The ticket includes encoded data or a code, unrecognizable to the player. The code determines whether you win or lose the game. The data is input by the player into a game processor which in turn generates an interactive game for play by the player. The actual play of the game by the player does not control whether the player will win or lose the game, since the outcome of the game is predetermined by the code on the gaming ticket.

JA Ex. C, at IN001405 (March 25, 1996 Amendment, p. 6, para. 3). The patentee's own statements during prosecution make clear that the outcome of the game is predetermined by the code which exists on the gaming ticket itself.

Further, to distinguish his invention over invalidating prior art cited by the examiner (U.S. Patent No. 5,377,975 issued to Clapper, Jr.,[5] among others), the patentee stated:

> None of the cited references disclose or suggest a game or method of playing a game in which a code entered by the player prior to game play controls the outcome, win or loss, of the game. The Clapper, Jr. reference discloses the use of a

_____
[5] A copy of U.S. Patent No. 5,377,975 is attached at Exhibit 5 for ease of reference.

13

> bar code which merely identifies indicia printed on a strip.
> The bar code is used to display the strip indicia to a game
> player.  The printed indicia on the strip determines whether
> the player wins or loses the game, and not the code.

JA Ex. C, at IN001406 (March 25, 1996 Amendment, p. 7).  In other words, to overcome

the rejection based on the prior art, including the Clapper, Jr. reference, the inventor

clearly distinguished between *data* containing information that determines win or loss (as

in his claimed invention) and data containing indicia or a *reference to data* containing

information that determines win or loss that is located elsewhere (as in Clapper, Jr.).

The Clapper, Jr. reference describes a system where the player is given a ticket

with indicia on it, *e.g.,* 3 lemons or 2 cherries and 1 lemon. Ex. 5, col. 3, lns. 24-28.

Specific combinations of these indicia refer to win amounts, *e.g.,* 3 lemons = $25. Ex. 5,

col. 3, lns. 49-54.  The player must refer to a key that shows the combinations of indicia

which correspond to win amounts to discover the result of the ticket.  Ex. 5, col. 4, lns.

15-17; *see also* Ex. 3, Bertram Depo. Tr. 100-106.  Thus, by distinguishing his invention

from the use of indicia in the Clapper, Jr. reference, the patentee surrendered any

protection he may have had to data in the code containing indicia or reference pointing to

other data containing the win/loss outcome information.  *See Ekchian v. Home Depot,*

*Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("since, by distinguishing the claimed

invention over the prior art, an applicant is indicating what the claims do not cover, he is

by implication surrendering such protection.").

The patentee of the '082 patent further stated:

> The bar code of the Clapper, Jr. reference is not entered by
> the player into a processor, nor is the bar code contained on a
> gaming piece required by a game player.  The Clapper, Jr.
> game requires the ticket be stored in a gaming machine,
> which ticket is not independent of the gaming machine.  In

14

> summary, the Clapper, Jr. reference use of code is only to
> automate the display of the indicia printed on the ticket,
> which code does not control game win or loss.  It is the
> indicia on the ticket which controls game win or loss, and not
> the code.

JA Ex. C, at IN001406.  Here, the patentee further distinguished the Clapper, Jr.

reference from his invention by pointing out that the ticket in Clapper, Jr. is not

independent of the gaming machine.  Thus, the patentee made clear that the code claimed

in the '082 patent is independent of the gaming machine, meaning the win/loss control is

contained entirely within that code, without the need to reference data on the gaming

machine to obtain that information.  Perry Kaye confirmed that the win/loss outcome

determination in the code used in his invention is independent of the gaming machine.

*See* Ex. 4, Kaye Depo. Tr. 310-311.

### 2.     The Encoded Data Is Unrecognizable to the Player

The first element of each of the asserted independent claims also state that the

data on the code is "unrecognizable to the player, such that the player does not know

whether the player will win or lose the game prior to play of the amusement game."

Given its ordinary meaning, this phrase means that as the data directly contains

the win/loss information, the data must be made unrecognizable to the player, such that

the player does not know whether the player will win or lose the games prior to play of

the amusement game.  "Unrecognizable" as used in the claim must mean that the code

containing the data is encrypted in order to preclude the player from being able to know

the outcome of the game, which is contained in the code.  Although "unrecognizable" is

not further explicitly defined in the asserted patents, its intent, meaning and scope is clear

from the specifications of the patents.

15

Tellingly, each embodiment disclosed in the specification of the '082 patent specifies that the code must be decrypted and decoded. *See, e.g.,* '082 patent, col. 3, lns. 20-21; col. 5, lns. 9-10; col. 5, lns. 40-42; col. 6, lns. 4-6; and col. 9, lns. 61-63. Moreover, the figures in the patent show that decrypting and decoding are required to process the code to discover how the games should play. S*ee* Fig. 1, block 13; Fig. 3, block 25; Fig. 6, block 48; and Fig. 8. block 112.  This consistent requirement for decryption and decoding of the code in the specification demonstrates that the patentee intended for the claims and the embodiments in the specification to be "strictly coextensive." *See Phillips*, 415 F.3d at 1323.

One of ordinary skill in the art would understand the term "unrecognizable" to mean encrypted in the context of the patents-in-suit.  Indeed, explaining the "unrecognizable" characteristic of the data in the code as used in the claims, one of Ingenio's experts, Dr. Bertram, testified that "if according to the claim it is unrecognizable, well, then it's encrypted."  Ex. 3, Bertram Depo. Tr. 89, lns. 21-22.  Dr. Bertram further concludes that the claims require some form of encryption.  *See* Ex. 3, Bertram Depo. Tr. 190, lns. 6-10 ("it says the data being unrecognizable, which implies some form -- some form of encryption").  Thus, as demonstrated in the context of the claims in which it is found and confirmed by one of Ingenio's experts, the "code" must be encrypted in order to ensure that the data in the code stating whether the player wins or loses the lottery game and an amusement game is unrecognizable to the player.

Concerning the process used to encrypt the code, Dr. Bertram explained that "there are a lot of different encryption schemes, but it's taking the actual content of the code and encrypting it in a way that it cannot easily be deciphered or read by -- by a

16

player." Ex. 3, Bertram Depo. Tr. 86, lns. 18-22. Dr. Grimes, the other Ingenio expert,

summarizes the process related to the code, as taught by the patent:

> A:    You could encrypt a code. In fact, that's what the
> patent teaches.
>
> . . .
>
> Q:    What is the code in the patent?
>
> A:    Well, it would be the access code or the destiny code.
> You would encrypt --
>
> Q:    How is it then --
>
> A:    You would encrypt the code, then you would decrypt
> the code, and then you would decode the code. They're
> separate steps because they're . . . .
>
> Q:    And the patent teaches all that?
>
> A:    Yes.

Ex. 2, Grimes Depo. Tr. 234, lns. 5-17.

Explaining encryption, the inventor of the patents-in-suit, Perry Kaye, explained

that "you encrypt the number so it becomes a different number or symbol." Ex. 4, Kaye

Depo. Tr. 172, lns. 10-12. Mr. Kaye further stated that "you would use encryption to go

and add an extra level of security." Ex. 4, Kaye Depo. Tr. 172, lns. 20-22. To Mr. Kaye

"[e]ncryption means changing the – changing the number. It would be changing the

number in a way that you can determine later what it was." Ex. 4, Kaye Depo. Tr. 173,

lns. 2-5. Dr. Bertram concurs with this understanding of encryption, stating that in "a

general sense, when you encrypt and decrypt, you end up at the same starting point." Ex.

3, Bertram Depo. Tr. 90, lns. 16-18.

B.     <u>"LOTTERY GAME AND AN AMUSEMENT GAME"</u>

The "lottery game" should be construed as a game based on three basic lottery principles:  participation in a chance to win; a result based on chance; and a prize awarded to the winner(s).  The claimed "amusement game" should be construed as a game played purely for player enjoyment, which is used to give the feel of a completely random game of chance, and ends when the player is awarded fictitious awards.

As an initial matter, the asserted independent claims require that the "code includes data indicating whether the player wins or loses the lottery game <u>and</u> an amusement game."  (emphasis added).  As used in ordinary English, the use of "and" clearly calls for two distinct games being referred to in the phrase, "lottery game and an amusement game," as used in each of the independent claims.  Indeed, Dr. Grimes, one of Ingenio's experts, testified that "and an amusement game" connotes that the amusement game has to be a different game than the lottery game.  Ex. 2, Grimes Depo. Tr. 99, lns. 12-15.  This construction is supported by the claims themselves, the specification, as well as the prosecution history of the '082 patent.

The "lottery game" which the player plays, as set forth in claim 1 of the '082 patent, begins when the player acquires a gaming piece.  *See* JA Ex. A, '082 patent, col. 10, lns. 66-67.   Thus, the first step of the lottery game claimed in the asserted patents is the acquisition of the gaming piece.  Unlike Ingenio's proffered definition of "lottery game," nothing in the claims or even the specifications of the asserted patents require the player to pay for the chance to participate for there to be a "lottery game."  Although the specification cites a person's purchase of a chance to win a game of chance as an "application" of the invention (*see* JA Ex. A, '082 patent, col. 1, lns. 17-20), the invention is in no way limited to games of chance in which a person must pay for

18

participation.

The specification makes clear that the "amusement game" is "purely for player enjoyment, and is used to give the feel of a completely random game of chance."  JA Ex. A, '082 patent, col. 3, lns. 25-27; JA Ex. B, '603 patent, col. 3, ln. 48-50.  This definition of "amusement game" as provided in the specifications of the asserted patents tracks  the claim language which specifies the predetermined nature of the amusement game outcome ("code which includes data indicating whether the player wins or loses the lottery game and an amusement game").

Ingenio's proffered construction, that the amusement game is "a game that amuses the player" is not tenable as it provides no real definition at all, relying on subjective assessments, leaving the term ambiguous and vague.  Indeed, Ingenio's expert, Dr. Bertram testified:

> Q:      How's it determined whether it amuses the player?
>
> A:      Well, that's a very subjective question.  Different people are amused by different things.  But it -- it provides some excitement, some variety, some anticipation.

Ex. 3, Bertram Depo. Tr. 66, lns. 8-13.  He further testified that Ingenio's definition of amusement game is "subjective in nature" and that how you measure amusement is also "very subjective."  *See* Ex. 3, Bertram Depo. Tr. 66-68.

The patent specifications further provide delineation and context of the claimed "amusement game."  After defining the amusement game as a game purely for player enjoyment, and used to give the feel of a completely random game of chance, the patent specification shows that the amusement game, at some point, either at the discretion of the player or the necessity of the game, comes to an end.  *See* JA Ex. A, '082 patent, col.

3, ln. 25-33.  And then, the system begins playing the actual game (sometimes referred to as the "actualization game"), which has the stated purpose of displaying, in a pleasing fashion, the actual prize that is stored in the Destiny Code and to display the game results as though there is a completely random element.  *See* '082 patent, col. 3, ln. 33-38.  The actual game, which is distinct from the amusement game, is a component of the lottery game with the stated purpose of revealing the predetermined prize of the lottery game, which is contained in the code.

Throughout the specification, the amusement game ends with the player being awarded fictitious awards.  *See, e.g.,* '082 patent, col. 3, lns. 41-44.  Those fictitious awards are then used in the actual game to reveal the actual prize contained in the code. By way of example:

> The on-line service now interactively plays an amusement game with the player at block 49.  The player is awarded Fictitious Awards and plays until the player wishes to play the actualization game or until the games rules require.

> The on-line service now interactively plays an actualization game with the Player at block 50.  The actualization game uses the fictitious awards in a way that gives the appearance that the awards have a value in the actualization game.  The actualization game then displays in some interesting and exciting fashion the game's outcome that was concealed in the Destiny Code.

'082 patent, col. 6, lns. 7-17.  The prosecution history of the '082 patent fully supports GameLogic's construction of the "lottery game and an amusement game" and is discussed next.

The phrase "lottery game and an amusement [game]" were added to both claims 1 and 10 of the '082 patent in response to a series of interviews conducted with the patentee

and his representative.  *See*  JA Ex. C, at IN001393-94.  The interviews indicated that the

claim language was amended for reasons related to patentability.  *See id.* at IN001399-98.

The original claims, as filed in the application for what issued as the '082 patent,

referred only to "the game."  *See, e.g.,* JA Ex. C, at IN001451 (". . . the gaming piece

including a predetermined code which includes data indicating whether the player wins or

loses the game, . . . .")  The patent examiner rejected all of the claims as filed, for among

other reasons, being indefinite for "failing to particularly point out and distinctly claim

the subject matter which applicant regards as the invention," in violation of 35 U.S.C.

§ 112.  The examiner stated that the claims "are replete with indefiniteness for not clearly

claiming the subject."  *See* JA Ex. C, at IN001409.  After specifying some of the claim

terminology which he deemed indefinite, the examiner continued, "[t]he examiner also

suggests to the Applicant that the phrase 'the game' is not clearly linked to a 'lottery type

game.'"  *Id.*

The examiner also rejected many claims as being anticipated under 35 U.S.C. §

102 and/or obvious under 35 U.S.C. § 103.  *See* JA Ex. C., at IN001409-15.  The prior art

references relied upon and cited by the examiner disclosed increasing the excitement of

playing a game of chance by providing the player with the amusement and entertainment

of another game while at the same time playing the game of chance, or lottery.  *See, e.g.,*

JA Ex. C, at IN001411-12.[6]  In other words, the prior art disclosed lottery games in which

---

[6]  ". . . Heidel discloses a video lottery terminal which permits games of chance such as
black jack to be played . . . .  It would have been obvious to one of ordinary skill in the art
at the time the invention was made to combine 'the processor presenting a game of
chance to the player on a display for interactive play by the player, the player controlling
game play by inputting game parameters to the processor" as taught by Koza in the
combination with Heidel with Clapper's apparatus in order to increase the excitement of

the lottery result was revealed via play of an amusement game.

After the patentee's attempts to amend these claims to overcome the grounds for rejection and a series of interviews conducted with the patentee and his representative (*see* JA Ex. C, at IN001398-407), the examiner allowed the claims that eventually issued, but only after providing his own amendments to the claims on June 11, 1996.  *See* JA Ex. C, at IN001392-95.

Importantly, the examiner amended claims 1 and 10 of the '082 patent, by among other things, adding the term "lottery game and an amusement" prior to "game," clarifying that there are two distinct games required in the independent claims of the '082 patent.  *See* JA Ex. C, at IN001393-94.  These examiner's amendments were done after a series of interviews in which the examiner and the patentee "[p]roposed and discussed claim language to overcome 112(2) issues and prior art and to further clarify/define novel and non-obvious features of [the] instant invention."  Further, "[a]greement was reached to amend claims 1, 5-6, and 10-17 and to cancel claims 18-21."  JA Ex. C at  IN001398. Thus, the amendments to claims 1 and 10 clearly narrowed those claims for reasons relating to patentability.

Further demonstrating the distinct nature of the lottery and amusement games claimed in the asserted patents is the plural reference to them in the claims themselves. For instance, in claim 10 of the '082 patent and claim 1 of the '603 patent, the first element recites in relevant part that "the player does not know whether the player will win or lose the <u>games</u> prior to play of the amusement game" (emphasis added).  Though

_____

playing a lottery game by providing the player with the 'amusement and entertainment of a video game while at the same time playing the lottery thus having the opportunity to win a lottery prize' (Koza, column 2, lines 37-40)."

claim 1 of the '082 patent ostensibly states only "whether the player will win or lose the game prior to play of the amusement game" without specifying which game is being referred to, the examiner's amendments make clear that claim 1 of the '082 patent should also refer to games in plural, depicting their distinct nature. *See* JA Ex. C, at IN001393 ("Claim 1, line 7, insert --s-- on 'game' before 'prior'.") For whatever reason, that examiner amendment issued with the Notice of Allowability was not made, although the examiner's intent was clear.

In light of the plain language of the claims, the description and usage in the specification, and the prosecution history, the phrase "lottery game and an amusement game" should be interpreted as requiring the lottery game and an amusement game (two distinct games). As recited in the claim, the code includes data indicating whether the player wins or loses each of these games.

## C.     THE "PROCESSOR"

The "processor" used in the asserted claims should be construed to mean a single, multi-purpose device that interprets and executes instructions that is performing all of the various steps outlined in the claims.

Neither the '082 patent nor the '603 patent define "processor." The claims themselves, however, specify that it is a single, multi-purpose processor which interprets and executes instructions. For example, the second element of claim 1 of the '082 patent requires "entering the code by the player into a processor prior to amusement game play." JA Ex. A, '082 patent, col. 11, lns. 7-8. The third and fourth elements refer to the same processor—and it is clear that it is the same processor referenced in the second element because it is now called "*the* processor." This can only mean the previously referenced

23

processor.  Thus the same processor into which the player enters the code in the second element is also the processor that "generat[es] the amusement game on a display for play by the player" and "control[s] whether the player will win or lose the amusement game based upon the code entered by the player."  *Id.* at col. 11, lns. 9-14.  Claim 1 of the '603 patent follows the same basic structure: the second element recites "a processor" while the third and fourth elements recite actions of this same processor (and refer to it as "the processor").  JA Ex. B, '603 patent, col. 16, lns. 6-10.

In independent claim 10 of the '082 patent, it is equally clear that the claim refers to a single processor.  The claimed "lottery type game" requires "a processor for receiving said code input by the player prior to amusement game play" as recited in the second element of the claim.  '082 patent, col. 12, lns. 12-13.  The third and fourth elements of the claim explicitly refer to "said processor," i.e., the same processor, generating the amusement game on a display and determining whether the player will win or lose the amusement game based upon said code.  *Id.*, col. 12, lns. 14-17.  Dependent claims 16 and 17 also refer to "said processor."  *Id.*, col. 12, lns. 32-37.

Although Ingenio argues that the processor can be one or more processors, the subsequent references to that processor in the claims clearly indicate that it is the same device at issue for the various steps called for in the claims.  Ingenio's emphasis on "a processor" to mean one or more processors is a red herring.  The dispute is not whether there is one or more processors, but rather whether the processor or processors performing the various functions specified in the asserted claims are contained in one device.  The claim language and specifications make clear that the processor(s) are contained in one place or in a single device which is performing each of the steps the

24

claimed "processor" completes in the claims of the asserted patents. *See, e.g.*, JA Ex. A, '082 patent, col. 4, lns. 53-61.

Further support for the GameLogic's construction of "processor" is found in the accompanying dependent claims. "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314 (citation omitted).

For instance, dependent claim 16 of the '082 patent recites, "[t]he lottery type game of claim 10 wherein said processor includes a computing device." Here, the processor from claim 10, which was introduced as "a processor for receiving said code input by the player prior to the amusement game play" and further referenced within claim 10 as "said processor" which generates the amusement game and determines win or loss of that amusement game based upon the code, is further specified to include a computing device. As claim 16 only refers to one processor in claim 10 without any further clarification, although "processor" is used in three separate elements of claim 10, it follows that there is only a single processor used and claimed in claim 10. Such singular usage and reference of the processor is consistent in the dependent claims of the '082 and '603 patents. *See* '082 patent, claims 8, 9, 16 and 17; '603 patent, claim 17. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314-15 (citations omitted).

D.      **"PROCESSOR WITHIN A COMPUTING DEVICE"**

Based on its ordinary meaning to one skilled in the art, the "processor within a computing device," as used in claim 8 of the '082 patent, should be construed as being synonymous with the "processor" set forth in the second element of claim 1, specifically where the code is entered by a player "into a processor prior to amusement game play." The processor, as used in claim 1, must be within a computing device for it to perform the functions specified in claim 1, namely generating the amusement game on a display for play by the player, who controls game play by inputting game parameters to the processor.  JA Ex. A, '082 patent, col. 11, lns. 7-11.  Any other construction of the "processor" as used in claim 1 of the '082 patent would make that claim indefinite.

One of Ingenio's experts, Dr. Grimes, confirms that in the context of the patent, the "processor" would always be within a computing device.  *See* Ex. 2, Grimes Depo. Tr. 205.  Dr. Grimes continued:

> It's not immediately clear what claim 8 [of the '082 patent] -- further limitations claim 8 adds, because as I understand the terms here, that claim 1 [of the '082 patent] -- the processor in claim 1 that the code is entered into would include a processor within a computing device.  So -- so I haven't analyzed this in great detail, but as I sit here now, claim 8 appears to be -- appears to be superfluous.

Ex. 2, Grimes Depo. Tr. 206, ln. 20 - Tr. 207, ln. 5.

E.      **"PROCESSOR WITHIN AN ON-LINE SUBSCRIPTION SERVICE"**

The ordinary meaning of a "subscription" is an order of future goods or services (*e.g.*, for a periodical for a given time period or for a series of performances).  A "subscription" may, in addition, include the purchase of goods or services to be received at the time of order.  Thus, a "processor within an on-line subscription service," as used in claim 9 of the '082 patent, should be construed to refer to a processor that is contained

in a device that is a component of a subscription service offered on-line by the provider

of the games.  Ingenio's proposed construction of claim 9 in which the processor is part

of an on-line subscription service such as at AOL, which is actually an Internet service

provider and not the provider of the games, contradicts the plain meaning of the claim.

"The inquiry into how a person of ordinary skill in the art understands a claim

term provides an objective baseline from which to begin claim interpretation.  That

starting point is based on the well-settled understanding that inventors are typically

persons skilled in the field of the invention and that patents are addressed to and intended

to be read by others of skill in the pertinent art."  *Phillips*, 415 F.3d at 1313 (citations

omitted).  In this case, the inventor of the '082 patent, Perry Kaye, understands

subscriptions as used in the context of his invention to be consistent with the plain

meaning of the claim language:

> Well, what this allowed the person to do is to subscribe to a
> service in which they would automatically be sent games
> and/or chances to win either electronically or through the
> mail or – you know, basically, that would be the two main
> things.

Ex. 4, Kaye Depo. Tr. 180, lns. 14-19.  Mr. Kaye continued:

> So the whole point was the recurring income, you would
> have – you would build customer loyalty, You have
> particular people interested in, you know, getting into certain
> groups, just like they play bridge Wednesday nights, they
> would play WinWare tickets Wednesday nights.

Ex. 4, Kaye Depo. Tr. 181, ln. 20 - Tr. 182, ln. 4.  Thus, the inventor contemplated the

subscription to facilitate a repeat relationship between the game provider and the end

users.  The subscription paid to an Internet service provider does not accomplish this

contemplated goal.   Further, it is possible to obtain access to the Internet without paying

27

for a subscription service.  Thus, the on-line subscription referenced in claim 9 must be a subscription offered by the game providers, who could offer their games on-line, as through the Internet, but the processor claimed must belong to the game provider, and not the Internet service provider, to accomplish the various functions allocated to the claimed processor in claim 1 of the '082 patent.

### F.    "PROCESSOR INCLUDES A COMPUTING DEVICE"

The ordinary meaning of the phrase, "processor includes a computing device" in claim 16 of the '082 patent is that the processor, such as a microchip, contains within it a personal computer.  Otherwise, claim 16 is indefinite.

Depicting its unclear nature, one of Ingenio's experts, Dr. Bertram, concluded regarding claim 16:

> Well, I must -- I must say I agree that the language of this claim is -- is a little but muddled.  But presumably, again, it is talking about the first processor for receiving the code by the player includes -- or is connected to a computing device.

Ex. 3, Bertram Depo. Tr. 126, lns. 12-17.  Dr. Bertram, to make any sense of this claim, was forced to add "is connected to" when providing its meaning.

### G.    "READING"

Many of the claim terms of the '082 patent also appear in the '603 patent, and the constructions addressed above apply equally to the '603 patent.  Claim 1 of the '603 patent differs from the '082 patent claims, however, in that rather than the player

"entering the code," a processor "read[s] the code."[7]  A "processor," such as a microchip,

is contained within a computer.  If data needs to be transferred to a computer (or

processor, or gaming machine, or any device for that matter), there are three basic ways

to achieve this:  (1) somebody inputs the data, e.g., typing it, (2) the data is transferred

through a telecommunications means, *e.g.*, telephone or modem, or (3) the device reads

the data from something, for example a coin with a memory chip as in the '603 patent.

The ordinary meaning of "reading," as used in claim 1 of the '603 patent

("reading the code by a processor"), means to actively examine and grasp the meaning of

the code.  This differs from Ingenio's proposed definition of "read," which is "receive

input of the code from some source."  The new matter of the '603 patent describes at

length the use of "casino chips or tokens containing Destiny Codes to allow a player to

simulate wagering games with cash."  JA Ex. B, '603 patent, col. 11, lns. 13-16.  The

chip or token can be inserted in a slot-machine like receptacle, and the machine processor

"*reads* the Destiny Code stored in the memory device contained on the gaming piece."

*Id*. at col. 12, lns.1-7 (emphasis added).

Ingenio's proposed definition is the opposite of what is disclosed in the

specification.  Whereas the specification describes the processor as actively extracting the

Destiny Code from the game piece memory, Ingenio's definition would merely require

the processor to be a passive recipient when the code is "input" from a source.

Ingenio's proffered construction of "reading" as used in the '603 patent makes

---

[7]  Another difference is that the limitation "the player controlling game play by inputting game parameters to the processor" found in claim 1 of the '082 patent is not present in either the '603 patent or in claim 10 of the '082 patent.

claim 1 of the '603 patent confusingly similar to claim 10 of the '082 patent.  As

Ingenio's expert, Dr. Bertram stated:

> Q:     . . . What's the distinction between those two claims?
>
> A:     Well it appears that the element in the -- the '603
> patent says, "Reading the code by a processor," which means
> inputting the code.  So it now has the code.  And this implies
> that the code has already been input, and a processor for
> receiving the code, which is -- I don't really see a clear
> distinction between the two.
>         The processor -- the processor that's reading the code
> is the processor for receiving the code input by the player.

Ex. 3, Bertram Depo. Tr. 118, lns. 13-22.  Dr. Bertram concluded that the two elements in

question in claim 10 of the '082 patent and claim 1 of the '603 patent are "accomplishing

the same step."  Ex. 3, Bertram Depo. Tr. 119, lns. 3-4.

## V.    CONCLUSION

For the foregoing reasons, the Court should adopt GameLogic's proposed

constructions for the disputed claim terms described herein.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

| | |
|---|---|
| Gary M. Hnath | By:  */s/ David E. Moore* _____ |
| Susan Baker Manning | Richard L. Horwitz (#2246) |
| Goutam Patnaik | David E. Moore (#3983) |
| Timothy A Molino | Hercules Plaza, 6th Floor |
| BINGHAM MCCUTCHEN LLP | 1313 N. Market Street |
| 2020 K Street,. NW, Suite 1100 | Wilmington, DE  19899-0951 |
| Washington, DC  20006 | Tel:  (302) 984-6000 |
| Tel:  (202) 373-6050 | rhorwitz@potteranderson.com |
| | dmoore@potteranderson.com |
| Dated:  May 1, 2006 | |
| 730314 / 28749 | *Attorneys for Defendant GameLogic Inc.* |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**<u>CERTIFICATE OF SERVICE</u>**

I, David E. Moore, hereby certify that on May 1, 2006, the attached document

was hand delivered to the following persons and was electronically filed with the Clerk of

the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF:

Edmond D. Johnson
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899

I hereby certify that on May 1, 2006, I have Electronically Mailed the documents

to the following non-registered participants:

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
Hunton & Williams LLP
1900 K Street, N.W., Suite 1200
Washington, DC  20006
rtate@hunton.com
bburoker@hunton.com
ccuneo@hunton.com

By:  */s/ David E. Moore*
　　　Richard L. Horwitz
　　　David E. Moore
　　　Hercules Plaza, 6th Floor
　　　1313 N. Market Street
　　　Wilmington, Delaware  19899-0951
　　　(302) 984-6000
　　　rhorwitz@potteranderson.com
　　　dmoore@potteranderson.com

672965