# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INGENIO, FILIALE DE
LOTO-QUEBEC, INC.,

              Plaintiff,

          v.

GAMELOGIC INC.

              Defendant.

Civil Action No. 04-1532 (KAJ)

**PUBLIC VERSION**

---

**PLAINTIFF INGENIO, FILIALE DE LOTO-QUEBEC, INC.'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF
INFRINGEMENT AND VALIDITY**

THE BAYARD FIRM

Edmond D. Johnson (No. 2257)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone (302) 655-5000
Facsimile (302) 658-6395

OF COUNSEL:

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
Hunton & Williams LLP
1900 K Street, N.W.; Suite 1200
Washington, DC 20006
Telephone (202) 955-1500
Facsimile (202) 778-2201

Counsel for Plaintiff
Ingenio, Filiale De Loto-Quebec, Inc.

624350v1

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1
      A.    The Parties .................................................................................................1
      B.    Background Of The Technology ...............................................................2
II.   STATEMENT OF UNDISPUTED FACTS ..........................................................3
III.  APPLICABLE LAW .............................................................................................6
      A.    The Summary Judgment Standard .............................................................6
      B.    Infringement Law.......................................................................................6
      C.    Enablement .................................................................................................6
      D.    General Claim Construction Principles ......................................................7
            1.    The Federal Circuit Has Reaffirmed The Paramount Importance Of
                  Intrinsic Evidence .........................................................................7
            2.    The Claim Language Defines The Metes And Bounds Of The Inventions.8
            3.    Claim Terms Generally Should Be Given Their Ordinary And Customary
                  Meaning ........................................................................................8
            4.    The Claims Must Be Read In View Of The Specification Without Reading
                  Limitations Into the Claims ...........................................................9
            5.    A Claim Construction Cannot Exclude A Preferred Embodiment ............11
            6.    The Prosecution History May Be Helpful In Construing Claims.............11
            7.    Extrinsic Evidence, Including Expert And Inventor Testimony, Is Less
                  Significant Than Intrinsic Evidence In Construing The Claims.................12
            8.    "A" means "one or more"..............................................................12
IV.   THE PROPER CONSTRUCTION OF THE PATENTS IN SUIT .....................13
      A.    Introduction..............................................................................................13
      B.    Code Which Includes Data Indicating Whether The Player Wins Or Loses The
            Lottery Game And An Amusement Game...............................................14
      C.    Lottery Game ...........................................................................................16
      D.    Amusement Game.....................................................................................17
      E.    The Data Being Unrecognizable To The Player, Such That The Player Does Not
            Know Whether The Player Will Win Or Lose The Game Prior To Play Of The
            Amusement Game.....................................................................................18
      F.    Reading The Code By A Processor ..........................................................21

i

| | | | |
|---|---|---|---|
| G. | | "A" Processor | 22 |
| | 1. | Processor Within A Computing Device | 23 |
| | 2. | Processor Within An On-Line Subscription Service | 23 |
| | 3. | Processor Includes A Computing Device | 24 |
| V. | | PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT OF THE ASSERTED CLAIMS SHOULD BE ENTERED | 25 |
| | A. | GameLogic's Non-infringement Positions Rely Entirely on Its Incorrect Claim Interpretations | 25 |
| | B. | GameLogic's Admissions Establish Infringement Under Ingenio's Interpretations | 26 |
| VI. | | GAMELOGIC'S ENABLEMENT DEFENSE FAILS UNDER A PROPER INTERPRETATION OF THE CLAIMS | 28 |
| VII. | | CONCLUSION | 28 |

## TABLE OF AUTHORITIES

Pages

Cases

*Abtox, Inc. v. Exitron Corp.,*
  122 F.3d 1019 (Fed. Cir. 1997) .............................................................................. 8

*Altiris, Inc. v. Symantec Corp.,*
  318 F.3d 1363 (Fed. Cir. 2003) ............................................................................ 12

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................. 6

*Carnan Indus. Inc., v. Wahl,*
  724 F.2d 932 (Fed. Cir. 1983) ............................................................................. 24

*CFMT, Inc. v. Yieldup Int'l Corp.,*
  349 F.3d 1333 (Fed. Cir. 2003) ............................................................................. 7

*Elkay Mfg. Co. v. Ebco Mfg. Co.,*
  192 F.3d 973 (Fed. Cir. 1999) .............................................................................. 12

*In re Buchner,*
  929 F.2d 660 (Fed. Cir. 1991) ............................................................................... 7

*In re Wands,*
  858 F.2d 731 (Fed. Cir. 1988) ............................................................................... 6

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ...................................................................... 7, 8, 9

*Interactive Gift Express, Inc. v. Compuserve, Inc.,*
  256 F.3d 1323 (Fed. Cir. 2001) ............................................................................. 9

*Inverness Med. Switz. GmbH v. Warner Lambert Co.,*
  309 F.3d 1373 (Fed. Cir. 2002) ............................................................................ 12

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
  175 F.3d 985 (Fed. Cir. 1999) ............................................................................... 6

*KCJ Corp. v. Kinetic Concepts, Inc.,*
  223 F.3d 1351 (Fed. Cir. 2000) ............................................................... 12, 13, 22

*Lampi Corp. v. Am. Power Prods., Inc.,*
  228 F.3d 1365 (Fed. Cir. 2000) ........................................................................... 11

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996) .................... passim

*McCarty v. Lehigh Valley R.R. Co.,*
  160 U.S. 110 (1895) ........................................................................................... 8, 10

*Merrill v. Yeomans,*
  94 U.S. 568 (1876) ................................................................................................. 8

iii

*Nazomi Communications, Inc. v. ARM Holdings, PLC*,
   403 F.3d 1364 (Fed. Cir. 2005) ................................................................................................ 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ......................................................................................... passim

*Process Control Corp. v. HydReclaim Corp.*,
   190 F.3d 1350 (Fed. Cir. 1999) ................................................................................................ 10

*Rheox, Inc. v. Entact, Inc.*,
   276 F.3d 1319 (Fed. Cir. 2002) ................................................................................................ 11

*SanDisk Corp. v. Memorex Prods., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ......................................................................................... passim

*Southwall Techs., Inc.v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ................................................................................................. 11

*Springs Window Fashions LP v. Novo Indus. L.P.*,
   323 F.3d 989 (Fed. Cir. 2003) ................................................................................................. 11

*Teleflex, Inc. v. Ficosa North Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ............................................................................................... 10

*United States v. Telectronics, Inc.*,
   857 F.2d 778 (Fed. Cir. 1988) ................................................................................................... 6

*Vitronics Corp. v. Conceptronics Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ........................................................................................ 7, 8, 9, 11

*White v. Dunbar*,
   119 U.S. 47 (1886) .............................................................................................................. 8, 9

**Statutes**

35 U.S.C. § 112 ........................................................................................................................ 6

**Other Authorities**

American Heritage Dictionary 4th ed., 2000 ............................................................................. 14

Cambridge Advanced Learner Dictionary, 2004 ....................................................................... 14

Merriam-Webster Online Dictionary ....................................................................................... 14

Webster's II New College Dictionary ................................................................................. 14, 15

**Rules**

Fed. R. Civ. P. 56(e) ................................................................................................................. 6

## I.     INTRODUCTION

Plaintiff, Ingenio, Filiale de Loto-Quebec, Inc., ("Ingenio") respectfully requests the Court to grant its coincident Motion For Partial Summary Judgment Of Infringement And Validity for at least the following reasons. As detailed below, Ingenio requests that the claims be interpreted in accordance with established claim construction principles and in accordance with the ordinary and accustomed meanings of the claim terms. If the Court construes the claims as requested by Ingenio, Defendant, GameLogic, Inc., ("GameLogic") has already admitted sufficient facts regarding the operation of its accused product that there is no genuine issue remaining for trial and an injunction to prevent further patent infringement should be granted.

In addition, GameLogic has asserted a theory of patent invalidity due to lack of an enabling disclosure. However, GameLogic's theory requires strained claim interpretations that run counter to established law. With properly construed claims, summary judgment denying GameLogic's charge of invalidity for lack of enablement is appropriate.

### A.     The Parties

Ingenio is a technology development subsidiary of Loto-Quebec, Inc., ("Loto-Quebec") the lottery entity for the Canadian province of Quebec. Ingenio is an award winning innovator and world-wide leader in the development of multimedia lottery products. Ingenio is the lawful assignee of all right, title and interest in and to U.S. Patent No. 5,569,082 (the "'082 Patent") and U.S. Patent No. 5,709,603 (the "'603 Patent") (collectively the "Ingenio Patents"), having acquired those rights from the inventor, Perry Kaye, in whose name the Ingenio Patents were initially issued.

GameLogic through a previous relationship with Scientific Games Corporation ("Scientific Games"), and now independently, offers to sell a computer based lottery game known as HomePlay that directly infringes one or more claims of both of the patents-in-suit.

### B.    Background Of The Technology

In the United States, there are three major types of lottery games and corresponding businesses. The first is known as the online lottery business, in which a computer system generates numbers or receives user-selected numbers and a periodic drawing determines the winner. The PowerBall, Pick Four, and games of that nature generally fall into that category. Like GTech (a defendant in a previous suit before this Court), Scientific Games is a vendor for the online lottery business and manages online lottery systems for entities providing such games.

Instant games are the second major type of lottery games. Instant games typically involve a "scratch-off" ticket that a consumer purchases. The consumer is then able to determine win/loss immediately (or whenever they choose). This type of lottery game has typically been "printed" in advance with win/loss information concealed until the ticket is purchased.

Various commercial embodiments of the Ingenio Patents, as practiced by a number of licensees and state-run lotteries in many parts of the world, represent a third type of lottery game. A computer generates a ticket with a code disposed thereon that is purchased for a chance to win prizes. Unlike historical "online games," the code is not used in a drawing. Rather, like traditional instant games, the consumer can either determine whether he or she won or lost on his or her own in one of two ways: (1) by having the vendor scan the code or a bar code on the ticket, or, (2) as is the intended scenario, by taking the code home and playing an amusement game on his or her computer, with the amusement game outcome and lottery game outcome being based on the code.

2

Ingenio is not a direct vendor to any of the state lottery agencies in the United States. Rather, it has entered into arrangements with business partners (who have historically been instant ticket vendors) who then contract directly with state lottery agencies. GameLogic's HomePlay Lottery offering directly competes for potential sales with Ingenio's licensees. To date, GameLogic has not completed a sale of its HomePlay Lottery to any state lotteries. It continues, however, to offer HomePlay Lottery for sale in violation of Ingenio's patent rights. Ingenio has brought this suit to obtain an injunction to prevent GameLogic's further infringement.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

1.    Ingenio is the lawful assignee of all right, title and interest in and to the Ingenio Patents. GameLogic offers to sell, has developed and owns HomePlay Lottery, a lottery-based gaming product. *See, e.g.*, Declaration of Dow K. Hardy ("Hardy Dec."), attached to Declaration of Brian M. Buroker ("Buroker Dec.") as Exhibit 1 (hereinafter "Ex. _"), ¶ 4.

2.    GameLogic uses a demonstration website (http://demo.homeplay.com) to demonstrate the HomePlay Lottery to potential customers (*i.e.*, offers for sale). *See, e.g.*, Hardy Dec. ¶ 13 (Buroker Dec. Ex. 1). GameLogic's system is designed for performance of a method for playing a lottery. For example, on its website (www.gamelogicinc.com), GameLogic advertises "a new easy-to-use Internet enabled lottery product ... which will provide your players with better value and more fun." *See, e.g.*, Buroker Dec. Ex. 4, IN001230.

---

[1] In this Memorandum, Ingenio sets forth only those facts necessary to demonstrate infringement under its proposed interpretation of the disputed claim terms. As discussed below, if the Court adopts Ingenio's proposed interpretations of those disputed claim terms, then GameLogic has presented no non-infringement position to preclude summary judgment. If the Court adopts any of GameLogic's proposed interpretations, additional evidence exists to demonstrate infringement. Such evidence, if necessary, may be submitted in opposition to GameLogic's anticipated motion for summary judgment.

3.      GameLogic admits that the "player buys a paper ticket from a lottery vendor." *See, e.g.,* Hardy Dec. ¶ 6; Deposition of Dow K. Hardy (pursuant to Rule 30(b)(6)) ("Hardy Dep.") 80:15-82:2 (Buroker Dec. Ex. 2).

4.      GameLogic admits that the ticket (gaming piece) comprises an access code printed on the paper ticket. *See, e.g.,* Hardy Dec. ¶ 6 (Buroker Dec. Ex. 1).  To play the HomePlay Lottery, the player accesses a website, enters the access code printed on the ticket in an appropriate field on the website, and submits the access code to the GameLogic servers. *See, e.g.,* Hardy Dec. ¶ ¶ 13-15 (Buroker Dec. Ex. 1).

REDACTED

5.      GameLogic admits that the access code is 16 characters long and includes both letters and numbers. *See, e.g.,* Hardy Dec. ¶ 10 (Buroker Dec. Ex. 1).

REDACTED

tell from the access code (*e.g.,* BYBHB5CV9TT9BT6H) whether he or she will win before play of one of the available games, such as Prize Reel Blackjack. *See, e.g.,* Hardy Dec. ¶ 14 (Buroker Dec. Ex. 1); Hardy Dep. 158:3-6 (Buroker Dec. Ex. 2).

6.      GameLogic admits that the HomePlay Lottery interactive games (the amusement game play) are played on a system of processors that receives input of the access code prior to amusement game play. *See, e.g.,* Hardy Dec. ¶ ¶ 13-14 (Buroker Dec. Ex. 1); Hardy Dep. 88:18-89:9 and 90:12-91:3 (Buroker Dec. Ex. 2).

4

7.    GameLogic admits that its system of processors generates the interactive games (the amusement game) on the user's web browser (display) for the player to play. The player controls the game play by selecting when the play occurs, what selections are made, etc., depending on the game. For example, but without limitation, GameLogic's online demo implements an amusement game, (*e.g.,* Prize Reel Blackjack) generated by the system of processors, in which a player may control game play by clicking on a lever to play blackjack and a spin-the-wheel game. *See, e.g.,* Buroker Ex. 4 at IN001222; Hardy Dec. ¶¶ 18-20 (Buroker Dec. Ex. 1); Hardy Dep. 109:10-16 (Buroker Dec. Ex. 2).

8.    GameLogic admits that its system of processors controls whether the player is awarded money at the end of Prize Reel Blackjack (and other similar games) (which is the amusement game under Ingenio's interpretation):

REDACTED

*See, e.g.,* Hardy Dec. ¶¶ 13-16 (Buroker Dec. Ex. 1); Hardy Dep. 52:5-11; 69:9-17; 70:10-71:5; and 141:6-15 (Buroker Dec. Ex. 2).

9.    GameLogic admits that at the end of the amusement game (*e.g.,* Prize Reel Blackjack), the player's winnings, if any, are revealed to him or her. *See, e.g.,* Hardy Dec. ¶ 17 (Buroker Dec. Ex. 1).[1]

REDACTED

10.    GameLogic admits that the "player buys a paper ticket from a lottery vendor." Hardy Dec. ¶ 6 (Buroker Dec. Ex. 1). GameLogic also admits that paper tickets have been

5

implemented for use with the HomePlay Lottery. *See, e.g.*, Hardy Dep. 80:15-82:2 (Buroker Dec. Ex. 2).

    11.    GameLogic admits that its Prize Reel Blackjack game includes a card game. *See, e.g.*, Hardy Dec. ¶ 16 (Buroker Dec. Ex. 1).

    12.    GameLogic admits that the GameLogic servers which receive the access code include computers (computer servers). *See, e.g.*, Hardy Dep. 128:3-6 (Buroker Dec. Ex. 2).

## III.    APPLICABLE LAW

### A.    The Summary Judgment Standard

Summary judgment of infringement is appropriate in patent cases where the material facts regarding the operation of the accused device or system are not in dispute. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999). Once the moving party establishes a *prima facie* case, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### B.    Infringement Law

Determination of infringement entails a two step analysis — construction of the claims, a legal issue, followed by application of the claims to the accused system, a question of fact. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

### C.    Enablement

Under 35 U.S.C. § 112, first paragraph, a specification meets the enablement requirement if the *claimed invention* enables a person skilled in the art to make and use the invention without undue experimentation. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988); *see also United States v. Telectronics, Inc.*, 857 F.2d 778, 785 (Fed. Cir. 1988). Thus, the focus in an enablement

inquiry is on the claims. The claims, as properly interpreted, that must be enabled. *Id.* A patent

need not teach, and preferably omits, what is well known in the art. *See, e.g., In re Buchner,*

929 F.2d 660, 661 (Fed. Cir. 1991). Furthermore, it is not necessary to "enable one of ordinary

skill in the art to make and use a perfected, commercially viable embodiment absent a claim

limitation to that effect." *CFMT, Inc. v. Yieldup Int'l Corp.,* 349 F.3d 1333, 1338 (Fed. Cir.

2003).

### D.    General Claim Construction Principles

#### 1.    The Federal Circuit Has Reaffirmed The Paramount Importance Of Intrinsic Evidence

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit

revisited the applicable principles of claim construction. The *en banc* decision expressly

reaffirmed the court's previous holdings in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967

(Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996), *Vitronics Corp. v. Conceptronics Inc.,* 90

F.3d 1576 (Fed. Cir. 1996), and *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*

381 F.3d 1111 (Fed. Cir. 2004). *Phillips,* 415 F.3d at 1312 ("What we said in those cases bears

restating, for the basic principles of claim construction outlined there are still applicable, and we

reaffirm them today."); *see also id.* at 1324 ("Today, we adhere to that approach and reaffirm the

approach to claim construction outlined in that case [*Vitronics*], in *Markman,* and in *Innova*.").

The *Phillips* court confirmed that the most probative evidence of the meaning of a patent

claim term is to be found primarily in the intrinsic record, *i.e.,* the claims themselves, the

specification, and to a lesser extent, the prosecution history. *See id.* at 1312-17. Extrinsic

evidence, such as dictionaries and treatises, may still be considered, but are generally disfavored

as a means of interpreting claim terms. *See id.* at 1317-19. Furthermore, the court reaffirmed

7

those holdings admonishing against any claim construction that attempts to limit the scope of the claims by the number of embodiments described in the specification. *See id* at 1323-24.

2.  **The Claim Language Defines The Metes And Bounds Of The Inventions**

The Federal Circuit in *Phillips* set forth a very clear blueprint for a district court to follow: claim construction analysis begins with the words of the claim. *Id. at* 1312 ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (citing *Innova,* 381 F.3d at 1115); *see also Vitronics,* 90 F.3d at 1582 ("we look to the words of the claims themselves ... to define the scope of the patented invention"); *Markman,* 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.").

Relying upon Supreme Court precedent, *Phillips* emphasized the "primary importance" of the claims in determining "precisely what it is that is patented." *Phillips*, 415 F.3d at 1312 (citing *Merrill v. Yeomans,* 94 U.S. 568, 570 (1876)). "Because the patentee is required to define precisely what his invention is," the court explained, "it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Id.* at 1312 (citing *White v. Dunbar,* 119 U.S. 47, 52 (1886); also citing *McCarty v. Lehigh Valley R.R. Co.,* 160 U.S. 110, 116 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim ... , we should never know where to stop")); *see also Abtox, Inc. v. Exitron Corp.,* 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("the language of the claim frames and ultimately resolves all issues of claim interpretation.").

3.  **Claim Terms Generally Should Be Given Their Ordinary And Customary Meaning**

The Court in *Phillips* reaffirmed that "the words of a claim are generally given their ordinary and customary meaning," *i.e.,* "the meaning that the term would have to a person of

ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13

(citing *Vitronics*, 90 F.3d at 1582; *Innova*, 381 F.3d at 1116). A person of ordinary skill in the

art is deemed to read the claim term not only in the context of the particular claim in which the

disputed term appears, but in the context of the entire patent, including the other claims and the

specification. *Id.* at 1313.

### 4. The Claims Must Be Read In View Of The Specification Without Reading Limitations Into the Claims

After stressing the "primary importance" of the claims themselves, *Phillips* added that

"[t]he claims, of course, do not stand alone"; rather they "must be read in view of the

specification, of which they are a part." *Id.* at 1315 (citing *Markman*, 52 F.3d at 978). While

emphasizing the importance of the specification in claim construction, *Phillips* warned against

the "danger of reading limitations from the specification into the claim." *See id.* at 1323.

Indeed, the Federal Circuit has repeatedly cautioned courts not to use the specification to

construe the claims in a manner inconsistent with their plain language. As the court explained in

*Innova*:

> Some persons seem to suppose that a claim in a patent is like a
> nose of wax which may be turned and twisted in any direction,
> by merely referring to the specification, so as to make it include
> something more than, or something different from, what its words
> express. The context may, undoubtedly, be resorted to, and often is
> resorted to, for the purpose of better understanding the meaning of
> the claim; but not for the purpose of changing it, and making it
> different from what it is. *The claim is a statutory requirement,
> prescribed for the very purpose of making the patentee define
> precisely what his invention is; and it is unjust to the public, as
> well as an evasion of the law, to construe it in a manner different
> from the plain import of its terms.* This has been so often
> expressed in the opinions of this court that it is unnecessary to
> pursue the subject further.

*Innova*, 381 F.3d at 1117 (quoting *White*, 119 U.S. at 51-52) (emphasis added); *see also*

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1333-44 (Fed. Cir. 2001)

9

(reversing various claim constructions of district court for importing limitations from

specification into patent claims); *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350,

1357 (Fed. Cir. 1999) ("we do not permit courts to redraft claims"); *Markman*, 52 F.3d at 980

("The written description part of the specification itself does not delimit the right to exclude.

That is the function and purpose of claims."). Indeed, this has been the law for more than one

hundred years. *See, e.g., McCarty*, 160 U.S. at 116 ("We know of no principle of law which

would authorize us to read into a claim an element which is not present ... The difficulty is that

if we once begin to include elements not mentioned in the claim in order to limit such claim ...,

we should never know where to stop.").

        The Federal Circuit has also repeatedly admonished against any claim construction

exercise that attempts to limit the scope of the claims by the number of embodiments described

in the specification. As the court explained in *Teleflex*:

> In sum, the number of embodiments disclosed in the specification
> is not determinative of the meaning of disputed claim terms. As
> we explained in *CCS Fitness*, an accused infringer cannot
> overcome the "heavy presumption" that a claim term takes on its
> ordinary meaning simply by pointing to the preferred embodiment
> or other structures or steps disclosed in the specification or
> prosecution history. We hold that claim terms take on their
> ordinary and accustomed meanings unless the patentee
> demonstrated an intent to deviate from the ordinary and
> accustomed meaning of a claim term by redefining the term or by
> characterizing the invention in the intrinsic record using words or
> expressions of manifest exclusion or restriction, representing a
> clear disavowal of claim scope.

*Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (emphasis

added); *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir.

2005) (claims may embrace "different subject matter than is illustrated in the specific

embodiments in the specification"); *Innova*, 381 F.3d at 1117 ("even where a patent describes

only a single embodiment, claims will not be read restrictively unless the patentee has

10

demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."); *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) ("[i]t is a familiar principle of patent law that a claim need not be limited to a preferred embodiment").

The *Phillips* court reaffirmed this basic tenet of claim construction. *Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

### 5.    A Claim Construction Cannot Exclude A Preferred Embodiment

Moreover, "[t]he court must always read the claims in view of the full specification." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "A claim construction that excludes a preferred embodiment is rarely, if ever, correct." *SanDisk*, 415 F.3d at 1285. Furthermore, the Federal Circuit has adopted claim constructions excluding an embodiment only when the prosecution history required the claim construction because of disclaimer. *Springs Window Fashions LP v. Novo Indus. L.P.*, 323 F.3d 989, 996 (Fed. Cir. 2003); *see Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326 (Fed. Cir. 2002). This follows from Federal Circuit precedent that "[t]he prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Rheox*, 276 F.3d at 1326 *(quoting Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

### 6.    The Prosecution History May Be Helpful In Construing Claims

In addition to consulting the specification, *Phillips* instructs that a court "should also consider the patent's prosecution history, if it is in evidence." *Id.* at 1317 (citing *Markman*, 52 F.3d at 980). "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317 (citations omitted). The Court cautioned, however, against relying too heavily on the prosecution history: "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1317 (citing *Inverness Med. Switz. GmbH v. Warner Lambert Co.,* 309 F.3d 1373, 1380-82 (Fed. Cir. 2002)) (the ambiguity of the prosecution history made it less relevant to claim construction).

7. **Extrinsic Evidence, Including Expert And Inventor Testimony, Is Less Significant Than Intrinsic Evidence In Construing The Claims**

Importantly, *Phillips* signaled a shift away from excessive reliance on the extrinsic record, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317. The court explained, "while extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (citations omitted). The court concluded, "[i]n sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

8. **"A" means "one or more"**

The Federal Circuit has repeatedly emphasized that an indefinite article "a" in a patent carries the meaning of "one or more" in open-ended claims containing the transitional phrase "comprising." *KCJ Corp. v. Kinetic Concepts, Inc.,* 223 F.3d 1351, 1356 (Fed. Cir. 2000); *Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 977 (Fed. Cir. 1999); *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1373 (Fed. Cir. 2003). If the claim is not specific as to the number of elements, the article "a" receives a singular interpretation only in rare circumstances when the patentee

evinces a clear intent to limit the article to that specific number. *KCJ*, 223 F.3d at 1356.

Therefore, the claim limitation "a," without more, requires at least one. *Id.* When the claim

language or context suggest ambiguity in application of the general meaning of an article, the

written description and prosecution history is to be examined to ascertain whether to limit the

meaning of the article "a." *Id.*

IV.    **THE PROPER CONSTRUCTION OF THE PATENTS IN SUIT**

A.    **Introduction**

All of the disputed claim terms should be given their ordinary and accustomed meanings.

In contrast, GameLogic contends that certain phrases should be construed contrary to their

ordinary and accustomed meanings. *See* Joint Claim Construction Chart ("JCCC").

Both Ingenio Patents disclose several preferred embodiments. For example, the '082

Patent discloses a "Self-Contained Amusement/Actualization" embodiment (*see, e.g.*, Figs. 2-5

and accompanying discussion beginning on col. 4, line 29), an "on-line embodiment" (*see, e.g.*,

Fig. 6 and discussion beginning on col. 5, line 60) and an embodiment in which the game is

stored on a "game medium" (*see, e.g.*, Fig. 7 and discussion beginning on col. 6, line 22). The

"basic components" are also disclosed (*see, e.g.*, Fig. 1).[2] Absent a clear disclaimer of the

subject matter disclosed in these preferred embodiments, the claims should be interpreted in the

light of the full specification. *SanDisk*, 415 F.3d at 1285. Each of the claim terms that the

parties have identified as being in dispute are addressed below.

---

[2] As the disclosure in the '603 Patent is substantially similar to the disclosure in the '082 Patent, these embodiments are also disclosed in the '603 Patent. For brevity, only cites to the '082 Patent are provided in the following sections, however, similar recitations can be located in the '603 Patent as well.

B.    **Code Which Includes Data Indicating Whether The Player Wins Or Loses
      The Lottery Game And An Amusement Game**

As discussed above, many of the terms in the phrase "code which includes data indicating whether the player wins or loses the lottery game and an amusement game" should simply be given their ordinary and accustomed meaning.  Applying its ordinary meaning, the parties agree that a code is a system of symbols (as letters or numbers) used to represent assigned and often secret meanings.  *See* Joint Claim Construction Chart.

As recited in the claims, the code is one "which includes data indicating whether the player wins or loses the lottery game and an amusement game."[3]  In this context, the parties essentially agree that "data" should be given its ordinary meaning – "information in numerical form that can be digitally transmitted or processed." *Merriam-Webster Online Dictionary; see also Webster's II New College Dictionary*, 287 (1995) (defining data as "numerical information suitable for computer processing").  Thus, the code (a system of symbols that represent an assigned and secret meaning) includes (contains within) data (information in numerical form that can be digitally transmitted and processed).

The dispute between the parties revolves around the word "indicating" in this phrase.  The ordinary usage of the word "indicating" in this context is "to show the way to or the direction of; point out" (*American Heritage Dictionary 4th ed.*, 2000); "to show, point or make clear in another way" (*Cambridge Advanced Learner Dictionary*, 2004).  The ordinary meaning thus leads to an interpretation wherein the information in numerical form shows the way to, points to, or makes clear in another way the win/loss result.  Putting the meanings together, then, the entire phrase means that the code is a system of symbols (*e.g.*, letters and numbers) that

---

[3] This phrase appears in '082 claims 1 and 10 and '603 claim 1.

14

within it contains data (information in numerical form that can be digitally processed) that points to a win/loss result.

GameLogic asserts that "indicating" must mean "stating." Such a construction is improper because (1) it relies on a definition of "indicating" that does not make sense in this context and (2) it excludes embodiments that applicant did not disclaim.

While some definitions of indicating may refer to the word "stating," the plain meaning of "state" is to "put into words; declare." *Webster's II New College Dictionary,* 1077. The intrinsic evidence does not support a construction where the data is "put into words." Therefore, the plain meaning of "indicating" in the context of the Ingenio Patents cannot be "state."

GameLogic will undoubtedly direct this Court to language in the specification in which a "Destiny Code" is said to "store the outcome of the game of chance." '082 Patent, 2:59-60.[4] First, GameLogic improperly interprets this phrase as requiring that the win/loss value be actually physically contained in the data in this particular embodiment.    Second, GameLogic unduly relies on this one embodiment to the exclusion of other embodiments in the Ingenio Patents in which the data in the code is used as a pointer to the win/loss value in a look-up table. For example, the intrinsic evidence also shows that the code may "conceal" the outcome of the game ('082 Patent, 4:58-61) and that the code may be compared to a "lookup table" to determine a win/loss result ('082 Patent, 9:61 - 10:2). GameLogic's proposed construction thus would violate the claim construction principle against exclusion of embodiments from the patent absent clear indication of the patentee's intention to do so, which it can not demonstrate. *See, e.g., SanDisk,* 415 F.3d at 1285. In summary, Ingenio asks the Court to adopt the following construction:

---

[4] Ingenio will use the convention X:Y-Z for the column and line numbers of the patents.

15

**code which includes data indicating whether the player wins or loses the lottery game and an amusement game**

> A system of symbols (e.g., letters and numbers) that within it contains the data (information in numerical form that can be digitally processed) that points to a win/loss result of the lottery game and an amusement game.

### C.    Lottery Game

The ordinary and accustomed meaning of a lottery game is a game based on three basic principles:  payment associated with participation in a chance to win; a result based on chance; and a prize awarded to the winner(s).  Such an interpretation is supported by the intrinsic evidence.

GameLogic has proposed a similar meaning with the distinction that "lottery game" should be construed to mean "participation in a chance to win" rather than "payment associated with participation."  GameLogic's interpretation is incorrect because it is not supported by the intrinsic evidence as a whole.

The intrinsic evidence indicates that the gaming piece is *purchased* for a lottery-type game.  *See, e.g.,* '082 Patent, 1:25-28 ("a player purchases a chance to win"), 2:39-41 ("a sales device used to purchase game media"), 4:41-47 ("a player wishing to purchase ... [m]oney is put into a bill validater 34") and Fig. 4, item 33 ("how many tickets do you want to buy?").  Thus, the player pays to receive a gaming piece (including a code) to participate in a lottery-type game with a chance to win a prize.

Payment associated with participation is thus an essential element of a lottery game and any interpretation that excludes such a requirement would be contrary to both the ordinary

16

meaning and the '082 Patent specification. In summary, Ingenio asks the Court to adopt the following construction:

### lottery game

A game based on three basic principles:  payment associated with participation in a chance to win; a result based on chance; and a prize awarded to the winner(s).

D.    **Amusement Game**

The ordinary and accustomed meaning of "amusement game" is a game that amuses the player. Such an interpretation is supported by the intrinsic evidence. Despite what would appear to be a relatively easy term to understand, GameLogic attempts to burden that term with a lot of unnecessary and overly restrictive language from the specification, again ignoring embodiments to which the restrictive language do not apply.

Specifically, GameLogic asserts that an amusement game must require a game "played purely for enjoyment, which is used to give the feel of a completely random game of chance, and ends when the player is awarded fictitious award(s)." *See* JCCC. Furthermore, GameLogic has asserted that the lottery game and the amusement game must be separate games. This represents a blatant attempt to read limitations from the specification into otherwise clear claim language.

As noted above, the lottery game is the game for which the player has purchased a gaming piece. In order to display whether the player has won a prize in the lottery-type game, an "amusement game" is provided. *See, e.g.,* '082 Patent, 1:62-2:2 and 3:23-29. In some preferred embodiments, the '082 Patent describes providing a plurality of games all as part of the overall amusement game, one that is purely for fun and one that is an "actual" or "actualization" game to display the win/loss result of the lottery-type game for which the gaming piece was purchased.

17

*See, e.g.*, '082 Patent, 3:33-54. In other preferred embodiments, the "amusement game" and the "actualization game" can be combined into a single game – the amusement game. *See* '082 Patent, 4:6-21. In other words, the prize associated with the lottery type game may be revealed through an entertaining game that may have both pure entertainment and entertainment in the form of revealing the prize all rolled into one game – the amusement game.

Therefore, the intrinsic evidence supports preferred embodiments for which the results of the lottery game can be revealed simultaneously with the results of an amusement game (*i.e.*, the amusement game and the actualization game are a single game) or separately from the results of the amusement game. As applicant did not disclaim any of these preferred embodiments, a proper claim construction must include them all. *See, e.g.*, *SanDisk*, 415 F.3d at 1285.

Furthermore, applicant clearly was in possession of the terms "actual" or "actualization" game. Both terms appear in the specification. However, neither term appears in the claims. Therefore, any construction that would require a separate amusement and actualization game is an improper importation of a limitation from the specification. *Phillips*, 415 F.3d at 1323. In summary, Ingenio asks the Court to adopt the following construction:

**amusement game**

| A game that amuses the player. |
| --- |

    **E.**    **The Data Being Unrecognizable To The Player, Such That The Player Does Not Know Whether The Player Will Win Or Lose The Game Prior To Play Of The Amusement Game.**

The plain meaning of "the data being unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game," is that the player is not able to recognize from the data whether the player wins or loses the lottery game and amusement game prior to play of the amusement game.

This interpretation is supported by rules of grammar. The clause "such that the player does not know whether the player will win or lose the game prior to play of the amusement game," modifies "unrecognizable" in the clause "the data being unrecognizable to the player." Thus, the degree to which the data is unrecognizable to the player is provided by the modifying clause. This interpretation is also supported by the intrinsic evidence.

The intrinsic evidence indicates that the code may be simply unrecognizable (*e.g.*, '082 Patent, 2:13-15), encrypted ('082 Patent, 2:55-60), symbolic (*id.*), encoded (*e.g.*, '082 Patent, 2:67-3:1), decoded (*e.g.*, '082 Patent, 3:1-3) or obscured because it is used as an index into a lookup table (*e.g.*, '082 Patent, 9:64-66). Thus, the intrinsic evidence clearly supports the "ordinary and accustomed" interpretation of the phrase.

GameLogic argues that this phrase should be limited to one of these examples - encryption. It asserts that this phrase means that the "the data is encrypted using a procedure such that if the player knew said procedure he would know the outcome of the game ...[t]hus, the data stating the outcome of the amusement game and the lottery game is put into a code that must be decrypted and decoded." Again, this interpretation ignores the plain meaning of the phrase and improperly excludes preferred embodiments.

As demonstrated by the plain meaning, the stated amount that the data be unrecognizable to the player is "such that the player does not know whether the player will win or lose the game prior to play of the amusement game." There is no requirement that the data be encrypted or encoded in the plain meaning of the terms.

Furthermore, as demonstrated above, the intrinsic evidence demonstrates numerous ways of making the data unrecognizable to the player. A proper claim interpretation cannot exclude embodiments of the invention absent a clear disclaimer. *See, e.g., SanDisk*, 415 F.3d at 1285.

19

In addition, the words "encrypt" and "encode" were known to the applicant as evidenced by their use throughout the specification. If the applicant intended to mean encoded or encrypted, he would have used those terms in the claim. Likewise, the claims as originally filed use the term "unrecognizable." *See, e.g.*, '082 Patent Application, JCCC Ex. C at IN001451. As noted above, the specification as originally filed includes a number of different examples of how the code can be rendered unrecognizable.

Finally, the prosecution history indicates that "unrecognizable" does not require encoding or encryption. Specifically, in the initial rejection of the originally filed claims, the art applied by the Examiner, U.S. Patent No. U.S. Pat. No. 5,377,975 to Clapper, Jr. ("Clapper") did not disclose encrypted data. Yet, despite Clapper's failure to mention encryption of data, the Clapper reference was considered by the Examiner to disclose "unrecognizable" data. *See* JCCC Ex. C, '082 Patent Prosecution History at IN001410-11. In response, applicant did not argue that Clapper failed to disclose "unrecognizable" data, but distinguished Clapper on other grounds. *See id.* at IN001406. This exchange demonstrates that both the patent examiner and the applicant understood that the word "unrecognizable" is broad enough to cover techniques other than just encryption, such as the obfuscation technique used in Clapper.

For all of these reasons, an interpretation of "unrecognizable" that requires encoding or encryption is improper. Thus, "unrecognizable" should be afforded its ordinary and accustomed meaning as described above. In summary, Ingenio asks the Court to adopt the following construction:

20

**the data being unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game.**

> The player is not able to recognize from the data whether the player wins or loses the lottery
>
> game and amusement game prior to play of the amusement game.

F.    **Reading The Code By A Processor**[5]

In the context of the '603 Patent the ordinary and accustomed meaning of the term "read" means "to receive input of data from a storage device, a data medium, or any other source." *See, e.g.*, Computer User's High-Tech Dictionary, http://www.computeruser.com/resources/ dictionary/dictionary.html. Thus, "reading the code by a processor" means to receive input of the code (a system of symbols that represent an assigned and secret meaning) from some source. That source may thus include a computer program/software source.

The intrinsic evidence supports an interpretation that is consistent with the plain meaning of the phrase "reading the code by a processor." For example, '603 Patent, 2:20-22 and 5:50-65 disclose reading a code (accepting input of the code) in a manner consistent with the ordinary meaning.

GameLogic has asserted that the phrase "reading the code by a processor" should be construed to mean "actively examining and grasping the meaning of the code." This interpretation is contrary to the plain meaning of the terms and not supported by the intrinsic evidence.

First, it is clear that the appropriate context for GameLogic's proffered interpretation of "reading" is the context of a human comprehending the meaning of visible text. It does not make

---

[5] This phrase appears in '603 Patent, claim 1. It is not used in the '082 Patent.

21

sense for a non-human processor to be able to grasp the meaning of anything.  Processors do not

grasp meanings, they receive inputs (and perform processing operations).  Thus, the plain

meaning of the terms does not support GameLogic's interpretation.

 In addition, the intrinsic evidence does not support GameLogic's proposed interpretation.

As discussed above, the intrinsic evidence shows that "reading" is used as in the context of

computer-based technology, not the context of the written word.  In summary, Ingenio asks the

Court to adopt the following construction:

**reading the code by a processor**

> To receive input of the code (a system of symbols that represent an assigned and secret meaning)
>
> from some source.  That source may thus include a computer program/software source.

### G. "A" Processor

 Several claims contain a recitation to "a processor" followed by a subsequent recitation to

"the (or said) processor."[6]  Furthermore, all of these recitations begin with the "open" claim

format signaled by use of the term "comprising."  As discussed above, the plain and accustomed

meaning of this type of claim format is that the use of "a" when accompanied by "comprising"

means "one or more" absent a clear intent to limit to the singular.  *KCJ*, 223 F.3d at 1356.

 The intrinsic evidence does not demonstrate a clear intent to limit the term "a processor"

to a single device.  For example, both the '082 Patent and the '603 Patent disclose an "on-line

embodiment" wherein multiple processors are necessarily present.  *See, e.g.*, '082 Patent, Fig. 6,

and 5:59-6:19.  Therefore, a proper construction is that one or more processors are present.  In

summary, Ingenio asks the Court to adopt the following construction:

---

[6] *See, e.g.*, '082 Patent claims 1, 10 and '603 Patent claim 1.

22

**a processor**

One or more processors are present.

### 1.    Processor Within A Computing Device

The plain and accustomed meaning of this phrase is that the processor is a component of a computing device. This interpretation is supported by the intrinsic evidence. For example, '082 Patent, Fig. 6 and 5:59 - 6:19 disclose examples of computing devices (*e.g.*, computer or interactive TV) that include processor components. In summary, Ingenio asks the Court to adopt the following construction:

**processor within a computing device**

The processor is a component of a computing device.

### 2.    Processor Within An On-Line Subscription Service

The ordinary and accustomed meaning of a processor within an on-line subscription service is that the processor is part of an on-line subscription service (*e.g.*, America On-Line ("AOL")). Again, this interpretation is supported by the intrinsic evidence. For example, '082 Patent Fig. 6 and 5:59 - 6:19 disclose embodiments where the player plays the game via an on-line service. In such an on-line (*i.e.*, networked) environment, processors are located at numerous points throughout the network.

GameLogic has asserted that "subscription" should be interpreted as "an order of future goods or services (*e.g.*, for a periodical for a given time period or for a series of performances) ... [and] may, in addition, include the purchase of goods or services to be received at the time of the order." There is no need to construe "subscription" beyond its ordinary meaning. However, even if there was, at the time the invention was made (circa, 1995) on-line service providers

including AOL, Delphi, CompuServe and Prodigy were all providing on-line access to the Internet for a subscription fee. Thus, one of ordinary skill in the art would have understood the term on-line subscription service to refer to a fee-based internet service provider. In summary, Ingenio asks the Court to adopt the following construction:

### processor within an on-line subscription service

> The processor is part of an on-line subscription service (*e.g.*, a fee-based internet service provider such as AOL).

### 3.     Processor Includes A Computing Device

The plain and ordinary meaning of the phrase "processor includes a computing device" is a processor (as defined above) that has a component device that can perform computations. Again, the intrinsic evidence supports the plain meaning interpretation of this phrase. For example, '082 Patent, Fig. 6 and 5:59 - 6:19 disclose that a home computer could be implemented to access the system. At the time of the invention (circa, 1995) home computers were well known to include circuitry and/or software that would perform computations.

GameLogic asserts that this phrase should be construed to mean that "the processor, such as a microchip, contains within it a personal computer." Thus, GameLogic concludes that the claim should be indefinite as it is impossible for a microchip to contain within it a personal computer. Of course, it is contrary to claim construction principles to construe a meaning that would render the claim invalid when another reasonable interpretation exists. *See, e.g. Carman Indus. Inc., v. Wahl*, 724 F.2d 932, 937 n. 5, (Fed. Cir. 1983). In summary, Ingenio asks the Court to adopt the following construction:

24

processor includes a computing device

A processor (as defined above) that has a component device that can perform computations.

## V. PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT OF THE ASSERTED CLAIMS SHOULD BE ENTERED

Every one of GameLogic's proffered non-infringement positions relies on its incorrect understanding of the claims and claim elements in dispute. If this Court properly construes the claims, as Ingenio has proposed, the undisputed facts (all based on GameLogic's own admissions or documents) establish infringement of all asserted claims.[7] Appendices A and B hereto demonstrate the evidence to establish infringement of all asserted claims. The admissions sufficient to establish infringement of claim 1 of the '082 Patent also establish infringement of most of the remaining claims and thus, claim 1 will be described in more detail here.

### A. GameLogic's Non-infringement Positions Rely Entirely on Its Incorrect Claim Interpretations

Through its various submissions, GameLogic has identified the following non-infringement positions with respect to claim 1 of the '082 Patent: (1) its access code is not a "code" because a code requires encryption; (2) its access code does not "contain" win/loss information which it contends is required by the claims; (3) it does not provide a separate amusement game and lottery game according to its proposed definitions for those two terms; and (4) its system does not provide a single computer that receives its access code, generate the amusement game, and control whether the player wins or loses.

---

[7] As discussed above in the Statement of Undisputed Facts, if the Court adopts one or more of GameLogic's interpretations, additional disputed facts beyond those stated in the undisputed facts exist that preclude summary judgment for GameLogic.

As discussed in detail above, (1) the claims do not require that the code be encrypted, (2) the code can "point to" the win/loss information and need not contain that information; (3) the amusement game can be part of the lottery game and need not be separate, sequential games; and (4) the term "processor" can be met by one or more processors. If the Court agrees with Ingenio on each of these four propositions, then GameLogic has presented no argument, let alone evidence, as to why summary judgment should not entered.

**B.    GameLogic's Admissions Establish Infringement Under Ingenio's Interpretations**

As properly interpreted, GameLogic's admissions are more than sufficient to establish infringement. Each element of claim 1 of the '082 Patent is discussed below.

**1.    A method for playing a player lottery game**

GameLogic's HomePlay Lottery product is a lottery game because it is to be sold by state lottery agencies, involves a player paying for participate in a chance to win a prize. *See, e.g.,* Hardy Dec. ¶ 4 (Buroker Dec. Ex. 1).

**2.    Acquiring by a player a game piece, the gaming piece including a code which includes data indicating whether the player wins or loses the lottery game and an amusement game, the data being unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game**

As properly construed, the HomePlay Lottery access code is a "code." **REDACTED**

GameLogic admits that the HomePlay Lottery ticket (gaming piece) comprises an access code printed on the paper ticket. *See, e.g.,* Hardy Dec. ¶ 6 (Buroker Dec. Ex. 1). To play the HomePlay Lottery, the player accesses a website, enters the access code printed on the ticket in an appropriate field on the website, and submits the access code to the GameLogic servers. *See, e.g.,* Hardy Dec. ¶¶ 13-15 (Buroker Dec. Ex. 1). **REDACTED**

26

REDACTED

In addition, the player is not able to determine from the access code on the HomePlay Lottery ticket whether they will win or lose the lottery game or any amusement game. *See, e.g.,* Hardy Dec. ¶ 14 (Buroker Dec. Ex. 1); Hardy Dep. 158:3-6 (Buroker Dec. Ex. 2).

      3.    **Entering the code by the player into a processor prior to amusement game play**

GameLogic admits that the HomePlay Lottery interactive games (the amusement game play) are played on a system of processors that receive input of the access code prior to amusement game play from the player. *See, e.g.,* Hardy Dec. ¶¶ 13-14 (Buroker Dec. Ex. 1); Hardy Dep. 88:18-89:9 and 90:12-91:3 (Buroker Dec. Ex. 2).

REDACTED

      4.    **The processor generating the amusement game on a display for play by the player, the player controlling game play by inputting game parameters to the processor**

REDACTED

player controls the game play by selecting when the play occurs, what selections are made, etc., depending on the game. *See, e.g.,* Hardy Dec. ¶¶ 18-20 (Buroker Dec. Ex. 1); Hardy Dep. 109:10-16 (Buroker Dec. Ex. 2).

5.    **The processor controlling whether the player will win or lose the amusement game based upon the code entered by the player**

REDACTED

This evidence also establishes infringement of all other asserted claims in Appendices A and B.

## VI.    GAMELOGIC'S ENABLEMENT DEFENSE FAILS UNDER A PROPER INTERPRETATION OF THE CLAIMS

GameLogic's enablement defense boils down to two points: (1) the claims require encryption *and* (2) the patent specifications of the '082 and '603 Patents fail to teach an encryption technique that could be used for the proposed lottery use. GameLogic's expert conceded that if the claims *do not require* encryption, then the claims are sufficiently enabled. *See* Deposition of Christopher L. Brandin, Buroker Dec. Ex. 3 at 78:10-79:2. The asserted claims from the '082 and '603 Patents *do not require* encryption (as discussed above) and thus, logically, GameLogic's enablement defense must be dismissed.

## VII.    CONCLUSION

Plaintiffs respectfully request that the Court adopt in its entirety the claim constructions Plaintiffs have proffered in its separate Joint Claim Construction Chart, submitted herewith. Further, the Court should reject GameLogic's strained constructions which improperly seek to import limitations from one or more embodiments from the patent specifications into the claims to the exclusion of other embodiments. Defendants' claim constructions are the product of a results-oriented approach which find no basis in the law, and are intended solely for the purpose

28

of escaping the consequences of its clear infringement.  Ingenio respectfully requests the Court

to grant its coincident Motion For Partial Summary Judgment for infringement and validity.


Dated: May 1, 2006                      Respectfully submitted,

                                        THE BAYARD FIRM

                                        By:
                                           Edmond D. Johnson (No. 2257)
                                           222 Delaware Avenue, Suite 900
                                           Wilmington, DE  19801
                                           Telephone (302) 655-5000
                                           Facsimile (302) 658-6395

                                        Attorneys for Plaintiff Ingenio,
                                        Filiale De Loto-Quebec, Inc.


OF COUNSEL:

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
Hunton & Williams LLP
1900 K Street, N.W.; Suite 1200
Washington, DC  20006
Telephone (202) 955-1500
Facsimile (202) 778-2201

29