## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INGENIO, FILIALE DE LOTO-
QUEBEC, INC.,

        Plaintiff,

        v.

GAMELOGIC, INC.

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 04-1532 (KAJ)

**PUBLIC VERSION**

---

### DEFENDANT GAMELOGIC, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT AND VALIDITY AND ANSWERING BRIEF ON CLAIM CONSTRUCTION

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
kdorsney@potteranderson.com

OF COUNSEL:

Gary M. Hnath
Susan Baker Manning
Goutam Patnaik
Timothy A Molino
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
(202) 373-6000

*Attorneys for Defendant*
*GameLogic, Inc.*

Dated: May 15, 2006
Public Version Dated: May 22, 2006

<u>**TABLE OF CONTENTS**</u>

I.      INGENIO'S ALLEGATIONS AND GAMELOGIC'S HOMEPLAY
        LOTTERY™ PRODUCT .................................................................................2

II.     INGENIO IMPROPERLY CONSTRUES RELEVANT CLAIM
        TERMS AND PHRASES ................................................................................4

        A.     CHARACTERISTICS OF THE CLAIMED "CODE" ...................4

               1.     "Code Which Includes Data Indicating Whether The
                      Player Wins Or Loses The Lottery Game And An
                      Amusement Game"............................................................4

               2.     "The Data Being Unrecognizable To The Player, Such
                      That The Player Does Not Know Whether The Player
                      Will Win Or Lose The Game Prior To Play Of The
                      Amusement Game"............................................................8

        B.     THE "LOTTERY GAME" ..........................................................12

        C.     THE "AMUSEMENT GAME".....................................................13

               1.     Ingenio's Claim Construction of "Amusement Game"
                      Ignores The Claim Language, The Specification, And
                      The Prosecution History ..................................................13

               2.     Ingenio's Claim Construction Improperly Attempts To
                      Capture An Embodiment Surrendered By The Patentee
                      During Prosecution ..........................................................14

        D.     THE "PROCESSOR".................................................................18

        E.     "PROCESSOR WITHIN A COMPUTING DEVICE".................20

        F.     "PROCESSOR WITHIN AN ON-LINE SUBSCRIPTION
               SERVICE".................................................................................20

        G.     "PROCESSOR INCLUDES A COMPUTING DEVICE"...........21

        H.     "READING THE CODE BY A PROCESSOR"...........................21

III.    INGENIO'S PARTIAL SUMMARY JUDGMENT OF
        INFRINGEMENT AND VALIDITY SHOULD BE DENIED ....................22

        A.     GAMELOGIC DOES NOT INFRINGE ANY OF THE
               ASSERTED CLAIMS .................................................................22

               1.     GameLogic's Access Code Is Not Covered By The
                      Claimed Code ..................................................................22

               2.     **Redacted**

               3.     GameLogic's HomePlay Lottery™ System Does Not
                      Infringe The Processor Limitation....................................26

       B.    GAMELOGIC'S ENABLEMENT DEFENSE IS STILL
              INTACT............................................................................................27

IV.    CONCLUSION...........................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Ekchian v. Home Depot, Inc.,*
   104 F.3d 1299 (Fed. Cir. 1997) ..................................................................... 8

*Phillips v. AWH Corp ,*
   415 F.3d 1303 (Fed. Cir. 2005) ............................................................... 4, 5, 6

*Rheox, Inc. v. Entact, Inc ,*
   276 F.3d 1319 (Fed. Cir. 2002) .................................................................. 15

*Southwall Technologies, Inc. v. Cardinal IG Co.,*
   54 F.3d 1570 (Fed. Cir. 1995) ............................................................ *passim*

*Springs Window Fashions LP v. Novo Indus. L.P.,*
   323 F.3d 989 (Fed. Cir. 2003) ............................................................ 15, 17

## STATUTES

35 U.S.C. § 102................................................................................................. 11

35 U.S.C. § 103................................................................................................. 11

35 U.S.C. § 112 ¶ 2........................................................................................... 16

Pursuant to the Court's Scheduling Order, dated March 28, 2005, and as amended on April 17, 2006, Defendant GameLogic, Inc. ("GameLogic") submits the following Opposition to Plaintiff Ingenio, Filiale de Loto-Quebec, Inc.'s ("Plaintiff" or "Ingenio") Motion for Partial Summary Judgment of Infringement and Validity and Answering Brief on Claim Construction.[1]

Ingenio bases its motion for partial summary judgment of infringement and validity on incorrect and improperly supported claim constructions of relevant terms and phrases used in U.S. Patent No. 5,569,082 ("the '082 patent") and U.S. Patent No. 5,709,603 ("the '603 patent") (collectively, "the asserted patents" or "the patents-in-suit"). In some cases, Ingenio construes claim terms and phrases ignoring the surrounding claim language or the clear and consistent usage in the specification, or solely relies on dictionary definitions without regard to the context of the claims or the specification. As such, Ingenio's motion for partial summary judgment is flawed for both its infringement and validity components, and should thus be denied.

GameLogic's constructions are consistent with the plain meanings of the claim language. GameLogic, in its Opening Brief on Claim Construction, makes clear that the claims themselves, the patent specifications, and the prosecution history all support and are completely consistent with GameLogic's proposed constructions of the disputed

---

[1] Plaintiff filed only one memorandum on May 1, 2006, which ostensibly covers issues of claim construction in addition to Plaintiff's Motion for Partial Summary Judgment. Plaintiff, however, should not be permitted to address claim construction issues in any reply brief it may file. Per the parties' Stipulation and Order to Amend Scheduling Order, the parties agreed that reply briefs would be limited to case dispositive motions, whereas issues of claim construction would not be briefed beyond answering briefs. *See* D.I. 110. Thus, Plaintiff should not be given an extra bite at the claim construction apple because it chose to combine all issues in one memorandum.

claim terms and phrases. Moreover, in many cases, Ingenio's own experts in this litigation, Dr. Bertram and Dr. Grimes, fully support GameLogic's proposed claim constructions. To the extent there is more than one plain meaning of any of the disputed language, GameLogic's proposed constructions are consistent with the specifications and the prosecution history of the asserted patents, while Ingenio's proposed constructions are not.

Because Ingenio set forth its claim construction positions in its motion, even for those terms and phrases on which Ingenio's infringement and validity positions are not based, GameLogic will address all of Ingenio's claim construction positions in addition to its motion for partial summary judgment in this pleading.

## I.   INGENIO'S ALLEGATIONS AND GAMELOGIC'S HOMEPLAY LOTTERY™ PRODUCT

In Ingenio's Memorandum in Support of Its Motion for Partial Summary Judgment of Infringement and Validity (hereafter, "Ingenio Brief"), Ingenio asserts that GameLogic continues "to offer HomePlay Lottery for sale in violation of Ingenio's patent rights." *See* Ingenio Brief at 3. Although GameLogic did intend to market and sell its HomePlay Lottery™ product, it has been unable to do so because of the cloud caused by this lawsuit and Ingenio's incorrect allegations of patent infringement which have been disseminated to potential customers in the lottery industry.

Ingenio also contends that "various commercial embodiments" of the asserted patents are practiced in many parts of the world. *See* Ingenio Brief at 2. Discovery taken in this litigation, however, reveals that it is questionable whether Ingenio's licensees actually practice the asserted patents, especially when the claim language, specification,

and prosecution history are examined for the meaning and scope of the asserted claims.[2]

In response to Plaintiff's statement of alleged undisputed facts, GameLogic notes that Ingenio's allegations that GameLogic's HomePlay Lottery[TM] system infringes the asserted patents are founded on an incorrect and/or incomplete understanding of GameLogic's contemplated system. GameLogic incorporates by reference the factual discussion of its product in its opening Summary Judgment brief and the declaration of Dow Hardy submitted with it for a more accurate and complete description of GameLogic's product. For instance, in its Statement of Undisputed Facts, No. 9, Ingenio asserts that **Redacted**                                    **Redacted**

Ingenio Brief at 5.

**Redacted**

*See* Ingenio Brief, Exhibit 1 at ¶ 12.

Moreover, when the claims are properly construed, it is evident that many critical elements of the asserted patents are missing from GameLogic's HomePlay Lottery[TM] system. For at least the following reasons, Ingenio's partial summary judgment for infringement and validity must be denied in its entirety:

**Redacted**

---

[2] Ingenio purchased the rights to the patents-in-suit from the named inventor, Perry Kaye.

3

**Redacted**

\-

## II.    INGENIO IMPROPERLY CONSTRUES RELEVANT CLAIM TERMS AND PHRASES

### A.    CHARACTERISTICS OF THE CLAIMED "CODE"

The code, which is central to the asserted claims, has certain characteristics which are set forth in the claims themselves and supported by the specification and prosecution history of the patents-in-suit. Ingenio cites dictionary definitions out of context and ignores the consistent traits of the code as described in the patent specifications for its proposed construction of the phrases which outline the qualities of the claimed "code."

#### 1.    "Code Which Includes Data Indicating Whether The Player Wins Or Loses The Lottery Game And An Amusement Game"

In its Brief, Ingenio focuses its construction of this claim phrase on the word "indicating." *See* Ingenio Brief at 14-15. It is, however, the entire phrase considered together which provides the proper meaning of this claim phrase as well as some of the characteristics of the claimed code. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("the context in which a term is used in the asserted claim is highly instructive").

When interpreting this claim phrase, the use of "includes" plays a key role. As Ingenio concedes, "includes" as used in the asserted claims means to contain within. *See*

4

Ingenio Brief at 14. Thus, there is no dispute that the code must contain within it the data indicating whether the player wins or loses the lottery game and an amusement game.

Ingenio refers to dictionary definitions for its proposed construction of "indicating" as "shows the way to, points to, or makes clear in another way." Ingenio Brief at 14. Ingenio also uses dictionary definitions of GameLogic's proposed construction, stating in a conclusory fashion that "[w]hile some definitions of indicating may refer to the word 'stating,' the plain meaning of 'state' is to 'put into words; declare.'" Ingenio Brief at 15 (citing Webster's II New College Dictionary). The Federal Circuit has admonished, though, that such conclusory use of dictionary definitions are problematic for claim construction. "[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Phillips*, 415 F.3d at 1321.

In analyzing the claim language, Ingenio places too much emphasis on dictionary definitions, improperly minimizing the specification and its role in discerning the ordinary meaning of a claim term. Indeed, the ordinary meaning of a claim term arises in the context of the entire patent. *See Phillips*, 415 F.3d at 1321 ("Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent.")

When given its proper role in claim construction, the specification makes clear that the patentee of the asserted patents intended the win/loss outcome to be stored in the code itself. Every embodiment in the specification uses a "Destiny Code" synonymously with the claimed code. The specification "acts as a dictionary when it expressly defines

5

terms used in the claims or when it defines terms by implication." *Phillips*, 415 F.3d at 1321 (citations omitted). Thus, by implication, the claimed code will have the same traits and characteristics as the "Destiny Code" used in the specification.

As Ingenio admits, the "primary function" of the Destiny Code "is to store the outcome of the game of chance." JA Ex. A, '082 patent, col. 2, lns. 59-60.[3] The claimed code does not contain within it data showing the way to or pointing to the win/loss outcome -- the code actually *stores* the outcome of the game of chance. That is its "primary function." This trait of the claimed code is consistently reiterated in various places in the specification.

Even Ingenio's citation to the embodiment in which the outcome is "concealed <u>in</u> the Destiny Code" (Ingenio Brief at 15) demonstrates that the win/loss outcome is contained in the code itself. *See* '082 patent, col. 4, lns. 59-61 (emphasis added). To conceal something, it must be there to conceal. Thus, the outcome must be contained within the code itself.

In citing the traits of the Destiny Code, GameLogic does not unduly rely on one embodiment to the exclusion of others. <u>Every</u> embodiment in the asserted patents uses a Destiny Code, which is the same codes described by the claims. So, the claimed code must have the same traits as those belonging to the Destiny Code, which the specification clearly defines.

Importantly, if the player knew the procedure to decode the Destiny Code, the player would be able to determine if the Destiny Code contained a winning chance or a

---

[3]   In their May 1st submissions, the parties attached to their Joint Claim Construction Chart a Joint Appendix which includes copies of the patents-in-suit as well as their file histories, which shall be cited throughout this Brief with the prefix, "JA."

losing chance. JA Ex. A, '082 patent, col. 2, lns. 64-67. This ability to discern the outcome contained in the code, independent of any machine or other external reference, is at the heart of the invention as claimed and demonstrates that the code itself contains within it the win/loss outcome of the lottery game and an amusement game.

Similarly, the win/loss outcome contained in the Destiny Code is predetermined at the time the Destiny Code is created. JA Ex. A, '082 patent, col. 10, lns. 12-14. Thus, the indication contained in the code exists from the very inception of the code and remains unchanged. As such, the claimed code need not, and does not, rely on an external reference for the information contained in it.

Ingenio, in referencing a "lookup table" from the '082 patent at col. 9, lns. 61, *et. seq.*, ignores a trait that is present in the code, even in that embodiment. The code contains the win/loss outcome. Indeed, as done with every embodiment, the Destiny Code used with a lookup table must first be decrypted and decoded, indicating that the win/loss information is contained within the code itself. *See* JA Ex. A, '082 patent, col. 9, lns. 61-63 ("The program calculates its predetermined outcome at block 234 using the Destiny Code that has already been decrypted and decoded at block 112 (FIG. 8)"). The decrypted code is then compared to a lookup table to calculate the win/loss outcome. Clearly, the code that has already been decrypted is not the same as the claimed code.

Further, the patentee made certain representations during the prosecution history which confirms that the claimed code contains **within it** the win/loss outcome. The patentee was forced to make these representations to overcome certain prior art, including the Clapper, Jr. reference (U.S. Patent No. 5,377,975). *See* GameLogic Opening Brief on Claim Construction at 12-15. The patentee distinguished his invention from the Clapper,

7

Jr. reference, in which it "is the indicia on the ticket which controls game win or loss, and

not the code." JA Ex. C at IN001406. The patentee further specified that the Clapper, Jr.

game "requires the ticket be stored in a gaming machine, which ticket is not independent

of the gaming machine." *Id.* Thus, the patentee clearly distinguished between Clapper,

Jr.'s use of an external reference as found in the gaming machine, versus his invention, in

which the code independently controls game win or loss. Those representations should

not now be ignored, as Ingenio is apparently doing.

By distinguishing his claimed invention from Clapper, Jr.'s use of an external

reference to determine win or loss, the patentee indicated what his claims do not cover,

*i.e,* data containing indicia or a reference to data located elsewhere that contains

information that determines a win or loss. *See Ekchian v. Home Depot, Inc.*, 104 F.3d

1299, 1304 (Fed. Cir. 1997) ("since, by distinguishing the claimed invention over the

prior art, an applicant is indicating what the claims do not cover, he is by implication

surrendering such protection."). Thus, the patentee surrendered any protection to codes

which require external references to ascertain win/loss results.

2.      **"The Data Being Unrecognizable To The Player, Such That The Player Does Not Know Whether The Player Will Win Or Lose The Game Prior To Play Of The Amusement Game"**

The center of the dispute between the parties regarding this claim phrase is

whether the code must be encrypted for the data contained within it to be

"unrecognizable" in the context of the asserted patents. Ingenio contends in its Brief that

GameLogic has improperly limited its construction of "unrecognizable" in the context of

the asserted patents to encryption, citing various places in which the intrinsic record

ostensibly provides other means for the code to be rendered unrecognizable. *See* Ingenio

Brief at 19-20.

8

Review of those citations provided by Ingenio, however, reveals the error of Ingenio's contention and fully supports that "unrecognizable" as used in the asserted patents means that the claimed code must be encrypted. Each of Ingenio's citations require encryption and will now be examined in turn.

Ingenio's first intrinsic record citation provided on p. 19 of its Brief is to the '082 patent, col. 2, lns. 13-15. This part of the specification, the Summary of the Invention, is merely a recitation of the elements of independent claim 1 of the '082 patent, and as such, uses the word, "unrecognizable," as do all of the asserted independent claims. As "unrecognizable" is the term the parties are currently construing and is central to the parties' differing view of the qualities of the claimed code, Ingenio's citation to the Summary of the Invention merely repeats the very claims which are being construed and does not shed any light on the issue. Ingenio's second and third citations from the intrinsic record on p. 19 of its Brief are to the '082 patent, col. 2, lns. 55-60. Ingenio concedes that encryption is specified in this part of the specification. What Ingenio omits, however, is that this part of the specification introduces and defines the "Destiny Code" which is consistently used in every embodiment of the asserted patents. The specification, in introducing and defining the Destiny Code, states:

> Block 10 shows that the start of the system for generating and controlling and tracking **encrypted** symbolic codes that signify the outcome of the particular game of chance to be played by the player. **These codes are called "Destiny Codes"** because their primary function is to store the outcome of the game of chance.

'082 patent, col. 2, lns. 55-60 (emphasis added).

Ingenio next cites to the '082 patent, col. 2, ln. 67 – col. 3, ln. 1, for the proposition that the code could be encoded to achieve the required unrecognizable

9

characteristic. This part of the specification, however, merely states that "[t]he total and actual result of the game is encoded in the Destiny Code." This description of the Destiny Code conforms to the "indicating whether the player wins or loses the lottery game and an amusement game" characteristic of the code, not the "unrecognizable" characteristic. Nonetheless, the citation itself refers to the Destiny Code, which as discussed above, is encrypted by definition. Similarly, Ingenio's next intrinsic record citation, '082 patent, col. 3, lns. 1-3, merely follows through with the encoding concept from the previous citation, namely, "[b]y decoding the Destiny Code one reveals whether or not a game was a winner or a loser, and if it was a winner, the prize won." Once again, the use of "Destiny Code" signifies that the code at issue is encrypted by definition.

Ingenio's last intrinsic record citation on page 19 of its Brief is to the '082 patent, col. 9, lns. 64-66, which Ingenio characterizes as showing that the data in the code, to be unrecognizable, can be "obscured because it is used as an index into a lookup table." Ingenio, in providing that citation, ignores the language describing that embodiment just prior to what Ingenio cites, namely:

> The program calculates its predetermined outcome at block 234 using the Destiny Code that **has already been decrypted and decoded** at block 112 (FIG. 8).

'082 patent, col. 9, lns. 61-63 (emphasis added). To be decrypted and decoded, that code must have been previously encoded and encrypted.

Thus, contrary to demonstrating "numerous ways of making the data unrecognizable to the player" other than encryption (Ingenio Brief at 19), Ingenio's various citations to the intrinsic record make abundantly clear that the claimed code is

10

always encrypted and that GameLogic has not excluded any preferred embodiments in its claim construction. Indeed, Ingenio cannot show otherwise. Each embodiment disclosed in the specification specifies that the code must be decrypted and decoded. *See* GameLogic's Opening Brief on Claim Construction at 16. Further, Ingenio's own experts, presumably of ordinary skill in the art, understand that "unrecognizable" means encrypted in the context of the asserted patents. *See* GameLogic Opening Brief on Claim Construction at 16-17.

Ingenio's reference to the prosecution history and the Clapper, Jr. reference to support its position that encryption is not required in the Kaye patents is confusing at best and draws unsupported conclusions. *See* Ingenio Brief at 20. The Clapper, Jr. reference was cited by the examiner for rejection under both 35 U.S.C. § 102 and § 103. *See* JA Ex. C at IN0409-15. Contrary to Ingenio's contention, the applicant did indeed address the Clapper, Jr. patent as it related to the "unrecognizable" characteristic of the claimed code. The applicant distinguished the Clapper, Jr. reference from the claimed invention by stating, in part, that Clapper, Jr.'s "printed indicia on the strip determines whether the player wins or loses the game, and not the code." JA Ex. C at IN001406.

Thus, the applicant represented that the code in Clapper, Jr. is fundamentally different than the claimed code, which must include "data indicating whether the player wins or loses the lottery game and an amusement game." If the win/loss data is not even present in the code used in the Clapper, Jr. patent, as stated by the applicant, there is no reason for the win/loss data to be unrecognizable to the player in that reference. By making this statement, the applicant represented that the "unrecognizable" characteristic of the claimed code was not at issue in Clapper.

11

B.    THE "LOTTERY GAME"

Ingenio argues that "lottery game" as used in the asserted patents requires, among other things, payment for participation in a chance to win. However, not all lotteries require payment, and nothing in the claims, the specification, or the file history indicate that the patentee intended to limit the claimed lottery this way. Ingenio provides no support for its position that the ordinary meaning of lottery requires payment. The claims only require that the game piece is acquired by the player. *See, e.g.*, claim 1 of the '082 patent ("acquiring by a player a game piece"). The patentee clearly intended to cover paid lotteries, charitable lotteries, and promotional lotteries.

The purpose of Ingenio's proposed construction is litigation driven. Ironically, it is Ingenio that is attempting to inject limitations into the claims that are not there in order to avoid a finding of invalidity. GameLogic has cited a prior art reference against Ingenio's patents that addresses promotional games. *See* U.S. Patent No. 5,373,440 to Cohen, *et al.* Ingenio's own actions confirm that the patents do not require payment for participation for a game to be considered a lottery in the context of the asserted patents.

**Redacted**

# REDACTED

# REDACTED

## C.  THE "AMUSEMENT GAME"

### 1.  Ingenio's Claim Construction of "Amusement Game" Ignores The Claim Language, The Specification, And The Prosecution History

The claims require that the code entered by the player must contain "data indicating whether the player wins or loses the lottery game and an **amusement game**." *See, e.g.,* '082 patent, claim 1 (emphasis added). The claimed "amusement game" must be something distinct from the "lottery game," including the portion of the lottery game where the result is displayed. This interpretation is based on the claim language, the specification, and the prosecution history. Ingenio's claim construction that the amusement game is merely any game that "amuses the player" ignores the clear teachings of the patent and its file history.

The specification clearly identifies two distinct types of games: "the actualization game" and "the amusement game." The specification defines the "actualization game" as the portion of the game that displays the actual results of the lottery as though there is a completely random element. *See* JA Ex. A, '082 patent, col. 3, lns. 34-37. The specification describes the amusement game as a game that "can be a completely random game where the player achieves points or awards. The game is purely for player enjoyment, and is used to give the feel of a completely random game of chance." *Id.* at col. 3, lns. 23-27.

The specification draws a clear distinction between the amusement game portion and the actual game portion. For instance, in one embodiment the amusement game is described as a horse race. The specification explains that after all of the horse races have been played by the player, "the amusement game comes to an end" and then "[t]he system now begins playing of the actual game . . ." *Id.* at col 3, lns. 32-34. The specification further explains that "[t]he purpose of the actual game is to display, in a pleasing fashion, the **actual prize** that is stored in the Destiny Code. . ." *Id.* at col 3, lns. 34-35 (emphasis added). Thus, the patent clearly distinguishes between the "amusement game" and the portion of the lottery game displaying the actual lottery results.

    2.    **Ingenio's Claim Construction Improperly Attempts To Capture An Embodiment Surrendered By The Patentee During Prosecution**

Ingenio's claim construction attempts to improperly capture an embodiment that the patentee surrendered during prosecution. As an initial matter, Ingenio's claim construction that the amusement game is any game that "amuses the player" makes no sense.[4] This claim construction would include the "actualization game," but the specification clearly draws a distinction between the actualization game and the amusement game. Using its overly broad construction, Ingenio argues that the asserted claims cover an embodiment where the amusement game and actualization game are combined. This embodiment is disclosed in the '082 patent at col. 4, lines 6-23.

To support its construction, Ingenio relies on caselaw containing statements that a claim construction that excludes a preferred embodiment is rarely, if ever, correct. *See*

---

[4]  An explanation of why Ingenio's proposed construction lacks any real meaning is set forth in GameLogic's Opening Brief on Claim Construction at 19.

14

Ingenio Brief at 11. Ingenio cites three cases under the section of its memorandum

entitled "A Claim Construction Cannot Exclude A Preferred Embodiment." Ingenio

Brief at 11. Ironically, two of the three cases Ingenio cites hold exactly the opposite. In

*Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326 (Fed. Cir. 2002) and *Springs Window*

*Fashions LP v. Novo Indus. L.P.*, 323 F.3d 989, 996 (Fed. Cir. 2003) (both cited in

Ingenio Brief at 11), the Federal Circuit upheld claim constructions that specifically

excluded preferred embodiments. In *Rheox*, for instance, the Federal Circuit stated:

> Although we recognize that an interpretation excluding a
> preferred embodiment "is rarely, if ever, correct and would
> require highly persuasive evidentiary support", where the
> prosecution history requires a claim construction that
> excludes some but not all of the preferred embodiments,
> such a construction is permissible and meets the standard of
> "highly persuasive evidentiary support."

*Rheox*, 276 F.3d at 1327 (internal citations omitted). Similarly, the *Springs* Court stated,

"[i]t is well established that the 'prosecution history limits the interpretation of claim

terms so as to exclude any interpretation that was disclaimed during prosecution.'"

*Springs*, 323 F.3d at 994 (citations omitted).

Like the claims in the *Rheox* and *Springs* patents, Ingenio's claims should be

construed to exclude the embodiment where the actualization game is combined with the

amusement game because of amendments made during prosecution. As stated above, the

patent specification clearly delineates between the amusement game and the actualization

game.

The originally filed claims of the patent might have been broad enough to cover

an embodiment that combined the amusement game and the actualization game. JA Ex.

C at IN001451-54. The original claims referred to "the game" without specifying which

15

game(s), *e.g.,* lottery, amusement, actualization, or actualization and amusement.

Examples of such limitations from original claim 1 are:

a.    a code "which includes data indicating whether the player wins or loses **the game**";

b.    the code contained unrecognizable data "such that the player does not know the outcome of **the game** prior to play of the game";

c.    "the processor presenting **a game** of chance to the player on a display for interactive play by the player, the player controlling game play by inputting game parameters to the processor"; and

d.    "controlling by the processor the outcome of **the game** of chance played by the player based upon the code entered by the player."

e.    providing on a display an indication to the player of **a game** win or a **game** loss based upon the code.

Thus, these limitations potentially covered all of the games mentioned in the specification. The examiner clearly interpreted the claims this way because one of the reasons the examiner rejected the claims was for indefiniteness under 35 U.S.C. § 112 ¶ 2. The examiner stated that "'the game' is not clearly linked to a 'lottery type game.'" JA Ex. C at IN001409. In other words, the reference to the "the game" in the original claim covered each of the "the games" mentioned in the specification, which the examiner considered to be improper.

The patentee attempted to overcome the rejection by amending the claims but refused to amend the claims so that "the game" was further defined. JA Ex. C at IN001401-04.[5]  This did not satisfy the examiner. The patentee and examiner then

---

[5]  The typed portion of the amendment, including the underlining and bracketing, constitute the patentee's changes. The handwritten notes show the examiner's changes made in the examiner's amendment after the patentee submitted this amendment. *See infra.*

16

conducted three telephone interviews. JA Ex. C at IN001398.[6]  After the final interview, the examiner allowed the claims but only after entering an examiner's amendment that modified the various references to "the game" to be either the "amusement game" or "the lottery game and an amusement game." *See* JA Ex. C at IN001392-95. The patentee did not rebut the examiner's amendment or seek further amendment, and thus, presumably agreed with the examiner. *See* JA Ex. C at IN001393, ¶ 1.

The reasonable conclusion that the public should be able to draw from the patentee's inaction is that the patentee was surrendering coverage of the combined amusement and actualization game embodiment. "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during prosecution of his patent." *Springs*, 323 F.3d at 995. When the patentee wanted to refer to the combination of the lottery game and the amusement game, the claims were amended to state "the lottery game and an amusement game" but when the patentee only intended a limitation to include the amusement game, the claim was amended to claim only the "amusement game."

The claims as issued require that the display provides "an indication to the player of **the amusement game** win or loss based upon the code." Other examples of limitations in claim 1 of the '082 patent where the patentee expressly limited its invention to the amusement game are:

"the player does not know whether the player will win or lose the game prior to play of the **amusement game**;"

"entering the code by the player into a processor prior to **amusement game** play;"

[6] Four interviews were actually conducted, but the first interview occurred before the patentee entered his only amendment. *See* JA Ex. C at IN001398-99 and IN0400-07.

17

> "the processor generating the **amusement game** on a display for play by the player;" and

> the processor controlling whether the player will win or lose the **amusement game** based upon the code entered by the player."

These limitations originally only referred to "the game." The patentee or examiner could have written these limitations to include both the amusement game and the actualization game or any other combination of the games described by the specification. But, the patentee chose to limit these elements to only the amusement game. For instance, an earlier limitation now states, "a code which includes data indicating whether the player wins or loses **the lottery game and an amusement game.**" By making these amendments, specifically limiting certain limitations to only the amusement game, the patentee relinquished coverage of the embodiment where the result of the amusement game and the actual lottery game are displayed in a combined manner. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995).

Thus, the proper construction of "amusement game" must be something more than any game that merely amuses a player and must be distinct from the actualization game. The claims, specification, and prosecution history support a construction of "amusement game" that includes the award of fictitious awards.

### D.    THE "PROCESSOR"

The "processor" in the asserted claims performs specific functions: to receive ('082 patent) or read ('603 patent) the code, generate the amusement game on a display for play by the player, and determine whether the player will win or lose the amusement game based upon the code. *See* claims 1 and 10 of the '082 patent and claim 1 of the '603 patent.

Ingenio, in its Brief at 22, argues that the processor in the asserted claims means one or more processors. The dispute, however, is not whether the claims allow for more than one processor. The true dispute is where those processors reside and perform the functions specified in the claims. As is made clear by the claim language itself, there is one, single multi-purpose device which is performing the various functions of the processor articulated in the claims, regardless of whether that device contains one or more processors. With the subsequent use of "the processor" or "said processor" in the third and fourth elements of the independent claims, and the reference to the same processor in the dependent claims, the claim language itself makes clear that the processor is contained in one place or in a single device which is performing each of the functions the "processor" must complete. Indeed, the dependent claims specify where the claimed processor(s) reside.

The specification is consistent with GameLogic's construction of "processor." For example, in the Self-Contained Amusement/Actualization embodiment disclosed in the specification highlights that all of the functions the processor must complete are done in one, multi-purpose device:

> Players bring the game medium, in block 18 (FIG. 2) to a
> self-contained amusement+actualization device shown in
> FIG. 5 and allows the game medium reader/writer to read
> the Destiny Codes from the game medium. The self-
> contained amusement+actualization device then reads in
> any order or in a sequential fashion, the Destiny Codes. If
> a Destiny Code has not been used, the device will allow the
> person to play the game to discover the outcome concealed
> in the Destiny Code.

JA Ex. A, '082 patent, col. 4, lns. 53-61.

Thus, GameLogic's construction of processor to mean a single, multi-purpose device that interprets and executes instructions is fully supported by and consistent with

the claim language itself and the specifications of the asserted patents.

### E.    "PROCESSOR WITHIN A COMPUTING DEVICE"

This phrase, as found in claim 8 of the '082 patent, must be construed as being completely synonymous with the processor of claim 1 of that patent. The parties don't really disagree regarding the meaning of this claim phrase. Claim 8, however, does not add anything to the patent as the processor of claim 1 of the '082 patent will always be within a computing device based on the functions it must perform.

### F.    "PROCESSOR WITHIN AN ON-LINE SUBSCRIPTION SERVICE"

Ingenio's proffered construction of this claim phrase, which is found in claim 9 of the '082 patent, extends beyond the plain meaning of the claim language by incorporating an additional party into the patent, namely an Internet service provider. The plain and ordinary meaning of the claim language is confirmed by the named inventor of the patent, who testified that he was trying to build customer loyalty with a subscription service. *See* GameLogic's Opening Brief on Claim Construction at 27. The on-line embodiment disclosed in the patent demonstrates that the processor within the on-line subscription service belongs to the game provider, and not an Internet service provider as proposed by Ingenio.

For example, Figure 6 in the '082 patent illustrates the on-line embodiment. *See* JA Ex. A, '082 patent, col. 5, lns. 59-60. In Figure 6, it is the on-line service which requests the Destiny Code and checks for its validity. *Id.* at FIG. 6, block 47. Further, it is the on-line service that decrypts and decodes the Destiny Code, and plays the amusement game and then the actualization game. *Id.* at FIG. 6, blocks 48-50. Given the security and fraud concerns associated with lottery play, it strains reason to believe that a

20

provider of games, such as Ingenio, would want an Internet Service Provider, such as AOL, to perform such sensitive functions as validating, decrypting and decoding the code, and actually playing the amusement and actualization games. It is more reasonable, especially given the customer loyalty ambition associated with a subscription service, that it was the game provider performing these functions. Thus, the processor performing the various functions of claim 1 must belong to the game provider, and not the Internet service provider as Ingenio contends.

G.    **"PROCESSOR INCLUDES A COMPUTING DEVICE"**

This claim language, as found in claim 16 of the '082 patent, is confusing given the context of the patent overall. As such, using its plain and ordinary meaning, it must be construed to mean that the processor, such as a microchip, contains within it a computing device such as personal computer.

H.    **"READING THE CODE BY A PROCESSOR"**

Ingenio's proposed construction of this phrase found in claim 1 of the '603 patent, which is to receive input of the code from some source, reveals little, if any, difference between claim 1 of the '603 patent and claim 10 of the '082 patent, which calls for "a processor for receiving said code input by the player." *See* JA Ex. A, '082 patent, col. 12, lns. 12-13.

"Reading" the code is used only in the '603 patent -- the term is not present in the claims of the '082 patent. After reading the code from the game piece, the processor generates the amusement game on a display for play by the player, and controls whether the player will win or lose the amusement game based upon the code. JA Ex B, '603 patent, col. 16, lns. 6-10. To perform these steps, the processor must actively retrieve and

21

examine the code from the gaming piece, such as a chip or token. JA Ex. B, '603 patent, col. 12, lns. 1-7. This is ostensibly the new matter that the '603 patent adds as a continuation-in-part of the '082 patent.

Thus, GameLogic's proposed construction conforms to the purpose of the '603 patent, whereas Ingenio's proposed construction merely reiterates the claims of the '082 patent.

## III. INGENIO'S PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT AND VALIDITY SHOULD BE DENIED

### A. GAMELOGIC DOES NOT INFRINGE ANY OF THE ASSERTED CLAIMS

Ingenio's motion for partial summary judgment of infringement should be denied because GameLogic's HomePlay Lottery$^{TM}$ product does not perform each of the steps of the asserted independent claims, as Ingenio alleges. *See* Ingenio Brief at 26-28.

#### 1. GameLogic's Access Code Is Not Covered By The Claimed Code

Specifically, as set forth above as well as in GameLogic's Opening Brief on Claim Construction, the code, which is fundamental to the claimed invention, must contain within it data which states whether the player wins or loses both the lottery game **and** a distinct amusement game. Moreover, as supported in the specification and understood by those of ordinary skill in the art, the code must be encrypted.

## Redacted

22

**Redacted**

Regardless of whether the Court finds that the prosecution history prevents the claims from being read broad enough to cover an embodiment where the amusement and actualization game are combined, GameLogic's system is still missing an "amusement game" as required by the claims.

**Redacted**

23

**Redacted**

Any comparison of GameLogic's Prize Reel Blackjack game to the embodiment in the patent where the amusement game and the actualization game (which displays the lottery results) are combined is inappropriate for several reasons. The embodiment in the patent consists of a poker game where the result of the poker game is the actual lottery game winnings by the player. *See* JA Ex. A, '082 patent, col. 4, lns. 6-21. For instance, the player is given a key that shows the jackpots and winning rules, such as where 1 pair of card equals $10.00 and 3 of a kind equals $15.00, etc. JA Ex. A, '082 patent, col 4, lns. 8-13. If the code entered by the player indicates that the lottery winnings for that ticket is $10.00, then the processor will provide a combination of cards so that the player wins $10.00, e.g., a pair of jacks. JA Ex. A, '082 patent, col. 4, lns. 16-21. The player's skill in no way affects the outcome of the poker game, and the result of the poker game is the result of the lottery.

**Redacted**

24

Redacted

Redacted

3.    **GameLogic's HomePlay Lottery [TM] System Does Not Infringe
The Processor Limitation**

Redacted

|*See* Ingenio Brief at 4, ¶¶

4, 6; *see also* Ingenio Brief at 27. As the claim, on its face, requires a single, multi-

purpose device in which the player enters the code, and which generates and controls the

play of the amusement game based on the code, GameLogic's multiple processor system

cannot infringe the patent.

Redacted

For at least these reasons, GameLogic's proposed system does not infringe any of

the asserted claims of the '082 or '603 patents. Thus, Ingenio's partial summary

judgment of infringement should be denied.

26

**B.    GAMELOGIC'S ENABLEMENT DEFENSE IS STILL INTACT**

Ingenio's partial summary judgment motion of validity relates only to GameLogic's enablement defense based on the premise that if the claims do not require encryption, then the claims are sufficiently enabled. *See* Ingenio Brief at 28. Because the patents clearly require the code to be encrypted, as supported bys the claim language, written descriptions, prosecution history, and testimony of those of ordinary skill in the art (including Ingenio's experts), Ingenio's motion for partial summary judgment of validity must be denied.

**IV.    CONCLUSION**

For the reasons set forth above and included in GameLogic's Opening Brief on Claim Construction and Opening Brief in Support of GameLogic's Motion for Summary Judgment of Non-Infringement, Ingenio's motion for partial summary judgment of infringement and validity should be denied in its entirety and GameLogic's proposed claim constructions should be adopted by the Court.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Gary M. Hnath
Susan Baker Manning
Goutam Patnaik
Timothy A Molino
BINGHAM MCCUTCHEN LLP
2020 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 373-6050

Dated: May 15, 2006
Public Version Dated: May 22, 2006

732435

By: */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Kenneth L. Dorsney (#3726)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19899-0951
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com
    kdorsney@potteranderson.com

*Attorneys for Defendant GameLogic Inc.*

27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on May 22, 2006, the attached document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Edmond D. Johnson
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899

I hereby certify that on May 22, 2006, I have Electronically Mailed the documents to the following non-registered participants:

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
Hunton & Williams LLP
1900 K Street, N.W., Suite 1200
Washington, DC  20006
rtate@hunton.com
bburoker@hunton.com
ccuneo@hunton.com

By:  /s/ David E. Moore
     Richard L. Horwitz
     David E. Moore
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, Delaware  19899-0951
     (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

672965