IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGENIO, FILIALE DE LOTO-QUEBEC, INC., | ) ) ) ) | |
| Plaintiff, | ) | Civil Action No. 04-1532 (KAJ) |
| v. | ) ) | |
| GAMELOGIC INC. | ) ) | |
| Defendant. | ) ) ) | REDACTED VERSION |

**PLAINTIFF INGENIO, FILIALE DE LOTO-QUEBEC, INC.'S OPPOSITION TO
DEFENDANT GAMELOGIC, INC.'S CLAIM CONSTRUCTION BRIEF AND
MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

THE BAYARD FIRM

Edmond D. Johnson (No. 2257)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19801
Telephone (302) 655-5000
Facsimile (302) 658-6395

OF COUNSEL:

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
Hunton & Williams LLP
1900 K Street, N.W.; Suite 1200
Washington, DC 20006
Telephone (202) 955-1500
Facsimile (202) 778-2201

Counsel for Plaintiff
Ingenio, Filiale De Loto-Quebec, Inc.


Original Filing Date: May 15, 2006
Redacted Filing Date: May 22, 2006

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................. 1

III.  APPLICABLE CLAIM INTERPRETATION LAW ...................................... 2

      A.   The Federal Circuit Has Reaffirmed The Paramount Importance Of Intrinsic
           Evidence ............................................................................................... 2

IV.   THE PROPER CONSTRUCTION OF THE PATENTS IN SUIT ................... 3

      A.   Introduction .......................................................................................... 3

      B.   Code Which Includes Data Indicating Whether The Player Wins Or Loses The
           Lottery Game And An Amusement Game ................................................ 4

      C.   The Data Being Unrecognizable To The Player, Such That The Player Does Not
           Know Whether The Player Will Win Or Lose The Game Prior To Play Of The
           Amusement Game .................................................................................. 8

           1.   GameLogic Misconstrues the Testimony of Dr. Bertram ................ 8

           2.   The Testimony of Dr. Grimes and Perry Kaye Support Ingenio's Claim
                Interpretation ............................................................................... 9

           3.   GameLogic's own expert disagrees with its proposed definition ........... 10

      D.   Lottery Game ...................................................................................... 12

      E.   Amusement Game ............................................................................... 13

           1.   The Amusement Game and Lottery Game are Not Mutually Exclusive .. 13

           2.   The Claims Do Not Require Mutually Exclusive Amusement and
                Actualization Games ..................................................................... 15

           3.   The Specification Provides Amusement Game Embodiments Where
                Fictitious Awards Are Not Provided ............................................... 17

           4.   The Prosecution History Does Not Support GameLogic's Twist on the
                Claims ......................................................................................... 17

      F.   Processor Recitations .......................................................................... 19

           1.   Processor Within A Computing Device ........................................... 20

           2.   Processor Within An On-Line Subscription Service ........................ 21

           3.   Processor Within A Computing Device ........................................... 22

      G.   Reading The Code By A Processor ....................................................... 23

V.    GameLogic's Motion For Summary Judgment Should Be Denied ................. 24

**Redacted**

i

1. Hardy's Testimony Refutes GameLogic's Contentions...........................25

2. The Cohen Discussion is a Red Herring.......................................27

**Redacted**

VI.   CONCLUSION ..............................................................................................36

## TABLE OF AUTHORITIES

Pages

**Cases**

*Aquatex Industries, Inc. v. Techniche Solutions,*
  419 F.3d 1374 (Fed. Cir. 2005) ...................................................................................28

*Carnan Indus. Inc., v. Wahl,*
  724 F.2d 932 (Fed. Cir. 1983) .....................................................................................22

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ....................................................................................2

*Insituform Technologies v. Cat Contracting, Inc.,*
  385 F.3d 1360 (Fed. Cir. 2004) ...................................................................................35

*Litton Systems v. Honeywell,*
  238 F.3d 1376 (Fed. Cir. 2001) ...................................................................................35

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996) .........................2

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)...........................................................2, 3, 8

SanDisk Corp. v. Memorex Prods., Inc.,
  415 F.3d 1278 (Fed. Cir. 2005) ....................................................................................3

Vitronics Corp. v. Conceptronics Inc.,
  90 F.3d 1576 (Fed. Cir. 1996) ..................................................................................2, 3

**Statutes**

35 U.S.C. § 112 .....................................................................................................17, 35

**Other Authorities**

54 C.J.S. Lotteries § 2 (2005).......................................................................................12

I.    **INTRODUCTION**

Plaintiff, Ingenio, Filiale de Loto-Quebec, Inc., ("Ingenio") respectfully requests that the Court deny GameLogic, Inc.'s ("GameLogic") Motion For Summary Judgment of Non-Infringement least the following reasons. GameLogic proposes strained claim interpretations that run counter to established law. In addition, even if the Court were to adopt all of GameLogic's proposed constructions, sufficient evidence exists to demonstrate infringement by the GameLogic product offering under those constructions, but certainly a sufficient dispute concerning the facts to warrant trial on the merits.

II.    **STATEMENT OF FACTS**

1.    Ingenio incorporates herein by reference the facts set forth in its previously filed Memorandum In Support of Its Motion For Partial Summary Judgment of Infringement And Validity. In addition, Ingenio submits the following additional facts.

**Redacted**

See

Deposition of Dow K. Hardy, (pursuant to Rule 30(b)(6)) ("Hardy Dep.") 169:8-14 (attached to the Declaration of Brian M. Buroker in Support of Ingenio's Motion for Partial Summary Judgment at Exhibit 2).

**Redacted**

3.    GameLogic's expert, Mr. Brandin, testified that merely covering the data (*e.g.*, using a card or the like) would satisfy the claimed "unrecognizable" requirement. *See*

Deposition of Christopher L. Brandin ("Brandin Dep."), Buroker Dec. Ex. 3, at 99:1-5. Mr.

Brandin also testified that he considered "obfuscation a form of encryption." Brandin Dep.

97:19-20. Mr. Brandin further testified that he believes any form of encryption or coding would

meet the requirements of the claim as long as you saw the data, as long as the data were there,

but the player could not discern its meaning. Brandin Dep. 112:3-6.

**Redacted**

## III.   APPLICABLE CLAIM INTERPRETATION LAW

With its Motion for Partial Summary Judgment, Ingenio provided a thorough analysis of

the proper approach to claim interpretation. Nevertheless, due to the improper approach taken by

GameLogic, some of the key principles its approach violates are discussed again.

### A.   The Federal Circuit Has Reaffirmed The Paramount Importance Of Intrinsic Evidence

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit

revisited the applicable principles of claim construction. The *en banc* decision expressly

reaffirmed the court's previous holdings in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967

(Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), *Vitronics Corp. v. Conceptronics Inc.*, 90

F.3d 1576 (Fed. Cir. 1996), and *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,

381 F.3d 1111 (Fed. Cir. 2004). *Phillips*, 415 F.3d at 1312 ("What we said in those cases bears

restating, for the basic principles of claim construction outlined there are still applicable, and we

reaffirm them today."); *see also id.* at 1324 ("Today, we adhere to that approach and reaffirm the

approach to claim construction outlined in that case [*Vitronics*], in *Markman*, and in *Innova*.").

The *Phillips* court confirmed that the most probative evidence of the meaning of a patent

claim term is to be found primarily in the intrinsic record, *i.e.*, the claims themselves, the

2

specification, and to a lesser extent, the prosecution history. *See id.* at 1312-17. While

emphasizing the importance of the specification in claim construction, *Phillips* warned against

the "danger of reading limitations from the specification into the claim." *See id.* at 1323.

Moreover, "[t]he court must always read the claims in view of the full specification." *SanDisk*

*Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (*quoting Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "A claim construction that excludes a

preferred embodiment is rarely, if ever, correct." *SanDisk*, 415 F.3d at 1285.

Furthermore, the court reaffirmed those holdings admonishing against any claim

construction that attempts to limit the scope of the claims by the number of embodiments

described in the specification. *See Phillips*, 415 F.3d at 1323-24. Moreover, reliance on

extrinsic evidence like expert testimony and inventor testimony is very disfavored. The court

concluded, "[i]n sum, extrinsic evidence may be useful to the court, but it is unlikely to result in

a reliable interpretation of patent claim scope unless considered in the context of the intrinsic

evidence." *Id.* at 1319.

## IV. THE PROPER CONSTRUCTION OF THE PATENTS IN SUIT

### A. Introduction

GameLogic proposes claim constructions that would distort the plain meaning of the

terms. GameLogic also repeatedly relies on extrinsic evidence to support their tortured claim

constructions. Its selective citation of out of context expert statements highlights the mischief in

relying on extrinsic evidence. Overall, despite providing a product that is virtually identical to

embodiments in the Ingenio patent specification, it wants to twist the claims to avoid

infringement. That attempt should fail.

3

**B.    Code Which Includes Data Indicating Whether The Player Wins Or Loses The Lottery Game And An Amusement Game**

GameLogic's proposed construction for this phrase is that the code must contain data that itself states the win/loss outcome. In other words, GameLogic appears to assert that the code must state "WIN$50" if the player is to win $50. Its interpretation is inconsistent with ordinary English understanding of the word "indicating" and ignores intrinsic evidence to the contrary.

First, "indicating" does not mean stating in the context of this claim language. Rather, in common English language, the primary use of the word "indicate" encompasses a broader meaning than just "stating." It includes pointing to or showing the way to. Thus, one can indicate an ice cream preference by saying "I want vanilla" or pointing toward the vanilla ice cream container. Under GameLogic's definition, a person who chose to point to the vanilla ice cream container would not be "indicating." That is plainly wrong in the context of these claims, particularly when reviewing the Ingenio patents where embodiments are described in which the code does not state an outcome.

As detailed in Ingenio's Motion for Partial Summary Judgment, in order to support its tortured reading, GameLogic ignores disclosed embodiments in the specification that clearly disclose the use of a look-up table to store the win/loss result (*e.g.*, '082 Patent at 9:61-10:2)[1] or that the win/loss result is concealed from the player ('082 Patent at 4:58-61). In those embodiments, the code "points to" an entry in a look-up table where the win/loss result is determined. The code does NOT state win/loss information. GameLogic makes no attempt to square this intrinsic evidence with their proposed requirement that the code state the win/loss result.

---

[1] As in its other filings, Ingenio uses the convention X:Y-Z to refer to the column and line numbers of the patent.

4

In addition, the very portions of the specification that GameLogic relies upon to support its construction do not prove that the code must state the win/loss result. For example, GameLogic relies on column 2, line 54 through column 3, line 3 of the '082 Patent for support. However, that portion discloses that the system uses "codes that *signify* the outcome of the particular game of chance." '082 Patent, 2:57-58 (emphasis added). Thus, the disclosed codes *signify* (*i.e.*, to serve as a sign of) the outcome, they do not state the win/loss result.

Similarly, GameLogic's reliance on '082 Patent, 6:55-65 is misplaced. In fact, that portion discloses that the code is "the number that can be entered at a redemption site to *indicate* whether or not the Game Medium [e.g., ticket] contains a winning game...." '082 Patent, 6:63-64 (emphasis added). Again, the intrinsic evidence shows that the code does not state a win/loss result, it indicates whether the ticket contains a winning game.

Likewise, despite GameLogic's reliance to the contrary, the prosecution history does not compel a construction that the code state a win/loss result. First, GameLogic alleges that the patentee's remarks that the code "determines whether you win or lose" somehow make clear that the code states the win/loss result. *See* GameLogic's Opening Brief on Claim Construction ("D.I. 117") at 13. However, the patentee's statements merely reflect the fact that the over-arching "game" being played is a lottery – a game containing a predetermined chance of winning – and whether one wins or loses the lottery is, ultimately, determined by the code. A predetermined result does not require that the code state the win/loss result. The code must somehow determine (*i.e.*, decide or establish) the result – not state it. Thus, patentee's statements during prosecution do not compel a construction that the code state the win/loss result.

5

The patentee's remarks in connection with the Clapper reference[2] also do not compel a construction that the code state the win/loss result, contrary to GameLogic's contention.

First, patentee's remarks concerning Clapper were that the bar-code (provided on the back of duplicate strip 32) does not anticipate the claimed code. *See, e.g.*, Joint Appendix ("JA") Ex. C at IN001406. Among the patentee's reasons[3] for the deficiency of the Clapper reference was that the bar-code does not determine whether the player wins or loses the game, but rather, the indicia (*e.g.*, three lemons) determine win or loss. GameLogic takes this statement to be a surrender of subject matter relating to a code containing a reference pointing to other data containing the win/loss outcome information. *See* Defendant GameLogic, Inc.'s Opening Brief In Support of Its Motion for Summary Judgment of Non-Infringement ("D.I. 177") at 14. However, this is simply not the case.

Clapper discloses an "electronic gaming apparatus which preferably corresponds to and electronically automates games of chance ... known as "Pull-Tab." *See, e.g.,* Clapper, abstract. As further disclosed by Clapper,

> In the conventional game of Pull-Tab, frequently played in gaming establishments, a large number of cards, or similar substrates, are located in a box or other open container. Each of the cards are printed with some type of indicia which may be a number, a symbol or the like and only a limited number of the cards in this box or other container have a winning indicia. Each of the indicia are covered by a removable cover sheet having a tab thereon and hence the cards are referred to as "Pull Tabs."

---

[2] U.S. Pat. No. 5,377,975, hereinafter "Clapper."

[3] Other reasons for the deficiency of the bar-code were that the bar-code was not entered by the player or contained on a gaming piece used by the player (the duplicate strip does not leave the machine). *See* JA Ex. C at IN001406. The existence of these other reasons for distinction also demonstrate that the patentee did not clearly surrender the subject matter that the code contains data indicating a win/loss result.

> A dealer, upon appropriate payment by a player, will remove one of the cards from the container and provide the same to a player. Since the indicia are covered by the removable cover sheet, and since the cards with winning indicia are randomly located within the container, neither the dealer nor the player know if the player is receiving a card with a winning indicia until such time as the tab is engaged and the cover sheet is removed.

Clapper at 1:40-58. Thus, in order to win a game of Pull-Tab, a player must purchase a card, pull the tab to reveal the "indicia" printed on the card and, if the indicia on the card match the predetermined winning combination of indicia, the player wins. Thus, the indicia *themselves* contain the win/loss *result* for the game. Much like in the game of blackjack where cards totaling to 21 are a winning *result* of the game, not a code that determines an outcome of a game.

Despite GameLogic's assertion that the above portion of Clapper shows the need for a player to reference a key to determine win/loss results (*see* D.I. 117 at p. 14), this is simply not the case. Clapper clearly does not require reference to other data to determine the win/loss result in a game of Pull-Tab. In fact, Clapper suggests that the win/loss result is known the moment the indicia are uncovered.[4] Clapper at 1:52-57. Furthermore, the patentee never distinguished over Clapper by arguing that the bar-code failed to anticipate the claimed code because it required a reference to other data containing win/loss outcomes. The patentee distinguished the bar-code of Clapper because the bar-code did not determine the outcome of the game, it merely displayed the indicia. Thus, the prosecution history does not support GameLogic's conclusion that the code be limited to a code that states a win/loss result.

In summary, Ingenio asks the Court to adopt the following construction:

---

[4] GameLogic's attempt to demonstrate the contrary using an example that 3 lemons = $25 is also misguided. For one, Clapper contains no such disclosure that the indicia must be referenced to a key to determine a win amount. Second, at best, GameLogic's hypothetical only demonstrates that a key may be necessary to determine a particular win amount, but not a win/loss result.

> **code which includes data indicating whether the player wins or loses the lottery game and an amusement game:**
>
> A system of symbols (e.g., letters and numbers) that within it contains the data (information in numerical form that can be digitally processed) that points to a win/loss result of the lottery game and an amusement game.

### C.     The Data Being Unrecognizable To The Player, Such That The Player Does Not Know Whether The Player Will Win Or Lose The Game Prior To Play Of The Amusement Game

Again, Ingenio believes that the ordinary and accustomed meaning of this phrase is all that is necessary to formulate a proper claim construction. On the other hand, GameLogic relies extensively on extrinsic evidence to support its assertion that "unrecognizable" must mean encrypted. Such an approach is contrary to Federal Circuit precedent. *See, e.g., Phillips*, 415 .3d at 1317-19.

#### 1.     GameLogic Misconstrues the Testimony of Dr. Bertram

In particular, GameLogic relies heavily on out-of-context and incomplete statements for one of Ingenio's experts, Dr. William Bertram. As mandated by the Federal Circuit, extrinsic evidence is generally disfavored as a means of interpreting claims. *Phillips*, 415 .3d at 1317-19. GameLogic's selective quotations demonstrate why that is.

GameLogic pulled selected portions of Dr. Bertram's testimony out of context and distorted his intended meaning. As noted in the attached Declaration of William K. Bertram, Ph.D. ("Bertram Dec."), (Ex. D hereto), to Dr. Bertram, "encryption" means some level of unrecognizability. *See* Deposition of William Bertram ("Bertram Dep.") (Ex. A hereto) at 90:3-4 ("anything that makes it unrecognizable would be considered encryption."). In contrast, GameLogic appear to be reading into Dr. Bertram's words that encryption must involve a

complicated public/private key type of encryption which Dr. Bertram clearly does not believe to be required by the claims. Likewise, the portion of Dr. Bertram's testimony relied upon for the proposition that unrecognizable requires encryption (D.I. 117, p. 16) is a snippet taken out of a discussion extending over approximately eight (8) pages of transcript and replete with hypothetical examples posed by GameLogic counsel. When taken in context, it is clear that Dr. Bertram was using the word "encryption" to describe a specific form of unrecognizable and that the claims do not require the specific form. *See* Bertram Dec. ¶¶2-6. For example, in context, Dr. Bertram commented as follows:

> Q: Within the destiny code, your idea for encryption for the code is captured; is that correct? Is the destiny code encrypted?
>
> A: It can be. I don't know whether it has to be or not. If -- if according to the claim it is unrecognizable, well, then it's encrypted. There might be a way to make it unrecognizable without some complicated encryption scheme, but I guess anything that makes it unrecognizable would be considered encryption.

Bertram Dep. 89:17-80:4.

### 2.    The Testimony of Dr. Grimes and Perry Kaye Support Ingenio's Claim Interpretation

Likewise, GameLogic improperly uses additional extrinsic evidence in the form of testimony from Dr. Grimes (another Ingenio expert) and Perry Kaye (the named inventor for the Ingenio Patents). Again, this testimony is taken out of context and distorted. In these depositions, GameLogic counsel is asking Dr. Grimes how the encryption examples provided in the specification would occur and Mr. Kaye about various commercial embodiments he considered implementing. The quoted passages were not discussing any limitations on the claims. Ingenio does not dispute the fact that the patent provides examples of encryption as one way to make a code unrecognizable or that Mr. Kaye considered using encryption for a commercial embodiment. Thus, these citations provide nothing.

GameLogic also fails to inform this Court that Dr. Grimes was very clear in saying that

he did not believe that unrecognizability required encryption. *See* Deposition of Jack B. Grimes

("Grimes Dep.") (Exhibit B hereto) stating:

> Q. And one -- one of the claim requirements is that the code is
> unrecognizable to the player, correct?
>
> A. Right.
>
> Q. But recognizable to somebody else, right?
>
> A. Sure. But that's actually not even security. That's not -- that
> doesn't have anything to do with encryption.

Grimes Dep. 286:11-18.

Similarly, the inventor, Perry Kaye, never testified that the word "unrecognizable"

requires encryption. In fact, he testified that a look-up table, encryption and encoding can all be

used in embodiments of his invention to make the outcome unrecognizable. *See* Deposition of

Perry Kaye ("Kaye Dep.") (Exhibit C hereto) at 118:4-119:18 ("But what I would have done is

taken that particular code and then using certain algorithms and just mathematical functions turn

that code into information about what the game was supposed to do. So what the prize table was

and what the value of the ticket was….The algorithm would convert the

information….Decoding, converting, whatever you want to use. But from that I find out the

information that I need. … When I wrote my programs, it doesn't matter if you use a decryption

algorithm or a look-up table or whatever. The idea is to just have it where you can tell accurately

what that ticket is supposed to mean to the user in the end result).

### 3. GameLogic's own expert disagrees with its proposed definition

Ironically, GameLogic would have this Court believe that all of the extrinsic evidence

supports its interpretation, when in fact, its own proferred expert does not agree. GameLogic's

expert, Mr. Brandin, testified that merely covering the data (*e.g.*, using a card or the like) would

10

satisfy the claimed "unrecognizable" requirement. Brandin Dep. 99:1-5. Mr. Brandin also

testified that he considered "obfuscation a form of encryption." Brandin Dep. 97:19-20. After

having some time to collect his thoughts over lunch, Mr. Brandin apparently concluded that

> I believe any form of encryption or coding would meet the
> requirements of the claim as long as you saw the data, as long as
> the data were there, but the player could not discern its meaning.

Brandin Dep. 112:3-6. According to Mr. Brandin, to be unrecognizable data can be either

obfuscated, coded or covered.

Accordingly, if the Court looks at all of the extrinsic evidence, it becomes clear that

whereas encryption is one example of how to make the code unrecognizable, a look-up table,

decoding and other methods are also within the scope of the term. Indeed, what all of the

quotations from Drs. Bertram and Grimes, the inventor Perry Kaye and even GameLogic's

proferred expert, Mr. Brandin, demonstrate is that the word "encryption" introduces more

uncertainty into the claim. All four persons questioned applied a different understanding of the

term "encryption."

For all of these reasons, an interpretation of "unrecognizable" that requires encoding or

encryption is improper. Thus, "unrecognizable" should be afforded its ordinary and accustomed

meaning as set froth below:

| the data being unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game: |
|---|
| The player is not able to recognize from the data whether the player wins or loses the lottery game and amusement game prior to play of the amusement game. |

### D. Lottery Game

Ingenio believes that the term "lottery game" should be accorded the ordinary and accustomed meaning, which requires a payment associated with a chance to win. GameLogic asserts that payment is not required, mere participation is enough. GameLogic is describing a drawing or a sweepstakes – not a lottery. As alleged proof that payment is not required GameLogic relies on '082 Patent, claim 1, stating that "the first step of the lottery game ... is the acquisition of the gaming piece." D.I. 117 at 18. GameLogic concludes, therefore, that "nothing in the claims or even the specifications ... require the player to pay for the chance to participate...." *Id.* This is simply false.

The claims specify acquisition of a gaming piece. *See, e.g.,* '082 Patent, claim 1. However, the gaming piece is for a <u>lottery game</u>, not a "promotional game," "video game" or "give-away game." <u>Lottery game</u> requires that a monetary prize will be awarded in exchange for a <u>purchased</u> chance to win. *See, e.g.,* 54 C.J.S. Lotteries § 2 (2005) ("The three necessary elements of lottery are the offering of a prize, the awarding of the prize by chance, and the giving of a consideration for an opportunity to win the prize.").[5] It is clear that the inventor intended to use the term "lottery" consistent with the ordinary usage where consideration in the form of a purchase is included. The examples of acquisition of a gaming piece given in the specification show that payment is required for acquisition. *See, e.g.,* '082 Patent, 1:25-28 ("a player purchases a chance to win"), 2:39-41 ("a sales device used to purchase game media"), 4:41-47 ("a player wishing to purchase ... [m]oney is put into a bill validater 34") and Fig. 4, item 33

---

[5] Corpus Juris Secundum §§ 6 and 7 explain that there are a few rare exceptions where states include schemes without payment as a lottery, but that such states explicitly deviate from the ordinary meaning of the term lottery.

("how many tickets do you want to buy?"). Thus, the player <u>pays</u> to acquire a gaming piece (including a code) to participate in a <u>lottery game</u> with a chance to win a prize.

Payment associated with participation is, thus, an essential element of a lottery game and any interpretation that excludes such a requirement would be contrary to both the ordinary meaning and the '082 Patent specification. In summary, Ingenio asks the Court to adopt the following construction:

| lottery game: |
| --- |
| A game based on three basic principles: payment associated with participation in a chance to win; a result based on chance; and a prize awarded to the winner(s). |

### E.    Amusement Game

Ingenio maintains that the term "amusement game" really does not need interpretation, but if it is interpreted, that term should be afforded its ordinary and accustomed meaning – a game that amuses the player. Although GameLogic's logic is difficult to follow, it appears to assert that (1) the amusement game and lottery game are separate games, with the amusement game not being part of the lottery game (the amusement game and lottery game are mutually exclusive), (2) the actualization game described in the patent specification is (a) separate from the amusement game and (b) part of the lottery game and (3) the amusement game must result in fictitious awards. It attempts to impose these requirements on the claims by expressly excluding embodiments in the specification to the contrary.

### 1.    The Amusement Game and Lottery Game are Not Mutually Exclusive

GameLogic argues at length that lottery game and amusement game should be interpreted as separate games and it intends the word "separate" to mean mutually exclusive. D.I. 117 at 18-23. Ingenio agrees that the claims require two games – a lottery game and an amusement game.

The claim recites both games without question. Ingenio also agrees that the outcome of both is determined based on the code. That is exactly what the claims state. Those points, however, do not compel a separateness or mutual exclusivity requirement. Rather, the amusement game can be *part of* the lottery game and still be a distinct item. One would certainly agree that a person has a head and a nose – two distinct elements, but one would not say that the nose is "separate" from the head. Similarly, the amusement game in the Ingenio claims is a distinct element, but one that may be part of the lottery game. In the typical scenario, the amusement game begins after the lottery game and then, based on the code, may conclude at the same time with the outcome of both games being the same according to the claims.

For example, in the patent specification, the lottery game "begins" when a player purchases a ticket. *See, e.g.*, '082 Patent, Fig. 2. The lottery game "ends" for that player when the win/loss result (and, if win, the prize) of the chance to win is revealed to the player. Such an arrangement is disclosed in the description of a prior art "scratch off lottery." The lottery begins when the player purchases a card "having symbols and a covered area that conceals the outcome of the game." '082 Patent, 1:25-28. The lottery game ends when the player scratches off the coating of the covered area and reveals the game's outcome. '082 Patent, 1:30-32.

The Ingenio Patents disclose the amusement game as a mechanism to reveal the win/loss result of the lottery game in an exciting and interesting fashion. *See, e.g.*, '082 Patent, 1:62-66. It indicates that the amusement game can either be two parts (with a pure amusement part and a reveal/actualization/actual part) or an amusement game that combines both parts. *See, e.g.*, '082 Patent, 1:62-2:2; 3:23-29 and 4:5-23. GameLogic's definition and analysis completely ignores the latter. In both examples, the amusement game "begins" when the player enters the code and

14

begins to play an interactive processor generated game (e.g., a computerize horserace). *See, e.g.,* '082 Patent, 3:37-39.

In the two part example, after interactive play, the player enters the actualization phase where the player awarded a chance win. *See, e.g.,* '082 Patent, 3:44-45. The outcome, and thus, "end," of the amusement game for this preferred embodiment occurs when the actualization game displays the win/loss (and prize, if win) results of the lottery game under the control of the processor and based upon the code (also simultaneously "ending" the lottery game). *See, e.g.,* '082 Patent, 3:46 - 4:5.

In the combination example, where the amusement game includes only a single game, the process is disclosed as follows. The code is used to set up a win or loss of the amusement game (*e.g.,* a poker game). *See, e.g.,* '082 Patent, 4:7-23. Play of the amusement game is controlled/determined by the processor based on the code. *Id.*; *see also* '082 Patent, 4:62-5:8 (describing a slot-type amusement game without fictitious awards). Because there is only a single game, the "end" of this amusement game will also display the win/loss (and prize, if win) result of the lottery game (thus, ending the lottery game).

Accordingly, given the two different embodiments described above, it would be improper for the Court to interpret amusement game to be separate mutually exclusive from the lottery game.

### 2.     The Claims Do Not Require Mutually Exclusive Amusement and Actualization Games

First of all, the phrase "actualization game" is not used in any of the claims of the Ingenio patents, making GameLogic's interpretation that calls for separate amusement and actualization games confusing. Second, as discussed above, the specification teaches that every example and embodiment in the specification describing amusement games and actualization games as two

components could also be implemented with those two components merged into a single amusement game, with the outcome of the code determining the outcome of that amusement game. *See, e.g.,* '082 Patent, 4:6-21. GameLogic refuses to even acknowledge this passage from the specification because it completely undermines its entire interpretation.

Furthermore, GameLogic ignores later recitations in the claims that preclude separate and distinct amusement and actualization games. For example, '082 Patent, claim 1, recites that "the processor controlling whether the player will win or lose the amusement game based on the code entered by the player" and '082 Patent, claim 10, recites "said processor determining whether the player will win or lose the amusement game based upon said code." The amusement game as identified by GameLogic does not contain these claimed features.

For example, GameLogic cites to '082 Patent, 3:25-33 and reasons that the amusement game comes to an end either by discretion of the player or necessity of the game. *See* D.I. 117 at 19. The cited portion of the specification states that the "necessity of the game" is because "all the [horse] races have been run or the player is out of money." '082 Patent, 3:29-33. Neither player discretion nor the "necessity of the game" are disclosed as being controlled or determined by the entered code. In fact, reading further in the specification, the win/loss of this game does not matter at all because, even if the player loses, an automatic chance to play the "actualization" part is granted. '082 Patent, 3:40-44.

In fact, the "actualization game determines the outcome of this game using the Destiny Code." '082 Patent, 3:46-47. Clearly, the claimed amusement game that is controlled by the processor must include the actualization game in order to satisfy the later claim recitations.

The same holds true in the second example cited by GameLogic. D.I. 117 at 20 (quoting '082 Patent, 6:7-17). As stated therein, the player plays the amusement game "until the player

16

wishes to play the actualization game or until game rules require." '082 Patent, 6:7-10. Clearly, game rules or player wishes are not controlled or determined by the processor based upon the code. Again, it is the outcome of the actualization part that is disclosed as being controlled by the code. '082 Patent, 6:15-17. Clearly, the intrinsic evidence does not support an interpretation that requires separate and distinct actualization and amusement games. Rather, the specification expressly teaches an amusement game that combines the elements of pure amusement and revealing the outcome of the lottery game in an exciting fashion and GameLogic's interpretation would require the Court to totally ignore that teaching.

### 3. The Specification Provides Amusement Game Embodiments Where Fictitious Awards Are Not Provided

Second, GameLogic's proposed requirement that the amusement game result in fictitious awards is a clear attempt to import language from examples in the specification into the claim. The fictitious awards examples are just examples. As mentioned above, another example provides for poker to be the amusement game with the result based on the code. *See, e.g.* '082 Patent, 4:5-23 (the poker game example without fictitious awards) and 4:62-5-8 (the slot amusement game example without fictitious awards).

GameLogic's interpretation of the significance of events during prosecution of the Ingenio Patents is also misguided. For example, GameLogic apparently argues that amendments allegedly necessitated by 35 U.S.C. § 112 somehow compel its proposed claim construction. This is incorrect.

### 4. The Prosecution History Does Not Support GameLogic's Twist on the Claims

If anything, the amendments made during prosecution clarify that a claim construction in which the amusement and actualization parts are separate and distinct is improper. For example,

in pertinent part, '082 Patent, claim 1 was amended as follows (additions indicated by underlining):

> a code which includes data indicating whether the player win or loses <u>the lottery game and an amusement game</u> ...;
>
>          * * *
>
> the processor controlling whether the player will win or lose the <u>amusement</u> game based upon the code entered by the player;

*See* JA Ex. C at IN001393. Thus, two games are specified – the lottery game and the amusement game. In addition, it is the win/loss outcome of the amusement game that is controlled by the processor. As noted above, the intrinsic evidence does not support a separate amusement and actualization game because there is no processor control of the fictitious awards game – only the actualization part is controlled by the code. The amendments during prosecution are consistent with Ingenio's proposed constructions.

Likewise, GameLogic's arguments regarding prior art rejections do not support a claim construction requiring an amusement game lacking processor control of the outcome based on the entered code. Assuming, *arguendo*, that GameLogic is correct[6] and "the prior art disclosed lottery games in which the lottery result was revealed via play of an amusement game," (D.I. 117 at 21-22), then it makes no sense that the claims would be allowed without an amusement game where the outcome is determined/controlled by the processor based on the code as urged by GameLogic's claim construction. If it existed in the prior art how could it be allowed? Clearly, the amusement game must include the actualization part, because it is the part of the amusement

---

[6] Ingenio does not concede that the prior art discloses this. In fact, numerous distinctions and improprieties of the proposed rejection were advanced by the patentee and the Examiner ultimately withdrew the rejections.

game for which the outcome is controlled/determined by the processor based on the entered code. In summary, Ingenio asks the Court to adopt the following construction:

| amusement game: |
| --- |
| A game that amuses the player. |

### F.    Processor Recitations

As noted previously, Ingenio maintains that the claim format used with respect to the term "processor" supports an interpretation of "one or more" processors. GameLogic argues that processor should be construed to mean "a single, multi-purpose device that interprets and executes instructions that is (sic) performing all of the various steps outlined in the claims." D.I. 117 at 23. However, on the next page, GameLogic concedes that one or more processors may be present. *Id.* at 24. According to GameLogic, the number of processors is not the dispute, "but rather whether the processor or processors performing the various functions specified in the asserted claims are contained in one device." *Id.*

By their plain meaning, none of the claims require that the "processor" be contained in a single device.[7] In contrast to this unambiguous meaning, GameLogic improperly tries to import limitations from a single embodiment described in the specification.

Not surprisingly, GameLogic asserts that column 4, lines 53-61 of the '082 Patent demonstrates that the one or more processors must be contained in a single device. Of course, the cited disclosure is in reference to a "Self-Contained Amusement/Actualization embodiment." *See* '082 Patent 4:30. By definition, the self-contained embodiment is a single device. However,

---

[7] In fact, '082 Patent claim 1 is a method claim that does not specify requirements for any devices.

the specification also discloses an "on-line embodiment" ('082 Patent 5:59 - 6:21) where multiple processors exist over a distributed network environment. Clearly, the term "processor" in the claims should not be limited to one or more processors within a single device.

GameLogic further asserts that '082 Patent claim 16 refers to one processor, thus, somehow showing that the one or more processors must be contained in a single device. This is incorrect. Claim 16 refers to the previously recited (*i.e.*, claim 10) processor as "said processor." As has already been established and conceded by GameLogic, claim 10 recites one or more processor by using the open format (*i.e.*, comprising) and the "a processor," "said processor" convention. Therefore, the reference to "said processor" in claim 16 is merely a repetition of the format used in claim 10 – "said processor" in claim 16 refers to the same one or more processors recited in claim 10. There is nothing in the language of claim 16 that would dictate that the one or more processors be contained in a single device. Therefore, a proper construction is that one or more processors are present without limit as to how many devices they inhabit. In summary, Ingenio asks the Court to adopt the following construction:

| **a processor:** |
| --- |
| One or more processors are present. |

## 1.    Processor Within A Computing Device

The plain and accustomed meaning of this phrase is that the processor is a component of a computing device. *See, e.g.,* '082 Patent, Fig. 6 and 5:59 - 6:19 (disclosing examples of

computing devices (*e.g.*, computer or interactive TV) that include processor components). GameLogic's reliance on extrinsic evidence cannot change this.[8]

In summary, Ingenio asks the Court to adopt the following construction:

| processor within a computing device: |
| --- |
| The processor is a component of a computing device. |

### 2.    Processor Within An On-Line Subscription Service

The ordinary and accustomed meaning of a processor within an on-line subscription service is that the processor is part of an on-line subscription service (*e.g.*, America On-Line ("AOL")). *See, e.g.,* '082 Patent Fig. 6 and 5:59 - 6:19 (disclosing embodiments where the player plays the game via an on-line service with processors located at numerous points throughout the network). Again, GameLogic's reliance on extrinsic evidence, this time from the inventor, should be ignored. GameLogic points to testimony from a deposition exhibit that comprised portions of Mr. Kaye's "invention journal." D.I. 117 at 27. Notwithstanding that this extrinsic evidence has little, if any, bearing on the claim construction, it is important to note that Mr. Kaye also understood "on-line subscription service" to be an internet service provider. In the part of his testimony that is skipped over by GameLogic, Mr. Kaye testified as follows:

Q:    Like I could get a WinWare subscription?

---

[8] GameLogic's interpretation is counter to accepted claim interpretation rules. Claim 8 is dependent from claim 1 and, therefore, claim 8 contains features that are not necessarily present in claim 1. Thus, the additional requirement specified for the processor in claim 8 (*i.e.*, that it include a processor within a computing device) means that the processor in claim 1 is not so limited (*i.e.*, the processor in claim 1 need not be included in a computing device). In fact, as GameLogic attempts to show with extrinsic evidence, to construe the other way around -- that claim 1 requires the processor to be in a computing device -- renders claim 8 superfluous or indefinite. Such an interpretation is not proper.

> A:     You could get a WinWare subscription.  So you go to your
>        America Online account and you open it up and there's
>        your chances to play today.

Kaye Depo. Tr. 180, ln. 20 - 181, ln. 2.  Therefore, Mr. Kaye clearly contemplated an on-line

subscription service to include accessing the games through an internet service provider, such as

America Online.  As demonstrated by Mr. Kaye's testimony, one of ordinary skill in the art

would have understood the term on-line subscription service to refer to a fee-based internet

service provider.  In summary, Ingenio asks the Court to adopt the following construction:

| processor within an on-line subscription service: |
| --- |
| The processor is part of an on-line subscription service (*e.g.*, a fee-based internet service provider such as AOL). |

### 3.     Processor Within A Computing Device

The plain and accustomed meaning of this phrase is that the processor is a component of

a computing device.  *See, e.g.,* '082 Patent, Fig. 6 and 5:59 - 6:19 (disclosing examples of

computing devices (*e.g.,* computer or interactive TV) that include processor components).

GameLogic, on the other hand, proposes that this phrase must have a nonsensical

meaning or be indefinite.  D.I. 117 at 28.  Again, GameLogic relies on extrinsic evidence to

support its proposed nonsensical meaning.  Of course, it is contrary to claim construction

principles to construe a meaning that would render the claim invalid when another reasonable

interpretation exists.  *See, e.g., Carnan Indus. Inc., v. Wahl,* 724 F.2d 932, 937 n. 5 (Fed. Cir.

1983).  In summary, Ingenio asks the Court to adopt the following construction:

| processor within a computing device: |
| --- |
| The processor is a component of a computing device. |

22

G.    **Reading The Code By A Processor**[9]

As stated previously, in the context of the '603 Patent, the ordinary and accustomed meaning of the term "read" means "to receive input of data from a storage device, a data medium, or any other source." Thus, "reading the code by a processor" means to receive input of the code (a system of symbols that represent an assigned and secret meaning) from some source. That source may thus include a computer program/software source.

The intrinsic evidence supports an interpretation that is consistent with the plain meaning of the phrase "reading the code by a processor." For example, '603 Patent, 2:20-22 and 5:50-65 disclose reading a code (accepting input of the code) in a manner consistent with the ordinary meaning.

GameLogic's proposed interpretation – "actively examining and grasping the meaning of the code" – makes no sense in this context. That describes what a human being does when he or she "reads" not what a machine does. Machines do not "grasp" meanings. They are programmed to interpret data and generate outputs.

GameLogic's arguments for its definition make even less sense. First, it argues that Ingenio's interpretation for "reading the code by a processor" would lead to a "confusingly similar" relationship between '082 Patent claim 10 (which recites a processor receiving a code) and '603 Patent claim 1 (which recites reading the code by a processor). These phrases may have substantial overlap in coverage (and thus accomplish the same step as Dr. Bertram explained), but still have different scope. '082 Patent claim 10 is directed to a "game" and '603 Patent claim 1 is directed to a "method." It goes without saying that claims drawn to a method

---

[9] This phrase appears in '603 Patent, claim 1. It is not used in the '082 Patent.

are fundamentally different than claims drawn to a game which is a product or article of manufacture. In summary, Ingenio asks the Court to adopt the following construction:

| **reading the code by a processor:** |
| --- |
| To receive input of the code (a system of symbols that represent an assigned and secret meaning) from some source. That source may thus include a computer program/software source. |

## V.    GameLogic's Motion For Summary Judgment Should Be Denied

As noted in Plaintiff's Memorandum In Support of Its Motion For Partial Summary Judgment (D.I. 113), every one of GameLogic's proffered non-infringement positions relies on its incorrect understanding of the claims and claim elements in dispute. If this Court properly construes the claims, as Ingenio has proposed, the undisputed facts (all based on GameLogic's own admissions or documents) establish infringement of all asserted claims.

However, even if the Court were to adopt GameLogic's proposed constructions in their entirety, summary judgment of non-infringement is still inappropriate as material questions of disputed facts remain. For example, it is a disputed question of fact whether (1) GameLogic's access code includes data indicating win/loss information which is encrypted and (2) whether GameLogic's HomePlay game includes an amusement game where the outcome of the amusement game is determined by the win/loss data contained in the code.

**Redacted**

24

Redacted

Redacted

Redacted

## 2. The Cohen Discussion is a Red Herring

Yet again, GameLogic has relied on out of context expert testimony to allegedly demonstrate how the Cohen reference[11] shows that GameLogic's access code precludes infringement. As an initial matter, the alleged "diagram" of an embodiment from Cohen is a product of GameLogic's counsel -- no such diagram exists in Cohen. D.I. 117 at 16-17. Furthermore, no such diagram was displayed in the actual March 23, 2006, deposition of Dr. Bertram.

During the deposition, the discussion about the Cohen reference begins some twelve pages prior to the cited quote from Dr. Bertram. Bertram Dep. 196:5. At the outset of that conversation, Dr. Bertram indicated that, because of numerous deficiencies in the Cohen disclosure, he found it to be "a rather far-fetched stretch" that Cohen would invalidate the asserted claims. Bertram Dep. 197:13-15. Thus, when read in context, there are numerous reasons that Dr. Bertram found Cohen to be totally different than some hypothetical example proffered by GameLogic's counsel. For example, Dr. Bertam pointed out that Cohen discloses a promotional game -- not a lottery (Bertram Dep. 197:13-16), there was no predetermined win/loss amount in a code entered by a player (Bertram Dep. 199:4-7) and that the preselected code disclosed in Cohen was not related to the player's code (Bertram Dep. 201:5-11). Thus, to

---

[11] U.S. Patent No. 5,373,440, herein after "Cohen."

put any special significance on GameLogic's cited portion of Dr. Bertram's testimony is inappropriate.

Finally, even if the above evidence is not sufficient to show literal infringement, it is certainly sufficient to show infringement under the Doctrine of Equivalents. For example, the HomePlay access code performs substantially the same function of the claimed code in substantially the same way to obtain substantially the same result. *See, e.g.*, Bertram Dec. at ¶¶7-8; Grimes Dec. at ¶¶4-5. Likewise, the interchangeability between a code requiring win/loss information to be contained in the code and the HomePlay access code which is directly linked to win/loss information is well know and the differences are insubstantial. *Id.*

GameLogic asserts that infringement under the Doctrine of Equivalents is precluded on the code including data which indicates a win/loss because of an alleged surrender of the subject matter during prosecution. This is incorrect. As discussed above with reference to the Clapper patent, the patentee did not distinguish the claims on the basis that Clapper discloses a code having a reference to data as opposed to a code containing the data. To invoke argument-based estoppel, the prosecution history must evince a clear and unmistakable surrender of subject matter. *Aquatex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005). The patentee's arguments made during prosecution concern the bar code feature of Clapper and merely clarify the claimed invention over the applied prior art. More importantly, the statements bear no relation to the subject matter that GameLogic is now alleging has been surrendered. Therefore, as the prosecution history fails to show clear and unmistakable surrender of the subject matter, the full range of equivalents is available to the patentee.

**Redacted**

28

**Redacted**

As discussed above, GameLogic's own expert, Mr. Brandin, testified that his definition of encryption may be met by "obfuscation" (Brandin Dep. 97:19-20) or "any form of encryption or coding would meet the requirements of the claim as long as you saw the data, as long as the data were there, but the player could not discern its meaning." Brandin Dep. 112:3-6.

It is clear that a question of fact exists whether GameLogic's system uses "encryption" under the various understandings of that phrase. As evidenced by the testimony of the various witnesses, what is meant by encryption is no simple matter. To Mr. Brandin, obfuscation is a form of encryption. Brandin Dep. 97:19-20. To Dr. Bertram, encryption is a type of unrecognizability. Bertram Dec. ¶¶2-6; Bertram Dep. 90:3-4. To Dr. Grimes, a computer science expert, encryption implies some sort of computer implemented scheme (*e.g.*, a key exchange, RAS, DES, Triple DES, use of a look-up table, *etc.*).[12] Grimes Dep. 220:13 - 224:3. These various definitions serve to highlight the problems inherent in GameLogic's proposed construction.

**Redacted**

---

[12] Thus it was not a surprise that Dr. Grimes testified that he was not aware of GameLogic using any encryption, because he was applying his definition of encryption. When asked whether GameLogic's use of a look-up table would meet Mr. Brandin's, Dr. Bertram's or the patent specification examples look-up table type of encryption, he readily stated that it would.

**Redacted**

Again, even if the above evidence is not sufficient to show literal infringement, it is certainly sufficient to show infringement under the Doctrine of Equivalents. For example, HomePlay access code performs substantially the same function of the claimed code in substantially the same way to obtain substantially the same result. *See* Bertram Dec. ¶9; Grimes Dec. ¶5

**Redacted**

30

**Redacted**

For this element, GameLogic asserts a construction that requires a separate amusement game and actualization game, where the actualization game is use to reveal the results of the lottery. As demonstrated by Mr. Hardy's testimony, GameLogic's product operates exactly in this manner.

To support its construction, GameLogic relies on portions of the '082 Patent that disclose an embodiment where the amusement game is a separate game during which the player wins fictitious awards. D.I. 117 at 18. GameLogic continues that, in that embodiment, the amusement game ends and then an actualization game begins, "which has the stated purpose of displaying, in a pleasing fashion, the actual result" stored in the code. D.I. 117 at 20 (quoting, '082 Patent 3:33-38).

**Redacted**

When asked to describe the what happens when a player elects to play Prize Reel Blackjack, Mr. Hardy testified as follows.

**Redacted**

31

**Redacted**

Hardy Dep. 45:8 - 46:3.  In addition, Mr. Hardy testified that                    —

**Redacted**

Hardy Dep. 51:10 - 52:11.  Mr. Hardy also testified as follows:                    ...

**Redacted**

32

Hardy Dep. 77:14-22.  Finally, when asked to explain a statement made in a previous

declaration[13] submitted by Mr. Hardy, his testimony was as follows:

**Redacted**

Hardy Dep. 79:22 - 80:14.

      Thus, as clearly demonstrated by Mr. Hardy's testimony, GameLogic's product includes

a game, Prize Reel Blackjack, that operates identically to the game required by GameLogic's

proposed claim construction.  Specifically

**Redacted**

                                    Thus, under their own construction,

GameLogic literally infringes the claims.

---

[13] That statement was: "Whether the player wins the lottery, and how much he or she wins, is predetermined and entirely unrelated to how well or poorly the player plays the interactive games."

33

GameLogic admits that the Prize Reel Blackjack game is "very similar" to the '082 Patent embodiments disclosing separate actualization and amusement games. D.I. 117 at 22. GameLogic attempts to distinguish from these embodiments by stating that only the blackjack (*i.e.*, the skill portion) is the amusement game and it's outcome is not determined by the code. *Id.* However, Mr. Hardy refuted this position with his testimony. Mr. Hardy testified that the

Redacted

*See, e.g.*, Hardy Dep. 80:2-4 and 45:8-46:3.

Again, even if the above evidence is not sufficient to show literal infringement, it is certainly sufficient to show infringement under the Doctrine of Equivalents. For example, the HomePlay product, Prize Reel Blackjack, performs substantially the same function of the amusement game in substantially the same way to obtain substantially the same result. Likewise, the interchangeability between the claimed amusement game and the HomePlay Prize Reel Blackjack game is well known and the differences are insubstantial. Bertram Dec. ¶9; Grimes Dec. ¶5.

GameLogic asserts that infringement under the Doctrine of Equivalents is precluded on the amusement game where the processor controls whether the player will win or lose the amusement game based upon the code because of an alleged surrender of the subject matter during prosecution. This is incorrect. As discussed above with reference to Ingenio's proposed construction for this phrase, the amendments made during prosecution clarify that a claim construction in which the amusement and actualization parts are separate and distinct is improper. A patentee may rebut the presumption that a narrowing amendment made for a reason of patentability surrendered the entire territory between the original claim limitation and the amended claim limitation. *Insituform Technologies v. Cat Contracting, Inc.*, 385 F.3d 1360,

1370 (Fed. Cir. 2004). First, the patentee may demonstrate that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment. *Id.* Second, the patentee may demonstrate that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question. *Id.* Finally, there may be some other reason suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent. *Id.* at 1368.

GameLogic improperly relies on *Litton Systems v. Honeywell* for the proposition that the patentee was barred as a matter of law from asserting a limitation under the doctrine of equivalents. 238 F.3d 1376, 1380 (Fed. Cir. 2001). In *Litton Systems*, the patentee made a statement that the original claims could not "properly be construed to refer to any other ion beam gum but the Kaufman gun" and later narrowed its claims in direct response to a rejection under 35 U.S.C. § 112 that the examiner issued because Litton did not claim what it regarded as its invention. *Id.* In contrast, during prosecution of the '082 patent, the patentee made no such limiting remarks. Further, the amendment directed to "amusement game" has nothing to do with the subject matter alleged to have been surrendered, as argued by GameLogic. The narrowing amendment was made in response to a rejection under 35 U.S.C. § 112 to clarify the term "game." There is no indication in the prosecution history of any relationship between the narrowing amendment and the subject matter alleged to have been surrendered in this case. Therefore, as the narrowing amendment was peripheral and not directly relevant to the subject matter, the full range of equivalents is available to the patentee. *See Insituform Technologies,* 385 F.3d at 1370 (finding reason for amendment and alleged equivalent involved different aspects of the invention).

## VI.    CONCLUSION

Plaintiffs respectfully request that the Court adopt in its entirety the claim constructions

Plaintiffs have proffered in its separate Joint Claim Construction Chart, submitted previously.

Further, the Court should reject GameLogic's strained constructions which improperly seek to

import limitations from one or more embodiments from the patent specifications into the claims

to the exclusion of other embodiments.  Ingenio respectfully requests the Court to deny

GameLogic's Motion For Summary Judgment of Non-Infringement.

Respectfully submitted,

Dated: May 22, 2006

Edmond D. Johnson (No. 2257)
222 Delaware Ave., Suite 900
P.O. Box 25130
Wilmington, DE 19801
(302) 655-5000

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC  20006-1109
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

Counsel for Plaintiff
Ingenio, Filiale De Loto-Quebec, Inc.

625565v1