**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

INGENIO, FILIALE DE LOTO-  )
QUEBEC, INC.,  )
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,  )　　C.A. No. 04-1532 (KAJ)
　　　　　　　　　　　　　　　　　)
　　　　v.  )　　**PUBLIC VERSION**
　　　　　　　　　　　　　　　　　)
GAMELOGIC, INC.  )
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.  )

**DEFENDANT GAMELOGIC, INC.'S REPLY IN FURTHER
SUPPORT OF ITS MOTION FOR
<u>SUMMARY JUDGMENT OF NON-INFRINGEMENT</u>**

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Kenneth L. Dorsney (#3726)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
kdorsney@potteranderson.com

OF COUNSEL:

Gary M. Hnath
Susan Baker Manning
Goutam Patnaik
Timothy A. Molino
BINGHAM MCCUTCHEN LLP
2020 K Street NW
Washington, DC 20006
(202) 373-6000

*Attorneys for Defendant
GameLogic, Inc.*

Dated:  May 22, 2006
Public Version Dated:  May 30, 2006

Table of Contents

Page

I.    GAMELOGIC DOES NOT HAVE A CODE CONTAINING DATA
      WHICH INDICATES A WIN/LOSS OUTCOME AND IS
      "UNRECOGNIZABLE," AS THAT TERM IS USED IN THE
      PATENTS-IN-SUIT ............................................................................2

      A.    Ingenio Tries To Blur The Clear Lines Drawn By The Asserted
            Patents In Describing GameLogic's Access Code. ...........................2

      B.    GameLogic's Access Code Does Not "Include Data Indicating
            Whether The Player Wins Or Loses The Lottery Game And An
            Amusement Game" .........................................................................4

            1.    GameLogic's Access Code Does Not Contain Data Which
                  Indicates The Win/Loss Outcome .........................................4

            2.    Ingenio's Expert Correctly Distinguished Between The
                  Code Used In Cohen And The Code Used In The Patents-
                  In-Suit ................................................................................9

            3.    The Doctrine Of Equivalents Is Not Available To Extend
                  The Claims To Cover Codes Which Point To A Win/Loss
                  Result ................................................................................10

      C.    GameLogic's Access Code Is Not "Unrecognizable" As Required
            By the Asserted Claims..................................................................11

            1.    Ingenio Ignores The Intrinsic Evidence When Arguing That
                  GameLogic's Access Code Is "Unrecognizable" ....................11

            2.    GameLogic's Access Code Cannot Be "Unrecognizable"
                  Under The Doctrine Of Equivalents ......................................14

II.   GAMELOGIC DOES NOT HAVE AN AMUSEMENT GAME WHERE
      THE RESULT IS DETERMINED BY THE CODE ..................................15

      A.    Ingenio Has Admitted That GameLogic's Amusement Game Does
            Not Have An Outcome Determined By The Code .............................15

      B.    Ingenio's Attempt To Create A Fact Issue By Confusing "The
            Games" Is Transparent....................................................................15

      C.    GameLogic's Blackjack Game And PrizeReel Game Are Distinct..........16

      D.    Ingenio Fails To Refute That Applying The Doctrine Of
            Equivalents To GameLogic's System Would Entirely Vitiate A
            Claim Limitation..............................................................................18

      E.    Ingenio Is Barred From Asserting The Doctrine Of Equivalents
            Because The Amendment Adding "Amusement" To "The Game"
            Is Directly Related To The Equivalent In Question .........................18

III.  CONCLUSION...................................................................................20

i

Table of Authorities

Page

## Federal Cases

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
   344 F.3d 1359 (Fed. Cir. 2003)....................................................18

*Freedman Seating Co. v. American Seating Co.*,
   420 F.3d 1350 (Fed. Cir. 2005)....................................................14

*Insituform Technologies v. Cat Contracting, Inc.*,
   385 F.3d 1360 (Fed. Cir. 2004)....................................................18

*Porter v. Farmers Supply Service, Inc.*,
   790 F.2d 882 (Fed. Cir. 1986)......................................................17

*Standard Oil Co. v. American Cyanimid Co.*,
   774 F.2d 448 (Fed. Cir. 1985)......................................................10

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996).......................................................9

Defendant GameLogic, Inc. ("GameLogic") submits the following Reply to Plaintiff Ingenio, Filiale de Loto-Quebec, Inc.'s ("Plaintiff" or "Ingenio") Opposition to GameLogic's Motion for Summary Judgment of Non-Infringement.

Ingenio's Opposition to GameLogic's Motion for Summary Judgment of Non-Infringement (D.I. 122) (hereafter, "Ingenio Opp. Br.") attempts to confuse, rather than clarify, the issues. In doing so, Ingenio ignores language from the claims and the specifications of the asserted patents to create fact issues where none exist. The patents say what they say, and there is no genuine dispute about how GameLogic's product operates.

Moreover, Ingenio, despite emphasizing the importance of intrinsic evidence, cites mostly extrinsic evidence in the form of dictionary definitions and expert testimony (including new declarations) to support its positions. When it does reference the intrinsic evidence, Ingenio selectively quotes from the specification while omitting relevant language from the same part of the specification. Instead of refuting every partial quotation from Ingenio's papers, GameLogic will simply attempt to boil the dispute down to its core and demonstrate that GameLogic's HomePlay Lottery[TM] product cannot infringe the asserted claims of U.S. Patent No. 5,569,082 ("the '082 patent") and U.S. Patent No. 5,709,603 ("the '603 patent") (collectively, "the asserted patents" or "the patents-in-suit").

As set forth in GameLogic's Opening Brief in Support of Its Motion for Summary Judgment of Non-Infringement (D.I. 116) (hereafter, "GameLogic Br."), GameLogic cannot infringe the asserted claims for at least the following reasons:

(1) The access code used in GameLogic's HomePlay Lottery[TM] product does not

have the same characteristics as the claimed code. Specifically, GameLogic's access
code does not include data indicating whether the player wins or loses the lottery game
and an amusement game, and the data contained in GameLogic's access code is not
"unrecognizable" to the player as that term is used in the asserted patents; and

(2) GameLogic's HomePlay Lottery[TM] product does not have an amusement
game where the processor controls whether the player will win or lose the amusement
game based upon the code. The outcome of the amusement game in GameLogic's
system, as illustrated by GameLogic's Prize Reel Blackjack game, is never based on the
code, only on the player's skill and the random draw of the cards.

**I.    GAMELOGIC DOES NOT HAVE A CODE CONTAINING DATA WHICH
INDICATES A WIN/LOSS OUTCOME AND IS "UNRECOGNIZABLE,"
AS THAT TERM IS USED IN THE PATENTS-IN-SUIT**

**A.    Ingenio Tries To Blur The Clear Lines Drawn By The Asserted
Patents In Describing GameLogic's Access Code**

Ingenio, in describing GameLogic's access codes, goes to great lengths in
attempting to create a fact issue where one does not exist. GameLogic's access codes
contain 16 digits.

**REDACTED**

The asserted patents make clear that the code must be both encoded <u>and</u> encrypted.
As GameLogic has already outlined in its previous submissions, every embodiment

**REDACTED**

2

disclosed in the patents requires that the code be decrypted <u>and</u> decoded, and thus the claimed code must necessarily have been both encoded <u>and</u> encrypted. *See, e g ,* Joint Appendix ("JA") Ex. A, '082 patent, col. 3, lns. 20-21; col. 5, lns. 9-10; col. 5, lns. 40-42; col. 6, lns. 4-6; and col. 9, lns. 61-63. Similarly, the figures in the patent show that decrypting and decoding are required to process the code to discover how the games should play. *See id* at Fig. 1, block 13; Fig. 3, block 25; Fig. 6, block 48; and Fig. 8. block 112. Ingenio does not even attempt to explain or rebut these references in the intrinsic record regarding the qualities of the claimed code.

Encoding and encrypting are concepts understood by those skilled in the art For example, if a lottery game was created where it was desired to hide the win/loss information within a 12 digit code by using the claimed method, the first step would be to create the code. In other words, different win amounts would have to be encoded in the 12 digit codes. For instance, the combination of numbers 1-2-3-4 could be used to represent a $10 win amount. That would mean that if any part of the 12 digit code contained this combination, the ticket would be a $10 winner. Thus, a ticket containing the code: 245812345567 would be a $10 winner and the ticket is now encoded with that win information. Such encoding would obviously be easy to decode by simple observation. A person would only have to analyze a small sample of lottery tickets to recognize that the pattern of 1234 in the code represents a $10 win. This is why the patents-in-suit require that the encoded characters also be encrypted. To encrypt the characters in the code, one could run them through an algorithm. A simple algorithm might be substituting letters for the odd numbers in the code. In other words, the number "1" would be replaced by either the letter "a" or the letter "k," which are the first and

eleventh letters of the alphabet, respectively. After being encrypted, the code above might be 24o8a2m4eo6g. It could also be 24e8k2c4oo6q. So, the $10 winning code has now been encoded (1234) and then encrypted (a2m4 or k2c4).

The asserted patents require both encoding and encrypting of the code. They must, otherwise the data indicating win or loss would be recognizable to the player, such that the player would know whether he or she will win or lose the lottery game and an amusement game prior to play of the amusement game. *See, e g,* claim 1 of the '082 patent. This is especially apparent in light of one of the stated goals of the patents-in-suit, namely to provide the security required to prevent fraud caused by game card theft or tampering. *See* JA Ex. A, '082 patent, col. 1, ln. 47.

    **B.**    **GameLogic's Access Code Does Not "Include Data Indicating Whether The Player Wins Or Loses The Lottery Game And An Amusement Game"**

        **1.**    **GameLogic's Access Code Does Not Contain Data Which Indicates The Win/Loss Outcome**

**REDACTED**

4

**REDACTED**

In opposing GameLogic's motion for summary judgment, Ingenio mischaracterizes GameLogic's position regarding the correct interpretation of "indicating" as used in the asserted claims. Ingenio argues that "GameLogic appears to assert that the code must state 'WIN$50' if the player is to win $50." Ingenio Opp. Br. at 4. According to the claim language, however, it is not the code, but the data contained within the code, which must indicate the win or loss outcome. *See, e.g.*, claim 1 of the '082 patent. Thus, as described above, the claimed code is encoded with data which states whether the player wins or loses the lottery game and an amusement game. The specification, with its consistent requirement for decoding and statements such as the "outcome is concealed in the Destiny Code" ('082 patent, col. 4, lns. 58-61 (emphasis added)), fully supports this interpretation.

Further, in attempting to recharacterize the Clapper prior art reference[2] and the patentee's attempts to distinguish his invention, Ingenio states that "Clapper clearly does not require reference to other data to determine the win/loss result in a game of Pull-Tab. In fact, Clapper suggests that the win/loss result is known the moment the indicia are uncovered." Ingenio Opp. Br. at 7 (citation omitted). Clapper, however, describes a system where the player is given a ticket with indicia on it where specific combinations of these indicia refer to win amounts. GameLogic Br. at Ex. 5, col. 3, lns. 49-54. The player must refer to a key that shows the combinations of indicia which correspond to win amounts to discover the results of the ticket. *Id* at col. 4, lns. 15-17.

Testimony by Ingenio's own expert belies Ingenio's most recent characterization of the Clapper reference and Ingenio's new spin on the patentee's representations regarding his invention. For instance, Dr. Bertram stated that in Clapper, "one has to have knowledge at some point of what different indices, combinations of them, are going to pay." Ingenio Opp. Br., Ex. A at 102, lns. 12-14. Dr. Bertram further agreed that the indicia in Clapper has to be referenced to something else to be meaningful. *Id* at 103, lns. 5- 10. As confirmed by Ingenio's own expert, the patentee distinguished between Clapper's reference to something else to ascertain the indicia's meaning and the claimed code which contains within it the win/loss determination.

GameLogic's access code does not have a win/loss outcome contained within it, as required by the asserted claims and supported by the specification and prosecution history. The '082 patent Abstract itself states that the gaming piece includes a "pre-determined code." Similarly, the patents teach that the outcome was predetermined at the

---

[2]  U.S. Patent No. 5,377,975.

time the code was created.  JA Ex. A, '082 patent, col  10, lns. 12-14.

**REDACTED**

First, the lookup table in the patent is compared

to the Destiny Code (which by definition, is encoded and encrypted)[3] only <u>after</u> the code

has been decrypted and decoded.  JA Ex. A, '082 patent, col. 9, lns. 61-63  GameLogic

---

[3] *See* JA Ex. A, '082 patent, col. 2, ln. 57 - col. 3, ln. 3 ("requires for generating and
controlling and tracking encypted symbolic codes . . . . The total and actual outcome of
the game is encoded in the Destiny Code.")

**REDACTED**

16. Second, the Destiny Code in the specification is compared to a lookup table to
"determine if the number is a loser or a winner and the size of the prize if any." *Id.* at col.
9, lns. 65-66. Explaining this, the specification continues, "[f]or example, if the series of
digits in the Destiny Code indicates that the game is a $75 winner, then the system will
set up a winning lotto drawing." *Id.* at col. 9, ln. 66 - col. 10, ln. 2. Thus, it is clear that
the lookup table referenced in the specification is a conversion chart or a legend used to
"calculate [the] predetermined outcome contained in the Destiny Code" ('082 patent, Fig.
12, block 234, which is referenced at col. 9, ln. 62) after it has been decoded and
decrypted.

**REDACTED**

        Further, in addressing the Clapper prior art reference, the patentee distinguished
his invention from Clapper, in part, by highlighting that the "Clapper, Jr. game requires
the ticket be stored in a gaming machine, which ticket is not independent of the gaming
machine." JA Ex. C at IN001406. The bar-code used in Clapper is an analog of the
indicia. The patentee overcame this prior art by stating that the Clapper code is
dependent on the machine and thus does not contain data indicating the win/loss

outcome.                          **REDACTED**

The patentee distinguished

his invention's use of data in the code which contains the win/loss outcome, and the use

of the gaming machine to ascertain the win/loss outcome associated with a given code.

**REDACTED**

GameLogic's reliance on the claims, specification and file history for support that

its access code does not contain within it the win/loss outcome as required by the asserted

claims is not "mere semantic games" as alleged by Ingenio. *See* Ingenio Opp. Br. at 26.

GameLogic and other competitors in the lottery industry are entitled to know and rely on

the intrinsic record of the asserted patents to determine whether or not they infringe. *See*

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("the claims,

specification, and file history . . . constitute the public record of the patentee's claim, a

record on which the public is entitled to rely").

    2.    **Ingenio's Expert Correctly Distinguished Between The Code
Used In Cohen And The Code Used In The Patents-In-Suit**

Ingenio's allegation that GameLogic's discussion of the Cohen reference in its

opening summary judgment brief is a "red herring" is incorrect and misses the point. *See*

Ingenio Opp. Br. at 27. Ingenio never disputes that: 1) GameLogic's description of the

code in Cohen is accurate; 2) Dr. Bertram correctly understood that description; 3) Dr.

Bertram accurately stated that the code disclosed in Cohen is not covered by the asserted

claims; or 4) the graphical depictions of Cohen's and GameLogic's codes on page 17 of

GameLogic's opening summary judgment brief are accurate. Instead, Ingenio's

argument seems to be that Dr. Bertram also believes that Cohen does not anticipate for

numerous other reasons, and therefore the fact that Cohen's code is different from the claimed code should be ignored.

REDACTED

Ingenio's argument is irrelevant and completely misses the point. The bottom line is that during his deposition, Dr. Bertram agreed with GameLogic's counsel's description of the code disclosed in Cohen, and further stated that this type of code was completely different from the code claimed in the asserted patents. *See* Ingenio Opp. Br., at Ex. A, pg. 208, ln. 7 ("I think it is totally different.")

REDACTED

3.    **The Doctrine Of Equivalents Is Not Available To Extend The Claims To Cover Codes Which Point To A Win/Loss Result**

As the asserted claims require that the win/loss outcome be contained in the code itself, GameLogic's random access code cannot perform substantially the same function in substantially the same way to obtain substantially the same result. GameLogic's access code is fundamentally different from the code claimed in the patents-in-suit.

Moreover, during prosecution, the patentee clearly distinguished between data containing information that determines a win or loss (as in the claimed invention) and data containing indicia or a reference to data containing information that determines a win or loss that is located elsewhere, such as in the gaming machine (as in Clapper). Thus, it would be improper for the patentee to recapture now what he disclaimed during prosecution. *See Standard Oil Co. v American Cyanimid Co*, 774 F.2d 448, 452 (Fed.

10

Cir. 1985)

**REDACTED**

Ingenio provides a doctrine of equivalents argument from one of its experts, Dr.
Grimes, for the first time in its Opposition Brief. *See* Ingenio Opp. Br. at 28, 30-31, and
Ex. E. Dr. Grimes, however, provided no such opinion in his expert report. Thus, he
should not now be permitted to proffer an equivalents argument when he chose not to do
so during the expert discovery phase of this litigation. *See* Ingenio Opp. Br., Ex. B at 47,
ln 16 - 49, ln 11. Dr. Grimes testified that he was waiting for a Markman ruling before
providing a doctrine of equivalents analysis, and thus GameLogic was unable to examine
Dr. Grimes on any equivalents positions. *See id* As such, any equivalents opinions
proffered by Dr. Grimes should be stricken from his declaration as well as from Ingenio's
Opposition Brief to the extent those statements are relied upon or cited

C.    **GameLogic's Access Code Is Not "Unrecognizable" As Required By
the Asserted Claims**

1.    **Ingenio Ignores The Intrinsic Evidence When Arguing That
GameLogic's Access Code Is "Unrecognizable"**

In arguing that "unrecognizable" as used in the asserted claims does not mean
encryption, Ingenio attacks GameLogic's citation to various portions of the testimony of
Ingenio's experts and the named inventor of the patents-in-suit. Ingenio Opp. Br. at 8-10.
Ingenio, however, completely ignores the plethora of intrinsic record citations highlighted
in GameLogic's Opening Brief on Claim Construction which show that the code must be
decoded <u>and</u> decrypted to determine the win/loss outcome. Ingenio does not even try to
explain the consistent use of "decrypt and decode" in each and every embodiment

11

disclosed in the patent. Obviously, Ingenio has no rebuttal. Instead, Ingenio relies on new testimony from its experts in the form of declarations in an attempt to confuse the Court on issues that were quite clear to those experts during their depositions.

For instance, Ingenio's quote from Dr. Bertram's testimony confirms that "unrecognizable" in the context of the patents requires encryption. Ingenio Opp. Br. at 9 ("if according to the claim it is unrecognizable, well then it's encrypted") (citing Bertram Dep. 89, lns. 21-22). Explaining what "unrecognizable" means in the context of the asserted patents, Dr. Bertram stated during his discussion of the Clapper reference:

> Q:    Would – is the indicia – if you don't have the
> reference, is the indicia on Clapper unrecognizable, as used
> in the patents in suit?
> A:    Not in my understanding, no.
> Q:    Why not?
> A:    Well, I mean, let's say we're talking about fruit
> combinations. Three lemons is three lemons. I recognize
> three lemons. It's not encrypted.
> Q:    Do you know what three lemons means?
> A:    I don't necessarily know how much it's going to
> pay unless I have looked at the pay table, but it's not
> encrypted in the sense that three lemons are three lemons.
> And I know I've got three lemons.
>       Now the question is, What does that correspond to?

Ingenio Opp. Br., Ex. A, at 103, ln. 11 – 104, ln. 5. Thus, Ingenio's expert confirmed that Clapper's use of indicia and a pay table is not "unrecognizable" as contemplated by the asserted patents

Similarly, GameLogic's access code is not "unrecognizable" according to the asserted patents.

## REDACTED

**REDACTED**

In attempting to create confusion regarding the "unrecognizable" requirement of the claimed code, Ingenio distorts the various experts' conclusions regarding encryption in the context of the asserted patents. *See* Ingenio Opp. Br. at 29. Ingenio tries to "clean up" the testimony provided by its own experts by submitting declarations from them with its Opposition Brief in which the experts effectively change their deposition testimony. Ingenio also cites the deposition testimony of GameLogic's expert, but ignores the Errata Sheet regarding that testimony submitted by Mr. Brandin and served on Ingenio's counsel on April 24, 2006, before any of the parties' briefs had been filed. *See* attached Exhibit 1. Indeed, Mr. Brandin clarified the testimony cited by Ingenio on pages 11 and 29 of its Opposition Brief, stating that he misunderstood the context for the question during his deposition. *Id* at errata identification for p. 97. Similarly, Mr. Brandin corrected his testimony which Ingenio incorrectly cites in its Statement of Facts, ¶ 3

13

(Ingenio Opp. Br. at 1-2) and pages 11-12 of its brief. *See id* at errata identification for p. 99.

Even the quotation from Dr. Bertram's deposition now relied upon by Ingenio confirms that he views the claims to require encryption, not that encryption is just one way to make the data unrecognizable as Ingenio now argues. *See* Ingenio Opp. Br. at 30. As Ingenio cites, Dr Bertram stated that "<u>anything</u> that makes it unrecognizable would be considered encryption " Ingenio Opp. Br. at 30 (citing Bertram Dep. at 90, lns. 3-4 (emphasis added)). Thus, in the context of the asserted patents, for the data to be unrecognizable, it must be encrypted. Ingenio's interpretation of Dr. Bertram's testimony to mean that "encryption means some level of unrecognizability" makes no sense and does not follow from Dr. Bertram's own words. *See* Ingenio Opp. Br. at 30.

Even if, as Ingenio argues, there is disagreement about what encryption means, that does not mean that summary judgment should not be granted. At most, this is an issue relating to claim interpretation, which should be resolved by the Court.

### 2. GameLogic's Access Code Cannot Be "Unrecognizable" Under The Doctrine Of Equivalents

As the intrinsic record makes clear, the asserted patents require that the claimed code be encrypted in order to be "unrecognizable." GameLogic's access code is not encrypted. Thus, a finding of infringement under the doctrine of equivalents would improperly vitiate the claim limitation, "a code which includes data indicating whether the player loses the game and an amusement game, the data being unrecognizable to the player." A theory that vitiates a claim limitation is improper as a matter of law. *Freedman Seating Co v American Seating Co*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citation omitted).

14

Furthermore, for the reasons set forth in section I.B.3. above, Dr. Grimes' opinions regarding the applicability of the doctrine of equivalents as it pertains to the "unrecognizable" characteristic of the claimed code should be striken and precluded from consideration.

II.    **GAMELOGIC DOES NOT HAVE AN AMUSEMENT GAME WHERE THE RESULT IS DETERMINED BY THE CODE**

    A.    **Ingenio Has Admitted That GameLogic's Amusement Game Does Not Have An Outcome Determined By The Code**

Ingenio, in its opposition brief, admits that GameLogic's amusement game does not have an outcome that is controlled by the player. Ingenio at page 33 of its brief states, "Specifically Prize Reel Blackjack includes a **separate amusement game --** blackjack." Ingenio never disputes, because there can be no dispute, that a player wins or loses GameLogic's blackjack game solely based on skill and chance, and not the code entered by the player. Ingenio also freely admits that the PrizeReel round of GameLogic's lottery game is "**a separate actualization game**." *Id.* There is also no dispute that the claims require that the outcome of the amusement game must be determined by the code entered by the player, and not the player's skill. Thus, GameLogic's product cannot infringe because, as Ingenio admits, GameLogic's amusement game is not controlled by the code.

    B.    **Ingenio's Attempt To Create A Fact Issue By Confusing "The Games" Is Transparent**

Ingenio, on pages 33-35 of its brief, does the same thing that the patentee did during prosecution of the '082 patent – attempt to confuse the reader by not being specific about "the game" being described. Ingenio spends much of this section of its opposition citing to Mr. Hardy's testimony. This testimony only restates what no party

disputes, which is that GameLogic's blackjack game is a game of skill. Ingenio then, it appears, tries to create confusion by citing Mr. Hardy's testimony where the questions refer to "interactive games." The term "interactive games" is not found in the claims. The term is used in the specification to describe the entire lottery game. JA Ex. A, '082 patent, col. 2, lns. 10 ("player interactive lottery type game"). Thus, Mr. Hardy's testimony regarding the interactive game does not disprove that the outcome of GameLogic's amusement game is controlled by the player's skill. During prosecution, the examiner also found the different uses of "the games" to be confusing. JA Ex. C, at IN001409. The examiner therefore required that each limitation identify the particular "game" being referenced. *See* JA Ex. C at IN001392-95.

### C.     GameLogic's Blackjack Game And PrizeReel Game Are Distinct

As Ingenio concedes, the claims plainly require the outcome of the "amusement game" to be determined based upon the code. *See* Ingenio Opp. Br. at 14. Ingenio's attempt to argue that the claimed "amusement game" really means both the amusement game <u>and</u> the actualization game ignores the plain meaning assigned to those terms in the specification. As stated above, Ingenio admits that the blackjack game corresponds to the amusement game and the PrizeReel game corresponds to the actualization game described by the specification. Thus, Ingenio's attempt to argue that for purposes of infringement, GameLogic's amusement game is the combination of both the blackjack game and the PrizeReel game is without merit. The specification also describes embodiments in which the actualization game is clearly separate and distinct from the amusement game. *See, e g,* JA Ex. A, '082 patent, col. 3, ln 22 - col. 4 ln. 5; col. 5, ln. 65 - col. 6, ln. 18. The one embodiment from the specification where the amusement

game and the actualization game are combined in one game is completely different from GameLogic's PrizeReel Blackjack. In that embodiment, the player plays poker and the outcome of the poker is the outcome of the actual lottery game. *See* JA Ex. A, '082 patent, col. 4, lns. 6-21. GameLogic's game does not work in such a manner. In GameLogic's PrizeReel Blackjack, a player plays three hands of blackjack and then spins a prize reel. A player can lose every hand of the blackjack game and still win the maximum prize in the PrizeReel game. The opposite is also true. This is not disputed. *See* Ingenio Opp. Br. at 33.

    As it has done throughout its arguments and analysis, Ingenio attempts to counter GameLogic's citations to the specification by citing to the same part of the specification but omits, distorts or ignores relevant language from the patents. For example, in addressing the horse race embodiment, Ingenio quotes certain parts of the specification regarding the end of the horse race part of the game and concludes that "the claimed amusement game that is controlled by the processor must include the actualization game in order to satisfy the later claim recitations." Ingenio Opp. Br. at 16. The complete sentence selectively quoted by Ingenio, however, reveals that it omits an essential part of the sentence in determining whether the actualization game is indeed part of the amusement game:

> At some point, either at the discretion of the player or the necessity of the game (all races have been run or the player has run out of money), **the amusement game comes to an end.**

17

JA Ex. A, '082 patent, col. 3, lns 29-32 (emphasis added). The system begins to play the

actual game only after the conclusion of amusement game. *Id* at col. 3, lns. 33-34.[4]

Thus, the specification clearly contemplates embodiments where the amusement game is

distinct from the actualization game.

### D.    Ingenio Fails To Refute That Applying The Doctrine Of Equivalents To GameLogic's System Would Entirely Vitiate A Claim Limitation

In its initial brief, GameLogic argued that applying the doctrine of equivalents to

capture GameLogic's blackjack game would entirely vitiate the claim limitation that the

outcome of the amusement game is "based upon the code entered by the player." *See,

e.g.*, '082 patent, claim 1. GameLogic Br. at 23-24. Ingenio does not refute this

argument. Even if it is not deemed waived, the argument prevents the doctrine of

equivalents from being applicable to GameLogic's blackjack game. GameLogic's games

involve elements of skill and chance, and are fundamentally different from the claimed

invention. To find that GameLogic's blackjack game, where the outcome is determined

by the player's skill and the random draw of cards, is somehow an equivalent to the

claimed amusement game would entirely "read out" or "vitiate" the requirement that the

amusement game outcome must be controlled by the code.

### E.    Ingenio Is Barred From Asserting The Doctrine Of Equivalents Because The Amendment Adding "Amusement" To "The Game" Is Directly Related To The Equivalent In Question

Ingenio is also barred from asserting the doctrine of equivalents to capture

GameLogic's amusement game because of amendments made during prosecution.

Ingenio attempts to refute this "*Festo* Bar" argument by asserting, without explanation,

---

[4] Ingenio's selective quotations to support its arguments is improper. *See Porter v Farmers Supply Service, Inc.*, 790 F.2d 882, 887 (Fed. Cir. 1986) (improper to distort a quote that is devastating to the quoting party's position).

that the amendment adding "amusement" to "the game" in all of the independent claims is somehow tangential to the equivalent at issue. This is simply incorrect. The question that must be addressed is "whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Insituform Technologies v. Cat Contracting, Inc.*, 385 F.3d 1360, 1370 (Fed. Cir. 2004) (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1365 (Fed. Cir. 2003)) During prosecution of the patents-in-suit, the examiner questioned which games were being described by the particular limitations. JA C, at IN0001409. The claims were amended to clarify that "the player will win or lose the amusement game based upon the code entered by the player." JA C, at IN001393-94[5]. The alleged equivalent at issue is an amusement game that has an outcome that is not determined by the code. Thus, the amendment is directly related to the alleged equivalent at issue, and Ingenio has not rebutted the presumption that it is barred from applying the doctrine of equivalents to this limitation.

---

[5] *See also* JA C, IN001402, which shows the handwritten examiner's amendment adding "amusement" in front of "game" in the limitation "whether the player will win or lose the game based upon said code."

## III.    **CONCLUSION**

GameLogic's accused HomePlay Lottery[TM] product does not include each and every limitation of any claim of the '082 or '603 patents. Despite Ingenio's attempts to create confusion regarding material facts, there are no disputed material facts. GameLogic's product does not infringe any properly construed claim of the asserted patents as a matter of law, making summary judgment appropriate. GameLogic therefore respectfully requests an Order granting Summary Judgment of Non-Infringement of the '082 and '603 patents.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ David E. Moore* _____

Gary M. Hnath
Susan Baker Manning
Goutam Patnaik
Timothy A Molino
BINGHAM MCCUTCHEN LLP
2020 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 373-6050

Dated: May 22, 2006
Public Version Dated: May 30, 2006
733417 / 28749

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Kenneth L. Dorsney (#3726)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
kdorsney@potteranderson.com

*Attorneys for Defendant GameLogic Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on May 30, 2006, the attached document

was hand delivered to the following persons and was electronically filed with the Clerk of

the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF:

Edmond D. Johnson
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899


I hereby certify that on May 30, 2006, I have Electronically Mailed the documents

to the following non-registered participants:

Rodger L. Tate
Brian M. Buroker
Christopher J. Cuneo
Hunton & Williams LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006
rtate@hunton.com
bburoker@hunton.com
ccuneo@hunton.com

By:  */s/ David E. Moore*
      Richard L. Horwitz
      David E. Moore
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

672965