FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2006 JUL 21 PM 3: 36

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INGENIO, FILIALE DE LOTO-QUEBEC, )
INC., )
                        )
         Plaintiff, )
                        )    Civil Action No. 04-1532-KAJ
    v.   , )
                        )    FILED UNDER SEAL
GAMELOGIC, INC., )
                        )
         Defendant. )

REDACTED

## MEMORANDUM OPINION

———————————

Edmond D. Johnson, Esq. The Bayard Firm, 222 Delaware Avenue, Suite 900, Wilmington, Delaware 19801; Counsel for Plaintiff.
     Of Counsel: Rodger L. Tate, Esq., Brian M. Buroker, Esq., Christopher L. Cuneo, Esq., Hunton & Williams LLP, 1900 K Street, N.W., Suite 1200, Washington, D.C. 20006.

Richard L. Horwitz, Esq., David E. Moore, Esq., Potter Anderson & Corroon LLP, Hercules Plaza, Sixth Floor, 1313 N. Market Street, P.O. Box 951, Wilmington, Delaware 19899; Counsel for Defendants.
     Of Counsel: Gary M. Hnath, Esq., Susan Baker Manning, Esq., Goutam Patnaik, Esq., Timothy A. Molino, Esq., Bingham McCutchen LLP, 2020 K Street NW, Washington, D.C. 20006.

———————————

July 21, 2006
Wilmington, Delaware



JORDAN, District Judge

## I. INTRODUCTION

This is a patent infringement case. Ingenio Filiale De Loto-Quebec, Inc. ("Ingenio") has sued GameLogic, Inc. ("GameLogic"), alleging infringement of two patents: U.S. Patent Nos. 5,569,082 (issued Oct. 29, 1996) (the "'082 patent") and 5,709,603 (issued Jan. 20, 1998) (the "'603 patent"). Before me are the parties' requests for construction of the disputed claim language in those two patents, as well as two summary judgment motions. Ingenio has filed a Motion for Partial Summary Judgment of Infringement and Validity (Docket Item ["D.I."] 112) and GameLogic has filed a Motion for Summary Judgment of Non-Infringement (D.I. 115). Jurisdiction is appropriate under 28 U.S.C. §§ 1331 and 1338.

For the reasons that follow, including my decision on claim construction, I will grant Ingenio's Motion for Partial Summary Judgment of Infringement (D.I. 112) as to Ingenio's claim that GameLogic infringes claim 1 of the '082 patent, and I will accordingly deny GameLogic's Motion for Summary Judgment of Non-Infringement (D.I. 115). I will also grant Ingenio's Motion for Partial Summary Judgment (D.I. 112) as to GameLogic's lack-ofenablement defense. I will deny Ingenio's Motion for Partial Summary Judgment of Infringement (D.I. 112) as to Ingenio's claim that GameLogic infringes claim 1 of the '603 patent.

## II. BACKGROUND

### A. *Procedural Background*

Ingenio filed its patent infringement complaint against GameLogic on December 20, 2004, alleging that GameLogic has willfully infringed the '082 and '603 patents.

(D.I. 1.) Ingenio is asserting claims 1, 4, 6, 8-10, 13, 15 and 16 of the '082 patent, and claim 1 of the '603 patent.[1] (D.I. 117 at 2.) In its answer on January 24, 2005, GameLogic asserted that the '082 and '603 patents are invalid and unenforceable based on inequitable conduct committed during the prosecution of the '082 patent. (D.I. 11 at ¶¶ 36-38, 40-41.) The parties are scheduled to try this case to a jury beginning on November 6, 2006.

The '603 patent is a continuation-in-part of the '082 patent, and it is undisputed that there is substantial overlap in the specifications of the '603 and '082 patents. (See D.I. 117 at 1 n.2; D.I. 113 at 13 n.2.)

B.    The Disclosed Technology

The two patents in suit disclose "[a] method and system for playing a . . . lottery type game." ('082 patent Abstract; '603 patent Abstract.) Independent claims 1 of the '082 patent and of the '603 patent each disclose a method for playing a lottery game, comprising particular steps, and independent claim 10 of the '082 patent discloses a lottery game itself. ('082 patent at 10:66-12:18; '603 patent at 15:64-16:13.) As an example, independent claim 1 of the '082 patent claims:

> A method for playing a player lottery game comprising the step of:
> acquiring by a player a game piece, the gaming piece including a code
> which includes data indicating whether the player wins or loses the lottery
> game and an amusement game, the data being unrecognizable to the
> player, such that the player does not know whether the player will win or
> lose the game prior to play of the amusement game;
>    entering the code by the player into a processor prior to
>    amusement game play;

---

[1] Claims 4, 6, 8, and 9 of the '082 patent depend from claim 1, and claims 13, 15, and 16 depend from claim 10.

> the processor generating the amusement game on a display for
> play by the player, the player controlling game play by inputting
> game parameters to the processor;
>
> the processor controlling whether the player will win or lose the amusement game
> based upon the code entered by the player; and
>
> providing on a display an indication to the player of the amusement
> game win or loss based upon the code.

('082 patent at 10:65-11:16.)  The '082 patent thus requires a player to enter a provided

code into a processor.  By contrast, claim 1 of the '603 patent provides that the

processor reads the code from a game piece at the outset of play.  ('603 patent at

15:64-16:13.)

     C.    *The Accused Product*

     The operation of GameLogic's accused HomePlay Lottery™ ("HomePlay") is

largely undisputed.  (Markman Hearing Transcript, D.I. 132 at 4:3-9.)  To begin playing

HomePlay, a player purchases a paper ticket from a lottery vendor.  (May 1, 2005

Declaration of Dow K. Hardy (Hardy Declaration 1),[2] D.I. 116, Ex. 1 at ¶ 10.)  The player

then uses his personal computer to log on to the HomePlay website, using the sixteen

character access code printed on the ticket.  (*Id.* at ¶¶ 10, 13.)

                   **REDACTED**                (*Id.* at ¶¶ 14,

16.)  Next, the player selects one of the interactive games available for play, such as

Prize Reel Blackjack.[3]  (*Id.* at ¶ 10.)  In Prize Reel Blackjack, the player is given the

opportunity to play a traditional game of blackjack,         **REDACTED**

---

    [2] Dow K. Hardy is Senior Vice President of Technology for GameLogic.  (March
8, 2005 Declaration of Dow K. Hardy (Hardy Declaration 2), D.I. 113, Ex. 1 at ¶ 3.)

    [3] The parties have agreed, for purposes of this lawsuit, to use Prize Reel
Blackjack as an example of the interactive games available for play on HomePlay's
website.  (D.I. 116, Ex. 6.)

**REDACTED**                                    . If the player wins

the hand of blackjack, the player is given a token to use in the prize reel round.  (*Id.* at ¶

38.)  Each token won in the blackjack round can be used for one spin in the prize reel

round;                              **REDACTED**                              (*Id.* at

¶¶ 40, 57.)

The result of the lottery is revealed after the player exchanges his tokens for

spins on the prize reel.  (*See id.* at ¶ 55.)


# REDACTED


## III.    APPLICABLE LAW/STANDARD OF REVIEW

A.    *Patent Infringement*

A patent infringement analysis involves two steps: claim construction and then

the application of the construed claim to the accused process or product.  *Markman*, 52

F.3d at 976.  The first step, claim construction, has been held to be purely a matter of

law.  *Cybor*, 138 F.3d at 1454-56.  The second step, application of the claim to the

accused product, is a fact-specific inquiry.  *See Kustom Signals, Inc. v. Applied

Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001) (Patent infringement, "whether

literal or under the doctrine of equivalents, is a question of fact.").  The patent owner

has the burden of proving infringement by a preponderance of the evidence.

4

*Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984) (citing *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed. Cir. 1983)). Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).

    B.    *Claim Construction*

Patent claims are construed as a matter of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (en banc). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.

To determine the ordinary meaning of a term, the court should review "the same resources as would" the person of ordinary skill in the art. *Multiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). Those resources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Both "the context in which a term is

5

used in the asserted claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning. *Id.*

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). In short, the claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Thus, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

On occasion, "the specification may reveal a special definition given to a claim term . . . that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). The specification may also "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor . . . [, which] is regarded as dispositive." *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)).

The court "should also consider the patent's prosecution history." *Markman*, 52 F.3d at 980. "Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citing *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992)).

6

The court may rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. In particular, "dictionaries, and especially technical dictionaries, . . . have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology." *Phillips*, 415 F.3d at 1318 (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). However, extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)).

During claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Phillips*, 415 F.3d at 1324.

C.    *Summary Judgment*

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of material fact, a court must review the evidence and construe all

7

inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

8

## IV.   DISCUSSION

### A.   *Claim Construction*

Each of the disputed claim terms below appear in claims 1 and 10 of the '082

patent, and in claim 1 of the '603 patent, with the exception of the term "reading," which

appears only in the '603 patent.

> 1.   "code which includes data indicating whether the player wins or loses"
>
> a.   The Parties' Proposed Constructions

The parties' dispute over this claim term centers on the meaning of the term

"indicating." (D.I. 113 at 14-16; D.I. 117 at 9-15.) Ingenio asserts that "indicating"

should be construed to mean "points to," in accordance with its ordinary meaning. (D.I.

113 at 14.) In support of its proposed construction, Ingenio cites two dictionary

definitions of the word "indicating," which define that term as "shows the way to, points

to, or makes clear in another way." (*Id.*) GameLogic, on the other hand, asserts that

"'indicating' connotes that the data itself states the win/loss outcome." (D.I. 117 at 9.)

GameLogic relies heavily on the specification, including the preferred embodiments,

and the prosecution history of the patent to support its assertion. (*Id.* at 10-15.)

Specifically, GameLogic asserts preferred embodiments in the patent state that all of

the win/loss data is stored in the code itself, without referencing additional information.

(*Id.* at 11-12.) To further support its argument, GameLogic also relies on the inventor's

statements during prosecution that the "code determines whether you win or lose the

game," and on the fact that a particular prior art reference was distinguished. (*Id.* at 12-

15.)

9

b.      The Court's Construction

No where in its briefing does GameLogic argue that the ordinary meaning of "indicating" does not include "shows the way to, points to, or makes clear in another way," as Ingenio contends. However, GameLogic asserts that in the context of the patent, including the specification and the prosecution history, Ingenio has limited the term "indicating" to mean that the code itself must include or store the relevant win/loss data. (D.I. 117 at 9-15.) In support of its argument, GameLogic points to several preferred embodiments, which state that "the outcome of the game is stored in the Destiny Code,"[4] ('082 patent at 6:28-29), or that the "primary function [of the Destiny Codes] is to store the outcome of the game of chance," (*id.* at 2:58-59). However, GameLogic ignores the embodiment of the patent that states that "[t]he outcome may be determined, for example, by comparing the Destiny Code to a lookup table to determine if the number is a loser or a winner and the size of the prize, if any." ('082 patent at 9:63-66.) That embodiment allows for the code to point to something else, e.g., a lookup table, to determine the outcome of the game. Thus, the specification of the '082 patent does not limit the meaning of "indicating" as GameLogic argues.

GameLogic also cites to the prosecution history of the '082 patent to support its argument that "indicating" must mean that the data is stored in the code itself. (D.I. 117 at 12-15.) During the prosecution of the '082 patent, the applicant distinguished the invention in U.S. Patent No. 5,377,975 issued to Clapper, Jr. ("Clapper, Jr.") from the

---

[4] The "Destiny Code," or access code, is a "symbolic code[] that signf[ies] the outcome of the particular game of chance to be played by the player." ('082 patent at 2:66-67.)

10

invention of the '082 patent. In a January 31, 1996 office action, the examiner,

reviewing the application for the '082 patent, rejected claims 18 and 20-21 as

anticipated by Clapper, Jr., and claims 1 and 10, as well as several dependent claims,

as obvious over Clapper, Jr. in combination with two other references. (D.I. 114, Ex. C

at IN1409-10.) In responding to that office action, the applicant stated:

> None of the cited references disclose or suggest a game or method of
> playing a game in which a code entered by the player prior to game play
> controls the outcome, win or loss, of the game. The Clapper, Jr.
> reference discloses the use of a bar code which merely identifies indicia
> printed on a strip. The bar code is used to display the strip indicia to a
> game player. The printed indicia on the strip determines whether the
> player wins or loses the game, and not the code.

(*Id*. at IN1406.) GameLogic argues that by this statement, the applicant disclaimed a

product where the data containing the win or loss information is not in the code itself,

but is located elsewhere.

I do not read the applicant's statements, or the Clapper, Jr. reference, in the way

that GameLogic does. In Clapper, Jr., a strip of paper containing indicia, or symbols,

such as lemons or cherries, is dispensed to a game player. (Clapper, Jr., D.I.116, Ex. 5

at GL00334.) A duplicate strip containing the same indicia is stored in the machine.

(*Id*.) On the back of the duplicate strip, a printed bar code is scanned by the machine to

display the same indicia printed on the strip on an electronic display. (*Id*.) Thus, the

bar code in Clapper, Jr. is used to display the same indicia that a player has on his or

her game piece on the machine. The applicant's statements in distinguishing Clapper,

Jr. do not give up a method of playing a game where the code requires a processor to

go to a lookup table to determine the win or loss result.

11

Therefore, I will construe "indicating," in the context of "code which includes data indicating whether the player wins or loses," in accordance with its ordinary meaning to mean that the code "shows the way to, points out, or makes clear in another way."

        2.      "lottery game and an amusement game"

              a.      The Parties' Proposed Constructions

The parties have two disputes regarding this claim term. First, they dispute whether a lottery game requires payment. The parties agree that a lottery game requires participation in a chance to win, a result based on chance, and a prize awarded to the winner. (D.I.113 at 16-17; D.I. 117 at 18.) Ingenio argues, however, that payment must also be associated with participation in a chance to win. (D.I. 113 at 16.) Ingenio argues that payment is part of the ordinary meaning of "lottery game," and that the specification supports its definition. (*Id.* at 16-17.) GameLogic asserts, on the other hand, that nothing in the claims or the specifications of either the '082 or '603 patents requires payment, and that thus, payment should not be a part of the definition of "lottery game." (D.I. 117 at 18-19.)

The parties' second dispute revolves around the definition of "amusement game," and specifically whether the amusement game must be separate from the lottery game. Ingenio argues that "amusement game" should be construed to mean "a game that amuses the player." (D.I. 113 at 17-18.) Ingenio relies both on the plain language of the claim, and on the preferred embodiments of the patent to support its construction. (*Id.*) It asserts that some embodiments provide for two games, one which is purely for fun, i.e. the "amusement game", and one "actualization game" which displays the result of the lottery. (*Id.*) Other embodiments, however, allow for the

12

amusement and actualization games to be combined into a single game, according to
Ingenio. (*Id.*) GameLogic argues, however, that Ingenio's proposed construction
"provides no real definition at all, relying on subjective assessments, leaving the term
ambiguous and vain." (D.I. 117 at 19.) According to Gamelogic, the amusement game
and the actualization game must always be separate. (*Id.* at 19-23.) GameLogic bases
its argument on the preferred embodiments in the '082 patent, and on that patent's
prosecution history. (*Id.*) GameLogic asserts that during prosecution, when the words
"lottery game and amusement game" were added to the patent, Ingenio gave up a
reading of the patent in which there was only a single game. (*Id.*)

        b.     The Court's Construction

The plain meaning of the term "lottery game" involves payment. *See Merriam-
Webster's Collegiate Dictionary* 688 (10th ed. 2002) ("a drawing of lots in which prizes
are distributed to the winners among persons buying a chance").[5] The specification of
the patent also supports a definition of "lottery game" which includes payment. *(See*
'082 patent, 2:39-41 ("FIG. 4 illustrates a sales device used to purchase game media
for the self-contained embodiment of the present game"); *id.* at 4:40-44 ("player wishing
to purchase . . . [m]oney is put into the bill validater").) GameLogic's arguments to the
contrary are unavailing, as the plain meaning of the term "lottery game," supported by
the specification of the '082 patent, controls. I will therefore construe the term "lottery
game" to mean "a game based on three basic principles: payment associated with

---

[5] No one contends that the meaning of "lottery" has changed between the time
the patents issued and today.

13

participation in a chance to win; a result based on chance; and a prize awarded to the winner(s)."

As to whether the amusement game and the actualization game must be separate games, rather than a single game, the preferred embodiments of the patent shed considerable light on the question. The '082 patent contains a number of preferred embodiments, several of which have two separate games, namely a game that "is purely for player enjoyment, and is used to give the feel of a completely random game of chance," and another game which "display[s], in a pleasing fashion, the actual prize that is stored in the Destiny Code and . . . display[s] the game results." ('082 patent at 3:25-46.) In another embodiment, the two games "can be run as one system, such as a poker game." (*Id.* at 4:6-21.) Thus, the preferred embodiments of the patent indicate that the amusement and actualization games can be run separately, or as one system.

GameLogic argues, however, that Ingenio gave up the latter preferred embodiment during prosecution when it changed the claim language from "the game" to "the lottery game and an amusement game." (D.I. 117 at 19-23.) That argument is unpersuasive. Construction of a disputed term such that "a preferred . . . embodiment in the specification would not fall within the scope of the patent claim . . . is rarely, if ever, correct and would require highly persuasive evidentiary support[.]" *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Indeed, the Federal Circuit has found that such a construction is proper only in "the rare case in which such an interpretation is compelled" by the prosecution history. *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000).

14

The prosecution history here does not provide compelling evidence that Ingenio intended to disclaim a preferred embodiment by adding to the patent the phrase, "the lottery game and an amusement game." After the examiner issued an office action rejecting the claims of the '082 patent application as anticipated, indefinite, and obvious, (D.I. 114, Ex. C at IN1409-12), the applicant amended claims 1 and 10 of the patent (*Id.* at IN1401-03). However, claims 1 and 10 of that patent still included the language "the game," and did not contain the language "the lottery game and an amusement game." (*Id.* at IN1401.) After three interviews with the examiner, the examiner issued an examiner's amendment which changed "the game" to "the lottery game and an amusement game." (*Id.* at 1393-94.) The only reasoning offered for that amendment was documented by the examiner as follows:

> Proposed and discussed claim language to overcome 112(2) issues and prior art and to further clarify/define novel and non-obvious features of instant invention. Agreement was reached to amend claims 1, 5-6, 10-17 and to cancel claims 18-21.

(*Id.* at IN1398.) This statement offers no explanation for why the phrase "lottery game and an amusement game" was added to the patent. In the absence of clear evidence, I will not construe this term to exclude a preferred embodiment set out in the patent. An amendment that adds something more to the claim than simply a reference to "the game" does not, without more, require that a lottery game cannot be amusing. Therefore, I will construe the term "amusement game" in the context of the phrase "the lottery game and an amusement game" to mean "a game which amuses the player, which can be combined with or be separate from the 'actualization' game which reveals the result of the lottery game."

15

3.    "data being unrecognizable to the player"

a.    The Parties' Proposed Constructions

Ingenio claims that this phrase should be construed in accordance with its plain and ordinary meaning, to mean that "the player is not able to recognize from the data whether the player wins or loses the lottery game and amusement game prior to play of the amusement game." (D.I. 113 at 18-21.) Ingenio cites to the language of the claim itself, and various examples in the specification of different methods for making the data unrecognizable. (Id. at 19.) GameLogic argues, however, that this phrase should be construed to require that the "win/loss data is encoded and encrypted." (D.I. 114 at 4.) GameLogic particularly asserts that a proper construction of the term "unrecognizable" must mean that the code must be encrypted, citing both the specification of the patent, as well as the statements of one of Ingenio's experts and the statements of the inventor to support its construction. (Id. at 15-17.)

b.    The Court's Construction

Claims 1 and 10 of the '082 patent, and claim 1 of the '603 patent each use the following language: "data being unrecognizable to the player, such that the player does not know whether the player will win or lose the game[s][6] prior to play of the amusement game." ('082 patent at 11:3-6; id. at 12:7-10; '603 patent at 16:2-5.) The plain meaning of this term on its face would allow for the data to be made unrecognizable in any manner, so long as a player could not determine whether he or she would win or lose prior to playing the amusement game.

_____

[6] The '603 patent uses the term "games," while the '082 patent uses the term "game." ('082 patent at 11:3-6; id. at 12:7-10; '603 patent at 16:2-5.)

16

The specification confirms this reading of the claim language. Although GameLogic is correct in pointing out that many of the embodiments of the patent talk about "decrypting and decoding" the data, (see, e.g., '082 patent at 3:20-21), the patent also offers other ways of obscuring the data to make it unrecognizable to a player. For example, in addition to describing the codes as encrypted and encoded, the specification talks about "comparing the Destiny Code to a lookup table to determine if the number is a loser or a winner and the size of the prize, if any." ('082 patent at 9:64-66.) Furthermore, contrary to GameLogic's argument that, to be unrecognizable, the code must be encrypted, the specification also states that "[i]f the player knew the *procedure to decode the* Destiny Code, the player would be able to determine if the Destiny Code contained a winning chance or a losing chance." (*Id.* at 2:64-67.) Thus, there are references in the patent to various ways of making the code unrecognizable, and there is nothing in the specification or prosecution history that indicates the patentee intended to give up any of the scope of the word "unrecognizable." I will therefore construe the phrase "data being unrecognizable to the player" to mean "the player is not able to recognize from the data whether the player wins or loses the lottery game and amusement game."

        4.    "a processor"

           a.    The Parties' Proposed Constructions

Ingenio asserts that "a processor" should be construed to mean "one or more processors are present." (D.I. 113 at 22-23.) Ingenio argues that even though "a processor" is followed by *claim language referring to* "the processor" or "said processor," the term should not be limited to a single processor because it is in a claim

17

using "comprising" claim language. (*Id.* at 22-23.) GameLogic asserts, to the contrary, that the language used in the asserted claims and the specifications of the '082 and '603 patents clearly limited this term to a single processor in a single location.

b.    The Court's Construction

The dispute between the parties centers around the meaning of the term "a" in the context of the claim language. The United States Court of Appeals for the Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Furthermore, that Court has held that "[u]nless the claim is specific as to the number of elements, the article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article." *Id.* This is true even where the patentee refers to "a" widget, and later refers to "the" or "said" widget. *See id.* at 1353, 1356-57 (finding that "a . . . continuous . . . chamber" was not limited to a single chamber, even where the claim language later referred to "said chamber"); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999) (holding that term "a . . . feed tube" was not necessarily limited to a single feed tube by later claim language "said feed tube," but that the prosecution history of the patent did so limit the claim).[7]

---

[7] To determine whether "a" means only one or one or more than one, the Federal Circuit looks to the language of the patent claims and specification. In both *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997) and *North Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571 (Fed. Cir. 1993), the Court held that the language of the patent indicated that "a" meant only one. *See Abtox*, 122 F.3d at 1023-24; *North Am. Vaccine*, 7 F.3d at 1575-76. In *Abtox*, the Court found that where the claim referred to

GameLogic's only argument that "a processor" should be limited to a single processor in a single device is the later claim language referring to "the processor" or "said processor." Notably, GameLogic has not cited a single case in support of its position. Because the Federal Circuit has previously held that such language does not evince a clear intent by the patentee to limit the claim to a single device, I will not so limit the claim language here. Thus, I will construe "a processor" to mean "one or more processors."

     5.    "reading the code by a processor"

        a.    The Parties' Proposed Constructions

The only asserted claim that contains the term "reading the code by a processor" is claim 1 of the '603 patent. ('603 patent at 16:6.) Ingenio asserts that the term "reading" in the context of the phrase "reading the code by a processor" means "to receive input of the code (a system of symbols that represent an assigned and secret meaning) from some source. That source may thus include a computer program/software source." (D.I. 113 at 22.) Ingenio relies on the ordinary meaning of the term "read," as well as the specification to support its proposed construction. (*Id.* at

---

"a chamber," but later repeatedly referred to "said chamber," "only one chamber is in question." *Abtox*, 122 F.3d at 1024. Similarly, in *North Am. Vaccine*, the court found that where a claim referred to linkage at "a terminal aldehyde group," but the specification referred to "the terminal aldehyde group," that there was only one linkage. *North Am. Vaccine*, 7 F.3d at 1576. Although the Federal Circuit interprets the term "a" in light of the claims and specification, the Court recently has more commonly held that "a" in patent parlance, means one or more than one, even where later claim language refers to "the" or "said." *See KCJ Corp.*, 223 F.3d at 1356 (holding that the article "a" would only be limited to its singular meaning when the inventor evinced a clear intent to so limit it). In light of the decisions in *Phillips* and *KCJ Corp.*, I have construed "a processor" to mean "one or more processors."

21-22.) GameLogic asserts, however, that "reading" should be construed to mean "actively examine and grasp the meaning of the code." (D.I. 117 at 29.) In support of its proposed construction, GameLogic cites the specification of the '603 patent and the testimony of one of Ingenio's experts. (Id. at 29-30.)

        b.     The Court's Construction

      The ordinary meaning of the term "read," in the context of a computer processor, is, as Ingenio asserts, "to input data from a storage device, a data medium, or any other source." *See Computer User's High-Tech Dictionary*, http://www.computeruser.com/ resources/dictionary/dictionary.html (cited by Ingenio at D.I. 113 at 21). The specification of the '603 patent confirms that this is the proper definition of the term "reading". (*See* '603 patent at 2:20-22 (the "code is stored on the gaming piece in a memory device. . . . The code is read by a processor.").) Nothing in the portions of the specification cited by GameLogic indicates that a different definition of "read" should be used. (*See id.* at 11:13-16 (describing an embodiment "using gaming pieces in the form of casino chips or tokens containing Destiny Codes to allow a player to simulate wagering games with cash"); *id.* at 12:1-7 ("the amusement +actualization game system reads the Destiny Code contained on the gaming piece. The reading operation takes place by a processor which reads the Destiny Code stored in the memory device contained on the gaming piece.") Therefore, the term "reading" in the context of the phrase "reading the code by a processor" will be construed to mean "receiving input of the code from some source, which may include a computer program/software source."

20

6.    "processor within a computing device" and "processor includes a computing device"

a.    The Parties' Proposed Constructions

The parties also dispute the terms "processor within a computing device," found in dependent claim 8 of the '082 patent, and "processor includes a computing device," found in dependent claim 16 of the '082 patent. Ingenio asserts that "processor within a computing device" means "the processor is a component of a computing device," citing to the specification of the patent where examples of computing devices are given. (D.I. 113 at 23.) GameLogic asserts, on the other hand, that this term should be construed to be synonymous with the term "processor" as set forth in claim 1, as the processor of claim 1 must be in a computing device to perform its claimed functions. (D.I. 117 at 26.) GameLogic further claims that any other construction of the term "processor within a computing device" would make claim 1 indefinite. (*Id.*)

As to "processor includes a computing device," Ingenio asserts that this term should be construed to mean that the processor "has a component device that can perform computations." (D.I. 113 at 24-25.) Ingenio cites to the portions of the specification of the patent that disclose that a home computer could be implemented to access the system, and states that, "at the time of the invention, home computers were known to include . . . software that could perform computations." (*Id.* at 24.) GameLogic, on the other hand, argues that the term should be construed to mean that "the processor, such as a microchip, contains within it a personal computer." (D.I. 116 at 28.) GameLogic also contends that this claim term is unclear.

21

b.     The Court's Construction

The ordinary meaning of the term processor is "[a] device that performs one or many functions, usually a central processing unit"[8] or "[a] program that transforms some input into some output, such as an assembler, compiler, or linkage editor." *McGraw-Hill Dictionary of Scientific and Technical Terms* 1676 (6th ed. 2003).[9]  Thus, a processor can either be circuitry or it can be a program in a computer that performs a particular function.  *Computer circuitry or a computer program, standing alone, cannot perform the functions of the patent*, such as allowing the player to "enter[] the code . . . into a processor."  That function, and others required by the patent, can be performed by the processor only where the processor is part of a computing device.  For that reason, the term "a processor" in claim 1 of the '082 patent must be construed such that the processor of claim 1 is within a computing device.  As a result, "processor within a computing device" will be construed to mean the same thing as "a processor."  The language "within a computing device" adds no additional limitation to the term "a processor," as a processor must be within a computing device to perform the functions it is required to perform in claim 1 of the '082 patent.

The term "processor includes a computing device" is indecipherable.  As Ingenio points out, the patent describes "a home computer or an interactive TV system" as examples of "a computing device."  ('082 patent at 5:60; *see also id.* at Fig. 6.)

---

[8] A central processing unit is "[t]he part of a computer containing the circuits required to interpret and execute the instructions." *McGraw-Hill Dictionary of Scientific and Technical Terms* 356 (6th ed. 2003)

[9] No one contends that the ordinary meaning of "processor" in the context of computer science has changed between the time the patents issued and today.

22

Because a processor itself must be a part of a computing device to function, it cannot also include "a computing device," as that terminology is used in the patent. Ingenio attempts to avoid this conclusion by arguing that the computing device in this claim is simply "a component device that can perform computations." (D.I. 113 at 24-25.) The patent's own description of what a "computing device" is, as cited by Ingenio, does not comport with this construction. Therefore, I find that the term "processor includes a computing device" is indecipherable in the context of this patent.

      7.     Remaining Terms

     The parties also dispute the meaning of a remaining term in dependent claim 9 of the '082 patent. Because I have construed the disputed terms in the independent claim and, by that construction, will grant summary judgment of infringement to Ingenio, construction of the remaining disputed term is not material to the outcome of the case, as it goes only to infringement of that dependent claim.[10] (D.I. 113 at 23-24; D.I. 117 at 26-28.) There is only one accused product at issue, and the only relief Ingenio has requested is an injunction, as it is undisputed that GameLogic has not yet made any sales of the accused product. Thus, GameLogic would be enjoined from commercializing its accused product or further practicing the patented invention, regardless of whether Gamelogic infringes one claim or more than one claim of the '082 patent.

---

[10] The only asserted claim of the '603 patent is claim 1, an independent claim. (D.I. 117 at 2.) All of the disputed terms in that claim have been construed.

B.    *Summary Judgment Motions*

1.    Infringement

The parties have cross-moved for summary judgment on infringement. (D.I. 112, 115.) Each party, of course, relies heavily on its own claim construction position in support of its own motion. In light of my claim construction rulings, Ingenio's Motion for Summary Judgment of Infringement (D.I. 112) will be granted as to claim 1 of the '082 patent,[11] and GameLogic's Motion for Summary Judgment of Non-Infringement (D.I. 115) will be denied.

GameLogic's HomePlay game meets each element of claim 1 of the '082 patent. HomePlay is "a method for playing a player lottery game comprising the step of: acquiring by a player a game piece," because a potential player buys a paper ticket from a state lottery agency, (Hardy Declaration, D.I. 116, Ex. 1 at ¶ 10), and the ticket serves the function ascribed to a "game piece," namely providing a code that will ultimately lead to a win or loss for the player. The game fits within the definition of lottery game as I have construed it here, *see supra* Section IV.A.2.b., as it has "payment associated with participation in a chance to win; a result based on chance; and a prize awarded to the winner(s)." Thus, HomePlay meets the first limitations of claim 1 of the '082 patent.

Likewise, HomePlay meets the claim limitation of "the gaming piece including a code which includes data indicating whether the player wins or loses the lottery game

---

[11] In its summary judgment briefing, Ingenio only argues that claim 1 of the '082 patent has been infringed. (*See* D.I. 113 at 26-28.) Ingenio makes no mention of the additional limitation "reading" in claim 1 of the '603 patent, and thus summary judgment of infringement as to that patent must be denied.

and an amusement game." First, with respect to "indicating," I have construed that term

to mean only that the access code must show the way to, point out, or make clear in

another way the result of the lottery game and amusement game. *See supra* Section

IV.A.1.b.                          **REDACTED**

(Hardy Declaration, D.I.

116, Ex. 1 at ¶¶ 10, 46-48.) Thus, the access code in HomePlay determines the

ultimate result of the lottery game within the meaning of claim 1 of the '082 patent.

In further support of its argument that it does not infringe the '082 patent,


**REDACTED**


(*Id.*) GameLogic's argument is

flawed because its assertion that it is practicing the prior art is not a viable defense to

infringement. *See Nazomi Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364,

1371 (Fed. Cir. 2005) ("this court cautions against the nonviable 'practicing the prior art'

defense that the district court may have found appealing in reaching its result"). 

Indeed, a patentee does not have to prove that the patent is valid, but only that the

accused device embodies every element of the claimed invention. *Baxter Healthcare*

*Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir. 1995) ("Literal infringement

exists if each of the limitations of the asserted claim(s) read on, that is, are found in, the

accused device. Questions of obviousness in light of the prior art go to validity of the

claims, not to whether an accused device infringes."). Thus, GameLogic's arguments

25

based on Cohen may go to invalidity arguments it wishes to make, but not to its non-infringement position.

Second, with respect to the amusement game, I have construed that term to require only "a game which amuses the player," and have determined that it can be either separate from or combined with the "actualization" game which displays the result of the lottery. *See supra* Section IV.A.2.b. Although GameLogic asserts that the amusement game in Prize Reel Blackjack is only the blackjack portion of the game, it concedes that the prize reel portion of that game is designed to be amusing to the player. (*See* Markman Hearing Transcript, D.I.132 at 51:15-17.)

**REDACTED**                    (Hardy Declaration, D.I. 116, Ex. 1 at ¶¶ 43-58.) Thus, the accused HomePlay meets the claim limitation "the gaming piece including a code which includes data indicating whether the player wins or loses the lottery game and an amusement game."

HomePlay's access codes are "unrecognizable to the player" within the meaning of the '082 patent, because I have construed that term such that it does not require the code to be encrypted. *See supra* Section IV.A.3.b.

**REDACTED**

(*See* Hardy Declaration, D.I. 116, Ex. 1 at ¶¶ 13, 46-48.) In fact, GameLogic's argument that the HomePlay access code is not "unrecognizable" is based on its claim construction of that term, which requires that "unrecognizable" means encrypted. (D.I. 123 at 22-23.) The HomePlay access codes are, however, "unrecognizable" within my construction of that term.

26

Finally, it is clear that, in playing Prize Reel Blackjack, the following steps take place: "entering the code by the player into a processor prior to amusement game play," (Hardy Declaration, D.I. 116, Ex. 1 at ¶ 10), "the processor generating the amusement game on a display for play by the player, the player controlling game play by inputting game parameters to the processor" (*id.* at ¶¶ 34-58), "the processor controlling whether the player will win or lose the amusement game based upon the code entered by the player," (*id.* at ¶¶ 40-58), and "providing on a display an indication to the player of the amusement game win or loss based upon the code," (*id.* at ¶ 55). GameLogic argues that it does not meet any of these limitations because "a processor," as described in the patents-in-suit, must be construed to mean only one processor,

**REDACTED**                    (D.I. 123 at 26;

*see also* Hardy Declaration 2, D.I. 113, Ex. 1 at ¶¶ 18-20.)  However, I have construed the term "a processor" to mean "one or more processors," and GameLogic's system accordingly meets this limitation.

GameLogic's accused HomePlay system thus meets every limitation of claim 1 of the '082 patent, and summary judgment of infringement will be granted to Ingenio.[12] For the same reasons, GameLogic's Motion for Summary Judgment of Non-Infringement will be denied.  Because neither party discussed infringement of claim 1 of the '603 patent in their summary judgment briefing, summary judgment as to that claim is denied.

---

[12] For the reasons discussed above, *supra* note 11 and Section IV.A.7., I will not address infringement of any of the other claims.

27

2.    Validity

Ingenio has moved for partial summary judgment of validity on GameLogic's

claim that the asserted claims of the patent are invalid because they are not enabled.

(D.I. 112.) Specifically, GameLogic has asserted that, under its construction of

"unrecognizable," the claims of the patent require encryption, and are not enabled

because they fail to teach an encryption technique. (D.I. 123 at 27; D.I. 113 at 28.)

GameLogic's sole argument on this point focuses on its claim construction of

"unrecognizable." (D.I. 123 at 27.) Because encryption is not required under the

definition of the term "unrecognizable" that I have adopted, GameLogic's lack-of-

enablement argument fails. Thus, summary judgment as to that defense will be

granted to Ingenio.

## V.    CONCLUSION

Accordingly, for the foregoing reasons, the disputed claim terms will be

construed as follows:

| Claim Term | The Court's Construction |
|---|---|
| "code which includes data indicating whether the player wins or loses" | The court construes construe "indicating" in the context of "code which includes data indicating whether the player wins or loses" to mean that the code "shows the way to, points out, or makes clear in another way." |
| "lottery game" | The court construes "lottery game" to mean "a game based on three basic principles: payment associated with participation in a chance to win; a result based on chance; and a prize awarded to the winner(s)." |

28

| | |
|---|---|
| "amusement game" | The court construes "amusement game" in the context of the phrase "the lottery game and an amusement game" to mean "a game which amuses the player, which can be combined with or separate from the 'actualization' game which reveals the result of the lottery game." |
| "data being unrecognizable to the player" | The court construes the phrase "data being unrecognizable to the player" to mean "the player is not able to recognize from the data whether the player wins or loses the lottery game and amusement game." |
| "a processor" | The court construes "a processor" to mean "one or more processors." |
| "reading the code by a processor" | The court construes "reading" in the context of the phrase "reading the code by a processor" will be construed to mean "receiving input of the code from some source, which may include a computer program/software source." |
| "processor within a computing device" | The court construes the term "processor within a computing device" to be synonymous with the term "processor" as it is used in claim 1 of the '082 patent. |
| "processor includes a computing device" | The term "processor includes a computing device" is indecipherable. |

Additionally, Ingenio's Motion for Partial Summary Judgment of Infringement (D.I. 112) will be granted as to Ingenio's claim that GameLogic infringes claim 1 of the '082 patent, and its Motion for Partial Summary Judgment of Validity (D.I. 112) will be granted as to GameLogic's lack-of-enablement defense. Ingenio's Motion for Summary Judgment that GameLogic infringes claim 1 of the '603 patent (D.I. 112) will be denied. GameLogic's Motion for Summary Judgment of Non-Infringement (D.I. 115) will be denied. An appropriate order will follow.