# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INGENIO, FILIALE DE LOTO-QUEBEC, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 04-1532 (KAJ) |
| v. | ) ) | |
| GAMELOGIC, INC. | ) ) ) | **REDACTED VERSION** |
| Defendant. | ) ) | |

## (PROPOSED) FINAL PRETRIAL ORDER

This matter having come before the court at a pretrial conference held pursuant to Fed.R.Civ.P. ("Rule") 16(d), and Edmond D. Johnson, The Bayard Firm, 222 Delaware Avenue, Suite 900, Wilmington, DE 19801, (302) 655-5000, and Rodger L. Tate and Brian M. Buroker, Hunton & Williams LLP, 1900 K Street, NW, Suite 1200, Washington, DC, 20006, (202) 955-1500, having appeared as counsel for Plaintiffs Ingenio, Filiale de Loto-Quebec, Inc. ("Ingenio"), and Richard L. Horwitz and David E. Moore, Potter Anderson & Corroon, LLP, Hercules Plaza 6th Floor, 1313 N. Market Street, P.O. Box 951, Wilmington, DE 19899, (302) 984-600, and Gary M. Hnath, Timothy A. Molino, and Goutam Patnaik, Bingham McCutchen LLP, 1120 20th Street, NW, Washington, DC 20036, (202) 778-6150, having appeared as counsel for Defendant GameLogic, Inc. ("GameLogic"), the following actions were taken:

I.    **Nature of the Case**

This is an action for patent infringement arising under the Patent Laws of the United States. Ingenio alleges that GameLogic infringes claims 4, 6, 9, 10, 13, and 15 of United States Patent No. 5,569,082 (the "'082 Patent") and claim 1 of United States Patent No. 5,709,603 (the "'603 Patent"). (The '082 Patent and '603 Patent are referred to collectively as the "Patents-in-Suit."). The Court has already entered summary judgment finding that GameLogic's HomePlay offering infringes claim 1 of the '082 Patent. Ingenio also alleges that the infringement has been willful. GameLogic contends that it does not infringe the claims of the Patents-in-Suit, and that each of the asserted claims of the Patents-in-Suit is invalid and unenforceable for alleged inequitable conduct.

II.    **Jurisdiction**

This is an action for patent infringement arising under the Patent Laws of the United States, Title 35, United States Code. Ingenio seeks injunctive relief to prevent further infringement, a finding that the infringement has been willful and resulting court-ordered remedies. GameLogic seeks a declaration that it does not infringe and that the patents are invalid and unenforceable. The Court's subject matter jurisdiction over this action is proper under 28 U.S.C. §§ 1331 and 1338(a). Venue is proper under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b). Subject matter jurisdiction and venue are not disputed.

III.    **Issues of Fact**

A.    The Parties' Agreed Upon Statements of Uncontested Facts

The following stipulated facts require no proof at trial, will become part of the evidentiary record in the case, and may be read to the jury by the Court or any party:

1.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271, *et seq.*

2.     Ingenio filed this suit against GameLogic on December 20, 2004.

3.     Ingenio is a Quebec Corporation organized and existing under the laws of Quebec, and maintaining its principal place of business at 500 Sherbrooke Street, West, Montreal, Quebec, Canada H3A 3G6.

4.     GameLogic is a Delaware Corporation organized and existing under the laws of the State of Delaware, and maintaining its principal place of business at 880 Winter Street, Suite 350, Waltham, MA 02451.

5.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a) for alleged infringement of the '082 Patent and the '603 Patent.

6.     GameLogic is subject to personal jurisdiction in the State of Delaware for purposes of this action.

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b) for purposes of this action.

8.     Perry Kaye is the sole named inventor of the Patents-in-Suit.

9.     The '082 Patent was issued from a patent application, Application No. 08/418,011, that was filed on April 6, 1995.

10.     The '082 Patent issued on October 29, 1996.

11.     The '603 Patent was issued from a patent application, Application No. 08/738,317, that was filed on October 25, 1996.

12.     The '603 Patent is a continuation-in-part of, and claims priority to, the '082 Patent.

3

13. The '603 Patent issued on January 20, 1998.

14. GameLogic has offered to sell and owns HomePlay Lottery™ system, a lottery-based gaming product.

15. GameLogic has used in the past a demonstration website (http://demo.homeplay.com) to demonstrate the HomePlay Lottery system to potential customers.

16. On its website (www.gamelogicinc.com), GameLogic has advertised in the past that the HomePlay Lottery™ system was "a new easy-to-use Internet enabled lottery product ... which will provide your players with better value and more fun."

17. As designed, to play the HomePlay Lottery system, the player could buy a ticket from a lottery vendor.

18. As designed, as a part of the HomePlay Lottery system, the ticket (gaming piece) could include an access code printed on the paper ticket.

19.                              REDACTED

20.                              REDACTED

21. GameLogic's Prize Reel Blackjack includes a card game.

22. U.S. Patent No. 5,373,440 to Cohen et al. ("Cohen") was cited by Perry Kaye's attorney, Martin Korn, to the United States Patent and Trademark Office during the prosecution of the '603 Patent on January 10, 1997.

23. International Patent Application Publication NO. WO 91/06931 to Raha Automaattiyhdistys ("Raha") was cited by Perry Kaye's attorney, Martin Korn, to the United

States Patent and Trademark Office during the prosecution of the '603 Patent on January 10, 1997.

24.    The Court determined that "indicating" in the context of "code which includes data indicating whether the player wins or loses" means that the code "shows the way to, points out, or makes clear in another way."

25.    The Court determined that the term "lottery game" means "a game based on three basic principles: payment associated with participation in a chance to win; a result based on chance; and a prize awarded to the winner(s)."

26.    The Court determined that "amusement game" in the context of the phrase "the lottery game and an amusement game" means "a game which amuses the player, which can be combined with or separate from the 'actualization' game which reveals the result of the lottery game."

27.    The Court determined that the phrase "data being unrecognizable to the player" means "the player is not able to recognize from the data whether the player wins or loses the lottery game and amusement game."

28.    The Court determined that the term "a processor" means "one or more processors."

29.    The Court determined that "reading" in the context of the phrase "reading the code by a processor" means "receiving input of the code from some source, which may include a computer program/software source."

30.    The Court determined that the term "processor within a computing device" is synonymous with the term processor as it is used in claim 1 of the '082 Patent.

5

31.    The parties agreed that the term "gaming piece" means "a physical element used with the game, including, but not limited to a paper ticket, plastic piece, token, casino chip simulating a coin, a magnetic medium or laser readable medium (e.g., floppy disk or CD-ROM)."

32.    The parties agreed that "including a code" in the context of the phrase "gaming piece including a code" means "a gaming piece that stores the code in or on the gaming piece."

33.    The Court determined that claim 1 of the '082 Patent is infringed.

**REDACTED**

35.                          **REDACTED**

36.    United States Patent No. 5,373,440 ("the Cohen patent") was filed on June 4, 1992 and issued on December 13, 1994.

37.    PCT/F190/00254 ("Raha") was filed on November 7, 1989 and was published on May 16, 1991.

38.    U.S. Patent No. 4,494,197 ("the '197 Troy patent") was filed on February 22, 1984 and issued on January 15, 1985.

39.    U.S. Patent No. 5,377,975 ("the Clapper patent") was filed on November 16, 1992 and issued on January 3, 1995.

40.    U.S. Patent No. 4,922,522 ("the Scanlon patent") was filed on June 7, 1988 and issued on May 1, 1990.

6

41.    U.S. Patent No. 4,689,742 (the "742 Troy patent") was filed on May 5, 1986 and issued on August 25, 1987.

42.    U.S. Patent No. 5,324,035 ("the Morris patent") was filed on December 1, 1992 and issued on June 28, 1994.

43.    As of September 1, 2006, Ingenio had not entered into a license agreement for the Patents-in-Suit with Betware.

44.    As of September 1, 2006, Ingenio had not entered into a license agreement for the Patents-in-Suit with Nethala Hapayis.

45.    Martin Korn is an experienced patent attorney familiar with the rules of the United States Patent and Trademark Office.

46.    Martin Korn was the patent attorney responsible for the prosecution of the patents-in-suit before the U.S. Patent and Trademark Office.

47.    The '082 patent issued on October 29, 1996.

48.    GameLogic first became aware of the existence of the asserted patents on or about March 18, 2004.

49.    Ingenio first notified GameLogic that the patents-in-suit were allegedly relevant to GameLogic's HomePlay Lottery™ system in correspondence dated October 29, 2004, from Ingenio to GameLogic.

50.                        **REDACTED**

51.    Ingenio is not currently seeking or making a claim for any royalties due to Ingenio from GameLogic for the alleged infringement of the '082 and '603 patents.

52.     Ingenio is not currently seeking or making a claim for lost profits in this action.

53.     Ingenio is not currently seeking or making a claim for any damages in this action.

54.     At one time, Ingenio asserted claims 8, 16 and 17 of the '082 patent against GameLogic in this litigation, but no longer does so.

55.     The parties agreed that the term "code" means "a system of symbols (as letters or numbers) used to represent assigned and often secret meanings."

B.     Ingenio's Statements of Contested Facts

1.     Ingenio is in the business of designing and developing computer based lottery games.

2.     Ingenio is the lawful assignee of all right, title and interest in and to the Patents-in-Suit.

3.     The Patents-in-Suit were assigned to Ingenio on March 5, 1999.

4.     GameLogic's system is designed for performance of a method for playing a lottery.

5.     As designed, to play the HomePlay Lottery system, the player could access a website, enter the access code printed on the ticket in an appropriate field on the website, and submit the access code to the GameLogic servers.

6.

**REDACTED**

8

7.                      **REDACTED**

8.                      **REDACTED**

9.     Prize Reel Blackjack is one game of the HomePlay Lottery product.

10.    The HomePlay Lottery interactive games are played on a system of processors that receive input of the access code prior to amusement game play.

11.    When playing the HomePlay Lottery, the player controls the game play by selecting when the play occurs, what selections are made, etc. depending on the game.

12.                     **REDACTED**

13.    In the HomePlay Lottery, at the end of the amusement game, the player's winnings, if any, are revealed to him or her.

14.                     **REDACTED**

15.    Paper tickets have been implemented for use with the HomePlay Lottery.

16.    The GameLogic servers which receive the access code include computers (computer servers).

17.                     **REDACTED**

18.                    **REDACTED**


**REDACTED**


20.    Licensees of Ingenio have sold commercial embodiments of the Patents-in-Suit in the United States.

21.    Ingenio has won awards based on games it has developed and licensed that are covered by the Patents-in-Suit.

22.    The Patent and Trademark Office did not reject any of the application claims that issued as the '603 Patent based on Cohen.

23.    The Patent and Trademark Office did not reject any of the application claims that issued as the '603 Patent based on Raha.

24.    GameLogic has made the HomePlay Lottery system.

C.    Ingenio's Brief Statements of Expected Proof

1.    Ingenio intends to prove that GameLogic infringes claims 4, 6, 9, 10, 13, and 15 of the '082 Patent and claim 1 of the '603 Patent literally or under the doctrine of equivalents. To prove infringement, Ingenio will show that GameLogic's lottery products meet each and every limitation of the asserted claims. Ingenio will prove infringement through, for example, the testimony of its expert witnesses, exhibits related to the HomePlay Lottery system, documents relied upon by GameLogic in its summary judgment briefs, and/or any other evidentiary and/or testimonial proof.

2.    Ingenio intends to prove that GameLogic willfully infringes the Patents-in-Suit. To prove willful infringement, Ingenio will show that GameLogic knew about the Patents-in-Suit,

**REDACTED**

. Ingenio will prove willful infringement through, for example, GameLogic's documents, testimony from GameLogic personnel and its counsel, testimony from Ingenio personnel and/or any other evidentiary and/or testimonial proof.

3.    Ingenio intends to prove that GameLogic should be permanently enjoined from making, using, offering to sell, or selling the patented inventions. To prove that Ingenio is entitled to a permanent injunction, Ingenio will show that (1) that Ingenio has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the Ingenio and GameLogic, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. Ingenio will prove that it is entitled to a permanent injunction through, for example, Ingenio's documents, the direct testimony of Ingenio's fact witnesses, GameLogic's documents and the cross-examination of GameLogic's fact witnesses, and/or any other evidentiary and/or testimonial proof.

4.    Ingenio intends to prove that this case is an exceptional case. To prove that this case is an exceptional case, Ingenio will show, for example, that because the Patents-in-Suit are willfully infringed, the award of attorney fees is within the district court's sound discretion. Ingenio will prove that this case is an exceptional case through, for example, Ingenio's documents, the direct testimony of Ingenio's fact witnesses, GameLogic's documents

and the cross-examination of GameLogic's fact witnesses, and/or any other evidentiary and/or testimonial proof.

5.    Ingenio intends to prove that GameLogic cannot prove by clear and convincing evidence that claims 1, 4, 6, 8, 9, 10, 13, and 15 of the '082 Patent and claim 1 of the '603 Patent are invalid based on the specific invalidity contentions in GameLogic's expert report. In rebuttal, Ingenio will show that GameLogic's cannot meet its burden of proof regarding its asserted invalidity positions and that the claims of the Patents-in-Suit are not invalid. To prove that the claims of the Patents-in-Suit are not invalid, Ingenio will show that the claims of the Patents-in-Suit are not anticipated or rendered obvious by any reference(s) that may be asserted by GameLogic and that secondary considerations render the claims of the Patents-in-Suit not obvious over any reference(s) that may be asserted by GameLogic. Ingenio will prove that the claims of the Patents-in-Suit are not invalid through, for example, the cross-examination of GameLogic's witnesses, the direct testimony of Ingenio's witnesses and rebuttal witnesses, Ingenio's documents, evidence of secondary factors demonstrating non-obviousness and/or any other evidentiary and/or testimonial proof.

6.    If necessary (because Ingenio asserts that the following defenses were raised too late), Ingenio intends to prove that GameLogic cannot prove by clear and convincing evidence that claim 1 of the '603 Patent is invalid based on statutory double patenting or obvious-type double patenting. In rebuttal and if necessary, Ingenio will show that GameLogic's cannot meet its burden of proof regarding its asserted invalidity position on double patenting and that the claim 1 of the '603 Patent is not invalid under double patenting. To prove that the claims of the Patents-in-Suit are not invalid, Ingenio will show that claim 1 of the '603 patent is not identical to or an obvious variation of any of the claims of the '082 Patent. Ingenio will prove

12

that the claims of the Patents-in-Suit are not invalid under double patenting through, for example, the cross-examination of GameLogic's witnesses, the direct testimony of Ingenio's witnesses, expert witnesses, and rebuttal witnesses, Ingenio's documents, and/or any other evidentiary and/or testimonial proof.

    7. Ingenio intends to prove that GameLogic cannot prove by clear and convincing evidence that claims 1, 4, 6, 8, 9, 10, 13, and 15 of the '082 Patent and claim 1 of the '603 Patent are unenforceable based on inequitable conduct. In rebuttal, Ingenio will show that GameLogic's cannot meet its burden of proof regarding its assertion that the Patents-in-Suit are unenforceable based on inequitable conduct. To prove that the claims of the Patents-in-Suit are not unenforceable, Ingenio will show that the there was no intent to deceive the U.S. Patent and Trademark Office and that the allegedly withheld information was not material. Ingenio will prove that the claims of the Patents-in-Suit are not invalid through, for example, the direct testimony of Ingenio's rebuttal witnesses, testimony of GameLogic witnesses, Ingenio's documents, and/or any other evidentiary and/or testimonial proof.

  D. <u>GameLogic's Statements of Contested Facts</u>

    1. GameLogic's HomePlay Lottery™ system does not practice or contain the additional elements of any of the claims of the '082 and '603 patents asserted at trial.

    2. Claim 16 of the '082 patent is invalid under 35 U.S.C. § 112.

    3. No restriction requirement was issued in the patent application that issued as the '082 patent.

    4. The issued claims of the '082 patent are directed to methods for playing a player lottery type game and to lottery type games.

13

5.   The issued claims of the '603 patent are directed to methods for playing a player lottery type game and to lottery type games.

6.   Based on the Court's Order and Memorandum Opinion, dated July 21, 2006 (D.I. 133), at least claim 1 of the '603 patent is directed to the same invention as claim 1 and/or claim 10 of the '082 patent.

7.   One of ordinary skill in the art is a person who has a basic understanding of mathematical coding methods and limitations, computers, and computer programming, with a bachelors of science in computer engineering or a minimum of five years of industry experience in computer or software development.

8.   The Cohen patent discloses, *inter alia,* a coded game card which the player inserts into a game machine to initiate game play.

9.   The Cohen patent is enabling.

10.   The Cohen patent anticipates the asserted claims of the '082 patent.

11.   The Cohen patent anticipates the asserted claim of the '603 patent.

12.   Raha teaches, *inter alia,* combining a lottery game and an amusement game.

13.   Raha is enabling.

14.   The '197 Troy patent discloses, *inter alia,* allowing a player to choose between two game types and allowing that player to select a particular combination of elements to be used in the first type game.

15.   The '197 Troy patent is enabling.

16.   The Clapper patent discloses, *inter alia,* a gaming piece where a win/loss indicator is unrecognizable to the player.

14

17.     The Clapper patent is enabling.

18.     The Scanlon patent discloses, *inter alia*, playing a game from remote locations.

19.     The Scanlon patent is enabling.

20.     The '742 Troy patent discloses, *inter alia*, that the player will have a choice between, for example, bowling, darts, dice or cards.

21.     The '742 Troy patent is enabling.

22.     The Morris patent discloses, *inter alia*, a video game where tickets can be selected and purchased which contain a code indicating win/loss of a lottery game and an amusement game.

23.     The Morris patent is enabling.

24.     To the extent the Cohen patent fails to anticipate the asserted claims of the '082 patent, then the combined teachings of one or more other prior art references (Raha, the '197 Troy patent, the Clapper patent, the Scanlon patent, the '742 Troy patent, and/or the Morris patent) with the Cohen patent render the asserted claims of the '082 patent obvious. One of ordinary skill in the art would be motivated to combine these pieces of prior art.

25.     To the extent the Cohen patent fails to anticipate the asserted claim of the '603 patent, then the combined teachings of one or more other prior art references (Raha, the '197 Troy patent, the Clapper patent, the Scanlon patent, the '742 Troy patent, and/or the Morris patent) with the Cohen patent render claim 1 of the '603 patent obvious. One of ordinary skill in the art would be motivated to combine these pieces of prior art.

26.     The Morris patent anticipates the asserted claims of the '082 patent.

27.     The Morris patent anticipates the asserted claims of the '603 patent.

15

28.    To the extent it is determined that the Morris patent fails to anticipate the asserted claims of the '082 patent, then the combined teachings of one or more other prior art references (Raha, the '197 Troy patent, the Clapper patent, the Scanlon patent, the '742 Troy patent, and/or the Morris patent) with the Morris patent render the asserted claims of the '082 patent obvious. One of ordinary skill in the art would be motivated to combine these pieces of prior art.

29.    To the extent it is determined that the Morris patent fails to anticipate the asserted claim of the '603 patent, then the combined teachings of one or more other prior art references (Raha, the '197 Troy patent, the Clapper patent, the Scanlon patent, the '742 Troy patent, and/or the Morris patent) with the Morris patent render claim 1 of the '603 patent obvious. One of ordinary skill in the art would be motivated to combine these pieces of prior art.

30.    The Cohen patent discloses, *inter alia*, a method for playing a player lottery game.

31.    The Cohen patent discloses, *inter alia*, acquiring by a player a game piece.

32.    The Cohen patent discloses, *inter alia*, that the gaming piece includes a code which includes data indicating whether the player wins or loses the lottery game and an amusement game.

33.    The Cohen patent discloses, *inter alia*, that the data is unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game.

34.    The Cohen patent discloses, *inter alia*, the entering of the code by the player into a processor prior to amusement game play.

16

35.    The Cohen patent discloses, *inter alia*, a processor for receiving the code input by the player prior to amusement game play.

36.    The Cohen patent discloses, *inter alia*, reading the code by a processor.

37.    The Cohen patent discloses, *inter alia*, that the processor generating the amusement game on a display for play by the player.

38.    The Cohen patent discloses, *inter alia*, that the player controlling game play by inputting game parameters to the processor.

39.    The Cohen patent discloses, *inter alia*, that the processor controlling whether the player will win or lose the amusement game based upon the code entered by the player.

40.    The Cohen patent discloses, *inter alia*, a display which provides an indication to the player of the amusement game win or loss based upon the code.

41.    The Cohen patent discloses, *inter alia*, that the gaming piece includes paper media for storing the code.

42.    The Cohen patent discloses, *inter alia*, that the amusement game includes a card game.

43.    The Cohen patent discloses, *inter alia*, that the step of entering the code into a processor which includes a processor within a computing device.

44.    The Cohen patent discloses, *inter alia*, the entering of the code into a processor includes a processor within an on-line subscription service, as that term is interpreted by Ingenio.

45.    The Morris patent discloses, *inter alia*, a method for playing a player lottery game.

46.    The Morris patent discloses, *inter alia*, acquiring by a player a game piece.

47.    The Morris patent discloses, *inter alia*, that the gaming piece includes a code which includes data indicating whether the player wins or loses the lottery game and an amusement game.

48.    The Morris patent discloses, *inter alia*, that the data is unrecognizable to the player, such that the player does not know whether the player will win or lose the game prior to play of the amusement game.

49.    The Morris patent discloses, *inter alia*, the entering of the code by the player into a processor prior to amusement game play.

50.    The Morris patent discloses, *inter alia*, a processor for receiving the code input by the player prior to amusement game play.

51.    The Morris patent discloses, *inter alia*, reading the code by a processor.

52.    The Morris patent discloses, *inter alia*, that the processor generating the amusement game on a display for play by the player.

53.    The Morris patent discloses, *inter alia*, that the player controlling game play by inputting game parameters to the processor.

54.    The Morris patent, *inter alia*, discloses the processor controlling whether the player will win or lose the amusement game based upon the code entered by the player.

55.    The Morris patent discloses, *inter alia*, a display which provides an indication to the player of the amusement game win or loss based upon the code.

56.    The Morris patent discloses, *inter alia*, that the gaming piece includes paper media for storing the code.

18

57.    The Morris patent discloses, *inter alia*, that the amusement game includes a card game.

58.    The Morris patent discloses, *inter alia*, that the step of entering the code into a processor includes a processor within a computing device.

59.    The Morris patent discloses, *inter alia*, the entering of the code into a processor includes a processor within an on-line subscription service, as that term is interpreted by Ingenio.

60.    The Clapper patent discloses, *inter alia*, that the gaming piece includes a code which includes data indicating whether the player wins or loses the lottery game and an amusement game.

61.    The code in the Clapper patent is unrecognizable to the player.

62.    Raha disclsoses, *inter alia*, combining a lottery game and an amusement game.

63.    Raha discloses, *inter alia*, a method where a lottery game machine presents the player with the illusion of playing a game of skill or chance (for amusement purposes) even though the outcome is predetermined.

64.    The '197 Troy patent discloses, *inter alia*, "...a game selection means capable of allowing a player to choose between a first type game and a second type game; a means of allowing a player to select a particular combination of elements to be used in the first type game;"

65.    The '197 Troy patent discloses, *inter alia*, that the central processor has a preprogrammed means capable of preselecting what particular play will be a winning play based upon pre-established standard for winning plays.

19

66.    The Clapper patent teaches, *inter alia*, a paper gaming piece where the win/loss indicator is stored.

67.    Raha discloses, *inter alia*, that in place of the card combinations of the poker game, the outcome of the game can be shown in terms of any other well-known card game or other similar game.

68.    The Clapper patent discloses, *inter alia*, methods where the game machine that has a processor reads the gaming piece.

69.    The '197 Troy patent discloses, *inter alia*, a plurality of playing means remote from the central processor.


REDACTED


REDACTED


REDACTED


REDACTED


REDACTED

**REDACTED**

77.    United States Patent No. 5,373,440 ("the Cohen patent") and European Patent Application WO 91/06931 ("the Raha patent") were each cited as references of "particular relevance" and as a basis for why "the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone" regarding each claim in PCT International Preliminary Examination Report for the PCT application corresponding to the '082 patent application (PCT/US96/03320).

78.    Mr. Korn's law firm received a PCT Search Report for the PCT application No. PCT/US96/03320 ("the PCT Search Report") on Sept. 10, 1996.

79.    Mr. Korn would have received the PCT Search Report from his law firm's mailroom in the ordinary course of business.

80.    Mr. Korn admits that the latest the PCT Search Report would have been delivered to him was within 10 days of its receipt.

81.    It was Mr. Korn's general practice in the time period of September 10, 1996 to review documents that were received from the PCT Cooperation Authority that were addressed to him.

82.    The PCT Search Report states that the invention claimed in the PCT application "cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone" based on two pieces of prior art, the Cohen patent and Raha application.

83.    Mr. Korn was aware of this material prior art at least one month prior to the issuance of the '082 patent, but Mr. Korn failed to disclose this prior art to the United States Patent and Trademark Office while the '082 patent application was pending.

84.    Martin Korn committed inequitable conduct by failing to disclose material prior art during the prosecution of the '082 patent with the intent to deceive.

85.    GameLogic did not copy the patents-in-suit when developing the HomePlay Lottery™ system.

86.    **REDACTED**

87.    **REDACTED**

88.    GameLogic had a good faith belief that it did not infringe the patents-in-suit.

89.    GameLogic did not commit willful infringement of the '082 or '603 patents.

90.    The parties stipulate to the authenticity and admissibility of the exhibits which have been listed in Defendant's Exhibit List.

91.    Under the Court's claim construction, claim 8 of the of the '082 patent does not meet the requirements of 35 U.S.C. 112, paragraph 4.

92.    Under the Court's claim construction, claim 8 of the '082 patent is invalid under 35 U.S.C. 112, paragraph 4.

93.    Neither the PCT Search Report, nor its existence, was disclosed to the United States Patent and Trademark Office during the prosecution of the '603 patent application.

REDACTED

E.     GameLogic's Brief Statements of Expected Proofs

GameLogic respectfully submits the following list of what it intends to prove at trial. In addition to the items identified below, GameLogic intends to offer proof of the issues of fact and issues of law identified in the parties' Pretrial Order. GameLogic also intends to offer proof to rebut the items on which Ingenio offers proof, and GameLogic reserves the right to amend and supplement this statement in response to Ingenio's pretrial activities. As to issues for which Ingenio has the burden of proof, GameLogic reserves the right to supplement this statement after receipt of Ingenio's statement of intended proofs.

1.     Plaintiff has not proved by a preponderance of evidence that GameLogic has infringed, either literally or under the doctrine of equivalents, any of the claims of the patents-in-suit that were asserted at trial. GameLogic shall rebut Plaintiff's evidence regarding infringement with, among other things, expert testimony, fact testimony and related exhibits regarding the contemplated function and operation of the HomePlay Lottery™ system.

2.     Plaintiff has not proved by clear and convincing evidence that GameLogic has in the past or is currently willfully infringing the '082 patent or the '603 patent. GameLogic shall rebut Plaintiff's allegations of willful infringement by showing, via fact testimony and related exhibits, that the totality of the circumstances do not evince willful infringement on the part of GameLogic.

3.     GameLogic has proved by clear and convincing evidence that the patents-in-suit are invalid. GameLogic, via expert and fact testimony and related exhibits pertaining to relevant prior art and the claims of the patents-in-suit and alleged commercial embodiments

thereof, shall provide evidence that the patents-in-suit are invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112.

       4.     GameLogic has proved by clear and convincing evidence that the inventor's patent attorney committed inequitable conduct in prosecuting the '082 and '603 patents, rendering those patents unenforceable. GameLogic shall demonstrate, via expert and fact testimony and related exhibits, that inequitable conduct occurred during the prosecution of the patents-in-suit based on the intentional failure to disclose material prior art and the failure to cure this omission.

       5.     Plaintiff has not proved by clear and convincing evidence that this is an exceptional case. GameLogic shall demonstrate, via fact testimony and related exhibits, that its actions pertaining to the HomePlay Lottery™ system have at all times been reasonable, precluding a finding that this case is exceptional based on the conduct of GameLogic.

       6.     GameLogic has proved by clear and convincing evidence that this is an exceptional case based upon the inequitable conduct committed during the prosecution of the '082 and '603 patents, the invalidity of the patents-in-suit, and the infringement allegations and related litigation brought by Ingenio.

## IV.  Issues of Law

    A.    <u>Ingenio's Statement of Issues of Law</u>

     Ingenio contends that the following issues of law remain to be decided by the Court:

       1.     Whether GameLogic infringes claims 4, 6, 9, 10, 13, and 15 of the '082 Patent literally or under the doctrine of equivalents. Whether GameLogic infringes claim 1 of the '603 Patent literally or under the doctrine of equivalents.

a.     Infringement

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271 (2006). The determination of patent infringement is a two step process. First, the Court must construe the claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). Then the jury compares the properly construed claim to the accused device. *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001) (citation omitted) ("Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact"). "A patent is infringed if any claim is infringed, . . . for each claim is a separate statement of the patented invention." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1220 (Fed. Cir. 1995) (citation omitted).

"[A]n accused product that sometimes, but not always, embodies a claimed method nonetheless infringes." *Bell Commc'ns Research Inc. v. Vita link Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995)), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000). *see also Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984) ("Imperfect practice of an invention does not avoid infringement."); *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 815 F. Supp. 1488, 1512 (D. Del. 1993) ("[I]t is of no moment that in certain modes of operation . . . the [accused product] may not operate in a way that would infringe the '145 patent. It matters that the accused device operate in an infringing way at some time . . . ."), *aff'd*, 18 F.3d 927 (Fed. Cir. 1994)). Additionally, "[c]ircumstantial evidence can support a finding of infringement." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1362 (Fed. Cir. 2006).

"An accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent." *Arnstar Corp. v. Envirotech Corp.*, 730 F.2d 1476,

1482 (Fed. Cir. 1984) (citation omitted). Likewise, an accused method "does not avoid literally infringing a method claim ... simply because it employs *additional* steps." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1380 (Fed. Cir. 2001) (emphasis in original) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir. 1986). Further, the steps of a method claim need not be performed in the order written unless logic, grammar, or the content of the specification dictates otherwise. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-71 (Fed. Cir. 2003); *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2000) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one.").

        "[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is "equivalence" between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. Inc v. Hilton Davis Chem Co.*, 520 U.S. 17, 21 (1997). "Infringement under the doctrine of equivalents requires an intensely factual inquiry." *Toro Co. v. White Consolo Indus., Inc.*, 266 F.3d 1367, 1369 (Fed. Cir. 2001) (citation omitted). The "essential inquiry" in determining infringement under the doctrine of equivalents is: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson*, 520 U.S. at 40. The doctrine of equivalents requires an element-by-element comparison of the accused method or product and the claim. *Id.* "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Eagle Comtronics, Inc v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002).

"To infringe a claim under the doctrine of equivalents, an accused device must include an equivalent for each literally absent claim limitation." *Toro*, 266 F.3d at 1370. Knowledge in the art that one element is interchangeable with another is highly persuasive objective evidence of equivalence. *Warner-Jenkinson*, 520 U.S. at 35-37; *Graver Tank*, 339 U.S. at 609; *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1222 (Fed. Cir. 1996) ("This court commends, for instance, evidence that persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.").

An accused method must contain every claim element, but "not necessarily in a corresponding component." *Corning Glass Works*, 868 F.2d at 1259. "A patentee is, for example, free to frame the issue of equivalency, if it chooses, as equivalency to a combination of limitations." *Id.* at 1259 n.6 (citation omitted). Courts have held that "'[o]ne-to-one correspondence of components is not required, and elements or steps may be combined without ipso facto loss of equivalency.'" *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp*, 149 F.3d 1309, 1320 (Fed. Cir. 1998) (quotation omitted).

> b.    Inducement

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988). Liability for inducing infringement requires a showing that the conduct being induced constitutes direct infringement and that the person inducing the infringement actively and knowingly aided and abetted the direct infringement of the patent. *See Water Techs. Corp.*, 850 F.2d at 668. Direct infringement may be inferred from circumstantial proof. *See Moleculon Research Corp.*, 793 F.2d at 1272; *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp.2d 181, 208-09

(D. Del. 2001) (finding direct infringement based on sales of the accused product and distribution of instruction manuals).

Similarly, "[w]hile proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *Water Techs. Corp.*, 850 F.2d at 668. The requisite intent to induce infringement may be inferred from all of the circumstances, including the preparation of consumer use instructions where the use of the product by the consumer in accordance with those instructions would constitute a direct act of infringement. *Id.* at 668-69; *see also Moleculon Research Corp.*, 793 F.2d at 1272.

c.      Contributory Infringement

"Whoever offers to sell or sells within the United States ... a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." 35 U.S.C. § 271(c); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 485 (1964); *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997). There can be no contributory infringement in the absence of direct infringement, but direct evidence of direct infringement is not necessary. *See Preemption Devices, Inc. v. Minnesota Min. & Mfg. Co.*, 803 F.2d 1170, 1173 (Fed. Cir. 1986).

d.      Burden of Proof

Infringement requires proof by a preponderance of the evidence. *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999). The burden is upon the patentee. "To show infringement of a patent, a patentee must supply sufficient evidence to prove

that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claims." *Id.*

Because the Court construed various terms of the patents in suit pursuant to an Order issued on July 21, 2006 (D.I. 134), the Jury must now determine whether the disputed elements of the properly construed claims read on the accused devices and methods of their use. Ingenio bears the burden of proof on this issue. It must meet this burden by proof amounting to a preponderance of the evidence.

        2.     Whether GameLogic willfully infringes the '082 Patent. If GameLogic is found to infringe any claim of the '603 Patent, whether GameLogic willfully infringes the '603 Patent.

        a.     Willful Infringement

Ingenio contends that the GameLogic's infringement of the '082 and '603 Patents has been willful. Pursuant to, 35 U.S.C. § 284, the court may "increase the damages up to three times the amount found or assessed." Willfulness, a question of fact, must be established by clear and convincing evidence. *SRI Int'l, Inc. v. Advanced Tech. Lab, Inc.*, 127 F.3d 1462, 1465 (Fed. Cir. 1997). The decision to enhance damages, and the amount of any enhancement, however, is within the discretion of the Court. *See* 35 U.S.C. § 284.

The test for willful infringement is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1555 (Fed. Cir. 1996). In the District of Delaware, courts have considered this question by giving consideration to the following factors: "(1) the infringer's deliberate copying of the ideas of another; (2) the infringer's knowledge of the patent rights of another; (3) any good faith belief of invalidity or

noninfringement formed by the infringer after an investigation of the patent rights of another; (4) the infringer's behavior as a litigant." *E.I. DuPont De Nemours & Co. v. Monsanto Co.*, 903 F. Supp. 680, 740 n.32 (D. Del. 1995).

        3.      Whether the Court should permanently enjoin GameLogic from making, using, offering to sell, or selling the patented inventions.

        a.      Permanent Injunction

      "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283 (2006). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity. . . ." *eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1841, 164 L. Ed.2d 641 (2006). Further, "the Patent Act also declares that 'patents shall have the attributes of personal property,' § 261, including 'the right to exclude others from making, using, offering for sale, or selling the invention,' § 154(a)(1)." *Id.* at 1840. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 1839.

30

4.      Whether the Court deems this case "exceptional" and whether the Court will award attorney fees to Ingenio pursuant to 35 U.S.C. § 285.

a.      Exceptional Case

A court may award attorney fees to a party in "exceptional" cases pursuant to 35 U.S.C. § 285. A trial court undertakes a two-step inquiry to adjudicate a request for attorney fees: the court examines whether there is clear and convincing evidence that the case is exceptional; and if so, whether an award of attorney fees to the prevailing party is warranted. *Evident Corp. v. Church & Dwight Co.*, Inc., 399 F.3d 1310, 1315 (Fed. Cir. 2005) (citing *Cybor*, 138 F.3d at 1460; *J.P. Stevens Co. v. Lex Tex Ltd.*, 822 F.2d 1047, 1050 (Fed. Cir. 1987)). Whether a case is exceptional depends on findings of fact by the trial court. *Rolls-Royce, Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1111 (Fed. Cir. 1986). Pursuant to 35 U.S.C. § 285, the decision to award attorney fees is committed to the discretion of the trial court. *Evident Corp.*, 399 F.3d at 1315 (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995)).

b.      Proof of Exceptional Case

Evidence proving "that the case for literal infringement was not close;" that the infringer "deliberately copied the invention in its products without investigating the scope of the patent;" and that the infringer "had not formed a good faith belief excusing its conduct" all strongly support "the trial court declar[ing] [a case] exceptional [ ] under 35 U.S.C. § 285 and award[ing] attorney fees." *nCube Corp. v. SeaChange Int'l, Inc.*, 436 F.3d 1317, 1325 (Fed. Cir. 2006). Likewise, "a finding of willful infringement may qualify a case as exceptional under § 285." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1347 (Fed. Cir. 2005) (en banc) (citation omitted). "That there were not actual damages does not

31

render the award of attorney fees punitive. Attorney fees are compensatory, and may provide a

fair remedy in appropriate cases. Upon a finding of willful infringement, the award of attorney

fees is within the district court's sound discretion." *Id.*

B.    Ingenio's Counter-Statement of the Law on the Issues for Which GameLogic Has
the Burden of Proof

1.    Whether GameLogic can prove, by clear and convincing evidence, that

claims 1, 4, 6, 8, 9, 10, 13, and 15 of the '082 Patent are invalid based on the specific invalidity

contentions in GameLogic's expert report. Whether GameLogic can prove, by clear and

convincing evidence, that claim 1 of the '603 Patent is invalid based on the specific invalidity

contentions in GameLogic's expert report.[1]

a.    Presumption of Validity

Defendants have asserted the affirmative defense of invalidity of each claim of each

patent in suit. A patent is presumptively valid, 35 U.S.C. § 282. The party asserting the

affirmative defense of invalidity has the burden of proving that defense by clear and convincing

evidence. "Clear and convincing evidence has been described as evidence which proves in the

mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are [sic]

highly probable.'" *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991)

(quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

The presumption of validity afforded an issued patent under 35 U.S.C. § 282 "exists at

every stage of the litigation." *Canon Computer Sys.*, 134 F.3d at 1088. "[T]he burden of

---

[1] Ingenio contends that GameLogic should be limited to the specific invalidity contentions in its expert report. *See* Ingnio's First Motion *in Limine*, *infra* Part VII. Therefore, the only legal issue regarding the validity of the asserted claims for the Court to determine is whether the asserted claims are invalid as anticipated under 35 U.S.C. § 102 or obvious under § 103 based solely on the analysis provided in Mr. Brandin's expert report. GameLogic's late assertion of statutory double patenting and obvious-type double patenting are highly improper and should be precluded.

persuasion is and remains always upon the party asserting invalidity ...." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed. Cir. 1984). "The presumption is *never* annihilated, destroyed, or even weakened, regardless of what facts are of record." *ACS Hosp. Sys" Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1574-75 (Fed. Cir. 1984) (emphasis in original). "[T]he burden of proving invalidity never shifts from the party asserting invalidity." *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 777 F. Supp. 330, 368 (D. Del. 1991), *aff'd*, 972 F.2d 1354 (Fed. Cir. 1992).

"The burden of proof arises from the presumption that the Patent Office properly carried out its administrative functions." *BOC Health Care, Inc. v. Nellcor, Inc.*, 892 F. Supp. 598, 602 (D. Del. 1995). Accordingly, the burden of showing invalidity is especially difficult when the prior art was before the examiner. *Hewlett-Packard v. Bausch & Lomb, Inc.*, 909 F.2d 1464 (Fed. Cir. 1990). "It is not necessary that the court hold a patent valid; it is only necessary that it hold that the patent challenger has failed to carry its burden." *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 1996 WL 621830 at *5 (D. Del. Oct. 21, 1996), *aff'd*, 228 F.3d 1338 (Fed. Cir. 2000). "[W]here the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Canon Computer Sys., Inc.*, 134 F.3d at 1088.

        b.    Anticipation

In order for a patent claim to be found invalid as anticipated under 35 U.S.C. § 102, a defendant must establish by clear and convincing evidence that each and every element of the claim apparatus or method is disclosed in a single prior art reference. The absence of a single claimed element from the reference prevents it from anticipating the patent claim. *Scripps Clinic & Research Fndtn v. Genentech, Inc*, 927 F. 2d 1565, 1576 (Fed. Cir. 1991).

35 U.S.C. § 102(b) states in pertinent part:

A person shall be entitled to a patent unless -

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . . .

"Anticipation under 35 U.S.C. § 102 means lack of novelty, and is a question of fact." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001). "Invalidity based upon lack of novelty (often called 'anticipation') requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee." *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999) (citation omitted).

"A claim is anticipated and therefore invalid only when a single prior art reference discloses each and every limitation of the claim." *Glaxo Inc. v. Novopharm Ltd*, 52 F.3d 1043, 1047 (Fed. Cir.). "Anticipation under § 102 requires 'the presence in a single prior art disclosure of all elements of a claimed invention arranged as in that claim.'" *Sandt Tech*, 264 F.3d at 1350 (citation omitted). "[A]nticipation does not permit an additional reference to supply a missing claim limitation." *Teleflex, Inc. v., Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002).

"Although this disclosure requirement presupposes the knowledge of one skilled in the art of the claimed invention, that presumed knowledge does not grant a license to read into the prior art reference teachings that are not there. An expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself." *Motorola, Inc. v. Interdigital Tech Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). "An anticipating reference must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention." *Crown*

34

*Operations Int'l, Ltd. v. Solutia, Inc,.*" 289 F.3d 1367, 1375 (Fed. Cir. 2002).

Prior art does not 'anticipate' for purposes of § 102 even "if the general aspects are the same and the differences in minor matters is [sic] ... such as would suggest itself to one of ordinary skill in the art." *BOC Health Care*, 892 F. Supp. at 603 (quoting *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984)); *see also Jamesbury Corp. v. Litton Indus. Prod., Inc.*, 756 F.2d 1556, 1560 (Fed. Cir. 1985) ("A prior art disclosure that 'almost' meets [the] standard ... does not anticipate.").

In order to anticipate, "[t]he prior art reference must also be enabling, thereby placing the allegedly disclosed matter in the possession of the public." *Key Pharms., Inc., v. Hereon Labs. Corp.*, 981 F. Supp. 299, 311 (D. Del. 1997), *aff'd*, 161 F.3d 709 (Fed. Cir. 1998). "A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipating disclosures cited as prior art are not enabled." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003). "To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipatory subject matter." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996).

The jury must determine whether defendants have demonstrated by clear and convincing evidence that any prior art reference introduced by Game Logic anticipates the asserted claims of the patents in suit. Ingenio intends to introduce evidence that the asserted claims of the patents in suit were not anticipated by any single prior art reference.

      c.    Obviousness

Although obviousness is a question of law, it is well understood that there are factual issues underlying the obviousness decision to be decided by the finder of fact. *Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001). "Obviousness is a legal

conclusion based on underlying facts of four general types, all of which must be considered by the tried or fact: (1) the scope and content of prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness." *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). "Such secondary considerations as commercial success . . . might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966) (citations omitted).

"Throughout the obviousness determination, a patent retains its statutory presumption of validity, see 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed. Cir. 2001).

"The consistent criterion for determination of obviousness is whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in the light of the prior art." *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988). "Both the suggestion and the expectation of success must be founded in the prior art, not in the applicant's disclosure." *Merck & Co. v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1, 29 (D. Del. 1988) (citation omitted), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989).

Section 103 requires that obviousness be determined with respect to the invention as a whole." *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985). This is essential for "virtually all [inventions] are combinations of old elements." *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). (citation omitted). "Thus, every element of a claimed

36

invention may often be found in the prior art. Identification in the prior art of each individual

part claimed, however, is insufficient to defeat patentability of the whole claimed invention." *In*

*re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000). (citing *In re Rouffet*, 149 F.3d at 1357).

 The Federal Circuit has emphasized that the pertinent obviousness inquiry takes place at

the time of the invention. *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999), *abrogated on*

*other grounds*, *In re Gartside*, 203 F.3d 1305 (2000). *Dembiczak* states:

> Measuring a claimed invention against the standard established by section 103 requires
> the oft-difficult but critical step of casting the mind back to the time of the invention, to
> consider the thinking of one of ordinary skill in the art, guided only by the prior art
> references and the then-accepted wisdom in the field.

*Id.* at 999 (citations omitted); *see also Ecolochem, Inc. v. S. California Edison Co.*, 227 F.3d

1361, 1371 (Fed. Cir. 2000). Thus, the use of hindsight in an obviousness analysis is always

impermissible.

 The Federal Circuit has singled out the danger involved in using hindsight to combine

prior art references. As *Ecolochem* states, there must be a showing that there was a motivation or

suggestion to combine the references at the time of invention:

> Our case law makes clear that the best defense against hindsight-based obviousness
> analysis is the rigorous application of the requirement for a showing of a teaching or
> motivation to combine prior art references. Combining prior art references without
> evidence of such a suggestion, teaching, or motivation simply takes the inventor's
> disclosure as a blueprint for piecing together the prior art to defeat patentability – the
> essence of hindsight.".

*Id.* at 1371-72. (internal quotation and citations omitted). It is improper, in determining whether

a person of ordinary skill would have been led to this combination of references, simply to '

[use] that which the inventor taught against its teacher. *(In re Lee*, 277 F.3d 1338, 1344 (Fed.

Cir. 2002)). (citation omitted). Close adherence to this methodology is especially important in

cases where the very ease with which the invention can be understood may prompt one 'to fall

victim to the insidious effect of a hindsight syndrome wherein that which only the invention taught is used against its teacher. (*In re Kotzab*, 217F .3d at 1369).

"The genius of invention is often a combination of known elements which in hindsight seems preordained. To prevent hindsight invalidation of patent claims, the law requires some 'teaching, suggestion or reason' to combine cited references." *McGinley*, 262 F.3d at 1351 (citation omitted) Therefore, "[i]n order to prevent a hindsight-based obviousness analysis, [the Federal Circuit has] clearly established that the relevant inquiry for determining the scope and content of the prior art is whether there is a reason, suggestion, or motivation in the prior art or elsewhere that would have led one of ordinary skill in the art to combine the references." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 664 (Fed. Cir. 2000). "The absence of such a suggestion to combine is dispositive in an obviousness determination." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997).

Evidence must be provided that "a skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed." *Ecolochem*, 227 F.3d at 1375 (citing *In re Rouffet*, 149 F.3d at 1357); *see also In re Kotzab*, 217 F.3d at 1371. ("[P]articular findings must be made as to the reason the skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed.").

A motivation to combine cannot come simply from the fact that the asserted prior art is within the same field. *See Winner Int'l Royalty Corp.*, 202 F.3d at 1349. (rejecting argument that prior art was combinable merely because the art was within the same field). Even when obviousness is based on a single prior art reference, there must be a showing of a suggestion or motivation to modify the teachings of that reference." *In re Kotzab*, 217 F.3d at 1370.

Motivation to combine requires an appreciation of the desirability of making the combination. It is not measured by the feasibility of making the combination. *Winner Int'l*, 202 F.3d at 1349; *see also Ecolochem*, 227 F.3d at 1372 ("[T]he question is whether there is something in the prior art as a whole to suggest the desirability ... of making the combination."). Failure to consider secondary considerations in reaching a determination of obviousness constitutes reversible error. *See Knoll Pharm. Co. v. Teva Pharms USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004).

The jury must determine whether defendants have demonstrated by clear and convincing evidence: (i) the scope and content of any asserted combination of prior art, (ii) the level of ordinary skill in art at the time of the invention of each of the two patents in suit, (iii) that there are no differences between the asserted combination of prior art and the asserted claim, and (iv) that any finding of obviousness is not rebutted by objective indicia of non-obviousness. Ingenio intends to introduce evidence regarding the four factors enumerated. Ingenio also intends to introduce evidence regarding specific objective indicia of non-obviousness, including evidence of commercial success of products covered by the patents in suit, the failure of others to make the invention, copying of the invention by others in the field, licensing, awards, recognition by others, expressions of disbelief or skepticism by those skilled in the art upon learning of the invention, and that the invention proceeded in a direction contrary to the accepted wisdom of those skilled in the art.

2.     If the Court permits GameLogic to raise invalidity contentions that were not in its expert report or provided in response to Interrogatories during discovery, then the following additional issue becomes relevant: Whether GameLogic can prove by clear and convincing evidence that claim 1 of the '603 Patent is invalid based on statutory double

patenting or obvious-type double patenting, a contention that is not provided in its expert report
or its Interrogatory responses served during discovery.[2]

          a.    Double Patenting

     "The double patenting doctrine generally prevents a patentee from receiving two patents
for the same invention. Thus, this doctrine polices the proper application of the patent term for
each invention. The proscription against double patenting take two forms: statutory and non-
statutory." *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1372 (Fed. Cir. 2005).

     There is a heavy burden of proof on one seeking to show double patenting. *Carman
Indus., Inc. v. Wahl*, 724 F.2d 932, 940 (Fed. Cir. 1983). A patent validity challenger is
"required to prove double patenting by clear and convincing evidence, a heavy and unshifting
burden." *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.3d 1569, 1580 (Fed. Cir. 1991).

          (i)    Statutory double patenting

     Statutory, or "same invention," double patenting is based on the language of § 101 of the
Patent Act. *Perricone*, 432 F.3d at 1372-73. More than one patent may not issue on the same
invention. 35 U.S.C. § 101. Section 101 prohibits a second patent on subject matter identical to
an earlier patent. *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir.
2003); *see also In re Goodman*, 11 F.3d 1046, 1052 (Fed. Cir. 1993) ("If the claimed inventions
are identical in scope, the proper rejection is under 35 U.S.C. § 101 because an inventor is
entitled to a single patent for an invention.").

---

    [2] Ingenio contends that GameLogic should be limited to the specific invalidity contentions in its expert
report. *See* Ingnio's First Motion *in Limine*, *infra* Part VII. Therefore, invalidity contentions based on double
patenting are not legal issues for the Court to determine. However, in an abundance of caution and for purposes of
this Proposed Final Pretrial Order, Ingenio provides its counter-statement of the issues of law regarding
GameLogic's invalidity contentions based on double patenting. The inclusion of this counter-statement is not an
acquiescence to GameLogic's contention that invalidity contentions based on double patenting are legal issues for
the Court to determine.